## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| ATTICA SCOTT, CORBIN SMITH, KAYLA MEISNER, TYLER WEAKLEY, STEVIE SCHAUER, WILLA TINSLEY, and the KENTUCKY ALLIANCE AGAINST RACIAL AND POLITICAL REPRESSION, on behalf of themselves and all others similarly situated, | Civil Action No. 3:20-cv-0535 (CRS) |

Plaintiffs,

v.

LOUISVILLE/JEFFERSON COUNTY METRO GOVERNMENT, GREG FISCHER, individually and in his official capacity as Mayor of Louisville, ROBERT SCHROEDER, individually and in his official capacity as Interim Chief of the Louisville Metropolitan Police Department, LaVITA CHAVOUS, individually and in her official capacity as Assistant Chief of the Louisville Metropolitan Police Department, and LOUISVILLE METROPOLITAN POLICE DEPARTMENT OFFICER "J." JOHNSON, LOUISVILLE METROPOLITAN POLICE DEPARTMENT OFFICERS JOHN DOES #1-#15 and JANE DOE #1, in their individual capacities,

Defendants.

## PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**PAGE NO.**

TABLE OF AUTHORITIES ..................................................................................iii-vii

PRELIMINARY STATEMENT ....................................................................................1

FACTUAL BACKGROUND ........................................................................................2

ARGUMENT .................................................................................................................6

    I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS ...............................................................................................................7

            A.     Named Plaintiffs Have Standing to Seek Injunctive Relief ........................8

            B.     Named Plaintiffs Are Likely to Succeed on Their First Amendment Claims ....................................................................................................11

                  1.     LMPD's Conduct Unreasonably Restricts Named Plaintiffs' Rights to Peacefully Protest .........................................................11

                  2.     LMPD Has Retaliated Against Those Recording LMPD's Misconduct ...................................................................................14

            C.     Plaintiffs Are Likely to Succeed on Their Fourth Amendment Claims.....16

    II.     PLAINTIFFS FACE IRREPARABLE HARM ....................................................20

    III.    AN INJUNCTION WOULD HARM NO ONE AND WOULD SERVE THE PUBLIC INTEREST IN PROTECTING CONSTITUTIONAL RIGHTS ...........22

CONCLUSION ............................................................................................................24

## TABLE OF AUTHORITIES

**PAGE NO.**

**Cases**

*Abay v. City of Denver*,
    No. 20-cv-1616, 2020 WL 3034161 (D. Colo. June 5, 2020) ....................... 12, 14, 17, 20

*Albert v. Unknown Individual Kentucky State Police Officers, et al.*,
    No. 3:20-cv-00418 (W.D. Ky.) ...................................................................... 4

*Am. Civil Liberties Union of Ill. v. Alvarez*,
    679 F.3d 593 (7th Cir. 2012) ...................................................................... 14

*Anderson v. Lawless*,
    No. 2:17-cv-1057, 2017 WL 6542532 (S.D. Ohio Dec. 21, 2017 .................................. 15

*Anti Police-Terror Project v. City of Oakland*,
    No. 20-cv-03866-JCS, 2020 WL 4584185 (N.D. Cal. August 10, 2020)................... 17, 20

*Barnett v. Aultman Hosp.*,
    No. 5:11-cv-399, 2012 WL 5378738 (N.D. Ohio Oct. 31, 2012)................................... 24

*Barrett v. Harrington*,
    130 F.3d 246 (6th Cir. 1997) ...................................................................... 24

*Berry v. Schmitt*,
    688 F.3d 290 (6th Cir. 2012) ...................................................................... 10

*Bible Believers v. Wayne Cty.*,
    805 F.3d 228 (6th Cir. 2015) ...................................................................... 12

*Black Lives Matter Seattle-King Cty., et al., v. City of Seattle, et al.*,
    No. 2:20-cv-00887, 2020 WL 3128299 (W.D. Wash. June 12, 2020) ........... 13, 17, 20, 22

*Brendlin v. California*,
    551 U.S. 249 (2007)...................................................................................... 17

*Brinkman v. Budish*,
    692 F. Supp. 2d 855 (S.D. Ohio 2010) ....................................................... 21

*Brower v. County of Inyo*,
    489 U.S. 593 (1989)...................................................................................... 17

*Budget Charters, Inc. v. Pitts*,
    No. 3:17-cv-722, 2018 WL 1745780 (M.D. Tenn. Apr. 11, 2018) ................................ 10

*Burgess v. Fischer*,
    735 F.3d 462 (6th Cir. 2013) ........................................................ 18

*Cabaniss v. City of Riverside*,
    231 Fed. App'x 407 (6th Cir. 2007) ........................................... 18

*Cabot Corp. v. King*,
    790 F. Supp. 153 (N.D. Ohio 1992).............................................. 7

*Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*,
    363 F.3d 427 (6th Cir. 2004) ..................................................... 23

*Chabad of S. Ohio v. City of Cincinnati*,
    233 F. Supp. 2d 975 (S.D. Ohio 2002) ...................................... 23

*Cherri v. Mueller*,
    951 F. Supp. 2d 918 (E.D. Mich. 2013)........................................ 9

*Ciminillo v. Streicher*,
    434 F.3d 461 (6th Cir. 2006) ......................................... 17, 19, 20

*City of Houston v. Hill*,
    482 U.S. 451 (1987)................................................................... 12

*Cole v. City of Memphis*,
    108 F. Supp. 3d 593 (W.D. Tenn. 2015)..................................... 21

*Connection Distrib. Co. v. Reno*,
    154 F.3d 281 (6th Cir. 1998) ..................................................... 21

*Craft v. Billingslea*,
    No. 17-cv-12752, 2020 WL 2308672 (E.D. Mich. May 8, 2020) ................................... 14

*Crawford v. Geiger*,
    996 F. Supp. 2d 603 (S.D. Ohio 2014) ...................................... 14

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson Cty., TN*,
    274 F.3d 377 (6th Cir. 2001) ..................................................... 23

*Don't Shoot Portland v. City of Portland*,
    No. 3:20-cv-00917, 2020 WL 3078329 (D. Or. June 9, 2020)............................ 17, 20, 22

*Edwards v. City of Martins Ferry*,
    554 F. Supp. 2d 797 (S.D. Ohio 2008) ...................................... 19

*Elrod v. Burns*,
    427 U.S. 347 (1976).................................................................. 21

iv

*Faith Baptist Church v. Waterford Twp.*,
   522 F. App'x 322 (6th Cir. 2013) ................................................................. 8

*Fields v. City of Philadelphia*,
   862 F.3d 353 (3d Cir. 2017) ..................................................................... 14

*Fordyce v. City of Seattle*,
   55 F.3d 436 (9th Cir. 1995) ..................................................................... 14

*Fritz v. Charter Twp. of Comstock*,
   592 F.3d 718 (6th Cir. 2010) ................................................................... 15

*Garrison v. Louisiana*,
   379 U.S. 64 (1964) ................................................................................. 23

*Glik v. Cunnife*,
   655 F.3d 78 (1st Cir. 2011) ..................................................................... 14

*Graham v. Connor*,
   490 U.S. 386 (1989) .......................................................................... 16, 17

*Grawey v. Drury*,
   567 F.3d 302 (6th Cir. 2009) ............................................................... 18, 20

