# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY

ATTICA SCOTT, CORBIN SMITH,
KAYLA MEISNER, TYLER WEAKLEY,
STEVIE SCHAUER, WILLA TINSLEY,
PATRICK MOORE, and the KENTUCKY
ALLIANCE AGAINST RACIAL AND
POLITICAL REPRESSION, on behalf of
themselves and all others similarly situated,

                    Plaintiffs,

     v.

LOUISVILLE/JEFFERSON COUNTY
METRO GOVERNMENT, GREG
FISCHER, individually and in his official
capacity as Mayor of Louisville, ROBERT
SCHROEDER, individually and in his
official capacity as Interim Chief of the
Louisville Metropolitan Police Department,
LaVITA CHAVOUS, individually and in her
official capacity as Assistant Chief of the
Louisville Metropolitan Police Department,
and LOUISVILLE METROPOLITAN
POLICE DEPARTMENT OFFICER "J."
JOHNSON, LOUISVILLE
METROPOLITAN POLICE
DEPARTMENT OFFICERS JOHN DOES
#1-#15 and JANE DOE #1, in their
individual capacities,

                    Defendants.

Civil Action No. 3:20-cv-0535

**FIRST AMENDED COMPLAINT
AND JURY TRIAL DEMAND**

## PRELIMINARY STATEMENT

"[O]ur constitutional command of free speech and assembly is basic and fundamental and

encompasses peaceful social protest, so important to the preservation of the freedoms treasured

in a democratic society." *Cox v. State of La.*, 379 U.S. 559, 574 (1965). Rarely before has this

principle been as readily apparent as it is today; following the senseless killings of George Floyd,

Breonna Taylor, and countless other Black individuals at the hands of police, protesters in all fifty states are demanding police accountability and reform.

Rather than treating its peaceful protesters as important parts of the democratic process protected by the Constitution, the City of Louisville has chosen to forcibly silence them—often using military-type weapons and tactics that resemble those used by authoritarian regimes to stifle dissent. In the days following the death of George Floyd, who was killed by Minneapolis police officers on May 25, 2020, a key demand for protesters who took to the streets around the country was justice for Breonna Taylor, who was killed by Louisville police officers in her own home on March 13, 2020. Louisville police officers sought to quell these demonstrations through the sustained use of tear gas, flash bangs, pepper balls, and other forms of military-grade technology. This combat-style response led to yet another senseless death: on May 31, 2020, Louisville police and the National Guard fired eighteen live rounds at David McAtee, a local Black restaurant owner, killing him. Since then, countless peaceful protesters—including elected officials and local educators—have been shot, gassed, beaten, and arrested solely for making their voices heard. Louisville police officers also abused the city's curfew order while it was in effect, employing force to arrest or disperse people hours before they were required by the curfew order to clear the streets. And to this day, both Louisville's Mayor and Kentucky's Governor have defended the police department's conduct.

Plaintiffs are a diverse group of individuals who have come together to exercise their rights to protest and demand change from their government. For that, Louisville police officers have subjected them to shocking and violent levels of force. Plaintiff Corbin Smith was tear gassed, beaten with batons, and forced to beg for his life while an officer kneeled on his neck. Plaintiff Patrick Moore was shot in the eye with a pepper ball, causing his retina to tear away

from his eyeball; three surgeries later, he still has not fully recovered his vision. Plaintiff Stevie Schauer was shoved to the ground and violently beaten by officers who saw her recording their misconduct; friends who tried to help her were shot with pepper balls.

Their experiences are just a few examples of the sustained violence that Louisville has unleashed on its citizens. Plaintiffs now bring this suit, on behalf of themselves and all others similarly situated, to guarantee and protect their constitutional right to demand change from their government at this singular moment in history.

## PARTIES

1.      Plaintiff Attica Scott is a citizen of the United States and currently resides in Kentucky. She currently serves in the Kentucky House of Representatives, representing the 41st District.

2.      Plaintiff Corbin Smith currently resides in Indiana.

3.      Plaintiff Kayla Meisner currently resides in Kentucky.

4.      Plaintiff Tyler Weakley currently resides in Indiana.

5.      Plaintiff Stevie Schauer currently resides in Kentucky.

6.      Plaintiff Willa Tinsley currently resides in Kentucky.

7.      Plaintiff Patrick Moore currently resides in Kentucky.

8.      Plaintiff Kentucky Alliance Against Racial and Political Repression ("KAARPR") is a 501(c)(3) organized under the laws of Kentucky that has more than 900 dues-paying members. Its mission is to "inform the public and provide a channel for public debate concerning the human and constitutional rights of all people; to bring together diverse groups of people to support those repressed for racist or political reasons; [and] to work to end racist

practices in the community and government."[1] The organization's work is focused on, among other things, combating the use of excessive force by police, including against protestors; challenging cruel and unusual conditions of confinement in prisons and jails in Kentucky; limiting the disproportionate effect of the criminal justice system on Black individuals; and improving education access and opportunity for Black and Brown children in the greater Louisville area.

9.      Since its founding more than 40 years ago, KAARPR has, among other things, highlighted the stories of victims of police abuse as a means of drawing attention to the larger systemic issues discussed above. For example, over twenty years ago, KAARPR launched a campaign around the death of Adrien Reynolds, who was subjected to excessive force during his arrest and then killed by correctional officials.

10.      KAARPR is also a leading member of Louisville Citizens Against Police Abuse, a coalition of local organizations united to fight police brutality in Black and Brown communities in Louisville.

11.      Defendant Louisville/Jefferson County Metro Government ("City of Louisville") is a municipality organized and existing under the laws of the State of Kentucky. Defendant City of Louisville, acting through the Louisville Metropolitan Police Department ("LMPD"), is responsible for the policy, practice, supervision, implementation, and conduct of all LMPD matters, including the appointment, training, supervision, and conduct of all LMPD personnel. In addition, the City of Louisville is responsible for enforcing the rules of the LMPD and ensuring that LMPD personnel obey the laws of the United States and the State of Kentucky.

---

[1] *About Us*, Kentucky Alliance Against Racial and Political Repression, http://www.kentuckyalliance.org/about html (last visited July 30, 2020).

12.     Defendant Greg Fischer is the Mayor of the City of Louisville. In that capacity, he is responsible for implementing the policy, practice, supervision, implementation, and conduct of all LMPD matters, including the appointment, training, supervision, and conduct of all LMPD personnel. In addition, Defendant Fischer is responsible for enforcing the rules of the LMPD and ensuring that LMPD personnel obey the laws of the United States and the State of Kentucky.

13.     Defendant Robert Schroeder is the Interim Chief of the Louisville Metropolitan Police Department. Defendant Schroeder was appointed to this role on or about June 1, 2020. Before his appointment as Interim Chief, Defendant Schroeder was Deputy Chief of the Louisville Metropolitan Police Department. In his capacity as both Interim Chief and Deputy Chief, he is responsible for implementing the policy, practice, supervision, implementation, and conduct of all LMPD matters, including the appointment, training, supervision, and conduct of all LMPD personnel. In addition, Defendant Schroeder is responsible for enforcing the rules of the LMPD and ensuring that LMPD personnel obey the laws of the United States and the State of Kentucky, including by conducting thorough and expeditious investigations into officer misconduct. At all relevant times, Defendant Schroeder was acting within the scope of his employment and under color of state law.

14.     Defendant LaVita Chavous is an Assistant Chief of the Louisville Metropolitan Police Department. In that capacity, she is responsible for implementing the policy, practice, supervision, implementation, and conduct of all LMPD matters, including the appointment, training, supervision, and conduct of all LMPD personnel. In addition, Defendant Chavous is responsible for enforcing the rules of the LMPD and ensuring that LMPD personnel obey the laws of the United States and the State of Kentucky, including by conducting thorough and

expeditious investigations into officer misconduct. At all relevant times, Defendant Chavous was acting within the scope of her employment and under color of state law.

15.     Defendants LMPD Officer "J." Johnson and LMPD Officers John Does #1-15 and Jane Doe #1, (collectively, "Defendant Officers" or "Officers") are police officers employed by the City of Louisville. In this role, Defendant Officers were duly appointed and acting officers, servants, employees and/or agents of Louisville. At all relevant times, they were acting in the scope of their employment and under color of state law.

## JURISDICTION AND VENUE

16.     This action arises under the First, Fourth, and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and Kentucky state law.

17.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367.

18.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (e) because at least some Defendants reside in this district and a substantial part of the acts and omissions giving rise to this action took place in this district.

## JURY TRIAL DEMAND

19.     Plaintiffs demand trial by jury.

## FACTS

***The Killings of Breonna Taylor and George Floyd Spur Nationwide Protests***

20.     Over the past several months, a number of high-profile instances of police killing unarmed Black people have shocked the nation's conscience.

21.     Shortly after midnight on March 13, 2020, three LMPD police officers shot and killed Breonna Taylor, a Black 26-year-old emergency medical technician who lived in Louisville.

22.    The LMPD officers executed a no-knock warrant at Ms. Taylor's apartment. Upon entry, the officers fired over twenty rounds at Ms. Taylor and her boyfriend.

23.    Ms. Taylor, who was unarmed and sleeping in bed, was struck eight times—but did not die immediately. Instead, for five or six minutes, she lay bleeding in her bed, her boyfriend pleading unsuccessfully for the officers to help her. Ms. Taylor died from her injuries.

24.    Ms. Taylor's story quickly captured national attention. Calls for justice for her killing began to grow.

25.    In response, the LMPD opened an internal investigation into whether its officers violated any departmental policies. The Attorney General of Kentucky has opened an investigation into possible criminal charges against the officers. And the Federal Bureau of Investigation has opened a separate probe into the officers' conduct.

26.    To date, however, the officers who killed Breonna Taylor have not been arrested. Defendant Schroeder has initiated termination procedures against just one of the three officers involved.

