# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| ATTICA SCOTT, CORBIN SMITH, KAYLA MEISNER, TYLER WEAKLEY, STEVIE SCHAUER, WILLA TINSLEY, PATRICK MOORE, and the KENTUCKY ALLIANCE AGAINST RACIAL AND POLITICAL REPRESSION, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br>  v.<br><br>LOUISVILLE/JEFFERSON COUNTY METRO GOVERNMENT, GREG FISCHER, ROBERT SCHROEDER, LaVITA CHAVOUS, and LOUISVILLE METROPOLITAN POLICE DEPARTMENT OFFICER "J." JOHNSON, LOUISVILLE METROPOLITAN POLICE DEPARTMENT OFFICERS JOHN DOES #1-#15 and JANE DOE #1,<br><br>    Defendants. | Civil Action No. 3:20-cv-0535 (BJB) (CHL) |

## <u>THIRD JOINT STATUS REPORT</u>

Plaintiffs Attica Scott, Corbin Smith, Kayla Meisner, Tyler Weakley, Stevie Schauer, Willa Tinsley, Patrick Moore, and the Kentucky Alliance Against Racial and Political Repression, on behalf of themselves and all other similarly situated, (together, "Plaintiffs") and Defendants Louisville/Jefferson County Metro Government, Greg Fischer, Robert Schroeder, and LaVita Chavous (collectively, "Defendants"), by undersigned counsel, submit this second joint status report on the status of the parties' discussions pursuant to the Court's Order dated March 14, 2022. *See* ECF No. 82.

1

I. **Procedural Background**

At Plaintiffs' request, this Court scheduled a discovery conference on March 10, 2022, to discuss ongoing disputes between the parties as to the completeness of each party's discovery responses. Prior to the conference, the parties were able to resolve Defendants' remaining concerns about Plaintiffs' productions, but could not reach agreement as to deficiencies Plaintiffs asserted regarding Defendants' production. At the March 10 conference, Plaintiffs thus presented their view that Defendants' productions were delayed to the point of deficiency in three broad categories of documents: (1) Body-Worn Camera (BWC) footage; (2) communications; and (3) internal records generated and/or maintained by the Louisville Metropolitan Police Department (LMPD). Defendants did not dispute the discoverability of these materials but indicated that delays were due to the "complexity of retrieving information responsive to the requests and the volume of information at issue to be reviewed and produced." ECF No. 82 at 2. Defendants then indicated "that they ha[d] an additional 100 hours of footage that they can commit to producing in the next two weeks . . . ." *Id.* That production was not made at that time.

After hearing arguments, the Court directed the parties to have an in-person meeting with counsel, a representative from Defendants' IT department, a representative from Defendants' e-discovery vendor, an LMPD representative, and a representative from Plaintiffs' e-discovery vendor. That meeting took place on April 21, 2022, and the parties were able to make progress in resolving some of their disputes. Plaintiffs followed up by email on April 26, 2022, to provide additional information about several of the documents and/or pieces of information they had requested at the meeting. Defendants responded to portions of Plaintiffs' email on April 29, 2022. The parties exchanged additional emails on May 6, 2022, and May 11, 2022, and talked over certain issues during a phone call on May 17, 2022 and May 20, 2022.

Consistent with the Court's previous Order, the parties write below to provide a summary of where materials or information remain outstanding. ECF No. 82 at 4.

## II.    Remaining Document Productions

Although the parties have made progress, they have not been able to resolve disputes in each of the three categories of materials previously discussed with the Court: BWC footage, communications, and internal LMPD records.

### A.    BWC Footage[1]

In their first consolidated discovery requests issued on November 25, 2020, Plaintiffs requested all video recordings, including BWC footage, depicting: (1) LMPD officers using Crowd Control Weaponry (a term defined to include tear gas, flash bangs, pepper balls, batons, and other similar types of less-than-lethal force); (2) protesters destroying property; (3) protesters throwing objects; (4) LMPD officers using force on protesters.[2] Based on Defendants' representations that the total universe of potentially responsive footage totaled over 1800 hours of material, Plaintiffs agreed to prioritize productions of BWC footage tagged with either of two

---

[1] As the Court may recall from discussions during the March 10, 2022, conference, BWC footage consists of individual videos recorded on body cameras worn by LMPD officers. The videos vary wildly in size and content, with some videos lasting only seconds and others lasting hours. Some videos contain intense video of police and protester interaction, but most videos contain little to no information that is material to the allegations in this case. Because the videos also contain sound, the file sizes of many of these files exceed five gigabytes of storage space. Individual videos of these size require specialized transfer and storage devote efforts and expenses. Further, videos are tagged with certain events that permit the parties to limit their searches. However, while those tags suggest to the user that video covers a certain event, the events depicted in many of those videos provide no information. In sum, when discussing BWC generally, tags, and numbers of files, it is important for the Court to understand that not all BWC is equal, easily accessible, and quickly producible. Defendants and defense counsel are addressing storage and file accessibility challenges through counsel's significant investment of a dedicated storage option for files of this size, but Defendants are still dealing with infrastructure issues outside of their control, which create transmission challenges for these and other video and audio files implicated in this case.

