UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

ATTICA SCOTT, ET AL.                                                    PLAINTIFFS

v.                                                          No. 3:20-cv-535-BJB

LOUISVILLE/JEFFERSON COUNTY                                            DEFENDANTS
METRO GOVERNMENT, ET AL.

## OPINION & ORDER DENYING CLASS CERTIFICATION

Federal Rule of Civil Procedure 23 was amended in 1966 to expressly authorize class actions seeking declaratory or injunctive relief against a defendant that "has acted or refused to act on grounds generally applicable to the class." FED. R. CIV. P. 23(b)(2).   "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of these injunction class actions, which "ste[m] from equity practice." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

The Plaintiffs in this civil-rights lawsuit seek a classwide injunction, under Rule 23(b)(2), to limit the use of crowd-control weapons by the Louisville Metro Police Department.  Each Plaintiff was active in the 2020 protests following the deaths of Breonna Taylor, George Floyd, and others.  And each was exposed to tear gas, pepper balls, flash-bang grenades, and other crowd-control weapons during confrontations with law enforcement that summer.  In July 2020 they filed free-speech and excessive-force claims for past damages and future protection—asserting the latter claim not only on their own behalf, but also for a putative class of "all Peaceful Protestors who participated in a protest" in Louisville during the summer of 2020. *See* Amended Complaint (DN 32) ¶ 272.

A lot has happened in Louisville and in this lawsuit since the summer of 2020. By 2023, when the Plaintiffs asked the Court to certify the class they sought to represent, protests had thinned, protestors had moved away, and public officials had moved on. Most important, police policy and practice had changed. Sometimes people achieve change faster out of court than in it: without an order from this or any other court, the LMPD substantially curtailed its crowd-control policy in a manner similar, if not identical, to the relief the Plaintiffs sought in litigation.

Considering these changes, the Plaintiffs' class-action request is practically, if not technically, moot.  A classwide injunction would have little if any continuing benefit for most of the 2020 protesters; what benefit it offered would no longer address a common injury under Rule 23(b)(2); and any benefit would be redundant with other

1

claims in this case.  Plaintiffs' counsel effectively agree: classwide relief, they concede, would add little to the injunctive or declaratory relief the individual named Plaintiffs may still pursue despite this ruling.  Under the practical doctrine of "prudential mootness," therefore, the Court declines to certify a class action.

## I. THIS LAWSUIT

### A. The Plaintiffs and Putative Class Representatives

The plaintiffs in this civil-rights suit describe themselves as "a diverse group of [seven] individuals" (plus one non-profit organization) who came "together to exercise their rights to protest and demand change from their government" during the summer of 2020.  Amended Complaint at 2.  That summer, of course, featured demonstrations and protests in Louisville and across the country concerning the use of lethal force by police in the tragic and familiar cases of Breonna Taylor, George Floyd, and others.  According to the Amended Complaint, each Plaintiff took part in those protests, which repeatedly produced tense confrontations between citizens exercising First Amendment rights and officers charged with maintaining order.  And each Plaintiff, at some point during the summer, felt the effects of the LMPD's efforts to move or disperse crowds of protesters with crowd-control measures such as tear gas, pepper balls, and flash-bang grenades.

Though the factual record in this case remains disputed in several important respects, evidence indicates that Plaintiff Willa Tinsley attended the first major day of protests (on May 28, the day the Breonna Taylor 911 recording was released and three days after George Floyd's death).  She was exposed to tear gas, flash bangs, and pepper balls[1] before she was able to find her car and leave.  Tinsley Dec. (DN 21-9) ¶¶ 6–9, 18–22.  She also protested on May 31.  That day, she says, the LMPD forcibly dispersed the crowd with tear gas and flash bangs.  Then officers arrested around 40 protesters—including Tinsley, who spent 30 hours in custody.  *Id.* ¶¶ 31–35; May 31 Use of Force Report (DN 139-3) at 2.

Kayla Meisner and Attica Scott attended the protests on May 29.  They were exposed to tear gas and flashbangs during the LMPD's effort to clear Jefferson Square Park.  Meisner Dec. (DN 21-14) ¶¶ 5–7; Scott Dec. (DN 21-15) ¶¶ 3–12.  Scott also saw LMPD officers use pepper balls and physical force on June 15 against a group of protesters that included Stevana Schauer; though Scott doesn't allege she was

---

[1] Pepper balls are "pepper-spray projectiles launched using guns or similar weapons," Amended Complaint ¶ 38, that were used by LMPD "both as a chemical dispersal system and as an impact weapon," DN 21-4 at 1.

harmed by crowd-control weapons that day.  *See* Scott Dec. (DN 21-15) ¶¶ 14–15; Schauer Dec. (DN 21-12) ¶¶ 7–15.

Corbin Smith and Tyler Weakley joined a group of protesters that marched down Broadway on May 31.  Smith Dec. (DN 21-10) ¶¶ 6–7.  They were "forced into the crowd" as officers closed off side streets.  Though they tried to leave once the LMPD deployed tear gas and flash-bang grenades, they were arrested and detained. *Id.* ¶¶ 6–8, 19–31; *see also* Weakley Dec. (DN 21-11).

Patrick Moore was hit in the eye with a pepper ball while trying to leave the protests on June 1.  Moore Dec. (DN 21-13) ¶¶ 5–24.

