UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE
CASE NO. 3:20-cv-535-BJB-CHL

**ATTICA SCOTT**, *et al.*                                                    **PLAINTIFFS**

**v.**                                   *Electronically Filed*

**LOUISVILLE/JEFFERSON COUNTY METRO
GOVERNMENT,** *et al.*                                                **DEFENDANTS**

\*\*\* \*\*\* \*\*\* \*\*\*

**METRO'S COMBINED MEMORANDUM IN SUPPORT OF
MOTION FOR PROTECTIVE ORDER
AND RESPONSE TO PLAINTIFFS' MOTION TO COMPEL [ECF 214]**

Defendant, Louisville/Jefferson County Metro Government ("Metro"), hereby furnishes its

Combined Memorandum in Support of Motion for Protective Order and Response to Plaintiffs'

Motion to Compel [ECF 214.]

**SUMMARY OF ARGUMENT**

On June 18, 2024, Plaintiffs took the 30(b)(6) deposition of Emily McKinley, Assistant

Chief of Police in charge of LMPD's Accountability and Improvement Bureau for five hours and

five minutes—just one hour and fifty five minutes short of the seven hour limit set forth in

30(d)(1)—and covered just five topics. Now, apparently unsatisfied with Assistant Chief

McKinley's adequate preparation and comprehensive testimony, Plaintiffs filed a Motion to

Compel more testimony on the same five topics while also demanding that Metro designate a

30(b)(6) witness for 34 other topics—most of which have no relevance to Plaintiffs' claims and

are overly burdensome and disproportional to the issues and damages involved. The parties briefed

many of the topics in Plaintiffs' 34 topic 30(b)(6) notice back in 2023 when a nearly identical

30(b)(6) notice was in dispute, and the shortcomings of Plaintiffs' 2023 notice remain. And Metro

is more informed now about Plaintiffs' unreasonable and unsupported expectations and demands

for "absolute perfection" in 30(b)(6) witness preparation and testimony, as revealed in Plaintiffs' pending Motion to Compel on Assistant Chief McKinley's five plus hours of testimony. Not only is it impossible for Metro to designate and prepare a witness to cover all the 34 noticed topics that Plaintiffs have identified in a manner that they will find sufficient, but the weeks (if not months) it would take to prepare such testimony will lead to no evidence relevant or admissible to Plaintiffs claims or Metro's defenses.

## **FACTUAL BACKGROUND**

Plaintiffs filed this lawsuit against the City of Louisville, Kentucky, its former mayor Greg Fischer, its former police chief, Robert Schroeder, and its former deputy police chief LaVita Chavous on July 30, 2020, alleging violations of Plaintiffs' First and Fourth Amendment rights as well as common law assault and battery related to Louisville's and its police department's ("LMPD") response to protestors and rioters from approximately May 28, 2020, through November 25, 2020. (*See* Amended Compl. [ECF 32].) Discovery has been ongoing for most of the last four years, and, in fact, the issues raised here have been in dispute since 2023.

Plaintiffs' discovery demands have been exhaustive, time-consuming, and exorbitantly expensive for Metro since the filing of this action. Metro detailed its extensive discovery efforts through July of 2023 in its previously filed Memorandum of Support of Motion for Protective Order [ECF 144-1 at p. 2-6], the declaration of Todd Cooper [ECF 144-3], and the declaration of Aimee Harrison [ECF 144-4], and those efforts and expenses have grown since that filing. To summarize, between July 30, 2020, and July 2023, Metro produced over 2.3 terabytes of data, which represents well over 150,000 documents. As of July 2023, Metro's e-discovery vendor had processed and produced 155,538 documents, consisting of 240,105 pages. And that data does not account for documents produced without the assistance of the vendor. Since July 2023, Metro has

produced hundreds more pages of documents to Plaintiffs. The sources of Metro's production are wide-ranging, as they came from a Metro electronic storage file designated for the events of 2020, cell phones, and email boxes from over a dozen different Metro employees—the lion's share of which no longer work for Metro. Plaintiffs have also deposed the three individually named defendants and former Chief Steven Conrad regarding the events in this case.

### A.    Background of the Discovery Disputes

The current discovery disputes arose after Plaintiffs subpoenaed and noticed Mayor Craig Greenberg's deposition in May 2023. After the parties engaged in several failed meet and confers, Metro filed a Motion for Protective Order to Quash Subpoena of Mayor Greenberg. [ECF 136.] On June 30, 2023, Plaintiffs served a 36-topic 30(b)(6) notice ("2023 Notice") on Metro that that covered a time-period of May 2020 to "present." On July 12, 2023, Metro filed a Motion for Protective Order related to the 2023 Notice. [ECF 144.]

On February 21, 2024, while Metro's Motion for Protective Order on the 2023 Notice was pending before this Court and the question of Mayor Greenberg's deposition was pending on Metro's objection to the Court's order denying the Motion to Quash, Judge Beaton held a hearing on Plaintiffs' Motion for Class Certification that addressed, among other things, those two issues. Plaintiffs argued at the hearing that specific Metro standard operating procedures could be read and applied in three hypothetical ways to justify their requested class certification and injunctive relief that necessitated Mayor Greenberg's deposition and several of the 36 topics in the 2023 Notice: (1) SOP 12.6.5 still allows chemical agents to be used on a crowd when an individual acts with intent to cause injury to police officers which includes a single individual throwing a water bottle [ECF 184 at 09:19-10:04] (hereinafter "12.6.5 water bottle hypothetical"); (2) SOP 9.1.4 provides "that chemical agents can be used in response to individuals who are fleeing," [*Id.* at