*Griffith v. Coburn*,
   473 F.3d 650 (6th Cir. 2007) ................................................................... 19

*Hartman v. Thompson*,
   931 F.3d 471 (6th Cir. 2019) ................................................................... 11

*Holzemer v. City of Memphis*,
   621 F.3d 512 (6th Cir. 2010) ............................................................... 14, 15

*Jones v. City of Memphis*,
   531 F. App'x 709 (6th Cir. 2013) ............................................................. 11

*Kingsley v. Hendrickson*,
   576 U.S. 389 (2015) ............................................................................... 18

*Kolender v. Lawson*,
   461 U.S. 352 (1983) ................................................................................. 9

*Lamb v. City of Decatur*,
   947 F. Supp. 1261 (C.D. Ill. 1996) ........................................................... 18

*Leary v. Daeschner*,
   228 F.3d 729 (6th Cir. 2000) ..................................................................... 6

*Malam v. Adducci*,
No. 20-cv-10829, 2020 WL 3512850 (E.D. Mich. June 28, 2020) ................................. 22

*Martin v. City of Broadview Heights*,
712 F.3d 951 (6th Cir. 2013) ........................................................................... 17

*Maryville Baptist Church, Inc. v. Beshear*,
No. 3:20-cv-278, 2020 WL 1909616 (W.D. Ky. Apr. 18, 2020) .................................... 7

*Matulin v. Village of Lodi*,
862 F.2d 609 (6th Cir. 1988) ........................................................................... 16

*McPherson v. Michigan High Sch. Athletic Ass'n*,
119 F.3d 453 (6th Cir.1997) ............................................................................. 6

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) ....................................................................................... 24

*Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Local 1199 v. Blackwell*,
467 F.3d 999 (6th Cir. 2006) ............................................................................. 7

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ....................................................................................... 24

*O'Shea v. Littleton*,
414 U.S. 488 (1974) ......................................................................................... 9

*Overstreet v. Lexington-Fayette Urban Cty. Gov't*,
305 F.3d 566 (6th Cir. 2002) ........................................................................... 20

*Pouillon v. City of Owosso*,
206 F.3d 711 (6th Cir. 2000) ........................................................................... 12

*Russell v. Lundergan-Grimes*,
784 F.3d 1037 (6th Cir. 2015) ........................................................................... 8

*Smith v. City of Cumming*,
212 F.3d 1332 (11th Cir. 2000) ......................................................................... 14

*Spier v. Elaesser*,
267 F. Supp. 2d 806 (S.D. Ohio 2003) .............................................................. 12

*Spier v. Elsaesser*,
93 F. App'x 704 (6th Cir. 2004) ....................................................................... 12

*Tatton v. City of Cuyahoga Falls*,
116 F. Supp. 2d 928 (N.D. Ohio 2000) .............................................................. 12

vi

*Texas v. Johnson*,
    491 U.S. 397 (1989) ........................................................................................... 24

*Thomason v. Jernigan*,
    770 F. Supp. 1195 (E.D. Mich. 1991) ............................................................... 13

*Thompson v. Grida*,
    No. 1:08-cv-271, 2009 WL 1069793 (N.D. Ohio Sept. 30, 2009) .................... 19

*Turner v. Lieutenant Driver*,
    848 F.3d 678 (5th Cir. 2017) ............................................................................. 14

*United States v. Mosley*,
    635 F.3d 859 (6th Cir. 2011) ............................................................................. 18

*Williams v. Wilkinson*,
    132 F. Supp. 2d 601 (S.D. Ohio 2001) ............................................................. 10

*Zurcher v. Stanford Daily*,
    436 U.S. 547 (1978) ........................................................................................... 18

## PRELIMINARY STATEMENT

For nearly three months, Louisville residents—and people across the country—have been engaged in sustained protests calling for the officers responsible for killing Breonna Taylor to be arrested and criminally charged. The longer that investigation takes, the more frustrated the protesters become—culminating in massive direct actions and demonstrations planned for today, August 25, and in the lead-up to the rescheduled Kentucky Derby, on September 5.

Because of the likelihood that the Louisville Metropolitan Police Department ("LMPD") will use military-grade crowd control weapons at these actions, Named Plaintiffs and the Plaintiff Class[1] (together, "Plaintiffs") will be unable to participate in this week's scheduled demonstrations without significant risk of serious injuries. LMPD's violent use of military-style weapons in response to peaceful demonstrations has already forced countless members of the Plaintiff Class to stop protesting out of fear for their safety. Their fears are eminently reasonable. Protesters have lost eyes, contracted COVID-19 after LMPD officers removed their masks, and endured the pain and terror of officers kneeling on their necks, slowly choking them.

Without this Court's immediate intervention, Plaintiffs will be forced to either forego their right to protest in this unprecedented moment in history or risk serious bodily injury for exercising that right. The Constitution does not permit LMPD to force Plaintiffs to make such a choice. Plaintiffs respectfully request that this Court (a) preliminarily enjoin LMPD from using tear gas, flash bangs, long-range acoustic devices, or other similar crowd-control weaponry against peaceful protestors, and (b) immediately issue a Temporary Restraining Order barring

---

[1] The Plaintiff Class comprises all individuals who peacefully participated in any day of protests between May 28, 2020 and July 30, 2020 on which LMPD officers utilized tear gas, flash bangs, pepper balls, rubber bullets, impact rounds, batons, or other comparable crow control weaponry and were actually exposed to crowd control weaponry at those protests. [DN 1 at ¶¶ 250-260.]

LMPD from using tear gas, flash bangs, long-range acoustic devices, or other similar crowd-control weaponry against peaceful protestors until the Court decides Plaintiffs' preliminary injunction motion.

## FACTUAL BACKGROUND

Following months of protests in Louisville (Black Lives Matter Decl. ¶¶ 8-9), protest organizers and racial justice activists with the national group Until Freedom are planning a direct action for today, August 25, 2020, to end "BreonnaCon," the four-day celebration of Breonna Taylor, who was killed by LMPD officers while asleep in her bed.[2] According to reports, the action is expected to be a "massive demonstration," *id.*, at which national figures such as Linda Sarsour, Tamika Mallory, and Porsha Williams will attend. Gatnarek Decl., Ex. E (screenshots of Until Freedom Facebook page). The social media advertisements for the direct action have been shared hundreds of times. *Id.* Much like Until Freedom's past demonstrations, the end of BreonnaCon promises to be a significant gathering.[3] In preparation for this large-scale action, LMPD has called all their officers in to work for an "all work-day," interrupting scheduled time off and vacations specifically in order to respond to this protest with the full force of the Department. Gatnarek Decl. Ex. F (LMPD General Memorandum #20-011). At these officers' fingertips are the military-grade technologies recently stockpiled by LMPD; since the protests in

---

[2] Bailey Loosemore, *Until Freedom plans 'BreonnaCon' with faith revival, 'massive demonstration' in Louisville*, LOUISVILLE COURIER JOURNAL (Aug. 18, 2020, 1:10 pm), https://www.courier-journal.com/story/news/local/breonna-taylor/2020/08/18/until-freedom-plans-four-day-breonnacon-louisville-honor-breonna-taylor/3392262001/.