27.    Less than two months later, on May 25, 2020, officers from the Minneapolis Police Department killed George Floyd while arresting him on suspicion of passing a counterfeit twenty-dollar bill.

28.    A bystander captured the killing on video; for nearly eight minutes after Mr. Floyd had been placed in handcuffs, a police officer kneeled on Mr. Floyd's neck while three other officers stood by and watched.

29.    Mr. Floyd repeatedly begged for mercy, pleading that he could not breathe. He called out for his mother. His last words were "please, I can't breathe."

30. Video of Mr. Floyd's murder spread almost immediately. Within days, his story had become the defining topic of national discourse. Elected officials and public figures of all political affiliations denounced the police officers' actions.

31. All four of the officers involved in Mr. Floyd's killing have been arrested and criminally charged.

32. The killings of Ms. Taylor and Mr. Floyd—emblematic of the widespread pattern of police violence against unarmed Black people—touched a nerve in communities across the country, sparking mass protests about how police interact with Black people.

33. Within a week of Mr. Floyd's killing, large-scale demonstrations had begun in all fifty states. Those protests remain ongoing.

***Protests Begin in Louisville, Prompting Immediate and Egregious Use of Force by LMPD***

*May 28, 2020*

34. On May 28, 2020, LMPD released the audio of the 911 call placed by Breonna Taylor's boyfriend the night she was killed.

35. That evening, large-scale demonstrations began in Louisville. At approximately 8:00 p.m., protesters carrying signs reading "Justice for Breonna" and chanting "Breonna was asleep" marched through downtown Louisville to gather near the Louisville Metro Hall.[2]

36. Protesters were met by a fleet of armed LMPD officers clad in riot gear.

37. At approximately 11:15 p.m., a handful of protesters threw plastic water bottles at the LMPD officers.

---

[2] Tessa Duvall, Darcy Costello, Billy Kobin, Lucas Aulbach, Bailey Loosemore, Mandy McLaren, Olivia Krauth and Sarah Ladd, *Sunday updates: Protestors arrested as Breonna Taylor rallies continue around Louisville*, Courier Journal (May 28, 2020 at 10:56 p.m.), https://www.courier-journal.com/story/news/politics/metro-government/2020/05/28/breonna-taylor-shooting-what-know-louisville-protest/5280762002/.

38.     In response, LMPD officers fired a combination of pepper balls (pepper-spray projectiles launched using guns or similar weapons) and live ammunition into the crowd of protesters, nearly all of whom were protesting peacefully. Seven people were hit with live bullets. Protesters began to disperse.

39.     At least one of the injured protesters claimed that he was shot in the back of the head by a police officer. He has sued both LMPD and the Kentucky State Police. *See Albert v. Unknown Individual Kentucky State Police Officers, et al.*, No. 3:20-cv-00418 (W.D. Ky.).

40.     LMPD officers then began to launch canisters of tear gas into the crowd.

41.     LMPD subsequently claimed that the tear gas and gunshots were necessary to prevent assaults on officers. But no officers were reported as injured during the protests.[3]

42.     The LMPD's use of tear gas against peaceful protestors on May 28, 2020 was widely reported in the media.

43.     Upon information and belief, no LMPD officers have been disciplined by Defendant Fischer, Defendant Schroeder, or Defendant Chavous for using tear gas against peaceful protestors on May 28, 2020.

*May 29, 2020*

44.     Demonstrations continued the next day, on May 29, 2020. An even larger group of protesters marched through downtown Louisville starting in the late afternoon. Many of the protesters were young teenagers.[4]

---

[3] Mike Baker, *7 People Shot at Louisville Protest Over the Death of Breonna Taylor,* N.Y. Times (May 29, 2020), https://www.nytimes.com/2020/05/29/us/louisville-protest-shooting-breonna-taylor html.
[4] Tessa Duvall, Darcy Costello, Billy Kobin, Lucas Aulbach, Bailey Loosemore, Mandy McLaren, Olivia Krauth and Sarah Ladd, *Sunday updates: Protestors arrested as Breonna Taylor rallies continue around Louisville*, Courier Journal (May 28, 2020, 10:56 p.m., updated May 31, 2020, 11:00 p.m.), https://www.courier-journal.com/story/news/politics/metro-government/2020/05/28/breonna-taylor-shooting-what-know-louisville-protest/5280762002/.

45.     By the early evening, LMPD officers began using flash grenades, tear gas, and pepper balls on the largely peaceful crowd.

46.     Plaintiff Attica Scott and her daughter were present at this protest; both were demonstrating peacefully but were shoved by police and then hit with tear gas.

47.     For over four hours, flash grenades launched by LMPD "volleyed through the air like cannon-fire" while tear gas deployed by LMPD "wafted across entire city blocks."[5]

48.     LMPD officers fired pepper balls indiscriminately into the crowd.

49.     As one newspaper reported, "[b]y 10 p.m., downtown Louisville looked like a war zone."[6]

50.     LMPD officers targeted journalists who were covering the chaos, firing pepper bullets at groups of reporters who were videotaping the scene.[7]

51.     Upon information and belief, no LMPD officers were disciplined by Defendant Fischer, Defendant Schroeder, or Defendant Chavous as a result of using tear gas, flash grenades, or pepper bullets against peaceful protestors on May 29, 2020.

*May 30, 2020*

52.     On May 30, 2020, Mayor Greg Fischer instituted a 9:00 p.m. citywide curfew and called in the National Guard.[8]

---

[5] Mandy McLaren, *A traumatized generation: Louisville's youth demand racial justice during mass protests,* Louisville Courier Journal (May 30, 2020, 5:31 p.m.), https://www.courier-journal.com/story/news/2020/05/30/breonna-taylor-protest-louisvilles-youth-demand-racial-justice/5291030002/.
[6] *Id.*
[7] @wave3news, "WAVE 3 News reporter Kaitlin Rust appeared to have been hit by rubber bullets reportedly fired by an LMPD officer during a protest in downtown Louisville," Twitter (May 29, 2020, 10:23 p.m.), https://twitter.com/wave3news/status/1266555731731415040?s=20.
[8] Darcy Costello, *Mayor Fischer sets curfew calls in National Guard for Breonna Taylor protests,* Louisville Courier Journal (May 30, 2020, 9:49 p.m.), https://www.courier-journal.com/story/news/politics/metro-government/2020/05/30/mayor-fischer-sets-breonna-taylor-protest-curfew-calls-national-guard/5290690002/.

53. Protesters began to gather downtown for peaceful demonstrations in the afternoon on May 30. Some volunteers brought stockpiles of water and milk to use both as eyewash due to LMPD's indiscriminate use of tear gas, as well as to provide essential drinking water for the protest on a long sunny day. They stored these stockpiles in Jefferson Square Park for all protesters to use.

54. At approximately 7:30 p.m., while protesters were peacefully demonstrating, a group of plainclothes LMPD police officers began destroying the protesters' stockpiles without explanation.[9]

55. Upon information and belief, LMPD officers intentionally destroyed the protesters' supplies to discourage protesters from remaining at the demonstrations.

56. Upon information and belief, LMPD officers had decided to use tear gas on protesters before they began to destroy the protesters' supplies.

57. At approximately 8:00 p.m.—an hour before the official curfew and thirty minutes after destroying the protesters' stockpiles of water and milk—LMPD officers began to launch tear gas into the crowd of peaceful protesters and beat them back with batons. At the time, some protesters had lain down on the street while chanting for police accountability.

58. LMPD officers launched tear gas at a crowd of protesters, including former State Representative Charles Booker, who were standing in a place several yards away from the riot line.[10]

---

[9] Natalie Neysa Alunda, *Police officers in Louisville smash milk jugs and water bottles at Breonna Taylor protest,* Louisville Courier Journal (May 30, 2020, 9:43 p.m.), https://www.courier-journal.com/story/news/local/2020/05/30/breonna-taylor-protest-louisville-police-smash-protesters-supplies/5295840002/.
[10] Charles Booker (@Booker4KY), "We were yards away. No one was confrontational. It was not 9p. They started throwing gas at us anyway. I wish I could say this is unbelievable," Twitter (May 30, 2020, 8:52 p.m.), https://twitter.com/Booker4KY/status/1266895243913367553?s=20.

59.     Approximately 40 protesters were arrested.[11]

60.     When asked about LMPD's conduct, Defendant Fischer conceded that the protesters were nonviolent, but he nonetheless defended the use of tear gas and batons by saying the demonstration "looked like it was going to be taking a turn for the worse," and that police used their judgment.[12]

61.     Upon information and belief, no LMPD officers have been disciplined by Defendant Fischer, Defendant Schroeder, or Defendant Chavous for using tear gas and batons on nonviolent protestors.

*May 31, 2020*

62.     The next evening saw similar violent police responses to largely peaceful protests.

63.     In the early evening on May 31, 2020, approximately 1,000 protesters gathered at the Muhammad Ali Center in downtown Louisville. From there, they marched to Jefferson Square Park, arriving shortly before 8:00 p.m.—again an hour before official curfew.

64.     Almost immediately, LMPD officers arrived at the park and decreed that the demonstration was an unlawful assembly without providing any further explanation.

65.     Just minutes later, LMPD officers began firing flash bangs (explosive devices commonly used by militaries, which cause temporary blindness, deafness, and loss of balance) and tear gas into the peaceful crowd, forcing protesters out of the park and onto the surrounding streets.

---

[11] Rob Byers, *Curfew remains in effect for Louisville for at least another night amid protests,* Louisville Courier Journal (May 31, 2020, 11:54 a m.), https://www.courier-journal.com/story/news/local/2020/05/31/breonna-taylor-protests-louisville-curfew-remains-effect-sunday/5299457002/.
[12] Darcy Costello, *Breonna Taylor protestors question police tactics used prior to Louisville's curfew time,* Louisville Courier Journal (May 31, 2020, 5:50 p.m.), https://www.courier-journal.com/story/news/politics/metro-government/2020/05/31/breonna-taylor-protesters-question-lmpd-tactics-against-saturday-rally/5300642002/.