[2] *See* Pls.' First Consolidated Discovery Requests, Doc. Request No. 5 ("Any and all videos, including but not limited to videos recorded using . . . body-worn cameras . . . that show the use of Crowd Control Weaponry at any demonstration in Louisville between May 28, 2020, and the present."); Doc. Request No. 7 (All documents, including . . . video recordings, showing and/or referring to demonstrators destroying property during the demonstrations in Louisville between May 28, 2020 and the present."); Doc. Request No. 8 ("All documents, including . . . video recordings, showing and/or referring to demonstrators throwing objects during the demonstrations in Louisville between May 28, 2020 and the present."). Plaintiffs also sought documents, including videos, showing injuries to officers and uses of force more broadly. Doc. Requests Nos. 9, 10.

labels: "Restrictions – Special Team" and "Special Circumstances," and limited their request to six of the dates about which the Amended Complaint contained allegations: May 28, 2020, May 29, 2020, May 30, 2020, June 1, 2020, June 15, 2020, and August 25, 2020.

Defendants have made five rounds of productions of BWC footage to respond to these requests. First, on February 9, 2021, Defendants produced four videos from different dates and times. Second, after intervention from this Court, Defendants produced a approximately 50 videos on December 16, 2021, all of which was generated by LMPD officers on May 29, 2020. Third, on January 14, 2022, Defendants produced 49 videos generated at various dates and times. Fourth, on May 16, 2022, Defendants produced nine videos, all generated by LMPD officers on May 28, 2020. Fifth, on May 24, Defendants produced approximately 34 videos, all generated by LMPD officers on May 28, 2020.

On May 6, 2022, Defendants for the first time provided Plaintiffs with logs of the total volume of footage tagged with either of the two proposed labels for each of the six requested dates. During the parties' call on May 17, 2022, counsel for Defendants indicated that he did not know which of the videos listed on those logs had been produced on February 9, 2021, or December 16, 2021. Upon Plaintiffs' review of the provided logs, it appears that the prior rounds of production include BWC footage not contained in the logs produced on May 6, 2022.[3] Further, it appears that Defendants' productions to date have not included several videos referenced on the log that were generated on May 29, 2020. Plaintiffs are in the process of identifying all the unlisted videos included in prior productions and all of the listed videos that have not yet been received. Defendants do not plan to object to the breadth or burden of producing the videos contained in the May 6, 2022, logs. Once Plaintiffs identify the unlisted

---

[3] Ostensibly, these videos were not tagged with either "Restrictions – Special Team" or "Special Circumstances," and thus do not appear on the produced logs.

videos included in the prior productions, they will confer with Defendants regarding any additional tags that may contain responsive footage.

The parties thus request the Court so order the following schedule for completion of BWC discovery:

- Within seven (7) days of the Court's order, Plaintiffs shall provide Defendants with a list of outstanding files of BWC footage that are logged on the May 6, 2022 logs to be produced ("Production List") and a separate list of any BWC video files previously produced that are not listed on the May 6, 2022 logs and that Plaintiffs contend have relevant and discoverable footage ("Tag List");

- Within thirty (30) days of receiving the Tag List from Plaintiffs, Defendants shall provide Plaintiffs with all of the tags applied to each video on the Tag List.

- Within sixty (60) days of receiving the Production List from Plaintiffs, Defendants shall produce all of the files identified in the Production List to Plaintiffs.

- Within fourteen (14) days of receiving all of the tags associated with the files on the Tag List, Plaintiffs shall identify for Defendants any additional tags which Plaintiffs believe contain responsive information;

- Within fourteen (14) days of Plaintiffs' sending the list of additional tags, the parties shall meet and confer about any objections from Defendants and/or a schedule for further BWC production.

### B. Communications

In their first consolidated discovery requests issued on November 25, 2020, Plaintiffs requested all relevant written, recorded, or otherwise memorialized communications, including, but not limited to, communications concerning (1) the police response to demonstrations in Louisville during the summer of 2020; (2) the use of crowd control weaponry against demonstrators; and (3) requests, authorizations, or approvals made to or by Individual Defendants

regarding the same.[4] To facilitate the identification of potentially responsive communications, Plaintiffs further circulated a proposed Electronically Stored Information ("ESI") Protocol in November of 2020 and attempted to initiate conversations regarding proposed custodians, date ranges, and search terms.

In November of 2021, for the first time, Plaintiffs received an email containing search terms selected and used by the Defendants for the period from May 28, 2020, to June 1, 2020. Attempting to reach a belated agreement on these issues, Plaintiffs responded providing a revised proposal and outlining concerns that the search terms and methods proposed were not sufficient to capture all relevant communications responsive to the requests for production. Plaintiffs once again requested Defendants' position on the proposed ESI protocol, in the interest of reaching agreement on the scope and procedure for the search before it was initiated Plaintiffs further requested that Defendants "please immediately provide us with information about the list of custodians, the timeframe of the search, and what data stores were or will be searched so we can assess whether additional searches may be necessary." Finally, Plaintiffs proposed a date range of May 28, 2020 through November 25, 2020, or approximately six months.