Finally, the Kentucky Alliance Against Racial and Political Repression is a nonprofit organization that "work[s] to end racist practices in the community and government" through public education and community organizing efforts.  Amended Complaint ¶¶ 8–10.  Members of the Kentucky Alliance maintained a presence at several of the demonstrations to support the protesters with "supplies and security." Aghaaliandastjerdi Dec. (DN 139-5) ¶ 6.  The Alliance asserts that several of its members suffered injuries during the protests, *id.* ¶ 7; Spencer Dec. (DN 139-23); Owens Dec. (DN 139-31), and that the organization itself suffered direct harm in the form of diverted resources when it had to commit "staff time and energy that could have been spent on other projects or initiatives" to support protesters.  Plaintiffs' Supp. Br. (DN 178) at 11 (quotation marks omitted).  It also "had to cancel at least one of its other scheduled activities" as a result of the confrontations with LMPD.  *Id.*; Edison Dep. (DN 178-12) 55:3–12.

## B. Relief Requested

Back in July 2020, while protests remained frequent and intense in Louisville, these Plaintiffs sued the Louisville Metro Government, fifteen unidentified LMPD officers, and three since-departed City leaders: Mayor Greg Fischer, interim Police Chief Robert Schroeder, and Assistant Chief LaVita Chavous.  Amended Complaint ¶¶ 11–15.  The Plaintiffs challenged the City's use of "nonspecific" or "indiscriminate" crowd-control weaponry—that is, devices such as tear gas and flash-bang grenades that could not be specifically targeted at violent or threatening protesters but instead would naturally affect nearby peaceful protesters as well.  *See* Class Cert. Hearing Tr. (DN 184) at 10:6–21.  LMPD's use of these weapons to subdue or disperse protesters, the Plaintiffs maintained, constituted unreasonable and excessive force under the Fourth Amendment—at least when the officer using the weapon knew it would affect people who were not threatening property or violence.  Amended Complaint ¶¶ 297–99.  This also violated the First Amendment rights of peaceful protesters, Plaintiffs alleged, by using force to deter future would-be protesters "from participating in future protests" and chilling Plaintiffs exercise of protected First Amendment rights."  ¶¶ 289, 291.

The lawsuit—filed in July 2020 and amended in September 2020—demands three main forms of relief (in addition to attorney's fees, costs, punitive damages, and other ancillary remedies):

1. Money damages for the Plaintiffs' own past injuries suffered from exposure to crowd-control weapons;

2. Forward-looking injunctive and declaratory relief to avert the additional harm they might suffer if they were to protest again and face similar crowd-control weapons; and

3. Similar prospective injunctive[2] relief on behalf of a class of "[a]ll individuals who were present and peaceful at any protest within the City of Louisville between May 28, 2020 and July 30, 2020 during which LMPD officers utilized tear gas, flash bangs, pepper balls, and/or long-range acoustic devices ("LRADs") (referred to together as "Crowd Control Weaponry"), and who were actually exposed to Crowd Control Weaponry at those protests." Certification Motion (DN 139) at 11.[3]

This order addresses only the third type of relief: the preliminary step of certifying this class of absent litigants, to be represented by the eight named plaintiffs, before the Court could find any constitutional violation and award injunctive relief on a classwide basis.   The order they seek would enjoin the "Defendants from using Crowd Control Weaponry on peaceful people at protests," and would "requir[e] Defendants to promulgate official policies restricting the use of Crowd Control Weaponry to only those individuals who pose an imminent risk of serious physical danger to an officer or others."   Certification Motion at 11.

---

[2] Plaintiffs mention classwide declaratory relief in their briefs, Certification Motion (DN 139) at 20; Plaintiffs' Supp. Br. at 1, but did not plead declaratory relief in their complaint. Nothing appears to turn on the distinction, so the Court refers only to injunctive relief.

[3] The Amended Complaint used a different class definition that appears somewhat narrower, given the requirement that class members not only protested in 2020 but intend to do so again.  The parties don't focus on the implications, if any, of the change from this prior definition:

(a) all Peaceful Protestors who participated in a protest" between May 2020 and September 2020 "at which police utilized" any combination of crowd-control measures "and who were actually exposed to Crowd Control Weaponry at those protests" and "(b) all people who will be Peaceful Protestors in the City of Louisville in the future or who would be … but for their fear that LMPD officers will unnecessarily utilize Crowd Control Weaponry."

Amended Complaint ¶ 272.

4

Previously, the City allowed "[c]rowd control chemical agents [to] be used to disperse disorderly aggressive crowds and restore order during a civil disturbance incident." SOP 9.1.8 (DN 139-10 at 9) (revised 11/07/19). This is the "Challenged Policy" that the Plaintiffs initially sought to enjoin and revise. *See* Plaintiffs' Supp. Br. at 6–7 ("LMPD's Challenged Policy caused … an objective chill. As of July 30, 2020, LMPD's Standard Operating Procedures expressly permitted the use of chemical agents—a significant level of force—'to disperse disorderly aggressive crowds….'") (quoting and citing since-amended SOP 9.1.8 (DN 139-10 at 9).[4]

### C. Developments During this Litigation

Viewed one way, the Plaintiffs haven't made much progress. Currently pending before the Court is their class-certification motion (DN 139), filed during the summer of 2023, three years after the events giving rise to this lawsuit began. They have not yet completed discovery, disclosed experts, or filed dispositive motions. Despite at least two attempts, they haven't successfully mediated the case. They have become mired in repeated discovery disputes—some of which remain ongoing (*see* DNs 186, 188) despite yeoman's work from the Magistrate Judge. They survived a motion to dismiss, granted in part and denied in part by the judge previously presiding over this case. *See* DN 42.