13:13-16] (hereinafter "9.1.4 Chart"); and (3) a certain SOP "expressly permits the firing of pepper balls at the ground around people in order to get them to move where they are not engaged in any violent or threatening conduct." [*Id.* at 15:01-04] (hereinafter "pepper ball hypothetical"). Judge Beaton responded that, in lieu of the mayor's deposition, Metro present a 30(b)(6) witness to testify on Metro's current interpretation of the three scenarios identified by Plaintiffs: "I mean, if you guys were able to get a quick 30(b)(6) deposition on someone who actually addressed the current state of play, wouldn't that largely eliminate your need and desire to depose the mayor?" (*Id.* at 43:14-17.) Plaintiffs' counsel asked Judge Beaton to include questions about the mayor's office's role, and he agreed. Plaintiffs' counsel then committed with these words: "So we would be okay with another witness as long as they're prepared to talk about all of the *interpretation of the current meaning* [of the three SOP's] that's being – that's being employed." (*Id.* at 44:11-14.) Stated differently, Plaintiffs agreed on the record that Metro's designation of a witness in lieu of the Mayor would satisfy Plaintiffs' alleged needs if the designated 30(b)(6) witness could discuss the three hypotheticals posed to Judge Beaton: the 12.6.5 water bottle hypothetical, the 9.1.4 chart, and the pepper ball hypothetical.

On June 11, 2024, Plaintiffs served a second Metro 30(b)(6) notice that covered topics not contemplated at the February 21 hearing. (*See* [ECF 214-1]) (hereinafter "June 2024 Notice"). That is, the June 2024 Notice broadened the three concrete situations identified by Plaintiffs and Judge Beaton at the hearing into five topics that reached the outer-most margins of those three situations. Several of the topics sought in the June 2024 Notice are simply an extension of the 2023 Notice. For instance, Topic 2 under City Organizational Structure of the 2023 Notice requests testimony on "The process for changing policies of the LMPD, including but not limited to changes made to LMPD's Standard Operating Procedures . . ." [ECF 144-2.] Similarly, the end of Topic 3

in the June 2024 notice requests testimony on the "process by which each of those revisions [to the identified SOPs] occurred." [ECF 214-1.] Topic 5 of the June 2024 Notice covers training on SOPs which is necessarily included under the Training of Officers topics in the 2023 Notice.

Metro agreed to present a witness on the five topics and on June 18, 2024, Plaintiffs deposed Assistant Chief of Police Emily McKinley as Metro's designee. As the assistant chief responsible for policy development and delivery, and as the individual designated by Metro to fulfill its commitment to Judge Beaton's request, Assistant Chief McKinley was ready, willing, and able to articulate Metro's "interpretation of the current meaning" of the 12.6.5 water bottle hypothetical, the 9.1.4 chart, and the pepper ball hypothetical—the three topics Plaintiffs identified to Judge Beaton. Assistant Chief McKinley testified about all three topics as well as the additional topics sought by Plaintiffs for five hours and five minutes.

### B.    Current Discovery Dispute

On November 15, 2024, Plaintiffs returned to the 2023 Notice by serving a 30(b)(6) notice on Metro that contains 34 of the original 36 topics ("November 2024 Notice"). (Ex. A) (*Compare* [ECF 144-2] *with* Ex. A).[1] Metro objected to the scope of the November 2024 Notice for largely the same reasons it objected to and engaged in motion practice on the 2023 Notice, and the parties exchanged letters outlining their positions on the scope of the topics. (December 13, 2024, B. Paul Letter, Ex. B; December 20, 2024, C. Logue Letter, Ex. C; January 7, 2025, W. Carroll Letter, Ex. D.) In a good faith effort to compromise, Metro (1) agreed to present a witness limited to two hours on certain topics and (2) designated previous testimony from various depositions and agreed to produce a witness for approximately ten of the topics. The parties were unable to reach a

---

[1] The primary difference between the November 2024 Notice and the 2023 Notice is that, since deposing Assistant Chief McKinley and losing class certification, Plaintiffs have limited the timeframe of the topics from May 2020 through present to May 2020 through November 2020.

compromise on the remaining 24 topics.

On July 10, 2024, the parties also engaged in a meet-and-confer regarding the June 2024 Notice and Assistant Chief McKinley's deposition without resolution. The parties then exchanged letters stating their positions on the adequacy of Assistant Chief McKinley's deposition. (*See* [ECF 214-2.]) Metro contends Assistant Chief McKinley has satisfied Metro's obligations as to the June 2024 Notice and certainly Judge Beaton's conception of "a quick 30(b)(6) deposition" on "the current state of play." Nevertheless, Plaintiffs filed their Motion to Compel further deposition testimony from Assistant Chief McKinley on January 3, 2025. [ECF 214.]

In compliance with this Court's December 10, 2024 Order [ECF 210], Metro now files this combined response and motion for protective order and requests that this Court (1) deny Plaintiffs' motion on the June 2023 Notice and (2) enter a protective order preventing Plaintiffs from burdening Metro with their attempted deposition related to the remaining 24 topics in the November 2024 Notice that are non-compliant with Rules 26(b)(1), 26(b)(2)(C), and 30(b)(6).

## **ARGUMENT**

### I.    **Legal Standard**

"Rule 26(b)(1) is the touchstone for the scope of civil discovery." *Pogue v. NorthWestern Mut. Life Ins. Co.*, No. 3:14-CV-598-CRS, 2017 WL 3044763, at \*4 (W.D. Ky. July 18, 2017). Under Rule 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Parties' discovery rights therefore have limitations. The court must limit the requested discovery where:

>   (i)    the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

(ii)     the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

(iii)    the proposed discovery is outside the scope permitted by Rule 26(b)(1).

Fed. R. Civ. P. 26(b)(2)(C).

Rule 30(b)(6) governs organizational depositions, where a party seeks testimony on identified topics. Fed. R. Civ. P. 30(b)(6). However, an important limitation exists wherein the party identifying the matter for examination must describe it with "reasonable particularity." *Id.* The designated witness "must testify about information known or reasonably available to the organization." *Id.* Although the designated witness' testimony need not be perfect, they "must be educated and gain the requested knowledge to the extent that it is reasonably available to the corporation." *Alvey v. State Farm Fire & Casualty Co.*, No. 5:17-CV-00023, 2018 WL 826379, at *3 (W.D. Ky. Feb. 9, 2018) (citing *Shall v. Suzuki Motor of Am., Inc.*, No. 4:14-cv-00074, 2017 WL 4050319, at *5 (W.D. Ky. Sept. 13, 2017)).