[3] Bailey Loosemore, *National Group Until Freedom Plans to #OccupyKentucky until Breonna Taylor gets justice*, LOUISVILLE COURIER JOURNAL (Aug. 4, 2020, 4:01 pm), https://www.courier-journal.com/story/news/local/2020/08/04/breonna-taylor-protests-until-freedom-plans-occupykentucky/3291312001/.

Louisville began in late May, LMPD has spent over $330,000 on tear gas, pepper balls, and other crowd-control weaponry to use on demonstrators.[4]

Nor is there serious doubt that LMPD stands ready and willing to actually use these technologies. Over the past three months, LMPD officers have consistently responded to large, peaceful gatherings—such as the one planned for today by Until Freedom—by discharging tear gas, flash bangs, pepper balls, and other military-grade crowd control weapons. Reporters and protesters who have been at these demonstrations have described scenes resembling "a war zone."[5] LMPD has engaged in hours-long assaults on protesters, volleying tear gas and firing pepper balls into largely peaceful crowds. At times, the tear gas has been so pervasive that it has covered entire city blocks.[6]

Plaintiffs have paid the price for LMPD's violence. Plaintiff Willa Tinsley first protested on May 28, 2020. Tinsley Decl. ¶¶ 2–3, 6. Though she was marching peacefully to demand justice for Breonna Taylor, Ms. Tinsley was tear gassed and exposed to flash bangs, then shot over ten times at close range with pepper balls—including as she tried to run away. *Id.* ¶¶ 7–20. The bruising she sustained was so severe that she could not use her arm for two days afterwards. *Id.* ¶ 22 & Ex. A (photo of leg bruising). On May 31, 2020, Plaintiffs Corbin Smith and Tyler Weakley were tear gassed, physically tackled, and beaten with batons just minutes after they

---

[4] Darcy Costello, *LMPD spent more than $300,000 on pepper balls, grenades, flash-bangs during early protests*, LOUISVILLE COURIER JOURNAL (Aug. 10, 2020, 6:16 AM), https://www.courier-journal.com/story/news/politics/metro-government/2020/08/10/louisville-police-spent-300-k-pepper-balls-munitions-protests/3303852001/.

[5] *Police and soldiers return fire, killing man in Louisville*, ASSOCIATED PRESS (June 1, 2020, *available at* https://www.fox5ny.com/news/police-and-soldiers-return-fire-killing-man-in-louisville.

[6] Mandy McLaren, *'A traumatized generation': Louisville's youth demand racial justice during mass protests*, LOUISVILLE COURIER JOURNAL (May 30, 2020, 5:31 PM), https://www.courier-journal.com/story/news/2020/05/30/breonna-taylor-protest-louisvilles-youth-demand-racial-justice/5291030002/.

joined a peaceful protest. Smith Decl. ¶¶ 10–12, 21–22; Weakley Decl. ¶¶ 5, 7, 12. Mr. Smith was pinned down by five LMPD officers, one of whom knelt on Mr. Smith's neck while Mr. Smith begged for his life. Smith Decl. ¶ 23. At that same protest, Ms. Tinsley was again tear gassed and shot with pepper balls before being arrested—to "teach her a lesson," as LMPD officers told her. Tinsley Decl. ¶¶ 27–29, 34–35. And on June 15, 2020, Plaintiff Stevie Schauer was standing on a sidewalk to record aggression by a line of LMPD officers marching down the roadway, when two officers spotted her, jumped onto the sidewalk, and shoved her to the ground, shattering her phone and bruising her shoulders. Schauer Decl. ¶¶ 5, 8–14.[7] LMPD officers pinned her down, bound her wrists together with a plastic tie, and placed her under arrest. *Id.* ¶ 16–17. Since then, she has been too afraid to participate in further demonstrations. *Id.* ¶ 25.

These experiences are by no means unique to Named Plaintiffs. Jonah Albert, a peaceful protester who attended a demonstration on May 28, 2020, was shot in the head by LMPD officers. Gatnarek Decl. Ex. A (Complaint filed in the matter of *Albert v. Unknown Individual Kentucky State Police Officers, et al.*, No. 3:20-cv-00418 (W.D. Ky.) Patrick Moore, another peaceful demonstrator, was shot in the eye with a pepper ball on June 1, 2020 while simply marching down the street. His retina was torn from his eyeball. *See* Moore Decl. ¶¶ 13, 18–19 & Ex. A (photo of eye). Mr. Moore has undergone three surgeries to repair his eye and has yet to recover full vision. *Id.* ¶¶ 18, 21–22. It is unclear if he ever will. *Id.* ¶ 24.

LMPD has engaged in this pattern of violently silencing protesters with the approval of Defendants Mayor Greg Fischer, Interim Chief Robert Schroeder, and Assistant Chief LaVita

---

[7] Jason Riley (@JasonRileyWDRB), TWITTER (June 16, 2020, 2:53 PM), https://twitter.com/JasonRileyWDRB/status/1272965516286705665.

Chavous. In the midst of LMPD's aggressive and unconstitutional response to the protests,

Mayor Fischer has repeatedly praised the police for their "restraint," and instead of urging the

police to respect the rights of protesters, Mayor Fischer has urged protesters to stop

demonstrating and "stay home."[8] Despite promising reforms to LMPD's policies on use of force

and use of chemical weaponry, neither Mayor Fischer nor Interim Chief Schroeder has taken any

steps to rein in LMPD's use of military-grade weaponry.[9] Quite the contrary; Mayor Fischer and

Assistant Chief Chavous have blamed protesters for violence, suggesting that protesters were

asking for violence by yelling at or insulting police, or carrying objects like umbrellas.[10] In fact,

Mayor Fischer's acquiescence to brutal force by LMPD prompted the Louisville Metro Council

to open an investigation into his handling of the protests on July 14, 2020. Gatnarek Decl. Ex. D

(Louisville Metro Council Order, July 14, 2020).

While Defendants Fischer, Schroeder, and Chavous have defended LMPD's actions,

LMPD has continued to fire pepper balls at peaceful protesters and has used long-range acoustic

devices ("LRADs")—developed for the military invasion of Fallujah, Iraq—on crowds. And

according to recent reporting, LMPD has spent hundreds of thousands of dollars to stockpile tear

---

[8] *Mayor Greg Fischer's statement on May 29 protests,* LouisvilleKY.Gov (May 30, 2020), https://louisvilleky.gov/news/mayor-greg-fischer%E2%80%99s-statement-may-29-protests.

[9] *Compare* Gatnarek Decl. Ex. B (LOUISVILLE METRO POLICE DEP'T, STANDARD OPERATING PROCEDURES ("SOP") § 9.1.8 (Nov. 4, 2019)), *with* Gatnarek Decl. Ex. C (SOP § 9.1.9 (June 27, 2020)).