66.     LMPD officers also fired projectiles at people holding innocuous objects like umbrellas.

67.     As protesters got into their cars to drive away from the protest, LMPD officers lined up on an overpass and fired at cars, breaking the windows of several vehicles.[13]

68.     Approximately 100 protesters were arrested and held in police custody.

69.     LMPD further defended the decision to use tear gas to disperse the crowd prior to the start of the official city-wide curfew, by claiming that "people with leaf blowers [were] in the crowd. We know those are used for things like dispensing powder chemicals and for blowing gas back toward police."[14] City officials also claimed, without providing any evidence, that leaf blowers were loaded with bleach.[15]

70.     Later that evening, and two and a half miles from the site of the protests downtown, LMPD officers and the National Guard shot and killed David McAtee while attempting to disperse a small social gathering in the parking lot of Mr. McAtee's restaurant.

71.     Upon encountering the group, LMPD officers and the National Guard began firing pepper balls. One of the pepper balls came dangerously close to striking Mr. McAtee's niece in the head.

72.     Mr. McAtee, in response, drew a handgun and fired a warning shot into the air.

---

[13] Painkiller Gillz (@Itz5500Gillz), "This is LMPD shooting at peoples vehicles as they tried to go home from the protest…they was us dead in Louisville, ky," Twitter (June 1, 2020, 9:52 a.m.), https://twitter.com/Itz5500Gillz/status/1267454024288292867.

[14] Hayden Ristevski (@HaydenWDRB). "Metro Council President David James tells WDRB 'police saw people approaching that had leaf blowers loaded wth bleach that was intended to blow at police. So they sent out the tear gas.' James says police were trying to disperse the crowd because that. UPDATE: response from @LMPD spokesperson…" Twitter (May 31, 2020, 10:24 p.m.), https://twitter.com/HaydenWDRB/status/1267280879614857219?s=20.

[15] Brooks Holton, *Protestors in Louisville question why police fired tear gas before curfew,* WDRB Louisville, KY (May 3, 2020), https://www.wdrb.com/news/protesters-in-louisville-question-why-police-fired-tear-gas-before-curfew/article_50da8e76-a3a9-11ea-95d8-bf6a8ed76863.html?utm_medium=social&utm_source=email&utm_campaign=user-share.

73.     Approximately eight seconds later, LMPD and National Guard officers fired eighteen live rounds at Mr. McAtee; one bullet from a National Guard officer struck Mr. McAtee, killing him.[16]

74.     None of the LMPD officers had turned on their body cameras, despite a mandate to do so in LMPD's own operating policies.

75.     Upon information and belief, no LMPD officers have been disciplined by Defendant Fischer, Defendant Schroeder, or Defendant Chavous for using tear gas, flash bangs, pepper balls, and other projectiles on peaceful protesters.

*June 1, 2020*

76.     The next day, on June 1, 2020, Defendant Schroeder was appointed as Interim Chief of the LMPD.

77.     That evening, protesters again congregated in Jefferson Square Park.

78.     The demonstration was peaceful; protesters and police officers even linked arms at points.[17]

79.     Nonetheless, at 10:00 p.m., officers fired tear gas and pepper balls into the crowd to disperse the protesters.

80.     Plaintiff Patrick Moore was present, peacefully protesting the excessive use of police force. As he left the park, he was shot in the left eye with a pepper ball.

---

[16] Billy Kobin and Kala Kachmar, *Investigation launched into LMPD. National Guard fatal shooting of West End business owner,* Louisville Courier Journal (June 1, 2020, 8:37 a.m.), https://www.courier-journal.com/story/news/2020/06/01/beshear-authorizes-investigation-into-louisville-police-national-guard-shooting/5306733002/.

[17] Lucas Aulbach, *The morning after: What happened at Monday's David McAtee and Breonna Taylor protests,* Louisville Courier Journal (June 2, 2020, 6:31 a.m.), https://www.courier-journal.com/story/news/local/2020/06/02/david-mcatee-breonna-taylor-protests-louisville-monday-recap/5315267002/.

81.     The next day, on June 2, 2020, one LMPD officer, Officer Katie Crews, posted a photo of a protester offering her flowers on her social media page and wrote, "I hope the pepper balls that she got lit up with a little later on hurt. Come back and get ya some more ole girl, I'll be on the line again tonight."[18]

82.     Officer Crews was one of the LMPD officers involved in the shooting death of David McAtee just two days prior, but she was allowed to continue in her duties.[19]

83.     Although Officer Crews is under investigation for her social media post, upon information and belief, no LMPD officers have been investigated or disciplined by Defendants Fischer, Schroeder, or Chavous for using tear gas and pepper balls on peaceful protesters.

***Defendants Fischer, Schroeder, and Chavous Approve of and Sanction LMPD's Use of Force, Resulting in Continued Use of Force by LMPD Officers***

84.     Upon information and belief, Defendants Fischer, Schroeder, and Chavous knew and, either explicitly, or through acquiescence, approved of LMPD's decision to use tear gas, flash bangs, pepper balls, batons, and other forms of force on protesters between May 28, 2020 and June 1, 2020.

85.     The version of LMPD's Standard Operating Procedures that was in effect at the time required supervisors—including Defendants Chavous and Schroeder—to be notified any time chemical agents, including pepper balls, were deployed.[20]

---

[18] *LMPD officer under investigation after Facebook post about protestor,* WDRB Louisville, KY (June 2, 2020), https://www.wdrb.com/news/lmpd-officer-under-investigation-after-facebook-post-about-protester/article_b295d622-a4d8-11ea-a7a4-931a2800a02d.html.
[19] Billy Kobin and Kala Kachmar, *Investigation launched into LMPD. National Guard fatal shooting of West End business owner,* Louisville Courier Journal (June 1 2020, 8:37 a. m.), https://www.courier-journal.com/story/news/2020/06/01/beshear-authorizes-investigation-into-louisville-police-national-guard-shooting/5306733002/.
[20] LOUISVILLE METRO POLICE DEP'T, STANDARD OPERATING PROCEDURES ("SOP") § 3.1.1 (May 31, 2004).

86. LMPD's Standard Operating Procedures also required approval from a commanding officer—such as Defendants Schroeder and Chavous—prior to using any chemical agents, including pepper balls.[21]

87. LMPD's conduct came under intense media scrutiny almost immediately. But Defendants Fischer, Schroeder, and Chavous have done nothing to correct LMPD's illegal course, instead acquiescing to LMPD's use of violent force on peaceful protesters.

88. Defendant Fischer has defended his and LMPD's prior decisions, despite the results, and has consistently refused to take meaningful action to protect protesters from unlawful uses of force.

89. On May 30, 2020, just hours after LMPD officers destroyed peaceful protesters' stockpiles of water and milk, arbitrarily enforced curfew restrictions over an hour earlier than announced, and launched tear gas at dispersing crowds as described above, Defendant Fischer issued a statement thanking LMPD for "show[ing] discipline, restraint and professionalism under extremely volatile circumstances." He then continued "to thank the law enforcement who came in to assist from other agencies," as well.[22]

90. In the same statement, Defendant Fischer stated that although he respected the right to protest peacefully, he instructed Louisville residents to "stay home."

91. When asked at a news conference about LMPD's destruction of protesters' supplies, Defendant Fischer defended LMPD's conduct, speculating that police may have

---

[21] SOP § 9.1.8 (Nov. 7, 2019).
[22] *Mayor Greg Fischer's statement on May 29 protests,* LouisvilleKY.Gov (May 30, 2020), https://louisvilleky.gov/news/mayor-greg-fischer%E2%80%99s-statement-may-29-protests.

believed there were flammable materials hidden among milk and water.[23] Defendant Fischer did not explain, and has not explained, any basis for such a conclusion.

92.     Defendant Fischer has repeatedly defended LMPD's use of tear gas on protesters. In a statement on June 2, 2020, Defendant Fischer's spokesperson, Jean Porter, said that although the Mayor was "sorry that some peaceful protesters were caught up in that," LMPD is there "to protect public safety and keep order, and they make the decision to use tear gas when they believe that is in jeopardy."[24]

93.     On June 3, 2020, Defendant Fischer issued a statement praising LMPD for "putting in long hours," while "suffering insults and assaults" in dealing with protests. The Mayor continued: "They are frustrated . . . I absolutely respect that. That doesn't change my appreciation of the work they are doing, as I've expressed time and time again."[25]

94.     On June 10, 2020, in response to pressure from the public and the Louisville Metro Council, Defendant Schroeder announced that LMPD officers would no longer be permitted to use tear gas without his approval.[26]

95.     The June 27, 2020 amendments to LMPD's Standard Operating Procedures make no reference to this new restriction.[27]

---

[23] Amina Elahi, *Louisville Mayor Claims, Without Details, Protestors' Seized Supplies were Hazardous,* WFPL News Louisville (May 31, 2020), https://wfpl.org/louisville-mayor-claims-without-details-protesters-seized-supplies-were-hazardous/.

[24] Andrew Wolfson and Darcy Costello, *Mayor Fischer says Louisville welcomes peaceful protest. Why was one cleared with tear gas?*, Louisville Courier Journal (June 2, 0202, 6:36 a m.), https://www.courier-journal.com/story/news/2020/06/02/kentucky-leaders-question-why-louisville-police-tear-gassed-protesters/5312665002/.

[25] Taylor Weiter and Heather Fountaine, *Watch: Louisville police walk out on Mayor Greg Fischer, FOP confirms*, WHAS11 ABC Louisville, KY (June 3, 2020, 8:07 p m.), https://www.whas11.com/article/news/local/louisville-police-fop-mayor-fischer/417-cddce593-b5dc-47e3-836b-25ca773e7109.