Defendants did not reply and on January 14, 2022, Plaintiffs received an initial production of printed emails which lacked any information regarding search terms, accounts searched, or the date range as well as attachments or meta data. Upon receipt of this production, parties met to

---

[4] *See* Pls.' First Consolidated Discovery Requests, Doc. Request No. 20 ("Any and all communications between any of the Individual Defendants and any planner or organizer of the demonstrations in Louisville between May 28, 2020 and the present."); Request No. 21 ("Any and all communications by, to, among, between, or referencing any of the Individual Defendants concerning the LMPD's response to demonstrations in Louisville between May 28, 2020 and the present, including but not limited to the use of Crowd Control Weaponry and other uses of force."); Request No. 12 seeks "[a]ll documents concerning any requests, authorizations, or approvals from LMPD personnel to any of the Individual Defendants regarding the use of Crowd Control Weaponry against demonstrators in Louisville between May 28, 2020 and the present[.]") Plaintiffs made several requests for "documents" incorporating therein the definition of document in paragraph 11, which included "communications, . . . correspondence, . . . electronic mail, . . . letters, . . . and all other writings."

confer on this and other issues at Plaintiffs' request. During that conversation Plaintiffs again raised concerns regarding custodians, search parameters, date ranges, and search terms. Defendants agreed to review the ESI protocol circulated by Plaintiffs and reply with any edits. Both Parties agreed to meet again on January 21, 2022, to discuss proposed search parameters. On January 21, 2022, Defendants agreed to search all inboxes belonging to the Individual Defendants using Plaintiffs' proposed search terms and provide hit reports outlining the scope of the response. Finally, Plaintiffs provided a proposed list of approximately forty additional custodians[5] and requested that Defendants state their position on the relevance of those custodians.

Following the discovery conference on March 10, 2022, the parties came to an agreement regarding the ESI protocol on April 15, 2022, which is now ready to be executed. The parties have been working on three primary issues related to communications since then: (1) custodians; (2) search terms and date ranges; and (3) data stores.

### i.    *Custodians*

The parties have nearly reached an agreement on custodians. On January 22, 2022, Plaintiffs circulated a proposed list of custodians each of whom we believed to be in possession of relevant communications and whose data stores we requested be searched. Following the discovery conference on March 10, 2022, Defendants did not dispute the relevance of these custodians and the parties reached an agreement on this list.[6]

---

[5] Defendants found the list to be burdensome but Defendants' counsel quickly discovered it would take more time and expense to vet the appropriateness of all the custodians than to just agree to them and run the searches. Therefore, given the delays experienced to date and the belief that nothing would be gained by engaging in days and weeks of back-and-forth about the real likelihood that the requested custodians would have responsive information, Defendants agreed to include every single custodian identified by Plaintiff in its email communications searches. Defendants do not take the same position when it comes to cell phone usage, however. Not every custodian was issued and uses a personal cell phone, and Defendants do not have centralized access to those devices or the data contained on them in the same way it has access to email. Defendants have searched the work-used cell phones of the three named defendants.

[6] *See* footnote 5, *supra.*

On April 21, 2022, during the meet-and-confer, Plaintiffs raised three newly identified custodians likely to be in possession of relevant communications: Nicole Yates, Margaret Broscoe, and Joshua Watkins. All three were identified by Chief Robert Schroeder as individuals involved in planning the protest response on behalf of the Office of the Mayor. Defendants agreed to two of the three newly proposed custodians, as one of the proposed custodians, Ms. Yates, was not an employee of Defendants and did not have a <@louisvilleky.gov> email address.

On June 3, 2022, Defendants asserted privilege over communications involving two of Plaintiffs' listed custodians. Plaintiffs are reviewing Defendants' invocation of privilege, and the parties will meet and confer further regarding these two custodians.

ii.    *Search terms and date ranges*[7]

Defendants ran searches of the proposed search terms of all the 43 custodians identified by Plaintiffs. To date, Defendants have produced well over 130,000 emails that the named defendants received. The Parties have been engaged in good faith on search parameters of those custodians' mailboxes that would not unduly burden Defendants in their production.

On April 21, 2022, Defendants reported that two search terms—"Justice for Breonna" and "Arrests"—were primarily responsible for driving the high unique hit rates and therefore increasing the overall volume of production. Plaintiffs agreed to consider solutions for limiting the

---

[7] Defendants wish to note, for the record, their considerable efforts on this front: Irrespective of the parties' efforts to finalize search parameters, Defendants have dedicated enormous resources in both time and dollars to the email production at issue. When Defendants engaged their ESI vendor, they were advised that most custodial mailboxes contain between two and ten gigabytes of data. Two of the custodians initially identified by Plaintiffs each had 130 gigabytes, and a third custodian had 360 gigabytes of data for the vendor to retrieve, store, and search. In whole, and excluding the additional two custodians recently requested by Plaintiffs, Defendants paid their vendor to retrieve, store, and search over 2 terabytes of data in the 40+ custodians. To quote Defendants' ESI vendor, the amount of data requested by Plaintiffs is "staggering." In the first four months of 2022 alone, Defendants' law firm professionals have spent over 100 hours just addressing Plaintiffs' email search demands. Although the firm provides an over fifty percent discount to the City of Louisville on the rates it charges, the City has still paid over $15,000 for just that email-related legal work in January through April of 2022. Further, the City has paid an additional $36,369.42 to its third-party ESI vendor during that period.