That judge also denied Plaintiffs a temporary order enjoining LMPD's use of crowd-control weaponry on peaceful protesters—an emergency order sought in August 2020 while the protest activity and the use of crowd-control weaponry remained relatively frequent. The Plaintiffs asked the Court to bar the LMPD from using "tear gas, flash bangs, long-range acoustic devices, or other similar crowd-control weaponry" on peaceful protesters. TRO Motion (DN 21) at 1–2. The judge denied the request based on concerns about the "vague," "indistinct," and "overbroad" nature of such an injunction:

---

[4] That version of the policy, which governed the use of chemical agents generally, provided in relevant part:

> Crowd control chemical agents can be used to disperse disorderly aggressive crowds and restore order during a civil disturbance incident…. Prior to using crowd control chemical agents during a civil disturbance/disorderly crowd situation, the incident commander (IC) should obtain the approval of a commanding officer, with the rank of major or above, if feasible.

Standard Operating Procedure ("SOP") 9.1.8 (DN 139-10 at 9). SOP 12.6.5, which previously didn't exist, now restricts the "use of chemical agents for crowd control or civil disturbance" to the more limited circumstances discussed below. SOP 12.6.5 (DN 179-1 at 19, 31–32); Class Cert. Hearing Tr. at 29:11.

> [I]t would be based on nothing other than conjecture as to what might happen and what might be necessary and what might not be necessary involving people who are doing things that might be peaceful or might not be peaceful, or they might be peaceful but illegal, or improper, or on somebody else's property, or they might be in such position that they present a danger to themselves or to other citizens. I don't know. No one can tell.

TRO Hearing Tr. (DN 29) at 25:15–26:1. Many such doubts about the concreteness and effectiveness of injunctive relief have only grown since that ruling.

Viewed another way, many of these post-litigation developments are hardly bad news for the Plaintiffs—because their efforts have proved quite successful in many respects. The record reflects no similar uses of crowd-control weapons on peaceful protesters since 2020. New leaders have replaced all of the individual Defendants originally sued in this lawsuit. In line with the Plaintiffs' request that the City "promulgate official policies restricting the use of Crowd Control Weaponry to only those individuals who pose an imminent risk of serious physical danger to an officer or others," Certification Motion at 11, the City has promulgated new LMPD Standard Operating Procedures—Section 12.6.5—that significantly limit police use of these devices: chemical agents for crowd control may be used only to protect against loss of human life, fire, gunfire or intentional violence, or serious property damage.[5]

---

[5] The new LMPD Standard Operating Procedures applicable to crowd-control weapons, whose content Plaintiffs don't dispute and which the Court may take judicial notice of, provide that:

> The use of chemical agents for crowd control may only be authorized by the Chief of Police, or his/her designee.… Chemical agents may only be authorized under the following safety circumstances:
>
> - To protect human life;
> - When an individual or group of individuals is acting with the intent to cause injury to police officers or other persons (e.g. physical assault/throwing bottles, rocks, bricks, chemicals, liquids, fireworks/explosives, or other items);
> - When an individual or group of individuals is acting with the intent to cause serious property damage (e.g. mass vandalism/looting/ destruction of structures or vehicles);
> - To prevent arson; or
> - When there is the presence of gunfire within the crowd.

So the risk of confronting tear gas, pepper balls, or flash-bang grenades is concededly far lower for a Louisvillian exercising her First Amendment rights than it was four years ago.  (All the more so for the four Plaintiffs who've moved away from Louisville.[6])  Indeed, when pressed at argument, Plaintiffs' counsel identified only three examples of crowd-control threats that persist today despite the revised policies:

- The use of chemical agents "[w]hen an individual or group of individuals is acting with the intent to cause injury to police officers or other persons (e.g. physical assault/throwing bottles, rocks, bricks, chemicals, liquids, fireworks/explosives, or other items)," SOP 12.6.5 (DN 179-1 at 19), such that police could use chemical agents in response to "a single individual throwing a water bottle," Class Cert. Hearing Tr. at 9:19–10:4.

- The "firing of pepper balls at the ground around people in order to get them to move where they are not engaged in any violent or threatening conduct," such that peaceful protesters may still be exposed to chemical agents, albeit in smaller amounts.  *Id.* at 15:1–10.

- SOP 9.1.4's seeming authorization of chemical agents "in response to individuals who are fleeing," such that officers could use unnecessary force against individuals who were trying to leave a protest that had gotten out of hand.  *Id.* at 13:12–16.[7]

---

Chemical agents will not be used to move or control a lawful crowd or for disorderly or unlawful crowds that are merely refusing to disperse, but do not present a specific danger as outlined above.  SOP 12.6.5 (DN 179-1 at 19).

[6] *See* Smith Dep. (DN 179-3) at 29:6–9 (moved to Cincinnati); Weakley Dep. (DN 179-4) at 23:12–15 (same); Tinsley Dep. (DN 179-5) at 8:5–12 (Florida); Schauer Dep. (DN 179-6) 25:5–12 (Oregon).

[7] Plaintiff's counsel also objected that SOP 9.1.4 could allow for the use of crowd-control weapons against fleeing protesters.  As discussed at the hearing, however, SOP 9.1.4 is hard to describe as a use-of-force policy addressing crowd-control weapons.  It is simply one way (a "roundel") of representing the use-of-force continuum familiar to police officers and civil-rights litigators alike.  This generic representation of force escalation surely could not trump SOP 12.6.5's specific policy governing uses of force in the crowd-control and civil-disturbance context.  As defense counsel explained, without rebuttal, "nothing in 9.1.4 would expand on the SOP authorization of the use of chemical agents beyond what's" in SOP 12.6.5.  Class Cert. Hearing Tr. at 19:3–6; *see Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991) ("A specific provision controls one of a more general application.").