In the context of Rule 26(b)(2)(C), a 30(b)(6) notice may be quashed if the discovery is unreasonably cumulative or duplicative or the requesting party has had ample opportunity to obtain the information by discovery in the action. *Edwards v. Scripps Media, Inc.*, 331 F.R.D. 116, 121-22 (E.D. Mich. 2019). 121-22. In *Edwards*, Magistrate Judge Stafford noted:

> because Rule 30(b)(6) is intended to streamline discovery, a court can consider if the deposition would be used inefficiently 'as a catch-all technique to reexamine at the end of the discovery the universe of information an adversary has produced during the discovery period . . . so that the burden on Defendant of designating and preparing a witness would almost certainly outweigh the benefit to Plaintiff.

*Id.* at 121 (quoting *Prasad v. George Washington Univ.*, 323 F.R.D. 88, 99 (D.D.C. 2017)).

## II.    Metro has fulfilled its obligations for the June 2024 Notice.

Plaintiffs claim that Assistant Chief McKinley was not properly prepared for her deposition, which they support with anecdotal examples of testimony they assert is imperfect. Yet

perfection is not required under the law: "Absolute perfection by the 30(b)(6) witness in his or her testimony is not required. Accordingly, the inability of a designee to answer every question on a particular topic does not necessarily mean that the corporation or agency has failed to comply with its obligations under the Rule." *Consumer Fin. Prot. Bureau v. Borders & Borders, PLC*, No. 3:13-CV-1047-CRS, 2016 WL 9460471, at *3 (W.D. Ky. June 29, 2016) (internal citations omitted).

Assistant Chief McKinley testified at length on the three topics identified at the February 21 Hearing: the 12.6.5 water bottle hypothetical, the 9.1.4 chart, and the pepper ball hypothetical. She also testified to the additional topics sought by Plaintiffs that were not articulated at the February 21 Hearing. Plaintiffs burned over five of their seven hours with Assistant Chief McKinley in this endeavor. As detailed below, Assistant Chief McKinley's testimony satisfies Metro's 30(b)(6) preparation and testimony obligations.

### A.     Chief McKinley's 30(b)(6) Testimony

During the five-plus-hour deposition, Assistant Chief McKinley testified that she oversees LMPD's Accountability and Improvement Bureau and has done so since August 2023. (McKinley Deposition at 14:7-14 and 20-22, Ex. E). Assistant Chief McKinley was responsible for policy development in that department dating back to 2021. (*Id.* at 17:14-25.) There is no better witness to testify about the policy related topics set forth in the June Notice.

Plaintiffs spent a considerable amount of time asking about Metro's position on the 12.6.5 water bottle hypothetical. (*Id.* at 143:12-147:24.) Assistant Chief McKinley elaborated that considerations would be whether there were continuous water bottles, what was in the water bottle, the composition of the bottle, the size of the crowd, resources on the ground, number of officers and injuries sustained, time of day, traffic and weather, what else was going on in the city, how many people were affected, and how many dispersal orders were given with no movement. (*Id.* at

145:19-146:7.)

Plaintiffs also questioned Assistant Chief McKinley for dozens of pages of her transcript regarding the 9.1.4 Chart. (*Id.* at 43:15-48:21 and 52:8-98:11.) Assistant Chief McKinley explained the meaning of the 9.1.4 Chart (*Id.* at 43:21-44:3); that the 9.1.4 Chart attempts to reflect the *Graham* factors and considerations (*Id.* at 44:16-45:4); and that the 9.1.4 Chart is important insofar as it provides officers with a visual depiction of their need to "take the totality of the situation at hand . . ." (*Id.* at 45:18-24.) She explained what the 9.1.4 Chart means when it comes to passive and active resistance and how an officer should respond. (*Id.* at 55:23-59:7.) She elaborated on whether a person walking away from an officer would be characterized as providing the officer with active and passive resistance by referencing the totality of the circumstances involved and the *Graham* factors. (*Id.*)

As to the pepper ball hypothetical, Assistant Chief McKinley explained that pepper balls could be used as chemical agents only if (1) lower levels of force do not work to disperse unlawful crowds, (2) the chemical agent is necessary "to protect human life when an individual or group of individuals is acting with the intent to cause injury to police officers or other persons," and (3) the police chief or designee approve of it after taking into consideration the totality of the circumstances. (*Id.* at 129:5-24.)

**B.    Chief McKinley's testimony satisfied Metro's 30(b)(6) obligation for the June 2024 Notice.**

Despite Chief McKinley's detailed testimony, Plaintiffs were not satisfied. Plaintiffs' Motion to Compel cherry-picks portions of Assistant Chief McKinley's deposition to argue that that her responses to Topic 1 "reflected personal opinions"; that she "could not answer questions about Topics 2, 3, or 4"; and that she apparently "ignored readily available documents that rendered her testimony on Topic 5 insufficient." [ECF 214].

1.      **Topic 1 – Meaning and Official Interpretation of Policies**

Regarding Topic 1, Chief McKinley spoke at length about "[t]he meaning and official interpretation of Sections 9.1.4, 12.6.4, 12.6.5, and 12.29 of" Metro's standard operating procedures. In preparation for the deposition, she reviewed the four policies, refreshed her memory, and discussed how they were applied to LMPD with her attorney. (*Id.* at 20:09-20:21.) Assistant Chief McKinley testified in painstaking detail on 9.1.4 (*id.* at 43:15-48:21 and 52:8-98:11); 12.6.4 (*id.* at 169:12-189:2); 12.6.5 (*id.* at 143:12-147:24) and 12.29 (*id.* at 172:15-173:7 and 189:3-194:4).