[10] Tessa Duvall, Darcy Costello, Billy Kobin, Lucas Aulbach, Bailey Loosemore, Mandy McLaren, Olivia Krauth and Sarah Ladd, *Sunday updates: Protestors arrested as Breonna Taylor rallies continue around Louisville*, Courier Journal (May 28, 2020, 10:56 p.m., updated May 31, 2020, 11:00 p.m.), https://www.courier-journal.com/story/news/politics/metro-government/2020/05/28/breonna-taylor-shooting-what-know-louisville-protest/5280762002/; *see also* Lucas Aulbach, *From tense to touching moments, here's how Louisville's protests went down Sunday night,* Louisville Courier Journal (June 1, 2020, 6:18 a.m.), https://www.courier-journal.com/story/news/local/2020/06/01/breonna-taylor-protest-what-happened-sunday-louisville/5305156002/.

gas, pepper balls, and other crowd control weapons since the protests started in May.[11] LMPD has also engaged in mass arrests, charging hundreds of peaceful demonstrators with felonies designed to silence them. On August 9, 2020, LMPD went even further, banning protests in public streets altogether and threatening to arrest anyone who demonstrates in a roadway.[12]

LMPD officers have even made social media posts that gleefully celebrate the violence they have used—and plan to continue using—on demonstrators. On May 31, 2020, for example, LMPD Officer Tim King posted on Facebook "Yo, are we fighting tonight?" One of his colleagues responded: "to the death."[13] The next day, on June 1, 2020, LMPD Officer Katie Crews posted a photo of a protester, writing: "I hope the pepper balls that she got lit up with a little later on hurt. Come back and get ya some more ole girl, I'll be on the line again tonight."[14]

## ARGUMENT

In determining whether to issue a temporary restraining order or a preliminary injunction, district courts consider four factors: "(1) whether the movant has a 'strong' likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000) (quoting *McPherson v. Michigan High Sch. Athletic*

---

[11] *See supra* note 4.

[12] LMPD (@LMPD), TWITTER (Aug. 9, 2020, 4:35 PM), https://twitter.com/LMPD/status/1292560250097336321?s=20.

[13] Julie Dolan, *LMPD investigating 3 officers' social media posts about protests*, WLKY LOUISVILLE, (June 3, 2020), https://www.wlky.com/article/lmpd-investigating-3-officers-social-media-posts-about-protests/32745652.

[14] *LMPD officer under investigation after Facebook post about protestor*, WDRB LOUISVILLE (June 2, 2020), https://www.wdrb.com/news/lmpd-officer-under-investigation-after-facebook-post-about-protester/article_b295d622-a4d8-11ea-a7a4-931a2800a02d.html

*Ass'n,* 119 F.3d 453, 459 (6th Cir.1997)); *Maryville Baptist Church, Inc. v. Beshear*, No. 3:20-cv-278, 2020 WL 1909616, at *2 (W.D. Ky. Apr. 18, 2020) (noting that "[i]n determining whether to grant a temporary restraining order, the Court considers the same four factors applicable to a motion for preliminary injunction"). These four factors are not, however, prerequisites; rather, they are "interrelated considerations that must be balanced together." *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006) (quotation marks and citation omitted). For example, "the showing of a strong likelihood of prevailing on the merits will enable a court to issue an injunction despite a lesser showing of irreparable harm." *Cabot Corp. v. King*, 790 F. Supp. 153, 155 (N.D. Ohio 1992) (citation omitted).

Here, all four factors counsel in favor of granting emergency relief. Plaintiffs risk being deprived of some of their most fundamental rights: to demonstrate peacefully about one of the most significant political debates taking place today, and to do so free of brutal violence at the hands of police. LMPD's conduct violates the First and Fourth Amendment rights of Plaintiffs. Because LMPD cannot claim any harm from the enjoining of unconstitutional behavior, and the public interest weighs strongly in favor of allowing members of the public to exercise their rights without fear of violence, this Court should grant the motion for a temporary restraining order.

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS

Plaintiffs are likely to succeed in proving that the LMPD's wanton discharge of crowd control weapons against peaceful protesters, including those recording police misconduct, violates both the First and Fourth Amendments. LMPD's continued misconduct creates a serious risk for future injury to give Plaintiffs standing to seek injunctive relief.

A.      **Plaintiffs Have Standing to Seek Injunctive Relief**

LMPD's past conduct, promises of further enforcement, and stockpiling of weapons has sent a clear message to protesters: the massive protests planned for this week will be met with massive, forceful retaliation. Plaintiffs have standing to seek injunctive relief from this Court.

To establish their standing for injunctive relief, Named Plaintiffs need only show "general facts that would suggest that [Defendants] ha[ve] injured [them] . . . through actions . . . [they] reasonably fear[] might be taken as a result of [their] conduct." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1049 (6th Cir. 2015). This inquiry is "relaxed in the First Amendment context because of a judicial prediction or assumption that the policy's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Faith Baptist Church v. Waterford Twp.*, 522 F. App'x 322, 330 (6th Cir. 2013) (internal quotation marks and citation omitted).

Here, there is no doubt that Plaintiffs both suffer ongoing injuries as a result of LMPD's violent responses to past protests and reasonably fear future similar violence. Tyler Weakley, for example, was tear gassed, shot at, tackled, and beaten by LMPD officers at the very first protest she attended on May 31, 2020; since then, she has not attended further demonstrations out of fear of further police violence. Weakley Decl. ¶ 25. Nor have her fears proven unreasonable; at multiple protests since May 31, 2020, LMPD officers have unleashed tear gas, shot protesters with pepper balls, and used other crowd control weapons to punish demonstrators. Patrick Moore and Stevie Schauer fell victim to this continuing violence; Mr. Moore was shot in the eye with a pepper ball by LMPD officers at a demonstration on June 1, 2020, and Ms. Schauer was violently shoved to the ground, pepper balls flying around her, at protests on June 15, 2020. Moore Decl. ¶¶ 5, 13; Schauer Decl. ¶¶ 11–13, 15.

8

Under settled law, such "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). And the consistency of LMPD's violent response to protests—deploying crowd-control weaponry at least ten times over three months—can alone establish Named Plaintiffs' standing to seek injunctive relief. *Cf. Kolender v. Lawson*, 461 U.S. 352, 355 n.3 (1983) (noting that plaintiff who was arrested fifteen times over two years had shown a sufficiently "credible threat" of further enforcement to seek injunctive relief). Because Plaintiffs have been forced to forego participation in protected speech, they have suffered—and continue to suffer—an ongoing injury. *Cf. Cherri v. Mueller*, 951 F. Supp. 2d 918, 929 (E.D. Mich. 2013) (finding that group of Muslim Americans suffered an ongoing injury sufficient to confer injunctive standing after repeated profiling at lawful border crossings caused them to cease crossings). Plaintiffs thus have standing to challenge LMPD's policy[15] of using excessive force to stifle political speech.

Even if LMPD's consistent response to the past nearly three months of protests were alone insufficient to confer standing, its policy statements, coupled with the scale of protests planned for August 25 and through the Kentucky Derby on September 5, promise imminent future violence. First, Defendants Fischer, Schroeder, and Chavous have taken no steps to limit LMPD officers' discretion to unilaterally declare a protest unlawful and use crowd control weapons to disband it. Rather, all three have staunchly defended LMPD's conduct.[16] LMPD officers retain total discretion to determine that a gathering is unlawful, and use tear gas, flash

---

[15] The LMPD's use of military-grade crowd control is, at a minimum, a course of conduct that has been tolerated by Defendants Fischer, Schroeder, and Chavous, which entitles Named Plaintiffs to challenge it in this Court. *Cherri*, 951 F. Supp. 2d at 937 (finding that defendant agency's unwritten "course of conduct" of religious profiling could be constitutionally challenged).