[26] Tessa Duvall, Sarah Ludd and Ben Tobin, *Louisville police roundup: Tear gas limits, detective sidelined, community policing survey*, Louisville Courier Journal (June 10, 2020, 11:27 a m.),  https://www.courier-journal.com/story/news/local/2020/06/10/louisville-police-cant-use-tear-gas-future-without-direct-order/5333275002/.

[27] SOP § 9.1.9 (June 27, 2020) (using same language as prior version of SOP).

96.     In the face of mounting public pressure, on June 15, 2020, Defendant Fischer apologized for the use of tear gas against protesters, and stated that, as a result, he would be instituting needed reforms to the LMPD's use of force practices. But the very next day, in response to criticism from the LMPD, Defendant Fischer walked back his promise, stating that he had not instructed and would not instruct officers to "stand down" and that Defendant Schroeder was responsible for determining the appropriate course of action.[28]

97.     Upon information and belief, since June 15, 2020, Defendant Schroeder has not implemented any changes to LMPD's use-of-force policies to better protect protesters.

98.     At a media briefing on May 31, 2020, Defendant Chavous blamed the violence on "anarchists" who intended to cause chaos—even though she identified no actual violent acts by protesters.[29]

99.     At that same conference, Defendant Chavous defended the decision to fire on individuals carrying umbrellas, saying that umbrellas "can be used as weapons."[30]

100.    Upon information and belief, Defendants Fischer, Schroeder, and Chavous have taken no action to reform LMPD's use-of-force policies or otherwise curtail LMPD's use of force against peaceful protesters beyond the announcement regarding central approval of tear gas usage.

---

[28] Ragsdale, Travis, *Mayor Fischer denied claim that he's giving Louisville police 'stand down' orders at protests,* WDRB Louisville, KY (June 16, 2020), https://www.wdrb.com/news/mayor-fischer-denies-claim-that-hes-giving-louisville-police-stand-down-orders-at-protests/article_4307b4b2-afe4-11ea-83cf-23b024a8834c.html.

[29] Tessa Duvall, Darcy Costello, Billy Kobin, Lucas Aulbach, Bailey Loosemore, Mandy McLaren, Olivia Krauth and Sarah Ladd, *Sunday updates: Protestors arrested as Breonna Taylor rallies continue around Louisville*, Courier Journal (May 28, 2020, 10:56 p.m., updated May 31, 2020, 11:00 p.m.), https://www.courier-journal.com/story/news/politics/metro-government/2020/05/28/breonna-taylor-shooting-what-know-louisville-protest/5280762002/.

[30] Lucas Aulbach, *From tense to touching moments, here's how Louisville's protests went down Sunday night,* Louisville Courier Journal (June 1, 2020, 6:18 a.m.), https://www.courier-journal.com/story/news/local/2020/06/01/breonna-taylor-protest-what-happened-sunday-louisville/5305156002/.

***Defendant City of Louisville's Ongoing Use of Force and Mass Arrests to Quell Protest and Prevent Recording***

101.     Following two weeks of relative calm between police and protesters, on June 15, 2020, the LMPD officers resumed their use of aggressive tactics and potentially lethal weapons on protesters.

102.     Throughout that afternoon and evening, LMPD officers deployed smoke grenades, pepper rounds, flash bangs, and a sound cannon against protesters. They also continued to target individuals, including members of the press, who were documenting the protests and the police response.

103.     In the late afternoon of June 15, a small group of peaceful protesters was gathered near 9th Street and W. Chestnut Street. A line of LMPD officers in helmets, armor, and riot shields moved toward the protesters, ordering them to move back. When the protesters did not leave, the police marched north on 9th Street firing pepper balls and impact rounds toward the crowd.

104.     As the police moved down the road, they approached Plaintiff Schauer, who was standing still on the sidewalk and was recording the officers with her cellphone. Two officers walked over to her, threw her to the ground, and fired pepper balls at protesters who attempted to help her. An officer then arrested Plaintiff Schauer.

105.     The police eventually moved down to the area around W. Jefferson Street and 7th Street, near LMPD headquarters, at which point the police took several steps backwards. The protesters cheered, thinking that the police were backing off. Instead, the police fired a round of pepper balls into the crowd.

106.     Shortly thereafter, police used a long-range acoustic device ("LRAD"), a sonic weapon that deploys a high-frequency sound wave, on peaceful protesters.

107.     During the protests, a number of riot police gang-tackled a man in the middle of the road. The officers' actions were captured by a security guard at the Hall of Justice, who recorded it on his cellphone camera from behind a window. As the guard recorded the activity, an officer fired a pepper ball at him, striking and cracking the window near where the guard had been standing. LMPD confirmed that an officer had fired at the security guard. The guard told Buzzfeed News that he had not reported the incident because he feared retaliation from the police.[31]

108.     Later that night, another officer ran his car into a peaceful protester. The man told WFPL, "I watched [the officer] look at his back up cam and he ran right into me, literally."[32]

109.     Police use of force against peaceful protesters continued throughout the week. On the morning of Wednesday, June 17, 2020, police again fired pepper balls at peaceful protesters on multiple occasions. One officer shot a reporter from the Courier Journal, who was recording the protests, with a pepper ball.

110.     On Thursday, June 18, 2020, the police used both peppers balls and LRADs against peaceful protesters again. The police reportedly shot one protester in the eye with a pepper ball. Another protester, who was sleeping in the park, awoke to an officer pointing a Glock firearm in his face.

111.     LMPD has continued to use military-grade crowd control technologies to force peaceful crowds to disperse—even doing so the same day it made representations to this Court

[31] Amber Jamieson, *Police Shot At A Man Who Filmed Them Tackling Protestors in Louisville,* BuzzFeed News (June 17, 2020, 8:50 p.m.), https://www.buzzfeednews.com/article/amberjamieson/louisville-shot-fired-security-guard-video.
[32] Staff, *User of Pepper Balls Resumes At Downtown Louisville Protests,* WFPL News Louisville (June 15, 2020), https://wfpl.org/use-of-pepper-balls-tear-gas-resumes-at-downtown-louisville-protests/.

that Plaintiffs had offered nothing but speculation in support of their concern about the continuing use of such tactics.

112.     On August 25, 2020, during a hearing before this Court, Defendants stated that emergency relief was inappropriate because crowd control technologies "ha[d] not been used since the middle of June." Tr. at 14:16–14:17.

113.     Defendants further defended LMPD at the hearing, asserting that "it's just speculation heaped upon conjecture that these devices are going to be utilized or that they need to be utilized." Tr. at 18:6–18:8.

114.     Based on Defendants' representations, the Court declined to enter emergency relief for Plaintiffs to prevent the use of military-grade crowd control technology.

115.     Just hours later, LMPD fired dozens of rounds of pepper balls into a peaceful crowd attempting to provide medical attention to a protester who had been hit by a speeding police car.

116.     LMPD officers have also continued to engage in mass arrests of protesters, many of whom have had charges subsequently dropped. In total, between May 28, 2020 and July 24, 2020, over 500 protesters have been arrested.[33]

117.     In conducting these arrests, LMPD has continued to target those recording or livestreaming the police response to protesters.[34]

---

[33] Hayes Gardner, *49 days and 435 arrests: Protestors in Breonna Taylor movement unfazed by charges,* Louisville Courier Journal (July 16, 2020, 1:13 p.m.), https://www.courier-journal.com/story/news/2020/07/16/breonna-taylor-protesters-arrests-show-we-mean-business/5434947002/; https://www.wdrb.com/news/76-demonstrators-arrested-after-shutting-down-market-street-as-part-of-breonna-taylor-protests/article_4f0f7000-cde5-11ea-b691-cf4c20dff0d1.html.

[34] Lucas Aulbach, *Livestreamers at Breonna Taylor protests believe Louisville police are targeting them,* Louisville Courier Journal (July 5, 2020, 3:23 p.m.), https://www.courier-journal.com/story/news/local/2020/07/05/louisville-breonna-taylor-protesters-say-police-target-live-streamers/5380284002/.

118.    Many protesters were initially charged with serious offenses, including felony

offenses that carry possible prison time.

119.    For instance, on Tuesday, July 14, 2020, more than 100 protesters arrived at

Attorney General Daniel Cameron's residence in Louisville to protest the Attorney General's

Office's delay in investigating the killing of Breonna Taylor.[35] Eighty-seven of the protesters

were ultimately arrested and charged with Intimidating a Participant in the Legal Process, a

felony.

120.    Three days later, the County Attorney for Jefferson County, Mike O'Connell,

announced that "in the interest of justice and the promotion of the free exchange of ideas," his

office was dismissing all of the 87 felony charges brought against the peaceful protesters.[36]

121.    On August 9, 2020, LMPD announced via its official Twitter account that

protesters would not be allowed to march in public roadways.[37] It stated that protesters who did

march in streets "will be eligible for citation and/or arrest."[38]

122.    On August 25, 2020, LMPD arrested 71 protesters for marching on streets, rather

than on sidewalks or green spaces.[39]

---

[35] *87 charged with felony after protest on AG Daniel Cameron's lawn in Louisville,* WLKY News, Louisville KY (July 14, 2020, 8:46 p m.), https://www.wlky.com/article/protesters-march-through-east-louisville-to-ag-daniel-camerons-home/33313871.

[36] *County attorney dismissing felony charges for protestors involved in sit-in at Cameron's home,* WDRB Louisville, KY (July 17, 2020), https://www.wdrb.com/news/county-attorney-dismissing-felony-charges-for-protesters-involved-in-sit-in-at-camerons-home/article_2a3ce3d2-c851-11ea-bd89-d7f2aba6b1b9 html.

[37] LMPD (@LMPD), "LMPD continue to balance the First Amendment right to protest with the public safety needs of the entire community. For nearly 75 days, Louisville residents have taken to the streets to express their desire for accountability and change," Twitter (Aug. 9, 2020, 4:35 PM), https://twitter.com/LMPD/status/1292560250097336321?s=20.