impact of those search terms and requested that Defendants provide copies of the relevant hit reports as well as samples of the types of responsive and un-responsive emails generated by those search terms. Defendants provided copies of the relevant hit reports on April 21, 2022, and May 6, 2022, and Defendants provided sample emails for Plaintiffs' review on May 11, 2022

After reviewing the relevant documents, during a meet and confer on May 17, 2022, Plaintiffs agreed to amend the search terms to narrow the scope of the search, including by removing "Justice for Breonna" and by providing limiting terms to cabin the response for "arrests." Defendants agreed to run the search using the proposed narrowing construction(s) and report the reduced hit rate. On May 18, 2022, Defendants provided updated hit reports, maintaining their position that the total number of hits would make review unduly burdensome. On May 20, after the parties conducted a call to discuss progress on these and other discovery issues addressed in this Report, Plaintiffs' counsel emailed Defense counsel restricted search terms that, Plaintiffs estimated, would lead to a batch of approximated 20,000 email-related documents in the custodians' mailboxes. On May 23, after consulting with its ESI vendor, Defense counsel advised that Plaintiffs had miscalculated, as the actual documents that would be responsive to the hit parameters was 27,552. Including family-level documents, which would have to also be reviewed and produced, the number of materials to review was 52,816. Defendants maintained their objection to the burden and proportionality of this review.

On May 31, Plaintiffs responded and identified six custodians they had requested, including two Defendants, who were not included in the hit report, as well as two individuals whose inboxes had been searched but were not on Plaintiffs' list of identified custodians. Plaintiffs further noted that one Plaintiff's name had been misspelled in conducting the searches. Plaintiffs disagreed with Defendants' burden and proportionality positions, but in the spirit of compromise

proposed a further narrowing that would remove specific terms from the searches conducted of certain custodians. In total, Plaintiffs estimated that their proposal would remove approximately 10,000 documents from the review pool. Defense counsel are currently working with their vendor to assess the new hit count and ensure that all proposed custodians are included in that count.

While the parties are continuing to negotiate, they may reach an impasse regarding how many hits would constitute an unreasonable universe of documents to review. The parties thus request the Court so order the following schedule for resolving all issues related to search terms and date ranges:

- Within fourteen (14) days of the Court's order, Defendants shall provide updated hit reports with all custodians and search terms properly included, both with and without Plaintiffs' May 31, 2022, proposed narrowing, along with a statement of their position regarding the burden and proportionality of reviewing each set of documents. If Defendants object to the burden or proportionality of such review, they shall include a specific proposal for further narrowing the searches to a point that would resolve the objection.

- Within seven (7) days of receiving Defendants' updated hit report and position, Plaintiffs will respond to either accept Defendants' proposal or indicate that the parties cannot agree on this issue. If the parties cannot agree, Plaintiffs will contact the court for guidance within two (2) days of responding to Defendants.

- If agreement is reached, within thirty (30) days of reaching an agreement, Defendants shall produce all responsive email communications yielded from these searches.

### iii.    Data Stores

The final outstanding dispute regarding responsive communications involves identifying the appropriate relevant data stores responsive to our requests. On April 12, 2022, ahead of the in-person meeting, Plaintiffs requested confirmation regarding the search procedure for responsive text messages and other communications contained on the cellphone devices of the listed custodians, as contemplated in the agreed upon ESI protocol edited by Defendants. At that time, Defendants did not reply to this request.

Plaintiffs again raised this issue on April 21, 2022, and provided supporting citations on April 26, 2022, at Defendants' request. On April 29, 2022, defense counsel objected to this request noting that Defendants did not agree that "every officer's phone is a location likely to have responsive information and is proportional to discovery requests." Plaintiffs clarified on May 4, 2022 that, as with all data stores contemplated in our ESI protocol, Plaintiffs agreed that the request would be cabined by the list of proposed custodians, including the three newly identified custodians. On May 11, 2022, defense counsel informed Plaintiffs that Defendants have begun the process of investigating who of the custodians was in possession of a cellphone used for work purposes and of evaluating this request. Plaintiffs understand a reply to be forthcoming.

Given the lack of clarity over which data stores had been or would be searched, on April 21, 2022, Plaintiffs requested and Defendants agreed to provide information regarding which data stores have been identified as well as which of those data stores has already been searched. On April 26, 2022, Plaintiffs reiterated this request for all custodians by email, noting that such a process of identification is required by the agreed-upon ESI Protocol, which contemplates the identification of all data stores "reasonably believed to be likely to contain responsive documents."

On June 3, 2022, Defendants confirmed that the following data sources have been searched and represented that Defendants have exhaustively searched all identified locations of reasonably responsive documents:

- Over fifty email boxes associated with the nearly fifty custodians identified by Plaintiffs.

- All cloud-based programs used by LMPD personnel to store, manage, and retrieve LMPD records such as BWC, CAD reports, and RTCC video footage.

- The P2 Security Detail[8] file created at the commencement of the protests identified in the Complaint. This is the file where all daily reports, after action reports, after incident reports, and any other document or report loosely associated with the protests and riots were stored.

- The LMPD's SRT storage drive.