These examples, of course, are almost inherently speculative. Nothing in the record indicates LMPD has exercised force in these ways since the Plaintiffs amended their complaint or moved for class certification. The use-of-force policy and its application, in other words, both look much different than they did during the summer of 2020, when Plaintiffs describe the indiscriminate use of tear gas, grenades, and pepper balls without any written policy constraints. Now, Plaintiffs appear to have identified only two additional changes they would make to the new policy "if [they] had the red pen." *Id.* at 21:3–7. First, that "at least a substantial portion of a crowd [be] engaged in violence or acting with intent to endanger an officer" before chemical agents can be authorized. *Id.* at 21:19–25. Second, to bar officers from aiming pepper balls at the ground near peaceful protesters. *Id.* at 15:1–10.

A classwide injunction to that effect, however, would not obviously protect the putative class of 2020 protesters from any ongoing or imminent harm, creating a risk that this Court would exceed its jurisdiction by intervening in municipal public-safety policy absent a concrete constitutional dispute. Given the ever-present command for federal judges to mind the limits of their constitutional authority, the Court ordered the parties to address justiciability in addition to class certification in supplemental briefs and at a hearing. DNs 177, 184.

## II. JUSTICIABILITY OF THE CLASSWIDE INJUNCTION REQUEST

**A. Standing.** Article III standing requires an injury that is "'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farm*, 561 U.S. 139, 149 (2010)). These are measured claim-by-claim, not in gross: a "plaintiff must demonstrate standing separately for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (quotation marks omitted).

When that form of relief is an injunction against *future* action, a plaintiff must also "show a present ongoing harm or imminent future harm" that the injunction would redress. *Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 981 (6th Cir. 2020). "[P]ast exposure to illegal conduct," the Supreme Court has held, "does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). And to certify a *class* seeking an injunction or some other form of classwide relief, at least one named plaintiff "must demonstrate individual standing vis-a-vis the defendant." *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998) (cleaned up).

Given concerns that the feared harms animating this dispute were no longer "imminent," the Court invited the parties to address "the nature of the plaintiffs' past

and potential future injuries, the causal connection between those injuries and the challenged actions, and the redressability of those injuries by the requested forms of injunctive relief." DN 177 (citing *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001)).

To illustrate their injuries, the Plaintiffs emphasized the fraught state of affairs for Louisville protesters in the summer of 2020. When the Plaintiffs filed their complaint, they claimed the "credible threat of [the Challenged Policy's] enforcement" chilled their First Amendment-protected speech by causing them to self-censor their protest activities. Plaintiffs' Supp. Br. 6, 8. Further, they faced a substantial risk of excessive force under the Fourth Amendment because the police had deployed crowd-control weaponry "over six days in the eight weeks leading up to the filing of the Complaint," establishing a likelihood of future harm. *Id.* at 8–9. At the time, police regularly issued "dispersal orders" that threatened the very harm the Plaintiffs seeks to enjoin: "This is an unlawful assembly. If you refuse to disperse, we will dispense chemical agents." *Id.* at 7 (quoting DN 178-2 at 2:03:09). Given these risks, moreover, the Kentucky Alliance had to divert resources to provide security to protesters. *Id.* at 11.

An injunction preventing the City from deploying these weapons, the Plaintiffs contend, would've halted the harm caused by the Challenged Policy. *Id.* at 14. Their "risk of future harm," in other words, was "sufficiently imminent and substantial" in July 2020 that the Plaintiffs could "pursue forward-looking, injunctive relief to prevent the harm from occurring." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435–36 (2021) (citing *Clapper*, 568 U.S. at 414, n.5; *Lyons*, 461 U.S. at 102, 103). On the other hand, Plaintiffs' fears (at least as reflected in the record) stem from six discrete encounters, all of which occurred in May or early June—well before the rejection of the TRO and filing of the Amended Complaint. The evidence that they self-censored because of police tactics is slim. So the record is not entirely clear that Plaintiffs faced an imminent and substantial risk of future harm in July 2020.

**B. Mootness.** Even assuming the record is adequate to establish standing in the summer of 2020, the world has changed significantly since then. And a plaintiff's interest in the relief sought "must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997). To be sure, no one doubts that the Plaintiffs' interest in a damages award persists today: if they can demonstrate that pepper balls, flash-bang grenades, and tear gas harmed them in violation of the First or Fourth Amendments, then they may pursue that interest in monetary compensation for the past injury, even if no threat of additional harm remains. So the Plaintiffs' retrospective damages claim means this lawsuit will persist regardless of whether an injunction class is certified.