Plaintiffs argue that Assistant Chief McKinley's testimony was insufficient because it reflected "personal opinion," but uttering the words "I think" or "I would consider" does not automatically render the statement a personal opinion. After all, Assistant Chief McKinley was testifying on behalf of Metro and, accordingly, her reference to "I" in that capacity binds Metro. Further, Plaintiffs curiously omit the context of their examples. For instance, regarding the "serious property damage" policy cited on page 10 of their brief [ECF 214 at #2486,] Assistant Chief McKinley testified in full as follows:

> Q.      Okay. And I guess what I'm asking, is there any city guidance on what constitutes serious property damage?
>
> A.      *I mean, there's state laws on criminal mischief, if that—if that would be a guidance. So there's felony level criminal mischief charges, that would be property damage.* I would consider a felony level property damage to be serious.

(*Id.* at 153:23-154:5.) Plaintiffs' counsel asked if there was "city guidance on what constitutes serious property damage" and Assistant Chief McKinley provided the guidance that Metro would rely upon—state laws. This is not her opinion or an attempt to evade the question; Metro would indeed rely on state law to determine "what constitutes serious property damage." In the "civil

disturbance" example cited by Plaintiffs [ECF 214 at #2486], the full testimony is as follows:

> Q.    . . . Are those sort of, two separate ways that something can become a civil disturbance under this policy?
>
> A.    I mean, I read it as an unlawful assembly that constitutes a breach of peace or any assembly of—of persons where there is an imminent danger of collective violence, destruction of property, or unlawful acts. So the unlawful assembly definition is down at the bottom, which if you go to that, is assembly of five or more persons for the purpose of engaging or preparing to engage in a riot.

(*Id.* at 103:1-11.) Again, Assistant Chief McKinley provided a sufficient response as to what constitutes "civil disturbance" under the policy.

Plaintiffs also claim that Assistant Chief McKinley's testimony was insufficient because she "routinely simply parroted the text of the policy." [ECF 214 at #2487.] Plaintiffs once again take statements out of context while demanding perfect answers. For example, Plaintiffs' apparently take issue with Assistant Chief McKinley defining "destruction of property" as "the damaging or destroying of property." (*Id.*) Metro is unclear how this answer is insufficient; Assistant Chief McKinley provided the definition that Plaintiffs requested. Although there was hardly any need to elaborate further on the definition of "destruction of property," Assistant Chief McKinley also addressed specific hypotheticals posed by Plaintiffs' counsel:

> Q.    Okay. So would breaking a window be considered a destruction of property?
>
> A.    Yes.
>
> Q.    Would graffiti be considered destruction of property?
>
> A.    Yes.

(*Id.* at 106:18-23.) Plaintiffs' motion also mischaracterizes an exchange about what is meant by "active resistance" where Plaintiffs' counsel asked whether "walking away" constitutes "active resistance." While Plaintiffs allege Assistant Chief McKinley testified "first that she would need

to 'read the entire use of force policy' and then it depends 'on the totality of the circumstances'"

[ECF 214 at #2487], the entire exchange is different:

> Q.     Okay. So does the city consider walking away from an officer to be active resistance under this policy?
>
> A.     It depends on the circumstance. Merely walking away is not active resistance. You would need to take all the other factors into consideration as far as what—the investigation that's—that is occurring, the severity of the crime that is at hand, the immediacy of the threat of the subject, if they are resisting arrest, and if they're fleeing because of an arrest, ***so all—merely walking away is not active resistance.***
> …
>
> Q.     Okay. Understood. Okay. So there are circumstances where walking away from an officer would not be active resistance, and there are circumstances where it would be?
>
> A.     Yes, depending on the totality of the circumstances.

(*Id.* at 57:13-24 and 59:2-7). Assistant Chief McKinley provided a clear answer that "merely walking away is not active resistance." Policing rarely involves bright line circumstances, and as Assistant Chief McKinley points out and Supreme Court authority requires, the officer must consider the totality of the circumstances. It is impossible to imagine a more accurate and appropriate response from Metro through its designee, and yet Plaintiffs allege it is lacking.

These are just two examples of Plaintiffs short-changing the completeness of Assistant Chief McKinley's preparation and testimony. Throughout the deposition, Plaintiffs clearly sought perfect "yes" or "no" answers to questions where such simplistic answers do not fit from Metro's standpoint. Again, "absolute perfection" is not required from a 30(b)(6) witness, particularly where the "absolute perfection" resembles Plaintiffs' narrative of the case instead of full and accurate answers from the deponent.

### 2.    Topic 2 – Communications

Topic 2 requests testimony on communications between any Chief, Deputy Chief, or

Assistant Chief and any member of the Mayor's Office concerning SOP 9.1.4, 12.6.4, 12.6.5, 12.29 and identifies a specific statement by the Mayor's spokesman. Assistant Chief McKinley directly addressed that statement by testifying that she made a specific inquiry about it and determined "[t]here were no e-mails from the chief, deputy chief, or assistant chiefs, anyone who held those ranks through the mayor's office, regarding the communication listed in [Topic 2]." (*Id.* at 204:12-24.) She learned after speaking directly with the mayor's public information officer that the statement came from LMPD's public information officer who, according to Assistant Chief McKinley, does not bind the department to any "policy interpretation." (*Id.* at 205:5-206:2 and 206:16-24.) Therefore, Assistant Chief McKinley provided the only information Metro had about that specified statement in Topic 2.

Assistant Chief McKinley also affirmatively testified that "[t]he city's interpretation of the policy would be the language of the policy" rather than the statement from the mayor's office. (*Id.* at 208:13-17). That Metro testimony advises that LMPD's chief and deputy chief—not the mayor or a public information person in the mayor's office—control LMPD policy development and implementation. (*See id.* at 206:19-20.) Because the mayor's office does not write or implement policy, her inability to recount each and every conversation that may have ever occurred between the mayor's office and LMPD does not render her testimony deficient on this topic. And because Assistant Chief McKinley was ready, willing, and able to testify to Metro's interpretation of every SOP identified in the notice, Plaintiffs' focus on this communication rather than the actual interpretation of those policies cannot be held against her.