[16] *See supra* note 8 and 10.

bangs, or any other military-grade crowd control to break it up. Such a broad grant of discretion—in which "a law enforcement officer's belief, substantiated or not, could trigger unconstitutional conduct on the part of law enforcement"—is powerful evidence supporting standing for injunctive relief. *Williams v. Wilkinson*, 132 F. Supp. 2d 601, 607 (S.D. Ohio 2001). Second, LMPD officers have made their punitive intent clear—both directly to Plaintiffs and in public social media posts. Two LMPD officers told Plaintiff Willa Tinsley that she had been arrested to "teach [her] a lesson." Tinsley Decl. ¶¶ 34–35. After shoving Plaintiff Stevie Schauer to the ground and tightly binding her hands, one LMPD officer asked "Was it worth it?" Schauer Decl. ¶ 22. And multiple LMPD officers have threatened—on public social media accounts—further violence against protesters. One officer posted a photo of a protester who had been shot, writing "I hope the pepper balls that she got lit up with a little later on hurt. Come back and get ya some more ole girl, I'll be on the line again tonight."[17] Two other officers vowed that they would be "fighting" "to the death" in response to the continued protests.[18] These threats are indicative of LMPD's attitude towards protesters, and its intention to continue its pattern of violence to silence them. *Cf. Berry v. Schmitt*, 688 F.3d 290, 297 (6th Cir. 2012) (finding defendants' verbal threats of enforcement sufficient to confer standing for injunctive relief).

Finally, the risk of LMPD's militarized response to future protests cannot be separated from the practical realities underlying Plaintiffs' claims. *See, e.g.*, *Budget Charters, Inc. v. Pitts*, No. 3:17-cv-722, 2018 WL 1745780, at *6 (M.D. Tenn. Apr. 11, 2018) (noting that the standing inquiry is not "formalistic," and must instead look at the "reality of the threat" of future violations) (internal quotation marks, emphasis, and citation omitted). That reality includes the

---

[17] *See supra* note 14.
[18] *See supra* note 13.

fact that LMPD has massively grown its stockpile of tear gas, pepper balls, and other crowd control weaponry.[19] Already, LMPD has attempted to restrict protesters' rights to demonstrate, barring protesters from demonstrating in public streets.[20] And most recently, in preparation for today's action, LMPD has recalled all its officers to be on duty, cancelling all vacation time or other time off. Gatnarek Decl. Ex. F. In other words, the powder keg is ready to be lit. Because of the likelihood that Plaintiffs will again be subjected to military-grade crowd control if they participate in further protests, they have standing to seek injunctive relief in this Court.

**B.     Plaintiffs Are Likely to Succeed on Their First Amendment Claims**

LMPD officers have unreasonably restricted Plaintiffs' right to peaceful assembly and unlawfully retaliated against them for recording police misconduct. Defendants' liability for both of these forms of misconduct is plain under the First Amendment.

*1.     LMPD's Conduct Unreasonably Restricts Plaintiffs' Rights to Peacefully Protest*

Defendants' smothering of Plaintiffs' political speech in a classic public forum cannot withstand strict scrutiny. "A First Amendment claim depends on three inquiries: (1) whether speech is protected; (2) 'the nature of the forum' in which the speech occurs; and (3) whether the government's restriction on speech satisfies the relevant forum's associated constitutional standard." *Hartman v. Thompson*, 931 F.3d 471, 478 (6th Cir. 2019) (internal quotation marks and citation omitted).

The First Amendment protects protesters' ability to demonstrate peacefully—indeed, it is "the right[] most fundamental to political discourse." *Jones v. City of Memphis*, 531 F. App'x 709, 710 (6th Cir. 2013). It is well-settled that "[e]xpressive activities such as peaceful picketing

---

[19] *See supra* note 4.
[20] *See supra* note 12.

11

with signs and other displays . . . constitute protected speech under the First Amendment."
*Tatton v. City of Cuyahoga Falls*, 116 F. Supp. 2d 928, 934 (N.D. Ohio 2000). This is
particularly true here, even if—perhaps, especially if—Plaintiffs' demonstrations involve "verbal
criticism and challenge directed at police officers." *City of Houston v. Hill*, 482 U.S. 451, 461
(1987); *accord Spier v. Elaesser*, 267 F. Supp. 2d 806, 811 (S.D. Ohio 2003), *aff'd sub nom.*,
*Spier v. Elsaesser*, 93 F. App'x 704 (6th Cir. 2004) (same). Plaintiffs' First Amendment rights
are particularly important to protect in the current political context: an unprecedented moment of
political reckoning around the killings of Breonna Taylor, George Floyd, and countless other
Black people. Other courts have recognized "the importance of shielding and uplifting this
ongoing, nationwide moment" by zealously defending protesters' First Amendment freedoms.
*Abay v. City of Denver*, No. 20-cv-1616, 2020 WL 3034161, at *4 (D. Colo. June 5, 2020)
(granting temporary restraining order barring Denver police department from using tear gas
without adequate warning or firing rubber bullets and pepper balls into crowds indiscriminately).

　　　Further, Plaintiffs have engaged in their protected activities in the quintessential public
forum of public roadways—"prime areas for public protest[.]" *Pouillon v. City of Owosso*, 206
F.3d 711, 715 (6th Cir. 2000). Streets and sidewalks "[a]re a traditional public forum which c[an]
not be restricted in [an] all-encompassing way." *Id.* at 716. In such public fora, LMPD's
restrictions on assembly must satisfy strict scrutiny—"which requires the police to achieve their
ends by using only those means that are the least restrictive with respect to the speaker's First
Amendment rights." *Bible Believers v. Wayne Cty.*, 805 F.3d 228, 253 (6th Cir. 2015).

　　　LMPD's actions fall far short of this exacting standard. It strains credulity to think that
the appropriate response to demonstrations—which, by Defendants' own admissions, have been

"largely peaceful"[21]—is to indiscriminately launch tear gas, flash bangs, and pepper balls at peaceful protesters, and then ban them from demonstrating in public streets altogether. Through both its practice and its official policies, LMPD has closed off this most important of public fora to *all* demonstrators. Such an approach can hardly be called the "least restrictive" means of maintaining order; in fact, it is difficult to imagine a *more* burdensome restriction on the right to peacefully demonstrate. *Cf. Thomason v. Jernigan*, 770 F. Supp. 1195, 1201–02 (E.D. Mich. 1991) (noting that completely barring access to public forum violates the First Amendment). And their efforts have worked; because of LMPD's pervasive violence, some Plaintiffs have refused to further engage in protected speech. Out of fear of further assault, Tyler Weakley has not attended a demonstration since being tear gassed, shot at, and violently tackled and arrested. Weakley Decl. ¶ 25. Patrick Moore has not returned to any demonstrations after being shot in the eye with a pepper ball, tearing his retina away from his eyeball. Moore Decl. ¶¶ 25, 28–29.