[38] *Id.*

[39] Jonathan Bullington, Emma Austin, Hayes Gardner, and Bailey Loosemore, *A total of 71 people arrested during Tuesday's protests in Louisville, police say,* Louisville Courier Journal (Aug. 25, 2020), https://www.courier-journal.com/story/news/local/breonna-taylor/2020/08/25/breonna-taylor-protests-64-arrested-louisville-march/5625256002/.

123.    In response to an isolated and random shooting on June 27, 2020, LMPD began enforcing an 11:00 p.m. curfew at Jefferson Square Park, the main site for organized demonstrations.

124.    LMPD officers also violently tore down encampments that protesters had erected in the park, destroying protesters' property. Defendant Schroeder recognized that LMPD officers' actions were "less than our standards" and apologized for the officers' actions.[40]

125.    Upon information and belief, LMPD officers' actions in destroying protesters' property was motivated in part by a desire to punish protesters for exercising their First Amendment rights.

126.    The curfew at Jefferson Square Park remains in effect, despite no further instances of violent conduct.

127.    Protests have continued nearly daily through downtown Louisville as of the date of this filing.

128.    The Kentucky Attorney General's investigation into the killing of Breonna Taylor remains pending. The conclusion of that investigation is likely to trigger larger protests and more aggressive police responses.

129.    On July 16, 2020, the Louisville Metro Council opened an investigation into whether Defendant Fischer and LMPD's conduct in response to the peaceful protests warranted Defendant Fischer's removal from office.[41]

[40] Kelli Dugan and Cox Media National Content Desk, *Police identify victim in fatal Louisville protest shooting; suspect in custody*, Fox 23 News Louisville KY, (June 28, 2020), https://www.fox23.com/news/trending/police-identify-victim-fatal-louisville-protest-shooting-suspect-custody/5BE6L63XLJGRHHDTMHQHPQYVBA/.
[41] Madeline Holcombe, Mirna Alsharif and Elizabeth Joseph, *Louisville mayor to be investigated for handling or protestors and Breonna Taylor's case*, CNN (July 16, 2020, 6:38 a.m.), https://www.cnn.com/2020/07/16/us/louisville-investigation-mayor-taylor-protest/index.html.

*The Dangers of "Less-than-Lethal" Force*

130.    Although termed "nonlethal" or "less-than-lethal" force, military-grade crowd control devices expose targets to serious risks of injury, and even death.

131.    The Sixth Circuit has recognized the significant damage done by using a chemical irritant such as tear gas: the gas "burns the face [and] nostrils, restricts breathing passages, and causes blindness. It causes a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx." *United States v. Mosley*, 635 F.3d 859, 862 (6th Cir. 2011) (internal quotation marks and citations omitted)

132.    Studies have found that individuals exposed to tear gas can continue to experience significant adverse health consequences up to one month after exposure.[42]

133.    Despite being frequently described as non-lethal technology, tear gas can result in death. Recently, a protester in Ohio who was exposed to tear gas and pepper spray died from cardiac arrest.

134.    The use of tear gas during the ongoing Novel Coronavirus – 2019 ("COVID-19") pandemic creates additional risks for those exposed. COVID-19 is spread through respiratory droplets, which are spread by coughing, sneezing, and talking.[43] In addition to burning of the eyes, nose, and mouth, exposure to tear gas can cause increased nasal secretions, immediate coughing, and sneezing.[44]

---

[42] Y.G. Karagama, J.R. Newton, and C.J.R. Newbegin. "Short-term and long-term physical effects of exposure to CS spray." Journal of The Royal Society of Medicine. J.R. Soc. Med. April 2003. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC539444/.

[43] Cornoavirus Disease 2019 (COVID-19) Frequently Asked Questions, https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Spread.

[44] Y.G. Karagama, J.R. Newton, and C.J.R. Newbegin, *Short-term and long-term physical effects of exposure to CS spray,* Journal of The Royal Society of Medicine. J.R. Soc. Med. (April 2003), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC539444/.

135.     Public health experts unanimously agree that wearing a respiratory mask is one of the most important ways of preventing the spread of COVID-19.

136.     Many protesters taking part in the nationwide demonstrations have thus made sure to don masks before leaving their homes.

137.     Because tear gas creates respiratory problems, however, many individuals exposed to tear gas cannot keep their masks on. When large groups of people congregate, remove their masks, and cough or sneeze, the risk of becoming infected with COVID-19 skyrockets.

138.     Because tear gas covers an entire area, it cannot be targeted at specific people. It inherently injures everyone exposed to it.

139.     Flash bangs can also cause serious injury, and even death. Flash bangs detonated too close to a person can cause burns, loss of limbs, and lasting partial hearing loss. In extreme cases, flash bangs can cause asphyxiation, heart attacks, and internal bleeding.

140.     When detonated around gravel or loose glass, flash bangs can send shrapnel flying with enough force to wound those nearby.

141.     Because flash bangs cover entire areas, they cannot be targeted at specific people. Flash bangs inherently place everyone exposed to them at risk of serious physical harm.

142.     Pepper balls and rubber bullets can cause significant injuries, and even death, if they hit a person's face, neck, or torso. Because such projectiles are often fired at velocities similar to live ammunition, they cause severe damage upon impact.

143.     A survey of those struck by such projectiles found that they prove fatal approximately 3% of the time, and cause permanent disability approximately 15% of the time.[45] Seventy-one percent of those struck with rubber bullets or pepper balls suffered severe injuries that required medical intervention.[46]

144.     Although rubber bullets and pepper balls can be targeted, their use at longer ranges is "likely to be inaccurate and indiscriminate."[47]

145.     LMPD's own Standard Operating Procedures recognize that "[t]he potential exists for [such types of ammunition] to inflict injury or death when they strike the face, eyes, and neck."[48]

146.     LRADs are sonic weapons that deploy a high-frequency sound wave at a target.

147.     LRADs, developed by the military for use in the Iraq War in 2004,[49] have been found to cause significant harm to individuals' ear drums and can cause permanent hearing loss.

### *Named Plaintiffs Are Injured by LMPD's Use of Force*

148.     All Named Plaintiffs have been victims of LMPD's disproportionate and violent response to protests.

### *Attica Scott*

149.     Plaintiff Scott first attended demonstrations on May 29, 2020. She and her teenage daughter joined a group of protesters at approximately 5:30 p.m. at 6th Street and W. Jefferson Street.

---

[45] Rohini J. Haar, Vincent Lacopino, Nikhil Ranadive, Madhavi Dandun, Sher D. Wesier, *Death, injury and disability from kinetic impact projectiles in crowd-control settings: a systematic review*, BMJ Journals Open, Vol. 7, Issue 12, (2017), https://bmjopen.bmj.com/content/7/12/e018154.full.
[46] *Id.*
[47] Physical Human Rights. International Network of Civil Liberties Organizations, https://www.inclo net/pdf/lethal-in-disguise.pdf.
[48] SOP § 9.1.10.
[49] Eric Niiler, *Sonic Weapons' Long, Noisy History,* History Stories (August 27, 2018), https://www.history.com/news/sonic-weapons-warfare-acoustic.

150.     Plaintiff Scott attended the demonstrations both to protest the killing of Breonna Taylor and, in her capacity as a Member of the Kentucky House of Representatives, to document what was happening in her community.

151.     Shortly before arriving at the protest, she saw footage online of dozens of LMPD officers in riot gear lined up in front of the YUM! Center.

152.     For several hours after Plaintiff Scott arrived, she observed no violence by other protesters. Instead, members of the group participated in die-ins, marches, and chanting; some protesters chanted "hands up don't shoot."

153.     After approximately three hours, Plaintiff Scott observed a small number of people in the crowd throw plastic water bottles. Other demonstrators immediately denounced the behavior.

154.     Without warning, the line of LMPD officers began advancing quickly with batons drawn, pushing the crowd back.

155.     Defendant Officer J. Johnson noticed Plaintiff Scott recording the scene and approached her, shoving her backward. While backing away, Plaintiff Scott tripped on a box behind her, fell to the ground, and injured her knee.

156.     Plaintiff Scott was able to meet up with her daughter, who informed her she was bleeding and needed medical attention. Plaintiff Scott found a medic tent set up by protesters to get first aid for her knee.

157.     As she received medical attention at the tent, LMPD officers deployed tear gas. An immediate cloud covered the area. Plaintiff Scott saw a thick cloud of smoke. Plaintiff Scott couldn't see anything through the smoke. Her eyes started burning badly, and she used her facemask to help act as a barrier between her face and the smoke.

158.     Plaintiff Scott ran from the tear gas. She ultimately met up with her daughter and her friend, and the three went to their car, where they stayed nearby the protest for another twenty or so minutes.

159.     Plaintiff Scott was also present at the protest on June 15, where she witnessed LMPD using pepper balls indiscriminately against protesters.

160.     On June 18, 2020, Plaintiff Scott filed a formal complaint with LMPD, asking the department to investigate its officers' inappropriate use of tear gas.

161.     LMPD responded by letter dated June 29, 2020, stating that her complaint was being investigated.

162.     She has received no further contact from LMPD since that letter.

*Corbin Smith and Tyler Weakley*

163.     Plaintiffs Smith and Weakley drove into downtown Louisville to go to dinner on the evening of May 31, 2020, but they decided to first stop by the demonstrations to show support for the community.

164.     They arrived downtown and, wearing face masks, began walking towards Broadway Street, where the protest was taking place. On their way, Plaintiffs Smith and Weakley walked past a group of police officers in riot gear who said nothing about a curfew in effect.

165.     Plaintiffs Smith and Weakley saw the group of protesters at approximately 8:30 p.m., thirty minutes before the official curfew that had just been implemented was schedule to begin.