- Mayor Fischer's personal cell phone.[9]

The only outstanding dispute between the parties is whether information contained on certain custodians' work cell phones is discoverable. As of June 3, 2022, Defendants have only partially investigated who on Plaintiffs' list of custodians was in the possession of a cell phone used for work. Defendants have asked Plaintiffs to provide a narrowed list of custodians whose cell phones Plaintiffs believed were reasonably likely to have discoverable information.

The parties thus request the Court so order the following schedule for resolving all issues related to data stores:

- Within three (3) days of the Court's order, Plaintiffs shall provide to Defendants a list of custodians whose work-issued cell phones Plaintiffs believe are reasonably likely to contain discoverable information.

- Within fourteen (14) days of receipt, Defendants will respond in writing and, for each custodian, either consent to searching that custodian's work-issued cell phones or object to doing so. Defendants shall state the specific basis for objecting to each custodian whose work-issued cell phones Defendants assert do not contain responsive information, including whether the data on such custodian's work-issued cell phone has been retained and, if not, the date on which such data was destroyed.

---

[8] LMPD creates names for special events that take place in Louisville requiring LMPD involvement, and the name of the protests special event is "P2 Security Detail."

[9] Colonel Chavous and Chief Schroeder both retired and submitted their LMPD-issued cell phones when they retired. Data on those phones was not retained because the department had limited resources and reissued those phones to other LMPD personnel. Mayor Fischer does not use and City-issued cell phone but has searched and identified his personal phone for responsive communications. Defendants contend that not every custodian identified for purposes of email usage is a likely storage source of documents or communications as identified in the requests listed in *supra* footnote 4.

- If Defendants object to searching the work-issued cell phone of any custodian, Plaintiffs shall within seven (7) days of receiving such objection contact the Court for guidance.

- Within thirty (30) days of reaching an agreement on all relevant data stores, Defendants shall produce all the outstanding responsive communications.

### C.  Internal LMPD records

The parties have been engaged in discussions about the several categories of internal LMPD records that have not yet been produced: CAD reports and associated radio runs, LMPD reports made to Louisville Emergency Services ("MetroSafe"), investigation records from the LMPD's Professional Standards Unit (PSU) or Public Integrity Unit (PIU), injured officer logs and property damage reports, and certain attachments to already-produced materials which appear to be missing.

### i.    *CAD reports and associated audio recordings*

At the Court's suggestion, the parties held two meet-and-confer meetings last year, on November 2, 2021, and November 30, 2021. At the parties' November 30, 2021, meet-and-confer, defense counsel informed Plaintiffs' counsel that there were generally three types of communications related to MetroSafe:[10] 911 calls, radio transmissions, and Computer Aided Dispatch (CAD) Reports. Defense counsel suggested that production of these documents begin with the CAD Reports from May 28, 2020, to June 1, 2020, which could then be used to ascertain certain 911 calls or radio transmissions during that time that may be relevant and responsive to

---

[10] *See* Pls.' First Consolidated Discovery Requests, Doc. Request No. 3 ("All documents...prepared during or after each demonstration from May 28, 2020 through the present..."); Doc. Request No. 6 ("All LMPD radio recordings and transcripts from May 28, 2020 through June 1, 2020 concerning the demonstrations in Louisville."); Doc. Request No. 7 (All documents, including audio and/or video recordings, showing and/or referring to demonstrators destroying property during the demonstrations in Louisville between May 28, 2020 and the present."); Doc. Request No. 8 ("All documents, including audio and/or video recordings, showing and/or referring to demonstrators throwing objects during the demonstrations in Louisville between May 28, 2020 and the present."); Doc. Request No. 10 ("All documents concerning the LMPD's use of force at any demonstration in Louisville between May 28, 2020 and the present...").

Plaintiffs' requests. Plaintiffs memorialized this agreement in an email on December 1, 2021. On December 3, 2021, defense counsel reported that it would take approximately two weeks to produce the relevant CAD Reports. Despite several attempts to follow up and receive production, no documents purported to be CAD Reports were produced until January 13, 2022. That production, however, was not made pursuant to Federal Rule of Civil Procedure 34, and it was not clear whether any of the documents were in fact CAD Reports.

Plaintiffs' counsel raised this issue with defense counsel several times in order to ascertain whether any of the production contained CAD Reports – in phone calls on January 14, 2022, and January 21, 2022, and in follow-up emails after those phone calls. Plaintiffs' counsel again raised this issue with defense counsel at the April 21 meet-and-confer ordered by the Court and memorialized the outstanding question in a follow-up email on April 26. On April 29, defense counsel responded via email that no CAD Reports had been produced: "We do not see them in the production. They are in the production that is being pushed to you now." Plaintiffs' counsel finally received a production on May 12, 2022, which was described as "CAD Production." Upon review, these records are similar if not identical to the records received on January 13, 2022, though in compliance with FRCP 34. Plaintiffs' counsel has requested defense counsel to review these records with their LMPD representative to confirm that all responsive CAD Reports were included in the May 12 production. Defense counsel has done so and confirmed that the CAD Report produced on multiple occasions is comprehensive and complete.