But mootness, like standing, is claim-specific. *See, e.g., Daingerfield Island Protective Soc'y v. Lujan*, 920 F.2d 32, 37 (D.C. Cir. 1990) ("[C]laim specific analysis [is] required before we [can] say that appellees have met the 'heavy' burden of demonstrating mootness." (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979))); *Gilbert v. Donahoe*, 751 F.3d 303, 313 (5th Cir. 2014) (plaintiff's retirement "destroy[ed] her standing to bring claims for injunctive relief" but not her damages claims). With respect to forward-looking relief, that means "the relief sought [must], if granted, make a difference in the legal interests of the parties." *In re Flint Water Cases*, 63 F.4th 486, 498 (6th Cir. 2023). And in class-action litigation, to avoid mootness the lead plaintiffs' interest in the remedy must still exist "at the time the class action is certified by the District Court pursuant to Rule 23." *Sosna v. Iowa*, 419 U.S. 393, 402 (1975). Otherwise (absent exceptions for fleeting claims and other unusual circumstances not relevant here), the class-action claim would be moot—no longer a live controversy fit for the Court's resolution—if intervening circumstances extinguish the named plaintiffs' interest in the dispute before class certification. If "the named plaintiff's claim becomes moot before certification, dismissal of the action is required." *Brunet v. City of Columbus*, 1 F.3d 390, 399 (6th Cir. 1993); *see also City of Parma, Ohio v. Cingular Wireless, LLC*, 278 F. App'x 636, 642 (6th Cir. 2008) (same).[8]

The Plaintiffs' interest, at this late date, in a prospective, classwide injunction is not clear. Everyone agrees that no actual injury from the use of crowd-control weapons is ongoing at this point; the Plaintiffs point only to a risk of future injury that they say remains imminent. *See* Class Cert. Hearing Tr. at 48:18–49:8.

Would an imminent injury be avoided, in 2024, if this Court issued the injunction Plaintiffs seek? Its language would command that Defendants stop "using Crowd Control Weaponry on peaceful people at protests" and would "requir[e] Defendants to promulgate official policies restricting the use of Crowd Control

---

[8] The fact and timing of certification are critical. *See, e.g., Brunet*, 1 F.3d at 399 ("*Once a class is certified*, the mooting of the named plaintiff's claim does not moot the action" and "the court continues to have jurisdiction to hear the merits of the action if a controversy between any class member and the defendant exists. Where, on the other hand, the named plaintiff's claim becomes moot *before* certification, dismissal of the action is required.") (emphases in original); *Ahmed v. University of Toledo*, 822 F.2d 26, 27–28 (6th Cir. 1987) ("A class action may sometimes remain justiciable notwithstanding that the claims of the named plaintiffs have become moot, if the class has 'acquired a legal status separate from the interest asserted' by the named plaintiffs. The plaintiffs' efforts at resuscitation cannot succeed here because the purported class was never certified under Rule 23.") (quoting *Sosna*, 419 U.S. at 399); 1 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 2:11 (6th ed.).

Weaponry to only those individuals who pose an imminent risk of serious physical danger to an officer or others." Certification Motion at 11.

The City has largely come around to the Plaintiffs' position, at least as a matter of official police policy. By now LMPD has in fact "promulgate[d] [an] official polic[y] restricting the use of Crowd Control Weaponry." *Id.* And it's one that substantially limits the "us[e] [of] Crowd Control Weaponry on peaceful people at protests." *Id.* Under the current policy, "[c]rowd control devices may only be utilized on disorderly or unlawful crowds to prevent injury, death, or property damage." SOP 12.6.5 (DN 179-1 at 19). "Chemical agents," moreover, "will not be used to move or control a lawful crowd or for disorderly or unlawful crowds that are merely refusing to disperse, but do not present a specific danger" to other people, property, or law enforcement. *Id.* And the new policy bars officers from aiming "pepper ball munitions at the body of an individual unless the individual is presenting a safety threat" to the officer, other people, or property. *Id.*

Under the policies in effect when the Plaintiffs sued, by contrast, the LMPD could use chemical agents "to disperse disorderly aggressive crowds." SOP 9.1.8 (DN 139-10 at 9). And the understanding of what was "disorderly" or "aggressive" was far looser: according to ex-Chief Conrad, "anything from blocking a street ... to outright rioting" could be considered disorderly. Conrad Dep. (DN 139-11) at 129:19–21. Curfew violations, for example, could render a protest unlawful. *Id.* at 169:10–12. This lack of legal constraints governing the use of force against peaceful protesters is precisely what brought the Plaintiffs to court seeking an injunction. Those constraints, by and large, now exist—as a result of executive rather than judicial decisionmaking.

True, the policy doesn't limit crowd-control weapons *solely* to the "imminent risk of serious physical danger," as the Plaintiffs would apparently prefer; it also contemplates uses to avoid arson and serious property damage. *See* SOP 12.6.5 (DN 179-1 at 19). But the use of force in response to property damage isn't the focus of the Plaintiff's requested relief and justiciability arguments—those focus on the dispersed use of force in response to de minimis threats to law enforcement. *See* Class Cert. Hearing Tr. at 9:19–10:17. They don't resist the notion that courts presume public officials will follow the law. *See Preiser v. Newkirk*, 422 U.S. 395, 402–03 (1975) ("While there is always the *possibility* that [state] authorities might disregard the specific [policy] in regard to [a plaintiff], 'such speculative contingencies afford no basis for our passing on the substantive issues [that plaintiff] would have us decide....") (quoting *Hall v. Beals,* 396 U.S. 45, 49 (1969)). Rather, the Plaintiffs point to a risk that they might still be harmed, even under the new policy, at a hypothetical future protest by the hypothetical use of tear gas in response to the hypothetical use of force by an adjacent non-peaceful protester. At the hearing, counsel used the example of a water bottle thrown at law enforcement that triggers the use of tear gas

or a crowd refusing to disperse that causes police to fire "pepper balls at the ground around [the] people." *See* Class Cert. Hearing Tr. at 9:19–10:4, 15:1–10.