### 3.    Topic 3 – Policy Revisions

Topic 3 involved "[t]he date on which the currently operative versions of [SOP 9.1.4, 12.6.4, 12.6.5, 12.29] were revised and put into effect, as well as the process by which each of

those revisions occurred." While reviewing SOP 9.1 with Plaintiffs' counsel, Assistant Chief McKinley testified that the last revision and effective dates were on the face of the policies:

> Q.    Thank you. And so, below that, there's a box that has three lines in it. The first reads "Effective date," and then "04-08-03." Do you know what that refers to?
>
> A.    The—the effective date would be the original date the policy came into place.
> . . .
> Q.    Okay. And then below that, there is PRV period, REV period date 09-21-20. Do you know what that refers to?
>
> A.    That was the date the policy was previously revised.

(*Id.* at 41:23-42:10.) Assistant Chief McKinley also brought prior versions of the policies to the deposition and compared them to the current versions. (*Id.* at 196:3-20 and 196:12-17.) She confirmed her familiarity with how policy changes occur. (*Id.* at 196:21-25.) Topic three called on her to testify about the *process*, and Assistant Chief McKinley confirmed "I'm familiar with the process of generally how policy changes occur," and Plaintiffs identified no issues to suggest that any of the particular SOP policy changes were out of the ordinary. (*Id.*)[2] Topic 3 sought information on the process of the changes, which is something she was ready, willing, and able to describe as the official who leads the bureau responsible for policy revisions. Again, Plaintiffs' election to raise specific problems or ask whether the changes to those particular policies varied from the general process is not Assistant Chief McKinley's fault or a lack of preparation.

### 4.    Topic 4 – Special Orders

On Topic 4, Assistant Chief McKinley testified that she was unaware of any special orders that modified the SOP provisions identified in the notice:

> Q.    So do you know if any official in the City has issued special orders

---

[2] Not only did Assistant Chief McKinley come prepared with knowledge on SOP revisions, but Chief Schroeder also testified regarding SOP amendments. Metro formally adopted Chief Schroeder's testimony on SOP revisions. (*See* December 13, 2024, B. Paul Letter, B) (designating Schroeder Dep. 82:24-86:11 and 86:22-87:24).

governing the use of crowd control devices since December 19, 2022, when Chapter 12.6 was last amended?

A.      I do not know of any special orders that have been issued regarding those since they've been amended.

(*Id.* at 200:15-20; *see also id* at 213:23-214:13.) She testified that she "attempted to determine if [any special orders] exist," but "did not know of any that exist." (*Id.* at 200:24-25.) Her testimony was informed by her reviewing either emails or PowerPDS. (*Id.* at 201:4-6.) Assistant Chief McKinley "would generally be aware of if special orders existed for particular policies" and expressly testified: "I'm not aware of any, and so I don't know of any special orders that would exist or that have been delivered regarding these policies." (*Id.* at 201:6-10). Any additional testimony on this topic would be superfluous considering Assistant Chief McKinley, the individual responsible for policy development in LMPD's Accountability and Improvement Bureau dating back to 2021, testified that she was not aware of any "special orders." After all, her testimony is accurate, as surely Plaintiffs would have identified to the Court in its motion such special orders—which are matters of public record—if there were any.

### 5.      Topic 5 – Training on Policies

Assistant Chief McKinley testified as to "[a]ll methods by which LMPD officers were informed of, trained on, or otherwise instructed concerning the revisions to" the SOPs identified in the notice. Plaintiffs claim that her preparation on this topic consisted only of reviewing a list of training topics and a PowerPoint presentation. [ECF 214 at #2488.] Yet Assistant Chief McKinley clearly testified that prior to the deposition she spoke with Lt. Wesley Bratcher, the commander of Special Response Team ("SRT")—the division responsible for complying with the civil disturbances governed by SOPs 12.6.4, 12.6.5, and 12.29. (*Id.* at 21:21-22:2.) Lt. Bratcher provided her with the SRT's "training schedule" and "topics for previous training that has taken

place." (*Id.* at 21:9-15.) Assistant Chief McKinley testified that SRT received monthly training, and the topics of those trainings included legal updates, policy updates, and first aid response. (*Id.* at. 23:14-19 and 24:18-20.) Although Assistant Chief McKinley could not recall the *exact* list of topics over a two-year period, she testified that SRT's training was "geared toward response to crowd control or First Amendment protest issues." (*Id.* at 24:22-24.)

Assistant Chief McKinley also testified that she met with David Allen, LMPD's training division major, prior to the deposition and spoke about training topics:

> I—I did speak with our training division major to learn about any relevant topics that may have been discussed or presented to LMPD members during annual in-service. And then I did talk to the supervisor of our research and development unit who would be in charge of the policy implementation and development process.

(*Id.* at 30:2-8). They discussed "the 2023 mandated in-service training curriculum, what relevant First Amendment civil disturbance courses did we deliver[,] [a]nd . . . he reminded me that we had a two-hour block on First Amendment response in the 2023 mandated in service for all department members." (*Id.* at 31:4-9). Assistant Chief McKinley explained that, prior to 2024, the annual training required officers to take "a 40 hour in-service course with a variety of topics" during an assigned week sometime throughout the year. (*Id.* 31:12-22). Training changed in 2024 so that it lasted throughout the year in four-hour blocks to ensure that no long lapses in training occurred. (*Id.* at 32:16-25 and 33:10-23.) She testified that these trainings include education on relevant "legal updates" and "case law updates." (*Id.* at 36:7-15.) All training is tracked through the Blackboard system in Training Academy. (*Id.* at 32:1-8.)