LMPD's attempts to justify its conduct by claiming that some protesters—a minority, by Defendants' own admissions—have engaged in some form of violence do not change its obligations to respect the First Amendment. Indeed, numerous courts have recently rejected the notion that discrete acts of violence by protesters warrant precisely the sort of force and overbroad restrictions that LMPD has employed here; "the proper response to potential and actual violence is for the government to ensure an adequate police presence, and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure." *Black Lives Matter Seattle-King Cty., et al., v. City of*

---

[21] Darcy Costello, *Mayor Greg Fischer ends Louisville curfew after 'largely peaceful' protestors ignored it*, LOUISVILLE COURIER JOURNAL, (June 4, 2020, updated 6:32 PM), https://www.courier-journal.com/story/news/politics/metro-government/2020/06/04/louisville-curfew-lifted-as-mayor-says-protests-largely-peaceful/3146726001/.

*Seattle, et al.*, No. 2:20-cv-00887, 2020 WL 3128299, at *3 (W.D. Wash. June 12, 2020)

(quotation marks and citation omitted); *accord Abay*, 2020 WL 3034161, at *3.

        2.     *LMPD Has Retaliated Against Those Recording LMPD's Misconduct*

LMPD has also ignored the First Amendment's prohibition on retaliation by targeting

journalists and other protesters who attempt to record LMPD's misconduct. *See Holzemer v. City*

*of Memphis*, 621 F.3d 512, 515 (6th Cir. 2010) (noting that First Amendment protects people

from retaliation for exercising protected speech). Defendants are liable if Plaintiffs show: (1)

Plaintiffs engaged in protected conduct; (2) Plaintiffs suffered an adverse action; and (3) there is

a causal connection between the two. *Id.*

Courts in this Circuit have found that "there is a clearly established First Amendment

right to openly record police officers in public spaces." *Craft v. Billingslea*, No. 17-cv-12752,

2020 WL 2308672, at *11 (E.D. Mich. May 8, 2020); *see also Crawford v. Geiger*, 996 F. Supp.

2d 603, 615 (S.D. Ohio 2014) (finding a "First Amendment right to openly film police officers

carrying out their duties"). Every circuit to consider the question has agreed. *See, e.g.*, *Fields v.*

*City of Philadelphia*, 862 F.3d 353 (3d Cir. 2017); *Turner v. Lieutenant Driver*, 848 F.3d 678

(5th Cir. 2017); *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 593 (7th Cir. 2012); *Glik v.*

*Cunnife*, 655 F.3d 78 (1st Cir. 2011); *Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000);

*Fordyce v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995). Recording LMPD's misconduct "serves a

cardinal First Amendment interest," where "the state has a special incentive to repress opposition

and often wields a more effective power of suppression." *Glik*, 655 F.3d at 82 (quotation marks

and citation omitted). By targeting those recording their conduct, LMPD will effectively evade

public oversight, for which there will be no adequate remedy after the fact.

Nor is there serious dispute that LMPD's conduct—deploying tear gas, flash bangs, rubber bullets, or other military-grade crowd control—is a cognizable adverse action. To constitute an "adverse action," a defendant's conduct need only cause "a person of ordinary firmness [to] be deterred" from protected conduct. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 728 (6th Cir. 2010). Threatening—or actually employing—violence against those recording police undoubtedly satisfied this standard. *Holzemer*, 621 F.3d at 524; *see also Anderson v. Lawless*, No. 2:17-cv-1057, 2017 WL 6542532, at *5 (S.D. Ohio Dec. 21, 2017) (holding that threats of physical violence are adverse actions).

Finally, evidence abounds to suggest that LMPD has been motivated at least in part by the Plaintiff Class's recording of their conduct. *Fritz*, 592 F.3d at 724 n.3 (affirming mixed-motive theory of retaliation for First Amendment claims). Video evidence shows LMPD's ongoing use of excessive force has often specifically targeted those who attempt to record officers' conduct. [22] Plaintiff Stevie Schauer, for example, was standing on the sidewalk and began recording a line of police officers marching down a public roadway. Schauer Decl. ¶ 10. In response, two LMPD officers left the line, got onto the sidewalk, and shoved her to the ground to place her under arrest—even though others were standing on the sidewalk without issue. *Id.* ¶¶ 9, 11–12. Other officers began to fire pepper balls at those who attempted to come to Ms. Schauer's aid. *Id.* ¶ 15. In another encounter caught on video, an officer broke ranks to walk towards and fire pepper balls at a local news crew from Wave 3 News that was covering the protests, despite the fact that no other protesters appeared to be present, and no other LMPD officers were using any force. [23] Journalists with the crew were struck with numerous pepper

---

[22] *See supra* note 7.

[23] Shellie Sylvestri, *LMPD officer fires pepper balls at WAVE 3 News reporter, photographer during Louisville protest*, WAVE 3 NEWS (last updated May 30, 2020, 1:54 PM),

balls. *Id.* And on at least one occasion, a man recording violent police conduct from inside his apartment—several stories above ground level—was shot at with a pepper ball.[24] These videos, which show that LMPD lacked any justification to shoot at those recording them, provide powerful circumstantial evidence that the recording itself has been a motivating factor in LMPD's use of force. *See Matulin v. Village of Lodi*, 862 F.2d 609, 614 (6th Cir. 1988) (finding "lack of a legitimate alternative justification" for conduct was evidence of retaliatory intent).

*    *    *

In short, LMPD officers have violated the First Amendment rights of Plaintiffs to protest in downtown Louisville and to record police misconduct. Because LMPD's actions lack any legal justification, Plaintiffs are likely to succeed on their First Amendment claims.

### C.    Plaintiffs Are Likely to Succeed on Their Fourth Amendment Claims

Plaintiffs are also likely to succeed on the merits of their Fourth Amendment excessive force claim because LMPD's deliberate and continued use of crowd control weapons—including tear gas, pepper bullets, and other chemical irritants—against peaceful protesters constitutes an unreasonable seizure within the meaning of the Fourth Amendment.

First, there is no doubt that LMPD's use of crowd control weapons against peaceful demonstrators constitutes a seizure triggering Fourth Amendment protection. *See Graham v. Connor*, 490 U.S. 386, 394–95 (1989). A seizure occurs when a police officer "by means of physical force or show of authority, terminates or restrains [a person's] freedom of movement."

---

https://www.wave3.com/2020/05/29/lmpd-officer-fires-pepper-balls-wave-news-reporter-photographer-during-louisville-protest/.

[24] Amber Jamieson, *Police Shot At A Man Who Filmed Them Tackling Protesters In Louisville*, Buzzfeed News (last updated June 18, 2020, 3:02 PM), https://www.buzzfeednews.com/article/amberjamieson/louisville-shot-fired-security-guard-video.

*Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotation marks and citations omitted). LMPD utilizes crowd control weapons—especially tear gas and pepper bullets—to control the movement of class members, restraining freedom of movement through the direct application of physical pain and the secondary discomfort caused by chemical irritants. Compl. ¶¶ 33–235; Meisner Decl. ¶¶ 5–7; Tinsley Decl. ¶¶ 28–30; Smith Decl. ¶¶ 11–13, 18. Such application of physical force intended to constrain movement and having the actual effect of restraining movement falls at the core of police activities regulated by the Fourth Amendment. *See Brower*, 489 U.S. at 595–99; *Ciminillo v. Streicher*, 434 F.3d 461, 465–66 (6th Cir. 2006) (analyzing excessive force claims against police who shot a person with a beanbag shot as a Fourth Amendment seizure and affirming that "apprehending an individual by way of shooting constitutes a seizure"). Indeed, other federal district courts considering nearly identical uses of crowd control weapons by police against protesters this summer have analyzed these excessive force claims under the Fourth Amendment. *See Abay*, 2020 WL 3034161, at *4–5 (D. Colo. June 5, 2020); *Don't Shoot Portland v. City of Portland*, No. 3:20-cv-00917, 2020 WL 3078329, at *3–4 (D. Or. June 9, 2020); *Black Lives Matter Seattle-King Cty.*, 2020 WL 3128299, at *4-5 (W.D. Wash. June 12, 2020); *Anti Police-Terror Project v. City of Oakland*, No. 20-cv-03866-JCS, 2020 WL 4584185, at *13–14 (N.D. Cal. August 10, 2020). LMPD's use of force against Plaintiffs must thus comply with the reasonableness requirement of the Fourth Amendment.

In determining whether use of force is reasonable, courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (quoting *Graham*, 490 U.S. at 386). Courts consider three key factors: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of

the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* This analysis must be conducted "in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013). Courts assess reasonableness objectively "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). In the context of force used at protests, "the requirements of the Fourth Amendment must be applied with scrupulous exactitude." *Lamb v. City of Decatur*, 947 F. Supp. 1261, 1263 (C.D. Ill. 1996) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978)).

Applying this standard, the Sixth Circuit has found that police use of force against people not under arrest is unreasonable and has specifically condemned the use of chemical irritants such as pepper spray except in a limited set of circumstances. *See Grawey v. Drury*, 567 F.3d 302, 311 (6th Cir. 2009) ("An officer has used excessive force when he pepper sprays a suspect who has not been told she is under arrest and is not resisting arrest."); *Cabaniss v. City of Riverside*, 231 Fed. App'x 407, 413 (6th Cir. 2007) ("[T]here is a very limited class of circumstances when the use of pepper spray is proper, including where a detainee is unsecured, acting violently, and posing a threat to himself or others."); *see also United States v. Mosley*, 635 F.3d 859, 862 (6th Cir. 2011) (describing the dangers and resulting serious constitutional concerns raised by the use of chemical irritants).[25] The Sixth Circuit has also considered the use

---

[25] "[P]epper spray can cause extreme pain and prolonged impairment of bodily organs. The spray burns the face and nostrils, restricts breathing passages, and causes blindness. It causes a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx. Unjustified use of pepper spray in other contexts confirms that it poses a serious risk of physical injury. . . . Its use may constitute excessive force in violation of the Fourth and Fourteenth Amendments." *Moseley*, 635 F.3d at 862 (internal citations and quotation marks omitted).

of impact projectiles in crowd control settings and similarly found that firing a beanbag shot against a person peacefully attempting to leave the scene of a riot was unreasonable. *Ciminillo*, 434 F.3d at 466–69. Indeed, the Sixth Circuit has unambiguously held since at least 2006 that "[t]he use of less-than-deadly force in the context of a riot against an individual displaying no aggression is not reasonable." *Id.* at 468; *accord Griffith v. Coburn*, 473 F.3d 650, 659 (6th Cir. 2007) ("[C]ases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest.") (quotation marks and citation omitted); *Edwards v. City of Martins Ferry*, 554 F. Supp. 2d 797, 806 (S.D. Ohio 2008) (applying *Ciminillo* and holding that "it was objectively unreasonable for the officer to use less-than-deadly force in the context of a riot against an individual who posed no risk, was engaged in no crime, and was not attempting to evade the police"); *Thompson v. Grida*, No. 1:08-cv-271, 2009 WL 1069793, at *7 (N.D. Ohio Sept. 30, 2009) (citing *Ciminillo* for the proposition that "even in the midst of a riot, police are charged with distinguishing between the severity of different types of threats posed by arrestees").

Plaintiffs' excessive force claims fall squarely within this line of precedent. LMPD officers have used violence against Plaintiffs who were peacefully protesting in downtown Louisville against the killing of Breonna Taylor, George Floyd, and other unarmed Black people by police. Although some sporadic and isolated disruptive acts did occur in the overwhelmingly peaceful demonstrations—such as half-empty water bottles thrown at police—no Plaintiffs engaged in violent acts. The police subjected all protestors to crowd control weaponry (particularly tear gas and pepper balls, both of which are chemical irritants) without giving them warning or an adequate opportunity to disperse, while they were either peacefully exercising their rights to protest or attempting to comply with police orders to disperse. Plaintiffs were not

19

rioting or behaving aggressively or violently, nor were they under arrest at the time LMPD officers began firing tear gas and pepper balls at them. As a result, LMPD officers satisfied none of the necessary conditions that the Sixth Circuit has required before finding the use of less-than-lethal force reasonable under the circumstances. *See Grawey*, 567 F.3d at 311; *Ciminillo*, 434 F.3d at 468.

Simply put, Defendants flagrantly ignored clearly established federal law by using chemical irritants and other crowd control weapons against class members who were not violent and were neither under nor resisting arrest. This excessive force constitutes an unreasonable seizure in violation of the Fourth Amendment. Consistent with outcomes in other federal courts that have considered similar cases in similar procedural postures this summer, Plaintiffs are likely to succeed on the merits of their Fourth Amendment excessive force claim. *See Abay*, 2020 WL 3034161, at *4–5; *Don't Shoot Portland*, 2020 WL 3078329, at *3–4; *Black Lives Matter Seattle-King Cty.*, 2020 WL 3128299, at *12–13; *Anti Police-Terror Project*, 2020 WL 4584185, at *13–14.

## II.   PLAINTIFFS FACE IRREPARABLE HARM

Plaintiffs will suffer irreparable harm in the coming days if their peaceful protesting is stifled by violence and the use of military-grade weaponry. Plaintiffs would like to exercise their constitutional rights to peacefully protest at events planned in Louisville between August 25, 2020 and September 5, 2020. Absent relief from this Court, LMPD has made it clear it will continue to use disproportionate violence to stop Plaintiffs from peacefully protesting, causing violations of their First and Fourth Amendment rights, for which there will be no remedy after the fact, and the law is clear that "denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet v. Lexington-Fayette*

*Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

First, as set forth more fully *supra*, Section I(B)–I(C), LMPD's use of military-grade crowd control has denied Plaintiffs their rights under the First and Fourth Amendments. And, as set forth *supra*, Section I(A), it is imminently likely that LMPD will engage in similar violent force in response to the planned demonstrations between August 25, 2020 and September 5, 2020. Plaintiffs will thus be forced to decide whether to risk their physical safety in order to voice their political opinions—precisely the choice the government cannot subject them to. The loss of these "First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Because "there are no available remedies at law that are adequate to compensate for a loss of First Amendment rights," *Brinkman v. Budish*, 692 F. Supp. 2d 855, 866 (S.D. Ohio 2010) (alterations and internal quotation marks omitted), Plaintiffs will suffer irreparable injuries absent this Court's intervention.