166.     For fifteen minutes, Plaintiffs Smith and Weakley observed protesters marching and chanting peacefully.

167.     Then, without warning or justification, LMPD officers began deploying flash bangs and tear gas into the crowd, causing a panicked stampede away from the police line.

168.     Plaintiffs Smith and Weakley were close to a tear gas cannister that exploded. Plaintiffs Smith and Weakley both inhaled the gas and immediately began choking. For several minutes, Plaintiffs Smith and Weakley both felt as if they were suffocating.

169.     Plaintiff Weakley observed a police car drive into the crowd of protesters on a street perpendicular to Broadway Street, further exacerbating the chaos.

170.     Tear gas began filling the air, obscuring visibility in the area. Nonetheless, officers began firing pepper balls and rubber bullets indiscriminately.

171.     Plaintiff Smith felt a pepper ball fly close to his ear, prompting him and Plaintiff Weakley to start running back to their car.

172.     On the way, Plaintiffs Smith and Weakley encountered a line of approximately 40 LMPD officers in riot gear.

173.     Plaintiff Smith begged the officers to let them get to their car. The officers responded by drawing and training their weapons on both Plaintiff Smith and Plaintiff Weakley.

174.     Both Plaintiff Smith and Plaintiff Weakley then slowly raised their hands above their heads and kneeled on the ground. Both feared that they were about to be shot, perhaps fatally.

175.     Although both Plaintiff Smith and Plaintiff Weakley had already submitted, LMPD Officers John Does #1-5 charged and tackled Plaintiff Smith to the ground, slamming him into the road. LMPD Officers John Does #6-9 and LMPD Officer Jane Doe #1 tackled Plaintiff Weakley and pinned her to the ground.

176. Plaintiff Smith, surprised by the use of force, asked why they were being placed under arrest. Defendant Officer John Doe #1 responded by calling him a domestic terrorist and pressing him further into the ground.

177. Defendant Officer John Doe #2 placed his knee at the base of Plaintiff Smith's neck and pushed down, further limiting Plaintiff Smith's ability to breathe. Echoing the haunting words of George Floyd, Plaintiff Smith began pleading that he could not breathe.

178. Defendant Officers John Does #1, 3, 4, and 5 then began to beat Plaintiff Smith with their batons, striking his back and his legs.

179. Plaintiff Smith feared that he would be killed by LMPD Officers John Does #1-5, joining the ranks of countless unarmed Black people killed by aggressive policing.

180. After a few minutes, Defendant Officers John Does #1-9 and Defendant Officer Jane Doe #1 pulled up Plaintiff Smith and Plaintiff Weakley and placed them on the sidewalk curb. Defendant Officer John Doe #3 pulled Plaintiff Smith's face mask off without explanation.

181. Defendant Officers John Does #1-9 and Defendant Officer Jane Doe #1 then placed both Plaintiff Smith and Plaintiff Weakley under arrest. Neither Plaintiff was told on what basis they were being arrested.

182. Plaintiff Smith was ultimately charged with one count of misdemeanor unlawful assembly and one count of misdemeanor curfew violation. Plaintiff Weakley was charged with one count of felony rioting.

183. LMPD's conduct profoundly impacted both Plaintiffs Smith and Weakley.

184. As a result of the attack, Plaintiff Smith sustained cuts and bruises to his knees, legs, and back.

185.     Plaintiff Smith, fearful of further police misconduct, did not attend any further protests for approximately one week. He has since returned to protests in Louisville.

186.     At every protest he has attended since, he remains afraid that LMPD officers will react as violently as they did on May 31, 2020.

187.     Plaintiff Weakley has been traumatized by the events of that night; she has refused to attend any further demonstrations out of fear. She attended one celebration on June 19, 2020, but she began to feel anxious as the sun went down; she left the event early for fear of police crackdown.

*Willa Tinsley*

188.     Plaintiff Tinsley first joined the protests on May 28, 2020. She had learned about the demonstrations on social media, and drove downtown to join at approximately 10:00 p.m.

189.     When Plaintiff Tinsley arrived at the protests, she observed LMPD officers in riot gear advancing on the protesters. Almost immediately, she saw flash bangs exploding by her and heard pepper balls being fired.

190.     A tear gas cannister exploded near Plaintiff Tinsley, who immediately could not open her eyes or breathe because of the pain. Disoriented, she began to run in the direction of the crowd, attempting to leave the area and find her car.

191.     Eventually, another protester who saw Plaintiff Tinsley helped wash out her eyes. Plaintiff Tinsley then began to search for her car to go home.

192.     As she searched, she encountered another protester who was also looking for his vehicle. As they walked, they encountered LMPD Officers John Does #10-13.

193. Defendant Officers John Does #10-13 began yelling at Plaintiff Tinsley and the other protester to clear the area. Plaintiff Tinsley responded that they were looking for her car. The other protester told the officers that they were on a public sidewalk.

194. Defendant Officers John Does #10-13 responded by firing pepper balls at Plaintiff Tinsley and the other protester—from just a few feet away. Plaintiff Tinsley was shot in the arm, torso, and leg at close range.

195. Plaintiff Tinsley and the other protester turned and began to run away. Defendant Officers John Does #10-13 continued to fire pepper balls at them, hitting Plaintiff Tinsley on the back and on her legs.

196. In total, Defendant Officers John Does #10-13 discharged approximately 30 rounds of pepper balls at Plaintiff Tinsley and her friend, striking Plaintiff Tinsley approximately 10 times.

197. She sustained significant bruising on her back and legs from the shots.

198. For several days following the incident, Plaintiff Tinsley could not use her arm because of severe pain.

199. Plaintiff Tinsley joined a demonstration on the evening of May 31, 2020. She had learned about the event on social media.

200. She joined the march downtown around 7:00 p.m. When she arrived, the scene was wholly peaceful; protesters were chanting and marching with signs.

201. The protesters were not causing any damage to surrounding property.

202. Despite the peaceful nature of the protesters, Plaintiff Tinsley heard LMPD officers stating that the demonstration was an unlawful gathering.

203.     Plaintiff Tinsley then heard the explosion of tear gas cannisters and saw clouds of smoke filling the air. She saw a flash bang detonate near her.

204.     The tear gas blinded her and burned her nose and throat, while the flash bang impaired her hearing and caused her to grow disoriented.

205.     Through the cloud of smoke, pepper balls began whizzing by her. Plaintiff Tinsley was struck multiple times in the arms and legs with projectiles, causing significant bruising.

206.     Disoriented, and unable to see or hear well, Plaintiff Tinsley stumbled onto a side street. Other protesters poured milk in her eyes to alleviate the burning.

207.     Eventually, scared to be alone in the midst of the widespread police violence, she found her way to a group of approximately 40 other protesters.

208.     A group of LMPD officers found the protesters and began beating them with batons, ultimately arresting the whole group.

209.     Plaintiff Tinsley was held in jail for approximately 30 hours and ultimately charged with one count of misdemeanor curfew violation.

210.     While Plaintiff Tinsley was in jail, an LMPD officer told her, in sum and substance: "We're trying to arrest you guys so you have to spend a night in jail and learn your lesson."

211.     At another point, an LMPD officer told her directly: "This is to teach you a lesson."

212.     Since then, Plaintiff Tinsley has been wary of attending further demonstrations. She has only attended a handful of protests, and never stays after sunset, out of a fear of further police force.

213.     For example, Plaintiff Tinsley planned on attending protests on June 15, 2020. After she learned LMPD was using an LRAD, however, Plaintiff Tinsley, who has hearing problems, decided not to attend the protest.

*Stevie Schauer*

214.     Plaintiff Schauer joined a small group of young people on the afternoon of June 15, 2020 for a march through downtown Louisville.

215.     Immediately, Plaintiff Schauer noticed that the police presence at the gathering was much more aggressive than on prior days of protests she had attended—even though there were only approximately 50 people protesting, a smaller gathering than the previous protests she had attended.

216.     Plaintiff Schauer observed an LMPD helicopter circling protesters from above.

217.     As the group of protesters, including Plaintiff Schauer, moved south on 9th Street from W. Jefferson Street towards W. Chestnut Street, they encountered a line of LMPD officers in riot gear—with their batons out—blocking off the street.

218.     LMPD officers yelled that the crowd needed to move back.

219.     Plaintiff Schauer immediately left the street and got onto the sidewalk, where no officers were present. Other individuals—who, upon information and belief, had not participated in the demonstrations—were also standing on the sidewalk without issue.

220.     In an effort to document what was happening, Plaintiff Schauer took out her cell phone and began to record the LMPD officers.

221.     Almost immediately after she began recording, LMPD Officers John Does #14-15 broke from the line of riot officers and approached her quickly.

222.    Defendant Officer John Doe #14 yelled "move back" and immediately shoved Plaintiff Schauer to the ground with enough force to bruise her shoulder and twist her ankle.

223.    The shove also caused Plaintiff Schauer's cell phone and eyeglasses to shatter.

224.    Plaintiff Schauer—who has a chronic condition that causes joint sensitivity— feared that she had badly injured her shoulder or ankle.

225.    Plaintiff Schauer's friend, who was also at the demonstration, tried to walk over to Plaintiff Schauer to check on her. LMPD officers began firing pepper balls at the friend's feet.

226.    Defendant Officers John Does #14-15 then pushed Plaintiff Schauer to the ground and used a plastic tie to bind her wrists.

227.    The plastic tie was coiled tightly enough to bruise her wrists.

228.    Plaintiff Schauer was placed under arrest at approximately 7:30 p.m. She was kept in jail for 10 hours and ultimately charged with one count of felony rioting and one count of misdemeanor unlawful assembly.

229.    At the precinct, an LMPD officer asked her "Was it worth it? You dirtied your record for this."

230.    Plaintiff Schauer had to keep her ankle wrapped in an elastic bandage for a week to heal the injury she sustained in the course of her arrest.