By email on May 19, 2022, defense counsel provided Plaintiffs' counsel with additional information regarding the CAD Reports and informed Plaintiffs' counsel that the CAD Reports could not be used to identify specific radio transmissions that would responsive to Plaintiffs' discovery requests. The parties discussed the issue by phone on May 20, 2022, and defense counsel

has now requested the labels and tags (e.g., date, time, location, issue tags) used to store and search for radio transmissions, and will provide that list to Plaintiffs' counsel upon receipt.

Defense counsel has assured Plaintiffs' counsel that he is working in good faith to determine the best ways to retrieve, store, listen to, and transfer relevant radio transmissions. However, these files, like the BWC footage and other relevant video footage discussed below, are large files that are not designed for easy external access or transferability. It is uncertain how quickly these issues can be resolved and, then, how quickly these data files can be transferred. Defendants' counsel believes that files such as these are critical to its case and has no incentive to locate and produce them to Plaintiffs.

       *ii.*    *LMPD Reports to MetroSafe*

Plaintiffs have requested information and documents related to the Emergency Operation Center, or "war room," at which city and LMPD leadership spearheaded the city's response to the ongoing protests. Defendants indicated that those documents were likely within the control of MetroSafe employees. Plaintiffs raised questions about these documents at their in-person meetings on November 2 and November 30, 2021, and at both meetings were told that the LMPD representative present was not the appropriate party to answer questions about these documents. Following those meetings, Plaintiffs requested another meeting with a MetroSafe representative who could answer questions about what type of documents are produced in the war room. Defense counsel refused to arrange such a meeting and stated that "all documents created in the 'war room' had been or were being produced."

While some "war room" documents have been produced, Plaintiffs have noted to Defendants that LMPD's Standard Operating Procedures refer to reports being made to MetroSafe when an officer encounters, or receives report of, a civil disturbance/disorderly crowd that cannot

be dispersed with the resources immediately available.  *See* SOP § 12.6.4.  Those reports should include "the nature and seriousness of the disturbance, particularly noting the availability of weapons" and "the number of personnel and equipment necessary to contain the disturbance." *Id.* These reports would apparently be responsive to several of Plaintiffs' document requests, including Request No. 13 ("Any and all directives, announcements, orders, statements, or commands issued or approved by any of the Individual Defendants concerning the use of force, including the use of Crowd Control Weaponry, against demonstrators in Louisville between May 28, 2020, and the present"), Request No. 4 ("All documents reflecting the nature and amount of Crowd Control Weaponry used by the LMPD at any demonstration between May 28, 2020 and the present, such as reports . . ."), Request No. 7 ("All documents . . . showing and/or referring to demonstrators destroying property during the demonstrations in Louisville between May 28, 2020 and the present"), and Request No. 10 ("All documents concerning the LMPD's use of force at any demonstration in Louisville between May 28, 2020 and the present . . .").

Plaintiffs raised this question again at the parties' most recent meet-and-confer on April 21, 2022, and Defendants agreed to look into the reports referenced in SOP 12.6.4 and confirm what these reports are. On June 3, 2022, Defendants confirmed that these documents are the after-incident and/or after action reports that have already been produced.[11]

### iii.    PIU and PSU investigation documents

LMPD's Public Integrity Unit investigates LMPD officers for alleged criminal misconduct, while the Professional Standards Unit investigates alleged violations of departmental policy or administrative guidance. Plaintiffs have requested all PIU and PSU investigation documents that

---

[11] Some of these reports may reference attachments that Plaintiffs have identified are missing. As discussed in this report, Defendants believe these missing "attachments" were never "attached" to the reports but, rather, were video files that were referenced in the report. Defendants are working to identify those files and provide that information to Plaintiffs' counsel—whether it is reference to a video Plaintiffs already have or a video that will be produced.

relate to demonstrations held from May 28, 2020, through the present. LMPD Chief Amy Hess before Metro Council on September 26, 2020, that at least 5–10 such investigations were occurring into LMPD's protest response. These materials would be responsive to Request for Production No. 19 ("All documents concerning any investigation conducted by the LMPD and/or the Metro Government in response to any complaint relating to demonstrators in Louisville between May 28, 2020 and the present.").

At a November 2, 2021 in-person meeting, Defendants indicated that all open PIU investigations were turned over to the FBI and were no longer in the control of LMPD or Louisville city leadership. Subsequently, on December 3, 2020, Defendants indicated via email that the PIU investigations were turned over "some time after the middle of June of 2020." LMPD did, however, produce PIU investigative documents to the United States Department of Justice (DOJ) in connection with DOJ's investigation into LMPD's protest response.

By email dated December 27, 2021, Plaintiffs raised concerns that LMPD had destroyed PIU/PSU documents that were responsive to their discovery requests, and that Defendants had failed to disclose the existence of those investigations in their interrogatory responses. In response, on December 30, 2021, Defendants indicated that they would be producing "PSU reports that have been closed/finalized" by January 3, 2022. That deadline was extended to January 13, 2022.

On January 7, 2022, Defendants clarified that no PIU investigative documents had been destroyed, but asserted for the first time that federal *Touhy* regulations—which govern federal agencies' production of documents in response to subpoenas—barred LMPD from producing these records. During a telephonic meet and confer on January 21, 2022, Plaintiffs explained that *Touhy* regulations only apply to federal agencies' disclosure of records, and thus do not bar state or local

agencies from disclosing materials in their possession, custody, or control. Defendants were not prepared to respond.