Simply describing the chain of events necessary to that theory of future injury reveals it's not imminent, but instead quite speculative. The record's post-2020 silence corroborates this. It includes no instances in which LMPD has used chemical agents for these purposes since 2020. Indeed, the record reflects no use of chemical agents or other nonspecific crowd-control weapons *at all* since 2020. That presumably correlates with the diminished frequency and intensity of protests since then—a change in circumstance that no party to this lawsuit (and no one who has lived in Louisville since 2020) doubts. Some of the Plaintiffs are no longer among that group: four have moved out of state. *See* above n.6. Others have not protested since. *See* Meisner Dep. (DN 179-9) 66:7-8 (didn't attend protests after August 2020 because organizers had dissolved by September). And all three named individual Defendants—leaders of the police force involved in the use or tolerance of crowd-control weapons in 2020—have retired. Defendants' Supp. Br. at 5.

If Plaintiffs were to sue for injunctive relief today, they'd almost certainly lack standing because a "'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 1149, 158 (1990)). And if the imminent harm that justifies the original suit disappears, so does the controversy. *Berry v. School Dist. of City of Benton Harbor*, 801 F.2d 872, 874–75 (6th Cir. 1986) (injunctive-relief claim moot because challenged conduct was not imminent). Indeed, no impending injury remains, then "the relief sought would" not "make a difference in [plaintiffs'] legal interests." *See In re Flint Water Cases*, 63 F.4th at 498. Even the TRO sought in the middle of the August 2020 protests was deemed too speculative and vague. *See* above at Section I.C. (quoting TRO Hearing Tr. at 25:15–26:1). The current risks fare far worse, and the Plaintiffs' evidence that they face "a 'substantial risk' that the harm will occur" is spare indeed. *Kanuszewski v. Michigan Dept. of Health and Human Services*, 927 F.3d 396, 410 (6th Cir. 2019) (quoting *Clapper*, 568 U.S. at 414 n.5 (cleaned up)).

The Plaintiffs lean most heavily not on proof of their own, but on the *burden* of proof, which flips from plaintiffs (who must establish standing) to defendants (to establish mootness). Plaintiffs' Supp. Br. at 14 (quoting *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019). The Defendants, they note, have offered "conflicting statements" about the meaning of the new policy and haven't carried the "heavy" burden of showing that post-litigation changes moot a lawsuit. *See, e.g.*, *Davis*, 440 US at 631. Under ordinary circumstances, pointing to the burden would not suffice. The record as it currently stands bears little resemblance to any imminent injury saving this case from mootness.

12

But according to the Plaintiffs, the City's "voluntary cessation" of the Challenged Policy changes the analysis. To avoid gamesmanship, courts apply this mootness standard more stringently when changed circumstances result from a defendant's response to the litigation itself. This case presents, at least in part, an example of such "voluntary cessation." *See generally Schlissel*, 939 F.3d at 767 . On the one hand, most of the subsequent litigation developments appear to have had little if anything to do with this case: the Plaintiffs don't ascribe the leadership changes, Plaintiffs' relocations, or the diminution of protest activity, for example, to their lawsuit. On the other hand, the LMPD's decision to adopt a new SOP for the use of crowd-control weapons could relate to this long-running lawsuit. (The record appears silent on its cause.) While courts typically credit a government's codified change in policy more so than a private defendant's voluntary and transitory change in course, *Schlissel*, 939 F.3d at 767 , this sequence of events requires asking whether there remains "a fair prospect that the [challenged] conduct will recur in the foreseeable future." *Resurrection School v. Hertel*, 35 F.4th 524, 530 (6th Cir. 2022) (en banc).

Nothing currently in the record appears to indicate any such prospect of recurrence. And the Plaintiffs are wrong to say *no* record evidence supports mootness. The City introduced evidence in support of its brief advocating mootness and lack of standing. *See, e.g.*, SOP 12.6.5 (DN 179-1 at 19, 31–32) ("Crowd control devices can only be used on disorderly or unlawful crowds to prevent injury, death, or property damage."); Special Order #20-034 (DN 179-1 at 25) ("Effective immediately, the use of tear gas for crowd control will require the approval of the Chief of Police, or his/her designee."). Plaintiffs don't contend they remain at risk because an LMPD officer might not follow the SOP—though they do wonder how the Department made (and conceivably might unmake) the new rules. *See* Class Cert. Hearing Tr. at 47:16–21. This, however, appears entirely speculative—and therefore insufficient to avoid mootness. There must "exis[t] some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *see also Berry*, 801 F.2d at 874 ("The mere *possibility* that a situation will arise … is insufficient to justify orders which are designed, in effect, to protect against conceivable eventualities.").

But the Plaintiffs are right that the Defendants have not shown there is *no* chance of a future injury under the new policy, and they have raised unaddressed concerns regarding how and when the City amended this policy (an amendment which, perhaps coincidentally, is dated just before the amended complaint, SOP 12.6.5 (DN 179-1 at 31–32)). Although little appears to link the chill or fear the Plaintiffs faced due to the Challenged Policy as of 2020 to their situation today, a ruling that this injunction request is moot—as a constitutional matter—is arguably

premature. Out of an abundance of caution given the sua sponte nature of the Court's justiciability concerns, and the Defendants' heavy burden of establishing constitutional mootness, the Court declines at this juncture to rule that no Article III controversy exists with respect to the forward-looking relief the Plaintiffs seek.

**C. Prudential Mootness.** Regardless of whether the injunction request is technically moot in all respects, however, it no longer promises putative class members significant classwide relief. These changed circumstances make clear that an anticipatory classwide injunction—directed at new and untested policies under vastly different circumstances—would supply little if any practical relief. So even if—due to burden-shifting and suspicion regarding voluntary cessation—the Plaintiffs' request for a classwide injunction isn't moot as a constitutional matter, it surely is as a prudential matter.