More specifically, as to the 9.1.4 Chart, Assistant Chief McKinley testified that officers receive annual in-service "firearms training," "ground fighting training," and "legal updates, training—case law training that often discusses the use of force." (*Id.* at 51:11-22.) As to the Pepper Ball Hypothetical, Assistant Chief McKinley testified that "officers do receive training

during annual firearms training on pepper ball systems." (*Id.* at 137:18-138:8.) Officers are notified about policy changes through PowerDMS. (*Id.* at 201:20-23 and 202:6-10.) LMPD officers' contract requires ten days' notice of policy changes. (*Id.* at 202:15- 24; 203:5-6.) Assistant Chief McKinley's testimony clearly satisfied Metro's obligation as to Topic 5. Plaintiffs Motion to Compel should be denied.

### III. Metro is entitled to a protective order barring 24 topics in Plaintiffs' November 2024 Notice and limiting the deponent's time to seven hours total.

In addition to the June 2024 Notice, Plaintiffs also served on Metro a 34 topic November 2024 Notice nearly identical to the overly broad 2023 Notice. The November 2024 Notice includes six topic headings: (A) City Organizational Structure, (B) Tracking of Crowd Control Devices, (C) LMPD Internal Oversight Mechanisms, (D) Training of Officers, (E) Documentation, and (F) Participation in this Litigation. Metro agreed to designate prior deposition testimony in lieu of presenting a witness on Topic A, City Organizational Structure, and SOP amendments generally. (December 13, 2024, B. Paul Letter, Ex. B).[3] Metro also agreed to present a witness limited to two hours[4] on eight of the topics: B (1, 2, 3, and 4); C (1); E (3 and 4); and F (1). (*Id.*) However, for many of the same reasons set forth in Metro's Motion for Protective Order filed in July 2023 [*see* ECF 144], Metro seeks a protective order on the remaining 24 topics in the November 2024 Notice. Metro's position is bolstered by Plaintiffs' unfounded allegations about Assistant Chief McKinley's five topic deposition, which suggest that no witness could ever comply with their

---

[3] Because Metro designated testimony on the City Organizational Structure topics, it considers the designated testimony as satisfactory, and these topics will not be addressed here. (*See* December 13, 2024, B. Paul Letter, Ex. B; December 20, 2024, C. Logue Letter, Ex. C; January 7, 2025, W. Carroll Letter, Ex. D.)

[4] Fed. R. Civ. P. 30(d)(1) limits Plaintiffs' 30(b)(6) deposition to one day of seven hours. Because Assistant Chief McKinley has already testified for over five hours, Plaintiffs cannot drag her back for another seven hours. Indeed, Metro will be designating Assistant Chief McKinley for these additional topics, and the committee note regarding Rule 30(d)(1) provides "[f]or purposes of this durational limit, the deposition of each person designated under Rule 30(b)(6) should be considered a separate deposition."

demands on the November 2024 Notice.

### A. Topic 5 under Tracking of Crowd Control Devices is overbroad and cannot reasonably be testified to as framed by Plaintiffs.

Metro agreed to designate a witness to testify to Topics 1, 2, 3, and 4 under Tracking of Crowd Control Devices. That leaves Topic 5, which unreasonably requests a witness to testify on "Any reviews or assessments conducted by the City or LMPD regarding the amount or extent of crowd control device usage." (Ex. A). The wording of this Topic remains unchanged from the 2023 Notice and is still overbroad and not reasonably particular because it contains undefined terms "reviews" and "assessments." Apart from the thousands of pages of documentation described in SOPs that have been produced and about which Plaintiffs are well-aware from their own ability to read those SOPs and reports, Metro has no way of ascertaining what other information Plaintiffs may be describing that constitutes "reviews" or "assessments."[5]

Plaintiffs attempted to clarify that "this topic seeks information about what type of review might be done following the use of crowd control devices, including incident reviews, logs and accounting of how many devices were used, and any other retrospective report that may be completed." (Ex. C.) Yet this "clarification" is still overly broad and unduly burdensome because Metro has no idea what "might" be done. Metro has produced thousands of records related to what actually was done throughout the summer and fall of 2020, and that does not even account for what "might" have been done. Metro cannot reasonably be expected to have a person study, memorize, and testify about all of the hundreds if not thousands of pages of reports prepared that

---

[5] Consistent with advisory note 2000 Amendment under Fed. R. Civ. P. 30(d)(1), Metro invited Plaintiffs to provide advance notice of which of the thousands of documents Plaintiffs would like Metro to use to prepare for on this and other objectionable topics. Plaintiffs' counsel responded that they were "certainly open to providing [Metro] with a list of relevant topics that we intend to cover, *though we would not that this list would not be exhaustive.*" (January 9, 2025 C. Logue Email, Ex. C) (emphasis added). This language is inconsistent with the advisory note and demonstrates that Plaintiffs need not bother providing such a list where they have no intent of limiting themselves to it.

mention the use of crowd control devices and answer every question perfectly—much less what "might be done" in those circumstances.

**B.    Topics 2, 3, and 4 under LMPD Internal Oversight Mechanisms relate to after the fact investigations that are irrelevant, and Metro's burden outweighs Plaintiffs' needs.**

Metro also agreed to designate a witness for Topic 1 under LMPD Internal Oversight Mechanisms. Topics 2, 3, and 4 under this section are improper because after-the-fact investigations are not relevant to Plaintiffs' claims. Plaintiffs contend Metro must testify about 14 topics related to PSU, PIU, and "other mechanisms by which the City conducted investigations into excessive force complaints, complaints specific to civil disturbances, or complaints regarding other mass events and imposed any discipline as a result." Plaintiffs argue that these topics are relevant to their *Monell* claim against Metro on a failure to investigate/ratification theory of liability—a position that Sixth Circuit precedent does not support.