The Fourth Amendment harms that Plaintiffs are likely to endure are also irreparable under the law of this Circuit. In *Cole v. City of Memphis*, for example, plaintiffs sued on behalf of a class of people who had been subjected to repeated mass sweeps and excessive force by Memphis police. 108 F. Supp. 3d 593, 597 (W.D. Tenn. 2015). In entering an injunction that barred the police from conducting similar sweeps, the *Cole* court relied on the fundamental nature of Fourth Amendment interest in bodily integrity, reasoning that "because there is an ongoing risk of the deprivation of class members' fundamental rights, Plaintiffs have shown that legal remedies by themselves are inadequate to resolve the City's constitutional violations." *Id.* at 607. And in the context of recent similar protests, district courts in Washington and Oregon have found that protesters facing the risk of further unconstitutional crowd control tactics such as

tear gas and pepper balls faced irreparable injuries, warranting injunctive relief. *See Black Lives Matter Seattle-King Cty.*, 2020 WL 3128299, at *4 (finding sufficient risk of militarized police response to protests based on one day of tear gas, flash bang, and foam bullet usage); *Don't Shoot Portland*, 2020 WL 3078329, at *4 (finding likelihood of future militarized police response based on one week of tear gas and flash bang usage).

Here, Plaintiffs have been—and will likely again be—subjected to those very same weapons. And the risks that such weapons pose are particularly serious in light of the ongoing COVID-19 pandemic. Members of the Plaintiff Class have protested while wearing face masks, one of the most effective ways to curb the spread of the disease. But LMPD's conduct has forced many protestors to remove their masks so they can breathe. *See* Scott Decl. ¶ 11. At other times, LMPD officers themselves have ripped off protesters' masks without reason. Smith Decl. ¶ 27. And courts in this Circuit have recognized that increasing one's risk of contracting COVID-19 can constitute irreparable harm "in the face of a deadly pandemic with no vaccine, no cure, limited testing capacity, and the ability to spread quickly through asymptomatic human vectors[.]" *Malam v. Adducci*, No. 20-cv-10829, 2020 WL 3512850, at *3 (E.D. Mich. June 28, 2020) (quotation marks omitted).

Without this Court's intervention, Plaintiffs will be denied two of their most fundamental rights. LMPD will subject them to excessive force and, in doing so, silence them from participating in the political process through peaceful demonstrations. Under settled law, these risks each independently—and certainly when taken together—constitute irreparable harm.

## III.   AN INJUNCTION WOULD HARM NO ONE AND WOULD SERVE THE PUBLIC INTEREST IN PROTECTING CONSTITUTIONAL RIGHTS

Defendants cannot credibly claim that a temporary restraining order would cause substantial harm to others or be contrary to the public interest. It is well-settled that "'[n]o

substantial harm can be shown in the enjoinment of an unconstitutional policy.'" *Chabad of S. Ohio v. City of Cincinnati*, 233 F. Supp. 2d 975, 987 (S.D. Ohio 2002) (citing *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson Cty., TN*, 274 F.3d 377, 400 (6th Cir. 2001)), *aff'd sub nom.*, *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427 (6th Cir. 2004). And LMPD has routinely resorted to use of tear gas, flash bangs, and LRADs on peaceful protesters without first attempting other forms of de-escalation; it cannot now complain that military-grade weaponry is somehow necessary to maintaining order. Any incidental burdens in ensuring constitutional policing pale in comparison to the importance of safeguarding protesters' rights as demonstrations continue in the upcoming days and weeks against police brutality on the Black community.

For these same reasons, enjoining LMPD from unconstitutional policing serves the public interest in protecting constitutional rights and preserving public spaces for debate on topics of utmost public importance. The Sixth Circuit has recognized that the "public interest is served by preventing the violation of constitutional rights." *Chabad*, 363 F.3d at 436. It is clearly in the public interest, at this singular moment in history, to protect the rights of those demanding accountability from police departments and those seeking to document this historic moment, without the threat of excessive force and violence by LMPD. Defendants are unable to claim any public interest in their violent response to protests in Louisville, or in their retaliatory conduct in an effort to shield these violent actions from the public eye.

Indeed, "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964). Zealous protection of this right "embod[ies] our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement,

caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" *Id.* at 75

(quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)); *accord Barnett v. Aultman*

*Hosp.*, No. 5:11-cv-399, 2012 WL 5378738, at *8 (N.D. Ohio Oct. 31, 2012) (noting that the

First Amendment's protections must be "zealously guarded" because "they are fundamental to

democracy"). The Supreme Court has repeated consistently over the years that protecting this

type of speech is the core value behind the First Amendment. *See, e.g.*, *Texas v. Johnson*, 491

U.S. 397, 411 (1989) (noting that "expression of dissatisfaction with the policies of this country"

is "situated at the core of our First Amendment values"); *NAACP v. Claiborne Hardware Co.*,

458 U.S. 886, 913 (1982) ("This Court has recognized that expression on public issues 'has

always rested on the highest rung of the hierarchy of First Amendment values.'" (internal

citation omitted)); *see also Barrett v. Harrington*, 130 F.3d 246, 263 (6th Cir. 1997) ("Freedom

to criticize public officials and expose their wrongdoing is at the core of First Amendment

values."). This Court, too, should recognize that protecting the people's ability to engage in core

First Amendment speech criticizing Louisville Metro Government's police policies and practices

is squarely in the public interest.

## CONCLUSION

Plaintiffs are eminently likely to succeed on their claims that Defendants, acting through

the LMPD, have violated Plaintiffs' First and Fourth Amendment rights. And if they do not

receive immediate protection from this Court, beginning today and in the following days and

weeks, at least some members of the Plaintiff Class will be denied the right to participate in

planned protests about police violence at this unparalleled moment in history. Because of the

strong public interest in protecting these rights to speak out against injustice, this Court should

(a) preliminarily enjoin LMPD from using tear gas, flash bangs, long-range acoustic devices, or

other similar crowd-control weaponry against peaceful protestors, and (b) immediately issue a

Temporary Restraining Order barring LMPD from using tear gas, flash bangs, long-range

acoustic devices, or other similar crowd-control weaponry against peaceful protestors until the

Court decides Plaintiffs' preliminary injunction motion.


Dated:          August 25, 2020
                Louisville, KY

                                        Respectfully submitted,


Ashok Chandran*
Christopher Kemmitt*                    /s/ Heather Gatnarek
Ajmel Quereshi*                         Corey Shapiro
Kristen Johnson*                        Heather Gatnarek
NAACP LEGAL DEFENSE &                   Mashayla Hays
EDUCATIONAL FUND, INC.                  Aaron Tucek†
40 Rector St., 5th Floor                ACLU OF KENTUCKY FOUNDATION,
New York, NY 10006                      INC.
Tel.: (212) 965-2200                    325 W. Main St. Suite 2210
Fax.: (212) 226-7592                    Louisville, KY 40202
achandran@naacpldf.org                  (502) 581-9746
ckemmitt@naacpldf.org                   corey@aclu-ky.org
aquereshi@naacpldf.org                  heather@aclu-ky.org
kjohnson@naacpldf.org                   mashayla@aclu-ky.org
                                        aaron@aclu-ky.org


Earl S. Ward**
O. Andrew F. Wilson**                   *pro hac vice application forthcoming
Samuel Shapiro**                        **pro hac vice application pending
Andrew K. Jondahl**                     †application for admission pending
EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
(212) 763-5000
eward@ecbawm.com
awilson@ecbawm.com
sshapiro@ecbawm.com
ajondahl@ecbawm.com

25