231.    Since this experience, Plaintiff Schauer has been too afraid to participate in further protests. Though she wishes to continue marching in support of the movement for police accountability, she fears further physical violence if she participates in any additional demonstrations.

232.    To date, she feels nervous and anxious around police officers.

*Kayla Meisner*

233.     Plaintiff Meisner attended a demonstration on the evening of May 29, 2020.

234.     The group of protesters was peacefully chanting and marching through downtown. As she marched, Plaintiff Meisner saw tanks lined up along the Second Street Bridge.

235.     The protest continued down to the courthouse. After marching around the courthouse several times, Plaintiff Meisner saw police officers stationed on top of buildings, and she saw that police had set up barricades and brought out tanks and police vans.

236.     Then, protesters were met by a phalanx of approximately 200 LMPD officers in riot gear and armed with batons, guns, and tear gas.

237.     LMPD officers began erecting barricades to prevent people from leaving the area.

238.     LMPD officers then threatened to fire into the trapped crowd unless the group sat down.

239.     With no options, the group—including Plaintiff Meisner—sat down.

240.     Nonetheless, LMPD officers began firing flash bangs and pepper balls and launching tear gas indiscriminately into the seated crowd, prompting a panicked retreat.

241.     The wave of tear gas hit Plaintiff Meisner; she was instantly unable to see or breathe from the pain of the irritant.

242.     Plaintiff Meisner had to be led away from the scene by a friend; together, they hid in a parking garage nearby as LMPD officers continued to launch tear gas into the dispersing crowd.

243.     Plaintiff Meisner then observed LMPD officers open fire on a group of local journalists who were covering the event.

244.     Though she continues to attend demonstrations, Plaintiff Meisner fears further police use of force against peaceful demonstrators. She feared for her life during the events of May 29, and no longer has any trust for public officials or LMPD. She believes that LMPD will retaliate against protesters who are trying to stand up for what is right.

*Patrick Moore*

245.     Plaintiff Patrick Moore began attending demonstrations on May 28, 2020. He attended further marches on May 29, May 30, and May 31, 2020.

246.     On June 1, 2020, Plaintiff Moore learned of a march scheduled to protest both the killing of Breonna Taylor and the killing of David McAtee. He drove downtown to join the march at approximately 5:00 p.m.

247.     Plaintiff Moore joined the protest at Jefferson Square Park. The group marched from the park to the intersection of 26th and Broadway, where David McAtee was shot.

248.     The protesters then marched back to Jefferson Square Park. For the entirety of the march, protesters remained peaceful.

249.     After returning to the park, a number of protesters decided to stay on and continue peaceful demonstrations, such as chants.

250.     Groups of LMPD officers dressed in riot gear began to congregate on the streets around the park.

251.     At approximately 10:00 p.m., LMPD officers announced that the gathering in the park was unlawful. Within minutes of making the announcement, LMPD officers began advancing on the gathering and firing pepper balls indiscriminately into the crowd.

252.     Fearful of the barrage of projectiles, Plaintiff Moore began to move away from the groups of officers. As he retreated, he turned to look back towards the line of officers.

253.    At that moment, he felt a sharp impact in his left eye, causing immense pain. Immediately, Plaintiff Moore lost vision in his eye.

254.    Plaintiff Moore was able to receive medical attention over the weeks following being shot; doctors diagnosed him with traumatic hyphema and a break in his retina.

255.    Plaintiff Moore underwent three intrusive surgeries to repair his eye. He was forced to spend two weeks prone, confined to bed, to avoid worsening his condition.

256.    To date, Plaintiff Moore has not fully recovered his vision. He may never recover full vision out of his left eye.

257.    Since being shot in the eye by LMPD officers, Plaintiff Moore has been too scared to participate in further protests. He has not attended a single march, action, or other demonstration in the three months since he was shot, though he wishes to continue to attend such protests.

*Kentucky Alliance Against Racial and Political Repression*

258.    As part of its work combatting racial discrimination in policing, Plaintiff KAARPR has been involved in coordinating and attending many of the recent demonstrations in Louisville.

259.    Earlier this spring, Plaintiff KAAPR launched a campaign related to the killing of Breonna Taylor calling for the arrest of those officers responsible for her death, as well as systemic reforms that will prevent excessive use of police force in the future. These include reforms to LMPD's use of force policies, as well as systems that allow for meaningful community oversight of the LMPD.

260.    Plaintiff KAARPR's members have attended demonstrations and peacefully protested in Louisville between May 28, 2020 and the present.

261. Many of Plaintiff KAARPR's members themselves been victims of police abuse during the protests; members who were protesting peacefully have been tear-gassed, shot with rubber bullets, pushed and hit with batons, and experienced flash bangs and LRAD usage.

262. As a result, Plaintiff KAARPR has been forced to divert resources into purchasing first aid supplies, as well as milk and water to treat those injured at protests. Additionally, Plaintiff KAARPR has hired individuals to provide security, and purchased security goggles, food, masks, and cleaning supplies for members attending protests.

263. On at least one occasion, during the course of a protest, LMPD directed sanitation officials to collect Plaintiff KAARPR's supplies, thus preventing Plaintiff KAARPR from using them and requiring Plaintiff KAARPR to purchase additional supplies.

264. Altogether, Plaintiff KAARPR has spent over $10,000 dollars in these and other purchases for protests responding to police violence.

265. Plaintiff KAARPR has also had to expend significant staff time responding to the excessive use of force by police at the protests.

266. Plaintiff KAARPR has expended time and money to organize additional protests directed towards addressing police use of force at previous protests.

267. Plaintiff KAARPR has also spent staff time participating in various public education events related to the excessive use of police force at the protests. For example, on several occasions, Plaintiff KAARPR's leadership has responded to local press inquiries regarding the use of excessive force against protestors. Likewise, Plaintiff KAARPR has launched a campaign, encouraging protestors to live stream marches and demonstrations, as a means of recording acts of police violence.

268. The money and staff time Plaintiff KAARPR has spent on responding to excessive police violence has prevented it from conducted other activities it had planned to engage in.

269. At the beginning of the year, Plaintiff KAARPR had planned to conduct public education events, including various panels and speakers, and organize public rallies related to the lack of adequate education for children attending schools in Louisville's West End, as well as the need for additional money in the City Budget for the education of Black and Brown children in Louisville.

270. As a result of the increased staff time need to treat protestors injured by police violence, purchase supplies to treat these protestors after they have been injured, respond to media and public inquiries regarding the use of police force, as well as organize additional protests in response to LMPD's excessive use of force against protestors, Plaintiff KAARPR has been unable to organize these events or otherwise work towards improving education access and education funding.

271. LMPD's use of force against peaceful protesters to shut down demonstrations has also frustrated Plaintiff KAARPR's mission to (a) ensure that public fora for free speech and debate regarding issues of human and constitutional rights remain available to all people; (b) eliminate police abuse against peaceful, private civilians; and (c) bring together community members to speak out on issues related to abusive police practices.

## CLASS ACTION ALLEGATIONS

272. Plaintiffs seek prospective injunctive relief on behalf of a class of similarly situated individuals under Rule 23(b)(1)(A) and (b)(2) of the Federal Rules of Civil Procedure ("Plaintiff Class"). The Plaintiff Class comprises (a) all Peaceful Protesters who participated in a

protest activity in the City of Louisville at which police utilized tear gas, flash bangs, long-range acoustic devices, pepper balls, rubber bullets, impact rounds, batons, or other comparable crowd control weaponry ("Crowd Control Weaponry") between May 28, 2020 and the date of this Amended Complaint, and (b) all people who will be Peaceful Protestors in the City of Louisville in the future or who would be Peaceful Protesters in the City of Louisville in the future but for their fear that LMPD officers will unnecessarily utilize Crowd Control Weaponry. A Peaceful Protestor is defined as an individual who, while in engaging in protest activities, poses no immediate, specific, and articulable threat to the safety of others and is not actively resisting arrest.

273.    Louisville's unnecessary and unreasonable use of Crowd Control Weaponry poses an immediate threat to the Plaintiff Class's First Amendment right to peacefully protest in a public forum and Fourth Amendment right to be free from the use of excessive force.

274.    The Plaintiff Class is so numerous that joinder of all individual members would be impracticable. Thousands of Peaceful Protesters regularly participate in protests related to police practices in Louisville and will continue to do so.  According to one report, at least 300 individuals gathered on August 25, 2020 to protest Ms. Taylor's killing.[50]  Protestors on June 1, 2020 numbered over 1,000.[51]

275.    The questions of law and fact presented by Plaintiffs are common to all members of the Plaintiff Class. Among others, the questions common to the Plaintiff Class include:

---

[50] Hayes Gardner, Emma Austin, Lucas Aulbach and Joel Shannon, *71 people arrested in Louisville in a day of demonstration over the death of Breonna Taylor,* USA Today (Aug. 25, 2020), https://www.usatoday.com/story/news/nation/2020/08/25/breonna-taylor-louisville-protest-until-freedom/5631870002/.

[51] Lucas Aulbach, *From tense to touching moments, here's how Louisville's protests went down Sunday night,* Louisville Courier Journal (Jun. 1, 2020), https://www.courier-journal.com/story/news/local/2020/06/01/breonna-taylor-protest-what-happened-sunday-louisville/5305156002/.

a. Whether the use of Crowd Control Weaponry on Peaceful Protesters causes an immediate end to peaceful demonstrations and actually stifles free speech and peaceful assembly on matters of significant public importance;

b. Whether the use of Crowd Control Weaponry on Peaceful Protesters is likely to deter a person of ordinary firmness from participating in further protests or demonstrations;

c. Whether the use of Crowd Control Weaponry on Peaceful Protesters creates a significant risk of serious bodily injury;

d. Whether the use of Crowd Control Weaponry on Peaceful Protesters is unnecessary and/or excessive to maintaining public safety;

e. Why LMPD has chosen and continues to choose to use Crowd Control Weaponry on Peaceful Protesters;

f. Whether LMPD officers have issued or will issue any warnings before employing Crowd Control Weaponry on Peaceful Protesters;

g. Whether LMPD has attempted or will attempt to use other forms of crowd control before resorting to Crowd Control Weaponry; and

h. Whether the City of Louisville has ratified the LMPD's conduct, either through its express statements or by acquiescence.