This issue was further discussed at the meet-and-confer that took place on April 21, 2022. With regard to PIU investigative documents, Defendants no longer maintained that *Touhy* regulations prevented disclosure. Instead, Defendants reiterated that LMPD did not have any physical or electronic copies of the PIU documents. Counsel explained, "when these things happen there are LMPD folks who are shifted into a different capacity. If they are shifted into a PIU . . . [they are] deputized as an FBI agent for purposes of the investigation, they may still have an LMPD title, they may still use an LMPD computer, but for purposes of this they are conducting FBI work." Plaintiffs also asked why the PIUs were not produced before the FBI came to Louisville and if any investigations were opened before the federal investigation, if those could be produced. In response, Defense counsel indicated that there were no PIU investigations not taken over by the FBI, and there may have been additional investigations beyond the PIU investigations. Counsel for LMPD was also present and explained that there is an agreement between LMPD and the FBI which bars them from producing these documents and promised to send this agreement to Plaintiffs. On June 3, 2022, Defendants produced this agreement. Plaintiffs are reviewing the MOU to determine whether Court intervention will be necessary.

With regard to PSU investigation records, Defendants agreed to produce these as they become finalized and suggested there may be five PSU investigations. Defendants indicated that two PSU reports had already been produced to Plaintiffs, and that a third was being finalized for production. Plaintiffs asked whether Defendants would be able to provide a list of open PSU investigations; Defendants indicated that they would need to talk to PSU and would let Plaintiffs know if they were able to provide a list. At minimum, Defendants agreed to tell Plaintiffs the

number of open PSUs and the names of those being investigated. These promises, including the provision of the task force agreement related to these investigations, were memorialized in follow-up emails on May 4 and May 11, 2022, and confirmed by defense counsel in an email response also on May 11, 2022. To date, Plaintiffs have not received this information.

### iv.    Injured officer logs and property damage reports

Documents previously produced by Defendants reference "injured officer logs," "personnel accountability reports," and "property damage reports," which appear to describe injuries sustained by officers and damage to property during the protests, respectively. These documents have not been produced by Defendants, although they are responsive to Plaintiffs' Request No. 9 ("Any and all documents referring to or related to injuries sustained by members of the LMPD during the demonstrations in Louisville from May 28, 2020 through the present"), Request No. 7 (All documents . . . showing and/or referring to demonstrators destroying property during the demonstrations"), and Request No. 8 ("All documents . . . showing and/or referring to demonstrators throwing objects during the demonstrations"). Plaintiffs requested these reports in an email dated December 14, 2021. On January 7, 2022, Defendants responded that they "have inquired about this and cannot commit to producing any such documents at this time since we do not yet know what specifically it is." Plaintiffs again raised these reports in an email on March 10, 2022, but have received no response.

Additionally, in an email on April 20, 2022, and in-person at the meet-and-confer on April 21, 2022, defense counsel informed Plaintiffs' counsel that they had identified and produced "information on criminal mischief reports, which cover property damage claims. One hundred fifty-one of those criminal mischief reports were tagged as protest-related. We have just received those and will be producing them to you in short order." Defendants produced the criminal mischief

documents on May 24, 2022. Defense counsel has conferred with Defendants and has identified no documents titled "injured officer logs." Defense counsel is inquiring with his client regarding "personnel accountability reports."

### v.    Incomplete Productions

Finally, Plaintiffs have repeatedly raised the issue of incomplete document productions, including productions missing attachments. For example, Defendants have produced a PSU report that includes as an attachment a photograph of a CD-ROM. Though the attachment apparently contained responsive records, the contents of the CD-ROM have not been identified or turned over to Plaintiffs. In another production, Defendants provided Administrative Incident Reports without the associated attachments. Defendants indicated that those attachments would be produced by January 13, 2022, but Plaintiffs have not yet received them.

On January 18, 2022, Defendants informed us that the problem was understood and Defendants would investigate any missing documents and complete productions in the manner required by Rule 34. Plaintiffs sent Defendants a list of specific missing documents on April 26, 2022; on May 11, 2022, Defendants indicated that these were "additional things that we are not ignoring but do not have answers for yet."

Defendants believe that the three documents identified by Plaintiffs in that April 26, 2022, email as containing unproduced attachments were likely referencing video footage records related to incidents described in the reports. Defendants are working to locate which files are referenced and, to the extent they have not already been produced, find efficient and secure means of producing these video records. These video records, like the BWC discussed above, are many gigabyte files that are not easily collected and viewed, much less transferred. Defendants oppose producing these and other records via physical storage devices because of security concerns.

However, Defendants' counsel has assured Plaintiffs' counsel that he is working in good faith to identify solutions to this issue.

*    *    *

The parties respectfully request that the Court Order information regarding PSU investigations (including closed PSU files), personnel accountability reports, and missing attachments within 30 days. The parties will provide the Court with an update regarding radio transmissions within 30 days.