The difference between constitutional mootness and remedial discretion—particularly in the realm of injunctions and other equitable remedies—has long been recognized in the federal courts. "[I]nherent in that [equitable] power is the concomitant power to deny relief altogether unless 'the moving party [can] satisfy the court that relief is needed.'" *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1212 (10th Cir. 2012) (op. of Gorsuch, J.) (quoting *W.T. Grant Co.*, 345 U.S. at 633). "In some circumstances, a controversy, not actually moot" under standard Article III considerations, "is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant." *Id.* (quoting *Chamber of Commerce v. U.S. Dep't of Energy,* 627 F.2d 289, 291 (D.C. Cir.1980)).

This is known as prudential mootness. *See Greenbaum*, 370 F.3d at 535–36. Drawing on equitable authority, courts may sometimes "decline to reach" the merits of a suit because, "as the circumstances have changed," they "can no longer afford petitioners any meaningful relief on this point." *Id.* (citing *Chamber of Commerce*, 627 F.2d at 291)). "The doctrine is discretionary and permits a court to 'dismiss [a lawsuit] not technically moot if circumstances [have] changed since the beginning of litigation that forestall any occasion for meaningful relief.'" *Solak v. Ford Motor Co.*, No. 23-cv-10064, 2023 WL 4628456, at *3 (E.D. Mich. July 19, 2023) (quoting *Hunt v. Imperial Merch. Servs. Inc.*, 560 F.3d 1137, 1142 (9th Cir. 2009)). "The discretionary power to withhold injunctive and declaratory relief for prudential reasons, even in a case not constitutionally moot, is well established." *S–1 v. Spangler,* 832 F.2d 294, 297 (4th Cir. 1987).[9]

---

[9] As courts have repeatedly recognized, considerations of mootness and the appropriateness of injunctive relief, while distinct, are closely related:

Although prudential mootness is of course not a normal consideration under Rule 23, the development of this case hasn't been normal. And courts may use the doctrine to deny certification of an injunction class under Rule 23(b)(2). *See Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 544 (E.D.N.Y. 2017). "Rule 23(b)(2) allows class treatment when 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) (quoting FED. R. CIV. P. 23(b)(2)). But that opportunity for classwide injunctive relief doesn't deprive courts of their traditional authority to fashion injunctive relief according to all the circumstances at the time of a judgment. Given "the 'remedial discretion' of the courts" that applies to "claims for equitable relief," *Winzler*, 681 F.3d at 1210, it would be strange indeed for a court to certify an injunction-only class based on facts that would lead the court *not* to issue an injunction. The court's "remedial discretion," after all, "necessarily includes the power to 'mould each decree to the necessities of the particular case.'" *Id.* (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)).

Several considerations illustrate why the request for a classwide injunction is moot—at least prudentially if not constitutionally. Four years into this litigation—with policies amended, protests diminished, and no imminent risk of crowd-control weapons on the horizon—a classwide injunction would add little of import to the relief the named Plaintiffs could achieve on their own.

---

[T]he analysis of whether a case is moot overlaps with the analysis of whether a permanent injunction is appropriate on the merits because both are concerned with the likelihood of future unlawful conduct. But the two inquiries are strikingly different [because] a defendant seeking dismissal on mootness grounds under the doctrine of voluntary cessation bears the extremely heavy burden of showing that it is absolutely clear that he will not revert to his old ways. But whether a permanent injunction is appropriate … turns on whether the plaintiff can establish by a preponderance of the evidence that this form of equitable relief is necessary.

*Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1182 n.10 (11th Cir. 2007) (citing *W.T. Grant Co.,* 345 U.S. at 633); *see also United States v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199, 203–04 (1968) (though case was not moot, district judge was not required to grant equitable relief: "Of course it is still open to appellees to show, on remand, that the likelihood of further violations is sufficiently remote to make injunctive relief unnecessary. This is a matter for the trial judge."); 13C Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 3533.5 (3d ed.) ("Even if discontinuance has not mooted the dispute, the court may exercise its remedial discretion to deny any present remedy. Remedial discretion is often described in open-ended terms.").

What—besides procedural complexity—would a class-action component add to any injunction the Court might award individual named plaintiffs?  Arguably nothing.  According to Plaintiff's counsel, "to the extent there is an injunction that … would apply to the … full department policies … there would be no difference" in the practical effect of a classwide or individual injunction.  Class Cert. Hearing Tr. at 63:22–64:1.  This strongly suggests that classwide relief would not be "meaningful" under the prudential-mootness doctrine.  *Greenbaum*, 370 F.3d at 534.

Indeed, classwide relief can become unnecessary when a "plaintiff has a remedial promise from a coordinate branch in hand," even if that promise isn't "sufficient to render a case moot as a constitutional matter."  *Winzler*, 681 F.3d at 1210.  That is the situation here.  At the outset of this litigation, the Challenged Policy arguably authorized the use of crowd-control weapons against peaceful protesters.  A classwide order might've brought equivalent relief to many similarly situated protesters simply by enjoining that policy.

Now, though, the script has flipped—in large part due to a "remedial promise from a coordinate branch"—here, the Louisville Metro Government.  The new policy would authorize the use of crowd-control weapons against peaceful protesters only in narrow circumstances.  And even Plaintiff's counsel seems to admit that an injunction against the new policy would not bar all such use of force: it would reach a more limited set of actions that would depend on a case-by-case determination of reasonableness.  *See* Class Cert. Hearing Tr. at 21:19–24 ("[T]here needs to be a finding that there's at least a substantial portion of a crowd that's engaged in violence or acting with intent to endanger an officer.  It can't be a single individual's actions that justify use of force on a crowd no matter how big.").