In *Pineda v. Hamilton County, OH*, the Sixth Circuit held that "a claim based on inadequate investigation requires not only an inadequate investigation in this instance, but also a clear and persistent pattern of violations in earlier instances." 977 F.3d 483, 495 (6th Cir. 2020) (internal quotations and citations omitted). The court continued: "there must be multiple *earlier* inadequate investigations and they must concern comparable claims." *Id.* (Emphasis added.)  Finally, the Court explained, "an entity's failure to investigate the plaintiff's specific claim will, by definition, come *after* the employee's action that caused the injury about which the plaintiff complains. Because the injury will have already occurred by the time of the specific investigation, 'there can be no causation' from that single failure to investigate." *Id.* (quoting *David v. City of Bellevue*, 706 F. App'x 847, 853 (6th Cir. 2017). Therefore, Plaintiffs cannot prove causation of their claims in this case by pointing to PSU, PIU, or "other investigations"—or failures to investigate—occurring

*after* Plaintiffs' alleged injuries.

Plaintiffs have ignored that precedent by focusing their discovery on PSU and PIU information related to the 2020 civil disturbances and subsequent—not prior—investigations. Although Metro produced over 25 closed and responsive files related to Louisville's subsequent investigations into 2020 incidents, none is relevant to—much less evidence of—Plaintiffs' burden of showing "a clear and persistent pattern of violations in *earlier* instances." Therefore, Metro ought not be required to prepare a witness to review, interview investigators, watch videos, memorize, and testify about over 25 after-the-fact investigations related to 2020 incidents that cannot, as a matter of law, prove causation of Plaintiffs' claims.

Plaintiffs have previously argued that Judge Simpson called the investigations relevant in his November 25, 2020, Order Granting in Part and Denying in Part Defendants' Motion to Dismiss (*see* [ECF 42]) and, therefore, Metro is bound by that holding. However, that ruling contradicts the binding *Pineda* decision, and Judge Simpson's opinion relies on outdated case law which the Sixth Circuit dismissed in *Pineda* as cases "from decades ago": "Since *Leach* and *Marchese*, . . . we have clarified the scope of this 'ratification' theory in a way that dooms Pineda's claim in this case." *Pineda*, 977 F.3d at 495.[6] The Court proceeded to articulate the "clear and persistent pattern of violations in earlier instances" requirement that Plaintiffs must show in this case for their claims. *Id.*

Further, even if the PSU, PIU, and other investigations were relevant to any of Plaintiffs' claims, the burden on Metro is disproportionate to Plaintiffs' benefit. As Plaintiffs can attest from their possession of the over two-dozen PSUs and PIUs, those investigative files contain all the

---

[6] Specifically, Judge Simpson's Order relied on *Wilson v. Louisville-Jefferson Cnty. Metro Gov't*, No. 3:19-CV-00739-CRS, 2020 WL 981717, at *1 (W.D. Ky. Feb. 28, 2020) which in turn relied on the cases *Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir. 1985) and *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989), both of which were dismissed by the *Pineda* court as "two cases from decades ago . . ." that "doom[ed]" the *Pineda* plaintiff's case.

process information, investigator information, videos, witness and documentation information,
and conclusions pertaining to each investigation. Each of those files contains scores of pages of
information as well as other videos and documentation that are referenced in the investigations.
Plaintiffs are better suited to read that information than Metro is to designate a witness to memorize
it. After all, it is impossible for a Metro witness to ascertain from the investigations any information
processed, or reasoning employed by investigators if the information is not in the documents. And
the investigators cannot provide any information on how or why the decision was made on each
investigation because such decisions are issued by the LMPD chief, not the investigator. No Metro
witness can possibly interview investigators who prepared the reports and the police chiefs who
made the decisions on the numerous investigative files and report that information during a
deposition. Finally, as set forth above, since these after-the-fact 2020 investigations could not be
the cause of any incidents that Plaintiffs claim are First and Fourth Amendment violations, the
burden on Metro in designating a witness on the topics far outweighs the investigations'
evidentiary value—which is none.

### C.   All Topics under Training of Officers are overbroad, not relevant, and not "reasonably particular."

It is impossible for Metro to designate a witness to testify on the hundreds of thousands
of pages of "documents," "policies," "procedures," and "data" it produced that could possibly
fall under the topics starting with "*all* training mandated for or made available" and "*[a]ll*
trainings, guidance, or other materials developed or provided." Even though the face of the
November 2024 Notice suggests it is limited to the six months between May 2020 and
November 2020, the testimony necessarily predates May 2020 because it fundamentally seeks
all training on these topics than any LMPD officer may have been provided before the May
2020 events. Plaintiffs have specific training documents that they have used in other depositions,

and Metro can certainly prepare to review and discuss the contents of those documents during deposition testimony if called on to do so. However, Metro cannot designate a witness to describe every training "mandated or made available" to virtually every member of the LMPD who engaged with the public in 2020—which is what Plaintiffs' training topics implicate. Finally, any suggestion by Plaintiffs that they would not impose such demands on a witness is directly contradicted by their motion on Assistant Chief McKinley's testimony, which asserts that she was not prepared because she could not recount date by date and document by document every training that occurred over a multi-year period of time.

Further, Plaintiffs do not allege a lack of LMPD training as a cause of Plaintiffs' alleged injuries. Although inadequate training may serve as a ground for § 1983 municipal liability, the Amended Complaint does not include that theory of liability. Instead, Plaintiffs allege the other three grounds for § 1983 liability: the existence of an official policy, decisionmaker ratification, and acquiescence. (Amended Compl. ¶¶ 288, 293, 301, and 304.) As such, all four subtopics under Training are irrelevant to Plaintiffs' claims and Defendants' defenses and disproportional to the needs of the case. Fed. R. Civ. P. 26(b)(1).

### D.    Topics 1, 2, and 5 under Documentation sound of catch-all and overbroad topics for which no Metro witness can prepare.

Metro agreed to designate a witness on Topics 3 and 4 under Documentation because Plaintiffs are seeking testimony on a reasonably narrow scope of information—damages to property and injuries to officers, of which the parties have agreed there is a narrow universe of documents. However, as to Topics 1, 2, and 5, it is impossible for Metro to search these documents and videos and identify everything that constitutes "all documentation concerning the decision to order dispersal of protests"; "all documentation completed concerning he decision to use crowd control devices"; and "all planning documents created during or in preparation for protests."