276. Common issues of law and fact predominate any individual issues.

277. All members of the Plaintiff Class are likely to be subjected to the same practices and policies of the City of Louisville.

278.     Plaintiffs' claims for prospective relief are typical of the Plaintiff Class.

Significant protests continue to occur in the City of Louisville, and both Plaintiffs and members

of the Plaintiff Class are reasonably fearful that LMPD will continue to use Crowd Control

Weaponry in an unconstitutional manner. Plaintiffs and members of the Plaintiff Class are

subject to the chilling effect of these uses of force on their willingness to assemble to peacefully

protest.

279.     The entire Plaintiff Class will benefit from the injunctive relief sought herein.

280.     Plaintiffs have no conflict of interest with any members of the Plaintiff Class, are

committed to vigorous prosecution of all claims on behalf of members of the Plaintiff Class, and

will fairly and adequately protect the interests of the Plaintiff Class.

281.     A class action is superior to any other method for the fair and efficient resolution

of this legal dispute, as joinder of all members of the Plaintiff Class is impracticable. Further, the

prosecution of thousands of individual actions by individual members of the Plaintiff Class

would create the substantial risk of inconsistent or varying adjudications, which would establish

potentially incompatible standards of conduct for Defendant City of Louisville.

282.     The Plaintiff Class is represented by competent counsel.

## COUNT I
### First Amendment Free Speech and Assembly – 42 U.S.C. § 1983
### (Against All Defendants)

283.     Plaintiffs and the Plaintiff Class incorporate the allegations in paragraphs 1-260

by reference as if fully set forth herein.

284.     At all relevant times, Defendant Officers, Defendant Fischer, Defendant

Schroeder, and Defendant Chavous have acted—and continue to act—under color of state law.

285. Plaintiffs and members of the Plaintiff Class engaged in and/or wish to engage in constitutionally protected speech and assembly by participating in peaceful protests about the killings of unarmed Black people at the hands of police officers.

286. Defendant Officers engaged in use of Crowd Control Weaponry, and the other forms of excessive force detailed above, causing injuries to Plaintiffs and members of the Plaintiff Class.

287. Defendants Schroeder, Fischer, and Chavous approved of and ratified the conduct of Defendant Officers and other LMPD officers who used such Crowd Control Weaponry or other forms of excessive force.

288. Defendants Fischer, Schroeder, and Chavous are final policymakers for all matters related to LMPD's conduct. Their decisions regarding LMPD matters constitute the official policies of Defendant City of Louisville.

289. Defendants' conduct is sufficient to deter a person of ordinary firmness from participating in further protests for fear of being subject to similar force, and did in fact actually deter Plaintiffs and members of the Plaintiff Class from participating in further demonstrations.

290. Plaintiffs and members of the Plaintiff Class reasonably fear the continued use of such weaponry at future protests.

291. Upon information and belief, certain Plaintiffs and members of the Plaintiff Class have been actually chilled in their exercise of protected First Amendment rights.

292. LMPD officers have continued to use Crowd Control Weaponry on protesters, including members of the Plaintiff Class, as recently as August 25, 2020.

293. Defendants City of Louisville, Fischer, Schroeder, and Chavous have continued to approve LMPD's use of force, both expressly and by their acquiescence.

294.     As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained the physical and emotional damages detailed above.

295.     As a direct and proximate result of LMPD's continued use of tear gas and flash bangs as approved by Defendant City of Louisville, Plaintiffs and members of the Plaintiff Class continue to fear participating in peaceful protests.

**COUNT II**
**Fourth Amendment Excessive Force – 42 U.S.C. § 1983**
**(Against All Defendants)**

296.     Plaintiffs and the Plaintiff Class incorporate the allegations in paragraphs 1-260 by reference as if fully set forth herein.

297.     At all relevant times, Plaintiffs and members of the Plaintiff Class have been peaceful and nonviolent protesters who did not disobey or refuse any police order.

298.     Defendant Officers nonetheless used Crowd Control Weaponry on Plaintiffs and members of the Plaintiff Class.

299.     By using Crowd Control Weaponry on Plaintiffs and members of the Plaintiff Class, and physically striking and tackling Plaintiffs, Defendant Officers subjected Plaintiffs and members of the Plaintiff Class to excessive force.

300.     Defendants Schroeder, Fischer, and Chavous approved of and ratified the conduct of Defendant Officers and other LMPD officers who used such force.

301.     Defendants Fischer, Schroeder, and Chavous are final policymakers for all matters related to LMPD's conduct. Their decisions regarding LMPD matters constitute the official policies of Defendant City of Louisville.

302.     As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Plaintiff Class have sustained the injuries detailed above.

303. LMPD officers have continued to use Crowd Control Weaponry on protesters, including members of the Plaintiff Class, as recently as August 25, 2020.

304. Defendants City of Louisville, Fischer, Schroeder, and Chavous have continued to approve LMPD's use of force, both expressly and by acquiescence.

305. Plaintiffs and members of the Plaintiff Class remain active advocates against police brutality and intend to peacefully protest again within the coming weeks.

306. As a direct and proximate result of LMPD's continued use of Crowd Control Weaponry, and other forms of physical force as approved by Defendants City of Louisville, Fischer, Schroeder, and Chavous, Plaintiffs and members of the Plaintiff Class will likely be further harmed if they participate in peaceful protests.

## COUNT III
### Common Law Battery
### (Against Defendant City of Louisville and Defendant Officers)

307. Plaintiffs and the Plaintiff Class incorporate the allegations in paragraphs 1-260 by reference as if fully set forth herein.

308. By deploying Crowd Control Weaponry, live ammunition, and other projectiles at Plaintiffs and members of the Plaintiff Class, Defendant Officers subjected Plaintiffs and members of the Plaintiff Class to a forcible physical touching.

309. At no point did Plaintiffs or the members of the Plaintiff Class consent, acquiesce, or otherwise agree to the touching as detailed above.

310. The forcible touching as detailed above was in no other way privileged.

311. As a direct and proximate result of Defendant Officers' forcible touching, Plaintiffs and members of the Plaintiff Class suffered the damages herein alleged.

312.     Defendant City of Louisville, as the employer of all LMPD officers, is responsible and liable for torts committed by all LMPD officers under the doctrine of *respondeat superior*.

**COUNT IV**
**Common Law Assault**
**(Against Defendant City of Louisville and Defendant Officers)**

313.     Plaintiffs and the Plaintiff Class incorporate the allegations in paragraphs 1-260 by reference as if fully set forth herein.

314.     By threatening to deploy and in fact deploying Crowd Control Weaponry, live ammunition, and other projectiles at Plaintiffs and members of the Plaintiff Class, Defendant Officers threatened to subject Plaintiffs and members of the Plaintiff Class to a forcible physical touching.

315.     At no point did Plaintiffs or the members of the Plaintiff Class consent, acquiesce, or otherwise agree to the touching as detailed above.

316.     As a direct and proximate result of Defendant Officers' forcible touching, Plaintiffs and the members of the Plaintiff Class suffered the damages herein alleged.

317.     Defendant City of Louisville, as the employer of all LMPD officers, is responsible and liable for torts committed by all LMPD officers under the doctrine of *respondeat superior*.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Plaintiff Class respectfully request that this Court certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and enter judgment in their favor and against Defendants as follows:

a.    Permanently enjoining Defendants City of Louisville, Fischer, Schroeder, and Chavous, as well as LMPD's officers, employees, and agents, from the use of Crowd Control Weaponry on Peaceful Protesters;

b.   Requiring Defendant City of Louisville to promulgate official policies restricting the use of Crowd Control Weaponry to situations when a police officer or other person faces an imminent risk of serious physical danger;

c.   Awarding such damages to Plaintiffs as will fully compensate them for their loss of rights, as well as their physical and emotional injuries, owing to Defendants' conduct;

d.   Awarding punitive damages against the Officer Defendants and Defendants Fischer, Schroeder, and Chavous;

e.   Awarding reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988; and,

f.   Granting such other relief as may be just and proper.

Dated:          September 11, 2020
                Louisville, KY


                                        Respectfully submitted,


                                        /s/ Ashok Chandran
Ashok Chandran*                         Corey Shapiro
Christopher Kemmitt*                     Heather Gatnarek
Ajmel Quereshi*                         Mashayla Hays
Kristen Johnson**                       Aaron Tucek
NAACP LEGAL DEFENSE &                    ACLU OF KENTUCKY FOUNDATION, INC.
EDUCATIONAL FUND, INC.                   325 W. Main St. Suite 2210
40 Rector St., 5th Floor                Louisville, KY 40202
New York, NY 10006                      (502) 581-9746
Tel.: (212) 965-2200                    corey@aclu-ky.org
Fax.: (212) 226-7592                    heather@aclu-ky.org
achandran@naacpldf.org                  mashayla@aclu-ky.org
ckemmitt@naacpldf.org                   aaron@aclu-ky.org
aquereshi@naacpldf.org
kjohnson@naacpldf.org                   Earl S. Ward*
                                        O. Andrew F. Wilson*
                                        Samuel Shapiro*
                                        Andrew K. Jondahl*
                                        EMERY CELLI BRINCKERHOFF
                                        ABADY WARD & MAAZEL LLP
                                        600 Fifth Avenue, 10th Floor
                                        New York, NY 10020
                                        (212) 763-5000
                                        eward@ecbawm.com
                                        awilson@ecbawm.com
                                        sshapiro@ecbawm.com
                                        ajondahl@ecbawm.com

                                        *admitted pro hac vice
                                        **pro hac vice application pending