## III.    Interrogatory Responses

Defendants served responses and objections to Plaintiffs' interrogatories and document requests on February 5, 2021. On February 3, 2022, Plaintiffs sent Defendants a deficiency letter asserting that numerous of Defendants' interrogatory responses and objections to requests for production were evasive, nonresponsive, or otherwise noncompliant with the Federal Rules of Civil Procedure. That letter asked Defendants to withdraw certain objections or supplement their responses by February 17, 2022.

On February 17, 2022, Defendants served amended responses and objections to Plaintiffs' document requests, but did not serve amended responses and objections to Plaintiffs' interrogatories. Defendants indicated that they "d[id] not yet have finalized and signed amended interrogatory answers to serve, but we hope to have those soon." The next day, Plaintiffs asked Defendants to provide a date by which they expected to serve amended interrogatory responses. On February 24, 2022, Defendants responded that they were "working . . . to prepare amended and separated interrogatory answers as requested," but provided no timeline for serving such responses. After three additional weeks passed, Plaintiffs again followed up with Defendants on March 15, 2022, asking for a date by which Defendants planned to serve amended interrogatory

21

responses and objections. On March 30, 2022, Defendants responded that they were "not any closer to getting those signed, but [were] working on it." In the six weeks since then, Defendants have no served any amended interrogatory responses.

A.  Plaintiffs' Position

Plaintiffs have been waiting for Defendants' amended interrogatory responses for nearly four months—responses which, by Defendants' own admission, Defendants are "not any closer" to serving. Plaintiffs have been flexible in repeatedly asking Defendants to provide timelines for serving amended responses, but Defendants have steadfastly refused to do so. Regrettably, it appears that only a Court-Ordered deadline to serve amended responses will resolve this dispute. Plaintiffs thus respectfully request that the Court enter an Order directing Defendants to serve their amended responses within seven (7) days of the Order under threat of sanction.

B.  Defendants' Position

Defendants acknowledge that they have been unsuccessful in coordinating and securing the necessary signatures for the Amended Interrogatory Answers from Colonel Chavous, Chief Schroeder, and Mayor Fischer. Two of the three officials are retired and Mayor Fischer has been unable to review and sign. However, Defendants are cautiously optimistic that they are close to securing these three parties final review, approval, and authorizations of these Amended Answers. Defendants contend that seven-day deadline with a threat of sanction is necessary. However, if the Court determines that a deadline is appropriate, Defendants request that deadline to be twenty-one (21) days and, if Defendants fail to serve the Amended Answers, Plaintiffs can move to compel and seek sanctions pursuant to Rule 37 and the Court's local rules.

IV.    **Joint Proposed Amended Scheduling Order**

In view of the above-mentioned outstanding productions and remaining disputes, which counsel for both parties continue to work to resolve, the parties jointly submit the following proposal for resetting the stayed deadlines in an expeditious, but practicable manner:

- Defendants' complete document production shall now be due on or before September 15, 2022.

- Plaintiff's Motion for Class Certification shall be filed on or before December 1, 2022.

- The Parties shall complete all fact discovery on or before December 16, 2022.

- Plaintiffs' expert report in compliance with Fed. R. Civ. P. 26(a)(2) shall be due by February 10, 2023; Defendants' expert report in compliance with Fed. R. Civ. P. 26(a)(2) shall be due by March 10, 2023; and Plaintiffs' rebuttal expert report, if any, shall be due by March 31, 2023.

- The Parties shall complete all expert discovery on or before April 28, 2023.

- The Parties shall file all *Daubert*/dispositive motions on or before June 9, 2023.

Dated:          June 3, 2022                    Respectfully submitted,

By: *with permission*                           */s/* Ashok Chandran
Chris J. Gadansky                               Corey Shapiro
Bruce Paul                                      Heather Gatnarek
James E. McKiernan, III                         Kaili Moss
McBrayer PLLC                                   ACLU OF KENTUCKY FOUNDATION,
500 West Jefferson Street, Suite 2400           INC.
Louisville, KY 40202                            325 W. Main St. Suite 2210
Phone: (502) 327-5400                           Louisville, KY 40202
cgadansky@mcbrayerfirm.com                      (502) 581-9746
bpaul@mcbrayerfirm.com                          corey@aclu-ky.org
jmckiernan@mcbrayerfirm.com                     heather@aclu-ky.org
                                                kaili@aclu-ky.org

*Counsel for Defendants*

                                                Ashok Chandran
                                                Christopher Kemmitt
                                                Anne Oredeko
                                                Catherine Logue
                                                NAACP LEGAL DEFENSE &
                                                EDUCATIONAL FUND, INC.
                                                40 Rector St., 5th Floor
                                                New York, NY 10006
                                                Tel.: (212) 965-2200
                                                Fax.: (212) 226-7592
                                                achandran@naacpldf.org
                                                ckemmitt@naacpldf.org
                                                aoredeko@naacpldf.org
                                                clogue@naacpldf.org

                                                Samuel Shapiro
                                                Andrew K. Jondahl
                                                EMERY CELLI BRINCKERHOFF
                                                ABADY WARD & MAAZEL LLP
                                                600 Fifth Avenue, 10th Floor
                                                New York, NY 10020
                                                (212) 763-5000
                                                sshapiro@ecbawm.com
                                                ajondahl@ecbawm.com

                                                *Counsel for Plaintiffs*