This tracks similar concerns under Rule 23—which only reinforce the appropriateness of prudential mootness.  Rule 23(b)(2) "does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant."  *Dukes*, 564 U.S. at 360.  A classwide injunction that contemplated the use of crowd-control weapons in some circumstances, based on a case-specific reasonableness review, would do little to clarify the legal rights and obligations of protesters or police.  Nor would it do much to alleviate any chilled speech or to protect against unreasonable force if class members returned to protest: the variety of partially peaceful crowd-dispersal scenarios under the new and untested policy are at once so speculative and so varied that judges and litigants alike would struggle to anticipate the injunction's effect.  So that order would likely operate on the margins of police operations and therefore affect very few putative class members—even assuming clashes between protesters and police reemerged in a similar fashion as in 2020.

16

This is a problem for the putative class representatives, because "certification under Rule 23(b)(2) is appropriate only if members of the proposed class would benefit from the injunctive relief they request." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 416 (5th Cir. 2004).  For classwide prospective relief to be "appropriate respecting the class as a whole," FED. R. CIV. P. 23(b)(2), there must be some "useful purpose … served by permitting this case to proceed as a class action." *Craft v. Memphis Light, Gas and Water Division*, 534 F.2d 684, 686 (6th Cir. 1976).  In *Craft*, the Sixth Circuit affirmed a district court's refusal to certify a class because the relief sought would "accrue to the benefit of others similarly situated" regardless of whether the court granted classwide or individual relief.  *Id.*[10]  "[W]hen the same relief can be obtained without certifying a class, a court may be justified in concluding that class relief is not 'appropriate.'"  *Dionne v. Bouley*, 757 F.2d 1344, 1356 (1st Cir. 1985).

One alternative to a rule-of-reason injunction would be "a *per se* rule that the use of indiscriminate weapons against a group of protestors comprised of at least some individuals that are engaged in no more passive resistance always violates the Fourth Amendment regardless of the any other circumstances." *Don't Shoot Portland v. City of Portland*, No. 3:20-cv-917, 2022 WL 2700307, at *11 (D. Or. July 12, 2022).  That was the request made by a putative class to an Oregon district judge, which denied certification for lack of commonality.  And it closely resembles the relief Plaintiffs seeks here—though counsel pointed to no precedent that held as much outside the preliminary-injunction context.  Class Cert. Hearing Tr. at 10:18–13:11.  As the Oregon court recognized, "such a rule is at odds with the nature of excessive force claims," and therefore the class faced a disconnect between the common injury claimed and any common order the Court might impose classwide.  Any injunction addressing only particular instances of crowd-control deployment that persist around the margins of the new policy would, almost by definition, fail to provide common classwide relief—and would introduce additional uncertainty counseling against keeping this putative class action on life support.

This is particularly true given the federalism and separation-of-powers implications of an anticipatory court order prescribing use-of-force policies for a municipal government in circumstances that no party to this lawsuit can necessarily anticipate.  Prudential mootness, like any thoughtful consideration of federal courts' limited role, embraces notions of comity toward "a coordinate branch of government." *Winzler*, 681 F.3d at 1210.  Particularly when that organ of government has already "step[ped] in to promise the relief [the plaintiff] seeks," ample basis exists for a court

---

[10] *See also Cook v. Barry*, 718 F. Supp. 632, 635 (S.D. Ohio 1989) (declining certification because "the declaratory and injunctive relief requested by plaintiffs would automatically accrue to the benefit of others similarly situated," regardless of certification, so "no useful purpose would be served by permitting this case to proceed as a class action.") (quoting *Craft*, 534 F.2d at 686).

to stay its hand. *Id.* Whatever limited "practical effect" this Court's anticipatory relief might have, *Resurrection School*, 35 F.4th at 530 (quoting *Ohio v. EPA*, 969 F.3d 306, 308 (6th Cir. 2020)), would undoubtedly have unintended consequences—and might well end up doing more harm than good. The apparent lack of meaningful incremental relief that an injunction might contribute to members of the putative class, relative to declaratory or injunctive relief awarded to named plaintiffs only, warrants dismissal of the claim and denial of certification on the ground of prudential mootness. "[E]ven if [the Plaintiffs'] claims were not constitutionally moot, this Court would have ample reason to exercise its discretionary power to withhold the requested relief on prudential grounds." *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690 (3d Cir. 1996).

## CONCLUSION

This ruling disposes only of the class-certification request. While mootness considerations bear on the named plaintiffs' own requests for declaratory and injunctive relief, the extent (if any) to which those inquiries differ is not an issue to which the parties have given significant attention at this time. It's possible the plaintiffs can show their own requested injunction isn't moot—either constitutionally or prudentially—and that it would indeed supply valuable and effective relief for them and potentially others. It's also possible that resolving the pending damages claim would supply the determination of legality that motivates the declaratory judgment claim. For that matter, should the threat of imminent harm reappear in a manner that would justify temporary or emergency injunctive relief, the Plaintiffs may return to this Court and raise such a request by expedited motion.

Based on the record and briefing currently before the Court, however, a classwide injunction would not meaningfully redress an active controversy threatening actual or imminent injury. Therefore certifying a class to consider such a broad, anticipatory injunction would represent an unjustified exercise of this Court's jurisdiction and remedial authority. So the Court denies Plaintiffs' motion to certify a class under Rule 23(b)(2).