Again, as of July 2023, Metro produced over 2.3 terabytes of data that includes 155,538 documents consisting of 240,105 pages. Since July 2023, Metro has produced hundreds more pages of documents. Those documents consist of reports, planning documents, letters, public statements, internal communications, and other emails about protest activities from between May 1, 2020, and November 25, 2020. Further, although "documents" is not defined, Plaintiffs' instructions also reference "data," which almost certainly elicits the tens of thousands of hours of video footage produced by Metro to Plaintiffs related to civil disturbance in 2020.

During the six month timeframe identified in the Notice there were thousands of hours of interaction between police and protestors. Documentation related to incidents of less lethal usage and dispersal orders likely extends into the thousands of pages. Responsive documentation might include letters and emails circulated to and from government employees and representatives and the public related to these issues. In sum, Topics 1, 2, and 5 under Documentation are precisely the "catch-all technique to reexamine at the end of the discovery the universe of information an adversary has produced during the discovery period" that the Eastern District of Michigan described with disapproval in *Edwards v. Scripps Media, Inc.* 331 F.R.D. at 121. Because Plaintiffs already have access to the voluminous documentation and do not need Metro to interpret it, "the burden on [Metro] of designating and preparing a witness would almost certainly outweigh the benefit to Plaintiff[s].'" *Id.*

### E.    Topic 2 under Participation in This Litigation constitutes improper "discovery about discovery."

Metro agreed to designate a witness to testify on Topic 1 under Participation in this Litigation: Metro's "efforts to retain and search for responsive documents in its data stores, including cell phones provided by the City to LMPD officers[.]" However, Topic 2 is a catch-all topic that requires Metro to identify a witness to testify about "[a]ll interrogatory responses served

by both the City and LMPD." (*See* Ex. A.) This topic constitutes "discovery about discovery," which is disfavored by courts in this and other circuits. *See Stein v. U.S. Xpress Enterprises, Inc.*, No. 1:19-cv-00098, 2022 WL 511553, at *2 (E.D. Tenn. Feb. 11, 2022) and *Moore v. Westgate Resorts, Ltd.*, No. 3:18-cv-410, 2020 WL 7017740, at *6 (E.D. Tenn. Jan. 24, 2020) (citing *Edwards*, 331 F.R.D. at 125).[7] Topic 2 is unduly burdensome and clearly disfavored by federal courts. Plaintiffs have filed no discovery motions accusing Metro of failing to produce any responsive information. And all Metro can do to verify its interrogatory answers is to affirm that they say Assistant Chief McClinton[8] signed them under oath as Rule 33 requires.

**F.    The seven-hour limit in Fed. R. Civ. P. 30(d)(1) treats Plaintiffs' June and November 2024 Notices as one corporate notice.**

In contrast with Judge Beaton's observation that Plaintiffs' limited deposition on just three easy topics about "the current state of play" should be "a quick 30(b)(6) deposition" [ECF 184 at 43:14-17), Plaintiffs stretched the topics into five 30(b)(6) topics and deposed Assistant Chief McKinley for over five hours. Fed. R. Civ. P. 30(d)(1) unambiguously places a seven hour and one day limit on the 30(b)(6) notices issued to Metro. Because Assistant Chief McKinley has already testified for over five hours, Plaintiffs are prohibited from subjecting her to another seven hours. *See* Fed. R. Civ. P. 30 Committee Notes on Rules—2000 Amendment ("For purposes of this durational limit, the deposition of each person designated under Rule 30(b)(6) should be considered a separate deposition."). The Court's protective order should therefore prohibit Plaintiffs from overburdening Assistant Chief McKinley any further and instruct them to comply with the seven hour limit on her testimony as Metro's 30(b)(6) designee.

---

[7] *See, also*, *Zeitler v. Nationwide Property and Casualty Ins. Co.*, No. 3:21-cv-519, 2022 WL 1125397, at *2 (D. Conn. Apr. 15, 2022), *Fish v. Air & Liquid Sys. Corp.*, No. GLR-16-496, 2017 WL 697663, at *6 (D. Md. Feb. 21, 2017), and *Bombardier Recreational Prods., Inc. v. Arctic Cat, Inc.*, No. 12-cv-2706 (MJD/LIB), 2014 WL 10714011, at *15 (D. Minn. Dec. 5, 2014).

[8] Plaintiffs have already been advised that Assistant Chief McClinton has retired from LMPD.

## **CONCLUSION**

Metro presented Assistant Chief McKinley for over five hours on the five topics addressed in Plaintiffs' June 2024 Notice. Now, Plaintiffs are seeking *additional* testimony on those five topics as they erroneously claim that Assistant Chief McKinley was improperly prepared. On top of that, Plaintiffs served on Metro a second 30(b)(6) that contains 24 unduly burdensome and overly broad topics that are disproportional to the needs of this case and would require far more than the two hours they have remaining for Metro's designee. Metro therefore requests that the Court (1) deny Plaintiffs' Motion to Compel as to the June 2024 Notice and (2) enter a protective order on the topics contained in Plaintiffs' November 2024 Notice to which Metro has objected.

## **LOCAL RULE 37.1 CERTIFICATION**

Metro, through counsel, affirms that it has complied with Local Rule 37.1. Counsel for the parties have conferred in detail numerous times, culminating in letters by counsel for both parties confirming that court intervention is necessary.

Respectfully submitted,

*/s/ Bruce B. Paul*
BRUCE B. PAUL
WILLIAM G. CARROLL
McBrayer PLLC
500 West Jefferson Street, Suite 2400
Louisville, Kentucky 40202
Phone: (502) 327-5400
bpaul@mcbrayerfirm.com
wcarroll@mcbrayerfirm.com
*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 10, 2025, the foregoing was electronically filed with the Clerk of the Court using CM/ECF which will send notice of electronic filing to the registered counsel.

*/s/ Bruce B. Paul*
*Counsel for Defendants*

–25–