EXHIBIT E

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

**CIVIL ACTION NO. 3:20-CV-0535 (BJB) (CHL)**

**ATTICA SCOTT, CORBIN SMITH, KAYLA MEISNER,**

**TYLER WEAKLEY, STEVIE SCHAUER, WILLA TINSLEY,**

**PATRICK MOORE, AND THE KENTUCKY ALLIANCE**

**AGAINST RACIAL AND POLITICAL REPRESSION,**

**ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY**

**SITUATED**

**V.**

**LOUISIVLLE/JEFFERSON COUNTY METRO GOVERNMENT, ET AL.**

**DEPONENT: EMILY MCKINLEY, ON BEHALF OF LOUISVILLE**

**JEFFERSON COUNTY METRO GOVERNMENT**

**DATE: JUNE 18, 2024**



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com
☎ 877.808.5856  |  502.589.2273

www.kentuckianareporters.com

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF KENTUCKY
 2         CIVIL ACTION NO. 3:20-CV-0535 (BJB) (CHL)

 3

 4          ATTICA SCOTT, CORBIN SMITH, KAYLA
            MEISNER, TYLER WEAKLEY, STEVIE
 5          SCHAUER, WILLA TINSLEY, PATRICK
            MOORE, AND THE KENTUCKY ALLIANCE
 6          AGAINST RACIAL AND POLITICAL
       REPRESSION, ON BEHALF OF THEMSELVES AND ALL
 7             OTHERS SIMILARLY SITUATED,
                      Plaintiffs
 8
                          V.
 9

10          LOUISVILLE/JEFFERSON COUNTY
           METRO GOVERNMENT, GREG FISCHER,
11             ROBERT SCHROEDER, LAVITA
              CHAVOUS, AND LOUISVILLE
12         METROPOLITAN POLICE DEPARTMENT
          OFFICER "J." JOHNSON, LOUISVILLE
13         METROPOLITAN POLICE DEPARTMENT
         OFFICERS JOHN DOES #1-#15 AND JANE
14                     DOE #1,
                      Defendants
15

16

17

18

19

20

21

22
     DEPONENT:    EMILY MCKINLEY, ON BEHALF OF LOUISVILLE
23               JEFFERSON COUNTRY METRO GOVERNMENT

24   DATE:        JUNE 18, 2024

25   REPORTER:    ALANNAH FLEET
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Page 2**

```
 1                    APPEARANCES
 2
 3    ON BEHALF OF THE PLAINTIFFS, ATTICA SCOTT, CORBIN
 4    SMITH, KAYLA MEISNER, TYLER WEAKLEY, STEVIE SCHAUER,
 5    WILLA TINSLEY, PATRICK MOORE, AND THE KENTUCKY ALLIANCE
 6    AGAINST RACIAL AND POLITICAL REPRESSION, ON BEHALF OF
 7    THEMSELVES AND ALL OTHERS SIMILARLY SITUATED:
 8    Ashok Chandran, Esquire
 9    Catherine Logue, Esquire
10    NAACP Legal Defense and Educational Fund, Inc.
11    40 Rector Street
12    5th Floor
13    New York, New York 10006
14    Telephone No.: (212) 965-2200
15    E-mail: achandran@naacpldf.org
16            clogue@naacpldf.org
17    (Appeared via videoconference)
18
19    AND
20
21
22
23
24
25
```

**Page 3**

```
 1                 APPEARANCES (CONTINUED)
 2
 3    Corey Shapiro, Esquire
 4    ACLU of Kentucky
 5    325 West Main Street
 6    Suite 2210
 7    Louisville, Kentucky 40202
 8    Telephone No.: (502) 581-1181
 9    E-mail: corey@aclu-ky.com
10    (Appeared via videoconference)
11
12    ON BEHALF OF THE DEFENDANTS, LOUISVILLE/JEFFERSON
13    COUNTY METRO GOVERNMENT, GREG FISCHER, ROBERT
14    SCHROEDER, LAVITA CHAVOUS, AND LOUISVILLE METROPOLITAN
15    POLICE DEPARTMENT OFFICER "J." JOHNSON, LOUISVILLE
16    METROPOLITAN POLICE DEPARTMENT OFFICERS JOHN DOES #1-
17    #15 AND JANE DOE #1:
18    Bruce Paul, Esquire
19    McBrayer PLLC
20    500 West Jefferson Street
21    Suite 2400
22    Louisville, Kentucky 40202
23    Telephone No.: (502) 327-5400
24    E-mail: bpaul@mcbrayerfirm.com
25    (Appeared via Videoconference)
```

**Page 4**

```
 1                APPEARANCES (CONTINUED)
 2
 3    Also Present:  Andrew Brennen, ACLU Intern; Kyle Smith,
 4    ACLU Intern; Kevin Yang, NAACP Intern
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1                     INDEX
 2                                                 Page
 3    PROCEEDINGS                                    7
 4    DIRECT EXAMINATION BY MR. CHANDRAN             9
 5    CROSS-EXAMINATION BY MR. PAUL                210
 6
 7
 8                    EXHIBITS
 9    Exhibit                                      Page
10    81 - Notice of Deposition                     18
11    82 - LMPD Use of Force Policy (SOP 9.1)       40
12    83 - LMPD Civil Disturbance/Disorderly
13         Crowds Policy (SOP 12.6)                 98
14    84 - KRS 525.050 - Unlawful Assembly         104
15
16
17
18
19
20
21
22
23
24
25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of EMILY MCKINLEY, taken on June 18, 2024

30(b)(6)                                                                    6..9

---

**Page 6**

STIPULATION

The 30(b)(6) deposition of EMILY MCKINLEY was taken at KENTUCKIANA COURT REPORTERS, 730 WEST MAIN STREET, SUITE 101, LOUISVILLE, KENTUCKY, 40202, via videoconference in which all participants attended remotely, on TUESDAY the 18th day of JUNE 2024 at 10:02 a.m. (ET); said deposition was taken pursuant to the FEDERAL Rules of Civil Procedure. The oath in this matter was sworn remotely pursuant to FRCP 30.

It is agreed that ALANNAH FLEET, being a Notary Public and Court Reporter, may swear the witness.

---

**Page 7**

PROCEEDINGS

THE REPORTER:  We are now on the record.  Will all parties except for the witness please state your appearance, your location, and how you're attending this meeting?

MR. CHANDRAN:  Good morning.  This is Ashok Chandran with the NAACP Legal Defense Fund.  I'm appearing via videoconference from New York.

MR. PAUL:  I'm Bruce Paul.  I am with McBrayer.  I am appearing on behalf of the witness. Everyone else is on mute.

THE REPORTER:  Yeah.

MR. PAUL:  Corey, Kate, someone?

MR. SHAPIRO:  Sure.  Corey Shapiro from the ACLU of Kentucky on behalf of Plaintiffs, and I'm appearing via video or Zoom, please, remotely.

MS. LOGUE:  I'm Catherine Logue from the NAACP Legal Defense Fund, on behalf of Plaintiffs, appearing remotely from New York as well.  Good morning, everyone.

MR. CHANDRAN:  We have some interns with us, so I don't know, would the court reporter prefer they note -- notice their appearances as well?

THE REPORTER:  They can.  If you'd like to

---

**Page 8**

announce them for them, that's fine.  But we just need -- just note for the audio record.

MR. CHANDRAN:  Sure.  I think we have three interns, Kyle Smith and Andrew Brennan with the ACLU of Kentucky, and then Kevin Yang with the NAACP Legal Defense Fund on with us as well.

THE REPORTER:  Thank you very much.  Will the witness now please state your full name for the record?

THE WITNESS:  Emily McKinley.

THE REPORTER:  Can you repeat that?

THE WITNESS:  Emily McKinley.

THE REPORTER:  Thank you.  And we did off the record decide that they will be sending a form of identification.  Is that okay for all Counsel?

MR. CHANDRAN:  Yes.  That's okay with the plaintiffs.

THE REPORTER:  Okay.  Great.  And at this point, we all agree that the witness is in fact who she says she is?

MR. CHANDRAN:  Yes, we do.  Plaintiffs stipulates.

THE REPORTER:  Thank you very much.
Ms. McKinley, will you please raise your right hand?  Do you solemnly swear or affirm that the

---

**Page 9**

testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE REPORTER:  You may begin.

DIRECT EXAMINATION

BY MR. CHANDRAN:

Q.  Good morning, Chief McKinley.  How are you doing today?

A.  I'm well.  How are you?

Q.  I'm well, thanks.  I -- my name is Ashok Chandran.  As I just mentioned, I work for the NAACP Legal Defense Fund, and I represent the plaintiffs in this case.  Also with me are a number of other attorneys who are representing the plaintiffs.  We are here for a deposition in the case of Scott et al. v. Louisville/Jefferson County Metro Government, et al. Are you aware of that?

A.  Yes.

Q.  Have you ever sat for a deposition before?

A.  Yes.

Q.  Okay.  Approximately, how many times?

A.  Once.

Q.  And can you tell me a little bit about that other deposition that you gave?

A.  It was a -- a deposition regarding a protest

---

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 10

1  incident.
2       Q.   Was it -- can you tell me about the protest
3  incident that that deposition came out of, to the extent
4  that you remember?
5       A.   It was a -- it was a protest incident from
6  2020.  It was a use-of-force incident of which I was a -
7  - a witness to and was testifying to that.
8       Q.   Okay.  You were appearing as a witness in that
9  case?
10      A.   I was a named defendant in the -- in the case
11  originally and was -- was a -- a witness to the use of
12  force.
13      Q.   Do you remember the name of that case?
14      A.   The -- the plaintiff was Jonah Albert.
15      Q.   And I believe you mentioned that you were
16  initially named as a defendant in that case.  Did that
17  change at some point?
18      A.   I can't remember.  No.
19      Q.   You can't remember?
20      A.   I can't remember the -- the exact details of -
21  - of how that ended up at the -- at the final, I guess,
22  outcome of the case.  But yes, originally, I was a named
23  defendant in that case.
24      Q.   Okay.  Okay.  Okay.  Did you, as part of that
25  case, give testimony in any other format?  I'm sorry, I

Page 11

1  couldn't hear you.
2       A.   Any other format meaning?
3       Q.   Such as at a hearing or at a trial, anything
4  like that?
5       A.   No.  No.
6       Q.   And I'm sorry, please bear with me.  I think
7  I'm having a little bit of -- I don't know if it's
8  feedback or something.  The audio is cutting out
9  occasionally on your answer, so I may ask you to repeat
10  things.  Please don't think anything of it, okay?
11      A.   Okay.
12      Q.   Okay.  So you may remember some of this from
13  the deposition you gave in the Albert case, but is it
14  okay if go over just some of the basic ground rules of a
15  deposition with you again?
16      A.   Yes.
17      Q.   Okay.  So you've been, as you may remember,
18  put under oath by our court reporter.  Do you remember
19  that?
20      A.   Yes.
21      Q.   So that means the answers that you're giving
22  in this deposition will have the same effect as if
23  you're testifying in open court.  Do you understand?
24      A.   Yes.
25      Q.   Okay.  And similarly, because we have both an

Page 12

1  audio recording and a transcription of this deposition
2  happening, it's going to be important that we both make
3  sure to verbalize and vocalize what we're saying, rather
4  than nodding or shaking our heads or giving, kind of,
5  affirmations like "uh-huh" or "uh-uh," because those can
6  be much harder to capture.  But does that sound okay?  I
7  know it can feel unnatural.  So I may ask you at times,
8  just if you could verbalize something or vocalize
9  something, again, just meant for the record, okay?
10      A.   Yes.
11      Q.   Great.  Similarly, just because of the record,
12  it's important that we don't talk over each other.  So
13  I'll do my best to make sure that you're finished with
14  an answer before I start another question.  And I'd ask
15  that you do the same, okay?  Let me finish a question
16  that I'm asking, even if you know where it's headed.  It
17  might be obvious at times what the end of a question is.
18  But even if you know where the question is headed, just
19  let me finish it before you begin your answer.  Does that
20  make sense?
21      A.   Yes.
22      Q.   And this is not meant to be any kind of a got
23  you or trick, sort of, questioning.  So if there's
24  anything I ask that's confusing or that doesn't make
25  sense, please feel free to ask me to clarify, or restate

Page 13

1  it, or repeat it or -- you know, ask for any additional
2  context you might need, okay?
3       A.   Okay.
4       Q.   And the flip side of that is, if you answer
5  the question, I'll assume that you did understand it.
6  Does that seem fair?
7       A.   Yes.
8       Q.   Okay.  Now, there will be times that your
9  attorney, Mr. Paul, might make objections to certain
10  questions that I ask.  Unless he specifically tells you
11  not to answer a question, you should still go ahead and
12  answer after the objection, okay?
13      A.   Okay.
14      Q.   And if at any point during this day, if you
15  feel like you need a break or you want to step out to
16  stretch your legs or get a glass of water, please feel
17  free.  This is not meant to be a grueling or demanding
18  day for you.  I'm hoping it'll be relatively quick.  But
19  if at any point you need a break, just let me know and
20  we can do that, okay?
21      A.   Okay.
22      Q.   The only caveat on that is, if I've asked you
23  a question, I just ask that you answer the question
24  before we take the break, okay?
25      A.   Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14

1    Q.   Does that all seem fair and okay to you?

2    A.   Yes.

3    Q.   Okay.  Great.  As you sit here today, is there

4  any reason you believe that you cannot testify

5  truthfully and accurately?

6    A.   No.

7    Q.   Okay.  Officer McKinley, what is your current

8  job?

9    A.   I'm currently an Assistant Chief of Police and

10  I oversee Louisville Metro Police Department's

11  Accountability and Improvement Bureau.

12    Q.   Okay.  And you said the Accountability and

13  Improvement Bureau?

14    A.   Yes.

15    Q.   Is that within the Administrative Services

16  Bureau or is that a new bureau?

17    A.   It is a new bureau.

18    Q.   Okay.  When was that bureau created?

19    A.   It was created in 2021.

20    Q.   Okay.  And have -- when did you become

21  Assistant Chief overseeing that bureau?

22    A.   In August of 2023.

23    Q.   Okay.  Who was head of that bureau before you?

24    A.   Prior to myself, Deputy Chief Paul Humphrey

25  oversaw that bureau.  There was not an Assistant Chief

Page 15

1  position until August of 2023.

2    Q.   Okay.  So were you the first -- or actually,

3  are you the first Assistant Chief to oversee that

4  bureau?

5    A.   Yes.

6    Q.   Okay.  And can you tell me a little bit about

7  what that bureau does?

8    A.   Sure.  So the Accountability and Improvement

9  Bureau includes two divisions, so our performance

10  division, which houses all of our audit capabilities

11  within the department.  So we have an -- an audit unit

12  comprised of civilian auditors that audit officer

13  performance for compliance, policy, and training just to

14  assess performance improvement opportunities.  It also

15  includes our wellness unit.  So we have a wellness

16  facility and that -- that is under our performance

17  division.  So our peer support team, any early

18  intervention systems, our health and safety unit, that

19  is all under our performance division.

20         The Accountability Improvement Bureau also

21  includes our training division.  So our training

22  academy, which would be our basic training academy for

23  new recruits, as well as formation of any ongoing annual

24  in-service that might be mandated or any ongoing, I

25  guess, elective courses that people might take -- want -

Page 16

1  - want to take for career development.  So it includes

2  our training division.

3         The Accountability Improvement Bureau also

4  includes our policy development unit, so our research

5  and development unit, which reviews policy, develops

6  policy, and delivers policy messaging to the department.

7  It also includes a compliance unit, which would be

8  responsible for the implementation of the -- our consent

9  decree that would be pending in the near future.

10    Q.   That is a lot of things that it has there.

11  Could you tell me a little bit about -- or let me back

12  up, actually.  I think you mentioned that the

13  Accountability and Improvement Bureau was created in

14  2021; is that right?

15    A.   Yes.

16    Q.   Did you move to the Accountability and

17  Improvement Bureau in 2021 when it was created?

18    A.   No, I did not.

19    Q.   When did you join the Accountability and

20  Improvement Bureau?

21    A.   I joined the Accountability Improvement Bureau

22  in August of 2023 when I was promoted to the Assistant

23  Chief position over the bureau.

24    Q.   Okay.  And what bureau were you working in

25  before that point?

Page 17

1    A.   Prior to that move, I was the major over our

2  administrative services division.

3    Q.   And -- oh, I'm sorry.  Did you -- were you

4  saying something?

5    A.   No.

6    Q.   Okay.  It must have been some feedback or

7  something.  Okay.  So when did the Accountability and

8  Improvement Bureau take over the responsibility for the

9  training division?

10    A.   In 2021, when it was created.

11    Q.   Okay.  So from its creation, it had

12  jurisdiction over the training division?

13    A.   Yes.

14    Q.   How about the policy development unit?

15    A.   That -- that transition was more recent.  I

16  don't know the exact date, off the top of my head.  Prior

17  to that move, the research and development unit fell

18  under the administrative services division.

19    Q.   Okay.  And that was the division that you

20  worked in until August of 2023?

21    A.   Yes.

22    Q.   Okay.  Did you oversee the policy development

23  unit in your time with the administrative services

24  division?

25    A.   Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 18

1      Q.   And I understand that you don't remember the
2   exact date.  Do you remember if the policy development
3   unit had transitioned over to the Accountability and
4   Improvement Bureau before you joined the Bureau?
5      A.   I don't remember.
6      Q.   Okay.  Chief McKinley, do you understand that
7   you're here today to testify as a designee of the
8   Louisville Jefferson County Metro Government, not in
9   your individual capacity?
10     A.   Yes.
11     Q.   And just for ease of -- you know,
12   communication, is it okay if I say the city instead of
13   Louisville Jefferson County Metro Government every time?
14     A.   Yes.
15     Q.   Okay.  Great.  Have you been informed of the
16   list of topics about which you're expected to testify
17   about on behalf of the city?
18     A.   Yes.
19          MR. CHANDRAN:  Okay.  I'm going to just put in
20      the chat here what we can mark as Plaintiff's
21      Exhibit, I believe, 81.
22          (EXHIBIT 81 MARKED FOR IDENTIFICATION)
23   BY MR. CHANDRAN:
24     Q.   And I'll go ahead and share my screen so you
25   can take a look at it.  Chief McKinley, can you see the

Page 19

1   document that I've shared?  I'm not particularly Zoom
2   proficient, so let me know if this is a problem.
3      A.   Yes, I can see it.
4      Q.   Okay.  Have you seen this document before?
5      A.   Yes.
6      Q.   What's your understanding of what this
7   document is?
8      A.   It's a notice of this deposition with the date
9   and time of this deposition, where it would take place.
10     Q.   Okay.  And just scrolling down to the appendix
11   here, have you seen this page of the document as well?
12     A.   Yes.
13     Q.   And what do you understand this appendix to
14   be?
15     A.   A list of topics for discussion during
16   deposition.
17     Q.   And are you prepared to testify about each of
18   these topics?
19     A.   Yes.
20     Q.   Okay.  I'm going to go ahead and stop sharing
21   my screen.  So in order to prepare testimony about these
22   topics, could you tell me, did you do anything to
23   prepare today?
24     A.   I discussed the list of topics with my
25   attorney, reviewed the specific policies that are

Page 20

1   indicated in that list, and discussed that with my
2   attorney.
3      Q.   Okay.  So I believe you said you discussed the
4   list of topics with your attorney.  Is that Mr. Paul?
5      A.   Yes.
6      Q.   And then I think you said you reviewed the
7   policies that were listed.  What did you mean when you
8   said that?
9      A.   There's four policies listed 9.1.4, 12. --
10          MR. PAUL:  You don't have to --
11          THE WITNESS:  I don't remember off the top of
12      my head.  It's the four policies that are listed.
13      I read those, just to rely on to refresh my memory
14      on -- on those policies and discussed how they're
15      applied to our department with my attorney.
16   BY MR. CHANDRAN:
17     Q.   Okay.  So you reviewed -- I mean, I guess to
18   back it up, when you say you reviewed the policies, you
19   reviewed the SOP chapters that were listed in that
20   appendix?
21     A.   Yes.
22     Q.   Okay.  And you discussed how those applied
23   with your attorney, Mr. Paul?
24     A.   Yes.
25     Q.   Did you review --

Page 21

1          MR. PAUL:  Just for the record, I just prefer
2      you not ask her what else she specifically talked
3      to me about, but --
4          MR. CHANDRAN:  I'm not going to get into that.
5          MR. PAUL:  I know you won't, just for sure.
6          MR. CHANDRAN:  Yeah.  Yeah, that -- thanks for
7      that, Bruce.
8   BY MR. CHANDRAN:
9      Q.   Did you review any documents beyond the SOP
10   provisions we just discussed in preparing for today's
11   deposition?
12     A.   I know there's some mention of some training.
13   I did -- I did review some training curriculum, training
14   schedule -- previous training schedules, topics for
15   previous training that has taken place.
16     Q.   Okay.  So can you tell me what training
17   curricula you reviewed?
18     A.   I discussed, with the commander of our Special
19   Response Team, their training topics that they review
20   during their monthly training specials.
21     Q.   I'm sorry.  You said you discussed that with
22   the commander of what response team?
23     A.   Special Response Team.
24     Q.   Okay.  Is the Special Response Team SRT?
25     A.   Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:20-cv-00535-BJB-CHL     Document 215-6     Filed 01/10/25     Page 9 of 85 PageID
#: 2667
The Deposition of EMILY MCCONVEY, taken on June 18, 2024
30(b)(6)                                                                22..25

Page 22

1    Q.   And who's the current commander of SRT?

2    A.   It is Lieutenant Wesley Bratcher.

3    Q.   And would you mind spelling that for the court
4    reporter?

5    A.   Sure.  Wesley, W-E-S-L-E-Y, Bratcher,
6    B-R-A-T-C-H-E-R.

7    Q.   And what did you discuss with Wesley Bratcher
8    about the training curriculum?

9    A.   I asked what training curriculum they provided
10   to their team for previous year, which would've been
11   2023, and the current year, 2024.  So the training
12   topics that would be just presented or discussed at
13   their monthly training for both years.

14   Q.   Okay.  And did you ask for that in a written
15   form?  Did you ask for the training curricula
16   themselves?  In what format did you receive that
17   information?

18   A.   I received it in a written form, a list of
19   training topics.

20   Q.   Okay.  Did you review any of the -- did you
21   review any documents that were used at the trainings?

22   A.   Yes.

23   Q.   What documents did you review that were
24   actually used at the trainings?

25   A.   I reviewed at least one PowerPoint

Page 23

1    presentation from one of the trainings.  I do not
2    remember if I reviewed any other PowerPoint
3    presentations.  But I have reviewed at least -- or
4    looked at -- saw one PowerPoint presentation that they
5    delivered at one of their trainings.

6    Q.   Okay.  Did you review any other documents that
7    were used at the trainings?

8    A.   Not that I can recall.

9    Q.   Okay.  And I believe you mentioned that you
10   looked at two years of training, that's 2023 and 2024;
11   is that right?

12   A.   Yes, it's what topics did they present to
13   their team during their training.

14   Q.   Okay.  Approximately how many trainings from
15   2023 did you receive information about in preparing for
16   today's deposition?

17   A.   So they -- they trained monthly.  So the lists
18   that I received were topics that were presented and
19   discussed during their monthly training.

20   Q.   Okay.  So if it was a monthly training, am I
21   fair to assume that there were 12 different trainings in
22   2023?

23       MR. PAUL:  Yes.

24       THE WITNESS:  I -- again, I can't assume that
25   they -- I know they had monthly training.  Some

Page 24

1    could have been canceled, but generally it's
2    monthly training.

3        MR. CHANDRAN:  And I'll just note -- I'll make
4    a request for Mr. Paul.  If you can -- you know,
5    instruct in the middle of an answer, it'd be
6    appreciated.

7    BY MR. CHANDRAN:

8    Q.   Okay.  So it's monthly training in 2023.  Was
9    it a similar monthly training set in 2024?

10   A.   I don't remember off the top of my head the
11   exact topics, but they have monthly training.

12   Q.   Okay.  Do you remember approximately how many
13   trainings for 2024 you reviewed?

14   A.   No.  Again, it was just a list of topics for
15   monthly training.

16   Q.   Okay.  Do you remember any of the topics that
17   were on that list of topics either for 2023 or 2024?

18   A.   There's legal updates, policy updates, tac
19   med, which would be application of first aid in the
20   field.  There's -- those are -- those are the ones that
21   I remember off the top of my head without referring to
22   that.  I -- I can't recall any others, but generally
23   they would be training geared towards response to crowd
24   control or First Amendment protest issues.

25   Q.   Okay.  And what is covered at the trainings

Page 25

1    that deal specifically with crowd control and First
2    Amendment issues?

3    A.   I mean, they would discuss policy, the Metro
4    policy.  Again, I do not have the training curricular or
5    the training documents in front of me to go over exactly
6    what was discussed in their training.  I did not attend
7    the training.

8    Q.   I understand.  And that would cover the
9    policy, you said?

10   A.   Yes.  I mean, any training is going to be in
11   congruent with all of our policies as well as law.  So
12   yes, training would -- would include the concept of
13   policy.

14   Q.   And would the training go over the specific
15   provision of policy relevant to the topic being covered?

16   A.   There is training on policy and law, so yes.

17   Q.   And so, which policies were discussed at the
18   training on crowd control and First Amendment?

19   A.   I don't have that information in front of me.

20   Q.   Okay.  Okay.  So I believe we mentioned that
21   you reviewed these training curricula, the list of
22   topics at the trainings, and one PowerPoint or at least
23   one PowerPoint.  Do you remember reviewing any other
24   documents to prepare for today?

25   A.   No.  There is a -- a -- a question about e-

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of EMILY MCCINLEY, taken on June 18, 2024

30(b)(6)                                                                26..29

Page 26

1  mail, I think, on -- or communications about -- between
2  the mayor's office and the chiefs of police, I believe,
3  about -- so asked about any e-mails that could have been
4  distributed or received from people in those ranks
5  between them and the mayor's office.
6       Q.   And who did you ask for those e-mails or other
7  communications?
8       A.   I don't remember, off the top of my head, who
9  specifically I asked.  It was personnel within the
10 mayor's office to determine where they -- where they may
11 have received that communication that's referenced in
12 Line Item 2, and then people within the ranks, the
13 current ranks that would've been referenced in Line 2,
14 to see if they recalled any communication regarding
15 what's mentioned there.
16      Q.   So you asked someone from the mayor's office
17 and then some people within LMPD who are in the ranks
18 mentioned in the appendix?
19      A.   Yes.
20      Q.   And did you receive any documents or e-mails
21 or other communications from any of those people?
22      A.   There was no communication between the people
23 of the ranks mentioned in the Line Item number 2, so the
24 chief, deputy chiefs, assistant chiefs with the mayor's
25 office regarding the reference information in Line

Page 27

1  Item 2.
2       Q.   Okay.  Okay.  Okay.  So I understand there
3  were no e-mails.  Were there any other documents beyond
4  the list of training topics, the PowerPoint from one
5  training, and some training curricula that you reviewed
6  to prepare for today?
7       A.   That is all that I reviewed.
8       Q.   Did you review any special orders?
9       A.   No.
10      Q.   Did you request any special orders to review?
11      A.   No.
12      Q.   Okay.  Did you review any PowerDMS logs?
13      A.   Logs, you said?
14      Q.   Yes.  Sorry.  PowerDMS logs.
15      A.   No.
16      Q.   Did you review any documentation of any other
17 kind related to the PowerDMS system?
18      A.   No.
19      Q.   Did you review any memos sent out by anyone in
20 the executive command of the LMPD to officers?
21      A.   No.
22      Q.   Did you request any memos sent from the
23 executive command of LMPD to officers in order to review
24 for today?
25      A.   No.

Page 28

1       Q.   Did you review any sign-off forms from
2  officers confirming they'd received any SOP revisions or
3  special orders?
4       A.   No.
5       Q.   Did you request to review those forms?
6       A.   No.
7       Q.   Okay.  So we talked a little bit about the
8  documents you reviewed to prepare for today.  Did you
9  review any deposition transcripts in preparing for
10 today?
11      A.   No.
12      Q.   Okay.  Did you watch any videos in preparation
13 for your deposition today?
14      A.   No.
15      Q.   Did you listen to any audio?
16      A.   No.
17      Q.   Okay.  I believe you've mentioned meeting with
18 Wesley Bratcher to prepare for today.  Did you meet with
19 -- excuse me, did you meet with anybody else to prepare
20 for today's deposition?
21      A.   Just Wesley Bratcher, but not meet with me.  I
22 spoke with him via phone and e-mail.
23      Q.   Okay.  Sorry.  Yeah.  Thank you for
24 clarifying.  So you spoke with Wesley Bratcher via phone
25 and e-mail; is that right?

Page 29

1       A.   Yes.
2       Q.   Approximately how many times did you speak
3  with Wesley Bratcher to prepare for today?
4       A.   Maybe a handful of exchanges back and forth.
5       Q.   Okay.  Do you remember how many phone calls
6  you had with him?
7       A.   No.
8       Q.   Was there more than one?
9       A.   I don't remember.
10      Q.   And when you say a handful of exchanges, do
11 you remember approximately, or do you have an estimate
12 of how many e-mails you exchanged with him?
13      A.   I had a handful.  A handful.  I -- I don't --
14 I don't know.
15      Q.   Okay.  I'm sorry.  I think I might have missed
16 the first part of your answer.  We keep having this
17 audio issue.  Could you repeat that?
18      A.   I said a handful.  I don't recall.  No.
19      Q.   Okay.  Did Wesley Bratcher send you any
20 documents that you reviewed to prepare for today?
21      A.   Yes.  He sent me the list of training topics,
22 and he sent me at least one PowerPoint.  Again, I can't
23 recall if there was a second one, but I know there was
24 at least one PowerPoint.
25      Q.   All right.  Did you speak with anyone else to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 30

1    prepare for today's deposition?

2        A.    I -- I did speak with our training division

3    major to learn about any relevant topics that may have

4    been discussed or presented to LMPD members during

5    annual in-service.  And then I did talk to the

6    supervisor of our research and development unit who

7    would be in charge of the policy implementation process

8    and development process.

9        Q.    Okay.  And can you tell me who is the training

10   division major that you spoke with?

11       A.    David Allen.

12       Q.    I'm sorry, could you repeat that?

13       A.    David Allen.

14       Q.    David Allen.  And would you just mind spelling

15   that for the transcript?

16       A.    It's D-A-V-I-D, Allen, A-L-L-E-N.

17       Q.    Thank you.  And who was the supervisor of the

18   research and development unit that you spoke with?

19       A.    Dale Brown.

20       Q.    Would you just mind spelling that again for

21   the transcript as well?

22       A.    D-A-L-E, B-R-O-W-N.

23       Q.    And I believe you mentioned you spoke with

24   Major Allen about the annual in-service trainings; is

25   that right?

Page 31

1        A.    Yes.

2        Q.    And what did you discuss with him about those

3    in-service trainings?

4        A.    Yeah.  In what -- the 2023 mandated in-service

5    training curriculum, what relevant First Amendment civil

6    disturbance courses did we deliver?  And we -- I learned

7    that we -- or he reminded me that we had a two- hour

8    block on First Amendment response in the 2023 mandated

9    in-service for all department members.

10       Q.    When did that 2023 in-service training happen?

11       A.    It was mandated in-service for all members,

12   and it took place throughout the entire year.  So

13   everyone took a 40-hour in-service course with a variety

14   of topics.  So it -- it would've started in January, and

15   continued through the rest of the year so that it was

16   delivered to every member of the LMPD.  So people may

17   have taken it at various points throughout 2023.

18       Q.    I see.  Okay.  So is that -- are there a

19   series of classes offered, or is it something that

20   officers can do on their own time?  How is it set up?

21       A.    Everyone is assigned a -- a week of in-

22   service.  You attend that week of in-service.

23       Q.    Does the city keep track of which officers

24   have or have not yet attended an in-service?

25       A.    Yes.

Page 32

1        Q.    How is that information tracked?

2        A.    It's tracked through the Training Academy

3    across that information.  We now use a Blackboard as our

4    tracking system.  It is also tracked at the state level.

5    So the State of Kentucky requires that every officer --

6    sworn peace officer in the State of Kentucky has

7    40 hours of in-service training.  And so, the state

8    tracks that training as well.

9        Q.    Okay.  Okay.  That's all.  Did you review any

10   records from either the Training Academy or Blackboard

11   or the state to see how many officers completed their

12   in-service training in 2023?

13       A.    I did not review records.

14       Q.    I'm sorry, that cut out for me.

15       A.    I did -- I did not review records.  No.

16       Q.    Is the in-service process working similarly in

17   2024 via the same sort of assignment structure that you

18   mentioned for 2023?

19       A.    2024 is different.  So instead of having a 40-

20   hour block of training for every officer, we now have

21   four hours a -- a month for ten months to get your

22   40 hours of training.  So in 2024, we changed our -- our

23   training schedule so that every member of LMPD receives

24   four hours of training every month instead of 40 hours

25   in one week period.  That is the difference there.

Page 33

1        Q.    I see.  Okay.  So in 2023, it was one week

2    blocked out to do 40 hours of training at one time over

3    the year?

4        A.    Yes.

5        Q.    And now it's every month, there's a four-hour

6    block put on each officer's schedule?

7        A.    Correct.

8        Q.    For ten months?

9        A.    For tens months.

10       Q.    Okay.  Why was that change made?

11       A.    Well, so we thought there -- if you received -

12   - if you have 40 hours of training and you took your

13   training in January of 2023, there could be a

14   possibility that you do not receive another in-service

15   training until, say, November of 2024.  So that's --

16   it's a significant amount of time that an officer would

17   go without potentially receiving training.

18            So we decided to, within LMPD, change that so

19   that every officer is receiving some sort of training,

20   and the training division is able to address every

21   officer every month.  And so, that's why we decided to

22   go with the schedule and break -- broke it up into four-

23   hour blocks instead of one 40-hour block.

24       Q.    Okay.  So it was to avoid longer gaps between

25   training sessions for officers?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of EMILY McKINLEY, taken on June 18, 2024

---

Page 34

1    A.   Yes.

2    Q.   Who was responsible for making that change?

3    A.   So when that change was made -- so Deputy
4  Chief Paul Humphrey was part of the decision in
5  implementing that change.  And then as well as myself
6  now that I've taken over the Accountability and
7  Improvement Bureau since August, the training division
8  has fell under -- under me.  So when we started that in
9  -- this in 2024, this year, I was a part of that
10 implementation as well.

11   Q.   Okay.  Who else other than you and Deputy -- I
12 should call him -- maybe I should call him Interim Chief
13 Humphrey, now, who else was involved in that decision to
14 change the training structure like this?

15   A.   So -- you know, Major David Allen, you had
16 spoke earlier as far as the training division major.  And
17 then Sergeant Justin Witt was -- was instrumental in
18 developing that schedule as well.

19   Q.   And I'm sorry, could you just spell that
20 sergeant's name for the record?

21   A.   Sure.  His first name is Justin, J-U-S-T-I-N.
22 Last name is Witt, W-I-T-T.

23   Q.   Okay.  Was there anyone else who was involved
24 in that decision process?

25   A.   There -- I mean, there's several commanding

---

Page 35

1  officers within the training division that ultimately
2  would be responsible for messaging and coordinating and
3  -- and structuring that change.  But the -- those that
4  I've named are the ones that were the most instrumental
5  in developing the strategy, developing the schedule, and
6  making the decision to proceed with that.

7    Q.   Okay.  Thank you.  So I believe you mentioned
8  last year, there was -- as part of that 40-hour block,
9  there was a two-hour block on First Amendment response;
10 is that right?

11   A.   Correct.

12   Q.   How is -- or I should say, does the in-service
13 training for 2024 include anything about First Amendment
14 response?

15   A.   No.

16   Q.   It does not?  Okay.  Why was the decision made
17 to not include anything about First Amendment response
18 in the 2024 in-service training?

19        MR. PAUL:  Objection.  This is outside of the
20        scope of the topics.  You can answer, but it's
21        outside the scope.

22        THE WITNESS:  It will be included in the 2025
23        printing, so that there are other constitutional
24        concepts that are incorporated into the '24 -- 20 -
25        - 2024 training.

---

Page 36

1  BY MR. CHANDRAN:

2    Q.   Understood.  I guess what I'm trying to ask is
3  how was it decided to take the First Amendment response
4  motion out of the 2024 training and put it in the 2025
5  training?

6        MR. PAUL:  Objection.  Misstates testimony.

7        THE WITNESS:  Officers received training in
8        2023 on First Amendment response.  2024, there are
9        other constitutional requirements that we are
10       delivering training on.  And in 2025, the schedule
11       will come back for an -- and another First
12       Amendment response training.  There is also legal
13       updates and -- and case law updates.  That is a --
14       that is another training that officers receive
15       during their mandated four-hour blocks.

16 BY MR. CHANDRAN:

17   Q.   And do the legal updates that you're talking
18 about that are part of these four-hour blocks, do those
19 include trainings on protest response and the First
20 Amendment?

21   A.   If there's case law -- relevant case law that
22 our legal office feels that officers should be updated
23 on it, then yes.

24   Q.   Okay.  So those are about relevant case law.
25 Would those also include trainings about the SOPs?

---

Page 37

1    A.   If they're applicable for what the legal
2  office is delivering to the officers.

3    Q.   Are there situations where the legal updates
4  training would include information about First Amendment
5  and protest response if there's no new case law
6  developments?

7    A.   I'm sorry, repeat the question?

8    Q.   Sorry.  That was poorly worded.  I heard you
9  say that the legal updates would include things on First
10 Amendment response if there are case law updates; is
11 that right?

12   A.   Yes.

13   Q.   Would there be any discussion of First
14 Amendment and protest response if there are no relevant
15 case law updates?

16   A.   There could be.

17   Q.   I'm sorry, I didn't -- did you answer?  I
18 didn't hear.

19   A.   I'm sorry.  There could be.

20   Q.   In what situations would that be?

21   A.   There could be a variety of discussions
22 throughout any training course.  So yes.  There could be
23 discussions on that.

24   Q.   Have there been -- has the city done any
25 trainings on First Amendment and protest response

---



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 13 of 85 PageID
#: 2671
The Deposition of EMILY MCKINLEY, taken on June 18, 2024
30(b)(6)                                                                          38..41

Page 38

1    through the in-service process in 2024 so far?
2        A.   No.  Not in the mandated in-service.
3        Q.   Has the city done any trainings on First
4    Amendment and protest response through the legal updates
5    trainings in 2024 so far?
6        A.   That training has not occurred.
7        Q.   Is there one currently scheduled?
8        A.   Again, I would need to look at -- yes.  There's
9    a -- there -- we received -- may -- an annual legal
10   updates.  I would need to go look at the schedule, or --
11   or look at the schedule to determine exactly when that
12   would happen.
13       Q.   And understanding that it has not yet
14   happened, will First Amendment and protest response be
15   covered at that legal update stream?
16       A.   I don't have the curriculum.  If there's
17   relevant case law or the legal office feels there's
18   relevant information to provide officers for that topic,
19   then yes, but I -- I do not have the -- their
20   curriculum.
21       Q.   Okay.  Did you review that curriculum in
22   preparing for today's depositions?
23       A.   No.
24       Q.   Did you review the curriculum from the 2023
25   in-service in preparing for today's deposition?

Page 39

1        A.   No, I did not.
2        Q.   Did you review any materials from that two-
3    hour block on First Amendment response from last year's
4    in-service?
5        A.   No.
6        Q.   I'm sorry.  I couldn't hear you.
7        A.   No.  No.
8        Q.   I'm sorry to keep asking you to repeat
9    yourself.  I really don't mean anything by it.  It's --
10   I think I'm having some audio problems on my computer.
11       A.   Okay.
12       Q.   Okay.  So I think you mentioned you spoke with
13   Major David Allen, Sergeant Dale Brown, and then William
14   -- oh, sorry.  Wesley Bratcher.  Did you speak with
15   anybody else to prepare for today's deposition?
16       A.   Not that I recall.
17       Q.   Okay.  Did you speak with interim Chief
18   Humphrey?
19       A.   Yeah.  He is aware that I'm doing this
20   deposition -- deposition.  Didn't necessarily speak with
21   him in preparation to prepare for the deposition.  He's
22   aware of the topics that we are discussing, but that's
23   the extent that he's aware of.
24       Q.   Okay.  Understood.  Did you speak with Chief
25   Gwinn-Villaroel?

Page 40

1        A.   No.
2        Q.   Okay.  Did you speak with anybody in the
3    mayor's office to prepare for today's deposition?
4        A.   No.
5        Q.   Okay.
6            MR. CHANDRAN:  I'm going to go ahead and put
7        in the chat what we can mark as Exhibit 82.
8            (EXHIBIT 82 MARKED FOR IDENTIFICATION)
9    BY MR. CHANDRAN:
10       Q.   I will go ahead and share my screen once more.
11   Okay.  Chief McKinley, can you see my screen?
12       A.   I can.
13       Q.   Okay.  Do you recognize this document?
14       A.   Yes.
15       Q.   What is this document?
16       A.   It is a Use -- our Use of Force Policy.
17       Q.   Okay.  And can you tell me generally, what
18   does the Use of Force Policy cover?
19       A.   It covers when officers are able to use force
20   in the field.
21       Q.   And does that apply to specific kinds of field
22   activity or what?
23       A.   Can you explain what you mean by that?
24       Q.   Sorry.  Yeah.  That was not clear.  You said
25   this applies -- this governs when officers are able to

Page 41

1    use force in the field.  What do you mean by in the
2    field?
3        A.   During the course of their duties.
4        Q.   Is that true of -- in any discharge of their
5    duties, or are there some times that this policy would
6    not apply?
7        A.   This applies at all times.
8        Q.   And why is it important to have -- or let me
9    back up.  Why does the department have a use of force
10   policy?
11       A.   So officers understand how to execute their --
12   their duty and how to -- what their expectations are,
13   what the law is, what our policy is, how they're going
14   to be held accountable.
15       Q.   And just looking at the top right-hand corner
16   of this first page, do you see a series of boxes, the
17   top one reading SOP number 9.1?
18       A.   Yes.
19       Q.   And is the chapter number here, SOP number?
20       A.   Yes.  It is.
21       Q.   I'm sorry, I got some feedback on that.
22       A.   Yes.  Yes.
23       Q.   Thank you.  And so, below that, there's a box
24   that has three lines in it.  The first reads, "Effective
25   date," and then, "04-08-03."  Do you know what that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of EMILY MCCARTHY, taken on June 18, 2024

Page 42

1  refers to?
2      A.   The -- the effective date would be the
3  original date the policy came into place.
4      Q.   Okay.  And would that be April 8, 2003?
5      A.   Yes.
6      Q.   Okay.  And then below that, there is PRV
7  period, REV period date 09-21-20.  Do you know what that
8  refers to?
9      A.   That was the date that the policy was
10 previously revised.
11     Q.   Oh, okay.  I see.  I see.  So then just
12 skipping quickly, the third line on this says, "Revised
13 date 09-19-22."  What does that mean?
14     A.   That was the last time the policy was revised.
15     Q.   Okay.  So the revised date refers to the last
16 date that the policy was revised, and then the PRV REV
17 date refers to the time before that most recent revision
18 that the policy was revised?
19     A.   Correct.
20     Q.   Okay.  So for this policy, it was last revised
21 September 19, 2022.  And before that it had been revised
22 in September 21, 2020?
23     A.   Correct.
24     Q.   Thank you.  That was helpful.  Has this policy
25 been revised since September 19, 2022?

Page 43

1      A.   No.
2      Q.   So this is the policy that remains in effect
3  today?
4      A.   It is the policy that is in effect today.
5      Q.   Okay.  Thank you.  I'd like to ask you a bit
6  about some parts of this policy, if that's okay.  I'm
7  going to scroll down to -- or first, let's see.  That
8  9.1.2 on this policy.  Do you see this heading?
9      A.   Yes.
10     Q.   It's titled definitions.  Do you see that?
11     A.   Yes.
12     Q.   Do these definitions apply to all of 9.1,
13 something narrower, something broader?
14     A.   Those are the definitions for 9.1.
15     Q.   Okay.  That's helpful to know.  Okay.  I'm
16 going to scroll down to -- it's Page 6 of this document,
17 which is 9.1.4.  Do you see the heading 9.1.4 titled
18 "Progression of Force"?
19     A.   Yes.
20     Q.   What is this Progression of Force visual?
21     A.   It is a graphic that is demonstrating to an
22 officer, or to the reader, that a situation is always
23 constantly evolving and changing.  And based on that
24 situation, that the officer needs to take into account
25 the totality of the circumstances and the situation that

Page 44

1  they are presented with in making their decision on
2  using force, and which force would be applicable per our
3  policy.
4      Q.   Okay.  And so, can you say a little bit more
5  about what you mean by that last part of how an officer
6  should take context into account into determining
7  whether and what kind of force to use?
8      A.   Sure.  A situation is constantly changing.  So
9  an officer needs to continuously assess and reassess the
10 situation as it's changing.  And that is indicated by
11 the arrows that is going around the situation circle in
12 the center.  And so, as situations change and different
13 -- different -- as factors are presented to the officer,
14 the officer needs to take those into account when the
15 officer is making a decision in the moment to use force.
16     And so, a lot of those situations and factors
17 -- I know you -- you are familiar with Graham v. Connor,
18 we call them Graham factors.  So the severity of the
19 crime at end, we need to take into account as we're
20 assessing situations.  The immediacy of the threat that
21 the -- that is presented to the officer, as that's
22 changing or evolving, as the severity of crime might be
23 changing or evolving, the resistance level that's
24 presented to the officer.
25     So that could change and evolve as different

Page 45

1  levels of force are applied or -- or presented, as well
2  as the flight of the subject.  So taking all of that
3  into consideration, that is what this graphic is
4  attempting to depict to the reader here.
5      Q.   Okay.  That makes sense.  Why does the city --
6  why does the police department have a graphic like this?
7      A.   The -- you know, when this policy was updated,
8  it's just -- you know, there are people who are -- do
9  well visually.  And so, this was a graphic that depicts
10 what I was attempting to describe with words.  And so,
11 it's essentially what I was explaining with words.  So
12 the arrows of constantly moving, and if you picture this
13 graphic as a wheel turning and -- and moving back and
14 forth, that is what is attempting to be depicted here
15 using this graphic.
16     Q.   Okay.  I see.  Is this an important part of
17 the department's policies?
18     A.   Having officers understand that they need to
19 take the totality of the situation at hand and
20 continuously assess those factors, the severity of the
21 crime, the immediacy of the threat, the resistance level
22 presented, the flight of the -- of the subject into
23 account as they're assessing whether or not to use force
24 and what type of force to use.  However, that -- that is
25 depicted, yes, it is important within our policy.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 15 of 85 PageID
#: 2673
The Deposition of EMILY MCKINLEY, taken on June 18, 2024
30(b)(6)                                                                46..49

**Page 46**

1    Q.   Okay.  And is there somewhere on this graphic
2    where the severity of the crime or the immediacy of the
3    threat, as you described them, is listed?
4    A.   Not on this graphic.
5    Q.   Okay.  So this graphic does talk about, as I'm
6    reading it, resistance levels; is that right?
7    A.   It does talk about resistance levels.
8    Q.   Okay.  Is there another graphic in any other
9    portion of the SOPs that talks about severity of crime
10   or immediacy of threat in assessing force?
11   A.   Not -- not that I know of off the top of my
12   head.
13   Q.   Okay.  Is there any other provision of -- or I
14   should say, is there another graphic in Chapter 9.1 of
15   the SOPs that deals with immediacy of threat or severity
16   of crime?
17   A.   There is not a graphic.
18   Q.   How long has the city had this progression of
19   force graphic in place?
20   A.   I'm -- I'm not sure when the graphic was
21   introduced into our policy initially.
22   Q.   Okay.  And I believe earlier we discussed that
23   this policy was last revised on September 19, 2022; is
24   that right?
25   A.   Correct.

**Page 47**

1    Q.   Was this progression of force graphic changed
2    during those September 19, 2022 amendments?
3    A.   I -- I would need to go and review the
4    previously revised, I guess, version.  So I -- I do not
5    -- I don't know just by looking at this right now.
6    Q.   Okay.  So yeah, understood.  Sitting here
7    today, you don't know?
8    A.   Correct.
9    Q.   And I'm guessing that that naturally leads to
10   an answer to the next question I had, which is: Do you
11   know when this continuum was last changed?
12   A.   No.
13   Q.   I'm sorry.  Was that a no?
14   A.   No.
15   Q.   Are officers trained on this progression of
16   force graphic?
17        MR. PAUL:  Object.
18        THE WITNESS:  Officers are aware of the
19        graphic in our -- in our policy and it has been
20        presented in previous trainings.  The concept of --
21        of what is messaged in the graphic is delivered in
22        trainings, and the concept is relevant throughout
23        the entire use of force policy.
24   BY MR. CHANDRAN:
25   Q.   Understood.  So even if the graphic isn't

**Page 48**

1    used, this -- the substance of the information that's
2    reflected in this graphic is trained?
3    A.   Yes.
4    Q.   And I guess, to make sure, this substance of
5    this graphic would be an accurate reflection of the
6    department's use of force policy?
7        MR. PAUL:  Object to form.
8        THE WITNESS:  It is in our policy.
9    BY MR. CHANDRAN:
10   Q.   And I guess I'm asking, is the graphic an
11   accurate reflection of the use of force policy?
12        MR. PAUL:  Same objection.
13        THE WITNESS:  It's a reflection of the
14        concepts that I've discussed, as far as what it's
15        delivering with the graphic.
16   BY MR. CHANDRAN:
17   Q.   Is the city aware of any inaccuracies in how
18   this graphic reflects the use of force policy?
19   A.   No.  Not that I'm aware of.
20   Q.   I'm sorry, could you repeat that?  I'm sorry.
21   A.   No.
22        MR. PAUL:  Hold on.  I think your first answer
23        was -- I'm not -- well, just -- can the court
24        reporter read back what the court reporter heard
25        her question? Because I think she just changed her

**Page 49**

1    answer.  I don't want to feed any information, if
2    that's okay with you, Ashok?
3        MR. CHANDRAN:  Yeah.  Yeah.  The court
4    reporter can read back.
5        THE REPORTER:  Sure.  The first answer, I
6    didn't pick it up on my end either, so it just
7    sounded like a noise glitch.
8        MR. CHANDRAN:  Maybe --
9        MR. PAUL:  Okay.
10       MR. CHANDRAN:  Can we take --
11       THE REPORTER:  So there -- so yeah.  Maybe we
12   could readjust the audio in the room.
13       MR. CHANDRAN:  Yeah.  Maybe --
14       THE REPORTER:  Let me see if I can get you off
15   the record.
16       MR. CHANDRAN:  Thank you.
17       THE REPORTER:  Give me just a moment.  I'll
18   take us off the record.
19       MR. CHANDRAN:  Thank you.
20            (OFF THE RECORD)
21       THE REPORTER:  We are back on the record.  It
22   is 11:22 a.m.  You may proceed.
23   BY MR. CHANDRAN:
24   Q.   Thank you.  So welcome back, Chief McKinley.
25   Before we move forward, I know we were having some audio

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 16 of 85 PageID
#: 2674
The Deposition of EMILY MCKINLEY, taken on June 18, 2024

30(b)(6)                                                              50..53

Page 50

1  issues.  Are there any answers that you gave in your
2  morning's testimony that you'd want to clarify or amend
3  or correct?
4      A.  The previous answer to the last question.  I
5  know there were some audio issues with the last question
6  and answer.  I stated -- what was -- what was the
7  question again?
8      Q.  The question was whether the graphic on the
9  progression of force section of the SOPs contains any
10  inaccuracies concerning the department's use of force
11  policy?
12     A.  And my original answer that did -- was not
13  captured, apparently, not that I'm aware of.
14     Q.  And again, I -- just because you're here
15  testifying on behalf of the city, when you say, you, are
16  you referring to the city, or you, yourself, personally?
17         MR. PAUL:  Well, that question is a little bit
18     outside of the scope, I would say, but you can go
19     ahead.  You can answer.
20         MR. CHANDRAN:  I mean, I disagree to the
21     extent that the meaning of the 9.1.4 is part of the
22     notice of topics that the city was notified of.
23         THE WITNESS:  I'm not aware of any
24     inaccuracies that the city is aware of with that
25     graphic.

Page 51

1  BY MR. CHANDRAN:
2      Q.  Okay.  Okay.  I'm going to go ahead and share
3  my screen again.  Chief McKinley, can you see this as
4  well?
5      A.  Yes.
6      Q.  Okay.  And is this the progression of force
7  graphic that we were just discussing?
8      A.  Yes.
9      Q.  Okay.  How frequently are officers trained on
10  the department's use of force policy?
11     A.  Again, officers receive annual in-service
12  training that covers a variety of policies.  Often, that
13  training includes -- it always includes annual firearms
14  training, so that is a level of force.  It often
15  includes GST training, which is ground fighting
16  training, and the use of force policy is incorporated
17  into all of those trainings.  And then officers receive
18  legal updates, training -- case law training that often
19  discusses the use of force.
20     Q.  And is Chapter 9.1 of the SOPs explicitly
21  discussed or trained as part of those trainings?
22     A.  In concept, yes.
23     Q.  Okay.  Okay.  Is it important to train
24  officers on the department's use of force policy?
25     A.  Yes.

Page 52

1      Q.  And why is that?
2      A.  Well, it -- it's important that officers
3  understand constitutionally how to use force, when they
4  can use force per law, and per policy, which is more
5  stringent than law, so it's -- it's important that
6  officers understand when and how they -- they can use
7  force.
8      Q.  Okay.  So looking at this graphic, you were
9  giving me a little bit of what this graphic means
10  earlier, but I'd like to walk through it a little bit
11  more closely if that's okay with you.
12     A.  Sure.
13     Q.  So at the core of this graphic is written,
14  "situation."  What does that mean as used in the
15  graphic?
16     A.  It is the incident at hand, the situation at
17  hand.
18     Q.  Okay.  So it's whatever the officer is
19  encountering in the field?
20     A.  Correct.
21     Q.  And then around situations, you were
22  discussing these -- these arrows that move around it.  Do
23  you see those?
24     A.  Yes.
25     Q.  Now, I'm going to try to zoom in so that we

Page 53

1  can read these.  I think, based on my read, they say,
2  "plan, act, and assess."  Do you see that?
3      A.  Yes.
4      Q.  What do those words mean as used in this
5  diagram?
6      A.  So as the situation is evolving, which is
7  indicated by the arrows moving around the circle,
8  officers should assess the situation, make a plan, and
9  then act on that plan as they're assessing that
10  situation.
11     Q.  Okay.  So the arrows mean they're supposed to
12  be doing them, meaning, sort of, as the situation
13  evolves?
14     A.  I'm sorry.  Can you repeat the question?
15     Q.  Yeah.  So is there -- I'll ask it as a
16  question.  Is there an order in which officers should be
17  doing these things?  What is the -- what does the arrows
18  mean?
19     A.  You should constantly be doing all three of
20  those things.  So you are assessing, you're planning,
21  you're acting as the situation is evolving, and you're
22  continuously doing those things.
23     Q.  Okay.  So the placement of the individual word
24  is not as important.  You should always be doing all
25  three?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of EMILY MCKINLEY, taken on June 18, 2024

30(b)(6)                                                    54..57

Page 54

1    A.    Yes.
2    Q.    Does the direction that the arrows are
3  pointing in mean anything?  I just see that they're all
4  going clockwise.
5    A.    You are constantly moving around from
6  assessing, planning, acting, assessing, planning,
7  acting --
8    Q.    Okay.
9    A.    -- as the situation evolves.
10   Q.    Okay.  Now moving, sort of, one circle out
11 from those words.  There's another circle that's shaded
12 black and white.  Do you see that?
13   A.    Yes.
14   Q.    And this one doesn't have any arrows, does it?
15   A.    No.
16   Q.    Okay.  And there are some words written in
17 this one.  Could you go ahead and read the words that
18 are in this black and white circle?
19   A.    Sure.  Starting on the right-hand side,
20 "Compliant, passive resistance, active resistance,
21 active aggression, serious physical injury or death."
22   Q.    And what are these referring to?
23   A.    Resistance levels that would -- could be
24 presented to officers.
25   Q.    Oh, okay.  So these are if -- the subject that

Page 55

1  an officer is encountering, this is the level of
2  resistance that they could be engaging in?
3    A.    I'm sorry?  Can you --
4    Q.    Poorly worded.  I can rephrase that.  Yeah.  So
5  these words refer to the level of resistance that a
6  subject that an officer's engaging with could be doing?
7    A.    Yes.
8    Q.    Okay.  And let's just start with what does
9  compliant mean as used in this policy?
10   A.    The officer is -- or I'm sorry, the subject is
11 complying with the officer's requests or demands, so
12 they are doing what the officer is asking.  They're not
13 posing any resistance.
14   Q.    Okay.  Okay.  And so, then what does passive
15 resistance mean as used in this policy?
16   A.    I will say there are definitions to each one
17 of these in the -- at the beginning of the policy.
18   Q.    I see.  Okay.  So maybe, then, we can scroll
19 up to those definitions.  Thank you for clarifying that.
20 I see.  Okay.  So here, there is a definition in 9.1.2
21 of passive resistance.  Do you see that?
22   A.    Yes.
23   Q.    Okay.  And can you tell me what is the
24 definition of passive resistance under this policy?
25   A.    When a subject is not complying with an

Page 56

1  officer's commands and is uncooperative but is taking
2  only minimal physical action to prevent an officer from
3  placing the subject in custody and taking control.  It
4  gives examples of standing stationary and not moving
5  upon lawful direction, falling limply, refusing to use
6  his or her own power to move, holding onto fixed object,
7  or locking arms to another during a protest or
8  demonstration.
9    Q.    Okay.  And so, all the things listed in this
10 parenthetical starting with, e.g., those are examples of
11 what would be passive resistance under the policy?
12   A.    Yes.  Those are examples.
13   Q.    Okay.  That's helpful.  Okay.  So then I'm
14 guessing the next word on this progression of force
15 graphic is active resistance.  I'm going to assume
16 there's a definition of that in the definitions as well?
17   A.    Yes.
18   Q.    Okay.  I'm going to go ahead and highlight
19 that in 9.1.2.  Would you mind just reading that for the
20 record?
21   A.    "Active resistance: When a subject's physical
22 actions are intended to prevent an officer from placing
23 the subject in custody or taking control, but are not
24 directed at harming the officer."  It gives examples:
25 pulling, walking or running away, breaking an officer's

Page 57

1  grip.
2    Q.    Okay.  So -- oh, I'm sorry.  Did you finish
3  your answer?  I don't want to cut you off.
4    A.    I'm finished.
5    Q.    So active resistance, as defined in this
6  policy, is situations where the subject is not directed
7  -- or the individual -- the subject's actions are not
8  directed at harming the officer; is that right?
9    A.    Correct.
10   Q.    And one of the examples that is given here is
11 walking away from an officer; is that right?
12   A.    That is an example.
13   Q.    Okay.  So does the city consider walking away
14 from an officer to be active resistance under this
15 policy?
16   A.    It depends on the circumstance.  Merely
17 walking away is not active resistance.  You would need
18 to take all the other factors into consideration as far
19 as what -- the investigation that's -- that is
20 occurring, the severity of the crime that is at hand,
21 the immediacy of the threat of the subject, if they are
22 resisting arrest and if they're fleeing because of an
23 arrest, so all -- merely walking away is not active
24 resistance.
25   Q.    So then, I guess, as defined in this policy,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 18 of 85 PageID
#: 2676
The Deposition of EMILY MCCOLEY, taken on June 18, 2024
30(b)(6)                                                        58..61

Page 58

1  what else would need to happen before walking or running
2  away would be considered active resistance?
3      A.  The subject would need to be -- the officer
4  would need to be affecting an arrest of the subject.
5      Q.  Okay.  And is that clarification put -- where
6  is that clarification in the policy?
7      A.  I mean, it's -- the entire use of force
8  policy, taken as a whole, explains when you can use
9  force when a subject's actions -- when we're deciding to
10 use force, if they're walking away, if -- if they are
11 under arrest, that would be where that's explained
12 throughout the entire policy.
13     Q.  Is there a point in 9.1 where that is written
14 down?
15     A.  I would need to read the entire use of force
16 policy.
17     Q.  I guess, are you aware of one?
18     A.  I'm sorry, aware of --
19     Q.  I'm sorry.  Are you aware of a place in 9.1
20 where that limitation is listed?
21     A.  I would need to read the entire use of force
22 policy.
23     Q.  Okay.  And I guess, did you do that to prepare
24 for today?
25     A.  I have read it.  It's several pages long.  I

Page 59

1  do not have it memorized.
2      Q.  Okay.  Understood.  Okay.  So there are
3  circumstances where walking away from an officer would
4  not be active resistance, and there are circumstances
5  where it would be?
6      A.  Yes, depending on the totality of the
7  circumstances.
8      Q.  Okay.  I understand, I -- just to clarify, I
9  understand that this is separate from the immediacy of
10 the threat and the severity of the crime.  I'm just
11 focused on this question of what resistance level we're
12 talking about, okay?
13     A.  (No verbal response.)
14     Q.  Okay.  Now, the next thing I wanted to ask you
15 was, the next word or the next phrase in this black and
16 white circle under 9.1.4 is active aggression.  Do you
17 see that?
18     A.  Yes.
19     Q.  Okay.  And I think I saw a definition for that
20 earlier as well.  Could you just read that definition
21 for me, for the transcript?
22     A.  "An overt act of assault through physical
23 means, coupled with the present ability to carry out the
24 assault, which reasonably indicates that assault or
25 injury to any person is imminent."

Page 60

1      Q.  Okay.  And so, could you just explain to me
2  the difference between active aggression and active
3  resistance under this policy?
4      A.  The difference between active aggression and
5  active resistance?
6      Q.  Yes, ma'am.
7      A.  Active aggression presents an imminent threat
8  of assault or injury.
9      Q.  Okay.  So active aggression is when there's a
10 safety concern for anyone?
11     A.  Yes.
12     Q.  And active resistance doesn't require that?
13     A.  Doesn't require what?  Sorry.
14     Q.  A threat of injury to somebody.
15     A.  No.  Their -- their -- their physical actions
16 are not directed at harming the officer in active
17 resistance.
18     Q.  Okay.  Understood.  And then the final wording
19 on this circle is serious physical injury or death.  Do
20 you see that?
21     A.  Yes.
22     Q.  I'm going to scroll back up and see if there's
23 a definition of that as well here.  I see one for
24 serious physical injury.  Is that the definition that's
25 applicable here?

Page 61

1      A.  Yes.
2      Q.  Okay.  And would you mind just reading that
3  for the record?
4      A.  "A serious physical injury, a bodily injury
5  that creates a substantial risk of death to the victim,
6  creates a prolonged impairment of health or prolonged
7  disfigurement, creates a prolonged loss of impairment of
8  a bodily organ."
9      Q.  Okay.  And I'm -- I don't see a definition of
10 death, but what does death mean under this policy?
11     A.  Well, there's a deadly force definition, so
12 that would be for risk of death.  So force which -- that
13 you have currently highlighted.
14     Q.  Yeah.  I guess I'm thinking of, separate from
15 an officer's use of deadly force, is there a difference
16 between what death means in that circle that we looked
17 at?  Or is it, like, the plain meaning of death, like it
18 could cause someone to die?
19     A.  I'm not following the question.
20     Q.  Sorry.  I'll scroll down again to the -- I'll
21 zoom in here.  This circle reads serious physical injury
22 or death.  Do you see that?
23     A.  Yes.
24     Q.  And we went through the definition that the
25 policy has for serious physical injury, right?



Kentuckiana Reporters                    502.589.2273 Phone
P.O. Box 3983                            502.584.0119 Fax
Louisville, KY 40201                     schedule@kentuckianareporters.com
                                         www.kentuckianareporters.com

Page 62

1    A.   Yes
2    Q.   I didn't see like a specialized definition for
3    death, and I'm just asking if it's kind of what everyone
4    understands death to be.
5    A.   Yes.
6    Q.   Okay.  Okay.  So under these definitions, what
7    level of resistance would somebody damaging property
8    count as?
9    A.   Well, I would need more information.  Property
10   damage is not necessarily a specific level of
11   resistance, so I would need more information as far as
12   the circumstances that are occurring.
13   Q.   I guess what I'm asking is -- actually, based
14   on that, it -- are there circumstances where property
15   damage is not any level of resistance under this policy?
16        MR. PAUL:  Object to form.  You can answer if
17        you understand.
18        THE WITNESS:  I -- I -- I -- yeah, I would
19        need more clarification on what you're trying to
20        ask.
21   BY MR. CHANDRAN:
22   Q.   I'm just trying to get some understanding for
23   all the -- of different levels of resistance.  And so,
24   if an officer encounters somebody who is engaged in
25   damaging property, what level of resistance would that

Page 63

1    be considered on this use of force continuum?
2    A.   Property damage is -- is a crime.  It is not a
3    level of resistance.
4    Q.   Okay.  So someone engaged in property damage
5    is not necessarily engaged in any level of resistance
6    when an officer encounters them; is that right?
7    A.   Correct.  I mean, you could be a -- you could
8    demonstrate any level of resistance here while you're
9    damaging property, so property damage is not a level of
10   resistance.
11   Q.   Okay.  Understood.  And under this policy,
12   would being present while someone else engages in an act
13   of violence be considered a particular level of
14   resistance?
15   A.   No.
16   Q.   Are these words -- based on the definitions,
17   how are these words ordered?  Compliant, passive
18   resistance, active resistance, active aggression,
19   serious physical injury or death?
20        MR. PAUL:  Object to form.
21        THE WITNESS:  How are they ordered -- can you
22        restate that question or reword that?
23   BY MR. CHANDRAN:
24   Q.   Sure thing.  Does the location that the words
25   are placed on this graphic have any meaning?

Page 64

1    A.   Not really understanding the question, I
2    guess.
3    Q.   Sure.  I'll re-say it this way.  Based on the
4    definition, it seems like compliant is the lowest level
5    of resistance an officer can encounter; is that right?
6    A.   Yes.
7    Q.   And on the other end, serious physical injury
8    or death would be the highest level of physical
9    resistance an officer could encounter; is that right?
10   A.   Yes
11   Q.   And so are these ordered from least level of
12   resistance, which is compliant, to passive resistance,
13   which is a step higher; is that right?
14   A.   Yes.
15   Q.   And then active resistance is a step more
16   resistance than passive resistance?
17   A.   Yes.
18   Q.   And then active aggression would be a step
19   more resistance than active resistance?
20   A.   Yes.
21   Q.   And then serious physical injury or death is a
22   step more resistance than active aggression?
23   A.   Yes.
24   Q.   Okay.  Okay.  Thank you.  And moving up again,
25   just one level out from that circle, there's a blue

Page 65

1    circle.  Do you see that?
2    A.   Yes.
3    Q.   There's also some other colored, not quite
4    full circles.  Do you see those?
5    A.   Yes.
6    Q.   What are these other colored circles or arcs?
7    A.   They are the various levels of force that
8    would be available to an officer.
9    Q.   I see.  Okay.  So the words in these outer
10   arcs reflect the force level that an officer could use?
11   A.   They are options available to the officer,
12   yes.
13   Q.   And so, starting with the smallest arc, I see
14   a red arc that says "deadly force."  Do you see that?
15   A.   Yes.
16   Q.   And what does the city consider to be deadly
17   force?
18   A.   There's a definition for deadly force.
19   Q.   Oh, yes.  Yeah.  I remember we looked at that
20   earlier.  I'm going to scroll up to it.  Would you mind
21   just reading that -- I'm going to try to highlight it so
22   you don't see any other thing.  Could you read that into
23   the transcript for us?
24   A.   Sure.  "Deadly force.  Force, which the
25   officer knows to create a substantial risk of causing



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 20 of 85 PageID
#: 2678
The Deposition of EMILY McKINLEY, taken on June 18, 2024

30(b)(6)                                                                              66..69

Page 66

1  death or serious physical injury.  Head, neck, throat,
2  or clavicle injuries caused by an impact weapon of any
3  sort can lead to death or serious physical injury."
4      Q.   Okay.  So what are some examples of what would
5  be deadly force as defined in this policy?
6      A.   An officer firing his or her handgun.
7      Q.   Okay.  So that means, like, using live
8  ammunition?
9      A.   Yes.
10     Q.   Would a chokehold be considered deadly force?
11     A.   Our policy, which only allows chokeholds to be
12  used in deadly force situations, yes, a chokehold can be
13  deadly.
14     Q.   Okay.  And it says here, "head, neck, throat,
15  or clavicle injuries caused by an impact weapon of any
16  sort can lead to death or serious physical injury."  Did
17  I read that right?
18     A.   Yes.
19     Q.   So any impact weapon used on the head would be
20  deadly force?
21     A.   Yes.
22     Q.   That -- does that depend on the type of impact
23  weapon we're talking about, or is it any impact weapon?
24     A.   We have a section written in the policy for
25  impact weapon, but it -- the impact weapon is generally

Page 67

1  the baton that are issued to officers.
2      Q.   And, I guess, are there any kinds of impact
3  weapons that would be not -- or that when used on the
4  head, neck, or throat, or clavicle would not be
5  considered deadly force under this policy?
6      A.   I'm sorry, repeat the question?
7      Q.   Sorry.  I'm just looking at this second
8  sentence under the deadly force section, and I'm
9  wondering, are there any kinds of impact weapons that,
10  when used on the head, neck, throat, or clavicle, would
11  not be considered deadly force?
12     A.   If -- any impact weapon that is used
13  intentionally on the head, neck, throat, or clavicle and
14  causes injury can lead to death or serious physical
15  injury.  It's acknowledging that it could lead to death
16  or serious physical injury.
17
18
19     Q.   And that would make it deadly force; is that
20  right?
21     A.   Yes.
22     Q.   Does the city train officers on what counts as
23  deadly force under this policy?
24     A.   What was the question again?
25     Q.   Does the city train officers on what

Page 68

1  constitutes deadly force under this policy?
2      A.   Yes.
3      Q.   How does it do that?
4      A.   As I discussed earlier, with training, we have
5  annual firearms training.  So we have training using our
6  handguns and qualifications.  We also have training on
7  ground fighting.  You mentioned chokeholds, and that --
8  so we were trained that those are deadly force and they
9  can only be used in deadly force situations.  And that
10  would be the training that's -- again, legal updates,
11  any case law regarding deadly force, that would be
12  training that officers receive.
13     Q.   Are officers trained that the use of impact
14  weapons on the head counts as deadly force?
15     A.   Yes.
16     Q.   How are they trained on that?
17     A.   It's communicated through policy, through --
18  it is -- it is known in our policy that impact weapons
19  to the head, neck, or throat are considered deadly
20  force.
21     Q.   And when you say communicated through policy,
22  are you referring to this definition here that we were
23  just reading?
24     A.   Yes.
25     Q.   Are there any other mechanisms by which that's

Page 69

1  communicated to officers?
2      A.   Basic training, the training academy that all
3  officers attend.
4      Q.   And the training academy is for all officers,
5  or is it for new hires?  When does that happen?
6      A.   So -- yes.  So the Training Academy, all new
7  officers attend our Training Academy, and then new hires
8  attend training as well.
9      Q.   And, I'm sorry, I don't know if I fully
10  understood.  Does -- do officers go to the Training
11  Academy when they're initially joining the department,
12  or do they continuously go to the Training Academy
13  throughout their tenure at the department?
14     A.   So our -- our Training Academy as a place that
15  is where officers attend their in-service training if
16  you can -- are considering a place.  But when officers
17  refer to going through the academy, they're generally
18  referring to their basic training when they were first
19  hired as a police officer, which would be their basic
20  Training Academy that they attend that's -- is several
21  months long.  But our annual in-service is held at our
22  Training Academy, if -- if that explains the differences
23  there.
24     Q.   Yeah, that's helpful.  Thank you.  So the -- I
25  believe you mentioned that this definition of deadly

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

1  force, that includes the use of impact weapons on the
2  head, neck, throat, or clavicle, beyond being listed in
3  the policy, is covered at Training Academy.  When you
4  said that, were you referring to basic training for new
5  hires, or annual in-services, or both?
6      A.   Officers are aware that the impact weapon to
7  the head, neck, or throat can lead to death or serious
8  physical injury.
9      Q.   And I'm just trying to get how officers are
10 made aware of that.
11     A.   Through various trainings throughout their
12 career.  That is how they're made aware of that.
13     Q.   So it's not just that basic training?
14     A.   Yeah.
15     Q.   It's also at various in-services or other
16 trainings?
17     A.   Correct.
18     Q.   Have you reviewed any of those in-services or
19 other trainings in preparation for today?
20     A.   No.
21     Q.   And can you tell me what the basis is for the
22 city's view that this definition of deadly force to
23 include impact weapons used on the head, neck, throat,
24 or clavicle are considered deadly force is included in
25 those in-service trainings?

Page 71

1      A.   I'm sorry, can you repeat that?
2      Q.   I asked just -- since you mentioned you
3  haven't looked at those in-service trainings, what's the
4  basis for the city's testimony that the in-service
5  trainings or other trainings do contain this definition
6  of deadly force to include impact weapons used on the
7  head, neck, throat, or clavicle?
8      A.   I -- I attended the basic academy that -- that
9  was delivered.  I know that that is -- that is taught as
10 officers trained for -- or new officers trained and used
11 the -- their impact weapon, that the head, neck, and
12 throat are considered deadly force situations.
13     Q.   Is there any other evidence for that
14 testimony?
15     A.   I do not have any specific evidence for that.
16     Q.   Okay.  Understood.  Okay.  So I'm going to
17 scroll back down to 9.1.4.  And I'll zoom in again.  This
18 red arc reading "Deadly Force," does the positioning of
19 this arc mean anything?
20     A.   Well, it's -- it is over the area of serious
21 physical injury or death.  So when a situation may
22 evolve to that, that level of resistance, deadly force
23 would be appropriate, or per policy, if the officer
24 makes that decision.
25     Q.   I see.  Okay.  So the red arc reading "Deadly

Page 72

1  force" is located above the black circle reading -- the
2  section of that circle reading, "Serious physical injury
3  or death."  Is that right?
4      A.   Yes.
5      Q.   And that means that when an officer is facing
6  a situation where a subject is threatening serious
7  physical injury or death, the officer would be permitted
8  under the policy to use deadly force?
9      A.   Yes.
10     Q.   I see.  Okay.  Thank you.  That is helpful.
11 No.  And the fact that this is an arc and not a complete
12 circle, does that mean that an officer should only use
13 deadly force when there's a threat of serious physical
14 injury or death?
15     A.   No.
16     Q.   Okay.  So what are the other situations where
17 an officer could use deadly force?
18     A.   Well, that -- what was your question
19 originally?
20     Q.   Sorry.  I'll repeat it.  The fact that this
21 red arc isn't a complete circle going around all of the
22 different resistance levels, is that meant to signify
23 that an officer should only use deadly force if there's
24 a serious -- if there's -- if the subject is threatening
25 serious physical injury or death?

Page 73

1      A.   That would be when deadly force would be
2  permitted for policy.
3      Q.   Okay.  So I guess to act it differently, would
4  deadly force be permissible when a subject is engaged in
5  active aggression, but not threatening serious physical
6  injury or death?
7      A.   No.
8      Q.   Okay.  And similarly, would deadly force be
9  permitted on someone who's engaged in active resistance,
10 but not threatening serious physical injury or death?
11     A.   No.
12     Q.   I'm sorry, could you repeat that?
13     A.   No.
14     Q.   Okay.  Understood.  So really, the only
15 situation where an officer can use that -- or I'll walk
16 that back.  The only situation where the policy says an
17 officer is permitted to use deadly force is when a
18 subject is threatening serious physical injury or death;
19 is that right?
20     A.   Yes.  That is the resistance level that an
21 officer is going to take into consideration.  They're
22 also going to consider several other factors.  The
23 immediacy of the threat, the severity of the crime, and
24 the flight.  So there -- there's a lot of things that
25 the officer is considering in making that decision.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1      Q.   Understood.  Understood.  Okay.  So next to
2   this red arc, there's a blue, it looks kind of like a
3   ring, there's a full circle.  And then there's a little
4   kind of bit sticking up.  Do you see that?
5      A.   Yes.
6      Q.   It has two phrases in it.  The first, I
7   believe, reads, "Officer presence," and the second
8   reads, "Perception."  Do you see those?
9      A.   Uh-huh.  Yes.
10     Q.   So what does officer presence mean as used in
11  this graphic?
12     A.   Well, it's the presence of the officer.  The
13  subject is aware the officer is present.  The officer
14  presence is important in making your determination of
15  what force and we're going to use, and how the situation
16  is evolving.
17     Q.   Okay.  So that's, like, an officer making
18  their physical presence known to a subject?
19     A.   Yes.
20     Q.   Okay.  What about perception?
21     A.   Again, this is the officer's perception.  So
22  the officer needs to assess the situation, continuously
23  assess how that -- that situation is -- evolving, and
24  use their perception of what they're perceiving to do
25  that.

Page 75

1      Q.   Oh, I see.  So it's, like, the officer
2   observing and paying attention to the situation as it's
3   unfolding?
4      A.   Yes.
5      Q.   Okay.  And so, if I'm seeing this correctly,
6   this blue circle extends around the whole circle, or the
7   whole, like, circle defining levels of resistance that
8   we talked about.  Do you see that?
9      A.   Yes.
10     Q.   So given what we just talked about with deadly
11  force, does the fact that this is a complete circle mean
12  that officers should always be, no matter what level of
13  resistance they're encountering, considering use of
14  physical presence and perception in engaging with the
15  subject?
16     A.   Yes.
17     Q.   Okay.  Understood.  Okay.  Next to that,
18  there's also, like, a darker green, not quite complete
19  circle, but almost.  Do you see that?
20     A.   Yes.
21     Q.   And in it is written, "Verbal direction."  Do
22  you see that?
23     A.   Yes.
24     Q.   What does that mean under this policy?
25     A.   I'm not sure if there's a definition for

Page 76

1   verbal direction.  We would be giving verbal direction
2   to the subject regarding what you want the subject or
3   what the officer wants the subject to do.
4      Q.   I see.  So that's, like, issuing commands?
5      A.   Yes.
6      Q.   So comparing it to the blue circle, it's not
7   quite a full circle.  When would use of verbal direction
8   be appropriate under this policy?
9      A.   At all times.
10     Q.   I'm sorry, could you repeat that?
11     A.   Verbal direction is appropriate at all times.
12     Q.   Okay.  Okay.  So whether a subject is
13  compliant up through their posing serious physical
14  injury or death, an officer can always use verbal
15  direction?
16     A.   Yes.
17     Q.   Understood.  Is there a reason that the green
18  circle -- or that the green verbal direction arc isn't a
19  complete circle or --
20     A.   It covers all the levels of resistance.
21     Q.   Okay.  Understood.  Next, there's a yellow arc
22  that also doesn't go around the full circle.  Do you see
23  that bright yellow?
24     A.   Yes.
25     Q.   And in it, there are two sets of words.  The

Page 77

1   first, I think, reads, "Soft empty hand control," and
2   the other reads, "Hard empty hand."  Do you see that?
3      A.   Yes.
4      Q.   So what is -- what does "soft empty hand
5   control" mean?
6      A.   I believe there's a definition for that.
7      Q.   Okay.  I will scroll up all -- yes, I see it.
8   Okay.  Could you just read that for us?
9      A.   It's, "Soft empty hand control.  The use of
10  grabs, holds, or joint locks to restrain an individual."
11     Q.   Okay.  So could you tell me what this means?
12     A.   Using your hands to control a person.
13     Q.   Is there a particular kinds of hand uses that
14  are soft empty hand control?
15     A.   It is not strikes with the hand.
16     Q.   I see.  Okay.  So when you're putting hands on
17  someone but not striking them, that's soft empty hand?
18     A.   When you are using your hands to -- to control
19  or restrain someone, that is soft empty hand control,
20  yes.
21     Q.   Okay.  Okay.  So that'd be, like, grabbing
22  someone by the arm or, like, putting your hand on their
23  back to keep them moving along, something like that?
24     A.   Yes.
25     Q.   Okay.  And so, then I'm going to guess that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 23 of 85 PageID
#: 2681
The Deposition of EMILY McCAULEY, taken on June 18, 2024

30(b)(6)                                                                     78..81

Page 78

1  there's also a definition of hard empty hand in here.
2  I'll scroll up to that. Okay. I see here "hard empty
3  hand control." Could you just read that for the record?
4     A.  "Hard empty hand control. The use of punches,
5  strikes, or kicks to restrain an individual."
6     Q.  Okay. And so, this is where we're moving from
7  -- you know, using your hand to grab someone or -- you
8  know, move them along to actually striking someone?
9     A.  Yes.
10    Q.  Okay. And so, could you just give me a quick
11 explanation, what's the difference between soft empty
12 hand and hard empty hand as used in this policy?
13    A.  Soft empty hand is using your hands to control
14 someone. Hard empty hand is generally using your hands
15 to punch or strike, or your legs to kick. It could
16 cause injury. Whereas soft empty hand should not cause
17 injury.
18    Q.  I see. Okay. Okay. So then is one
19 considered a greater degree of force than the other?
20    A.  Yes. Soft empty hand is less than hard empty
21 hand.
22    Q.  Okay. I'm going to go back down to 9.1.4
23 again. They're both in the same yellow arc on this
24 graphic. Could you tell me do the -- does the
25 positioning of the words mean anything here?

Page 79

1     A.  It's showing -- demonstrating as situations
2  evolve a level of resistance that would be appropriate,
3  given the situation for a -- an -- a use of force.
4     Q.  Understood. I guess what I'm asking is, the
5  other ones we've been looking at so far are separated
6  out by color, and soft empty hand control and hard empty
7  hand, they're in the same color band. When would soft
8  empty hand control be appropriate under this policy?
9     A.  For compliant individuals, for those
10 demonstrating passive resistance and transitioning into
11 active resistance.
12    Q.  Okay. So soft empty hand control then can be
13 used regardless of the level of resistance?
14    A.  You can use soft empty hand control at any
15 level of resistance, if that makes sense.
16    Q.  Yeah. Thank you. That's helpful. You've
17 looked at this thing a lot more than I have. So then
18 looking at the other phrase in this, hard empty hand.
19 When would hard empty hand be permissible under this
20 policy?
21    A.  You can use hard empty hand control during
22 active aggression, depending on the situation that the
23 officer is encountering. Again, that would be the
24 resistance level that the officer needs to take into
25 consideration, but there's other factors that the

Page 80

1  officer should consider to utilize the lowest level of
2  force reasonable, given the situation.
3     Q.  Understood, understood. So based on where
4  it's based, hard empty hand control -- excuse me, should
5  only be used for active aggression; is that right?
6     A.  You should not -- you should not use empty --
7  hard empty hand control for any level of resistance
8  lower than that.
9     Q.  All right. Okay. That -- that's -- so the
10 minimum that you'd need to use hard empty hand control
11 is active aggression?
12    A.  Yes.
13    Q.  Okay. So you shouldn't use hard empty hand
14 control when encountering active resistance, or passive
15 resistance, or a compliant person?
16    A.  Correct.
17    Q.  Okay. Thank you.
18    A.  Depending on other factors that might be
19 present to the officer.
20    Q.  Understood, understood. I'm just trying to
21 get narrowly what this graphic is showing. And that --
22 how is that depicted on this graphic?
23    A.  I'm sorry, what depicted?
24    Q.  The fact that hard empty hand should only be
25 used -- or should not be used for less than active

Page 81

1  aggression?
2     A.  It's its placement on the -- the diagram.
3     Q.  Okay. Oh, so, like, with deadly force, that's
4  above serious physical injury or death, hard empty hand
5  is above active aggression, to show that that's what you
6  need before you should consider using hard empty hand?
7     A.  Correct. And also consider other factors
8  present.
9     Q.  Understood. Okay. And then I think the final
10 arc on here, I think we've talked about all the other
11 ones, is the orange one. Do you see that?
12    A.  Yes.
13    Q.  And it has the words, "impact weapon, chemical
14 agent," and then "CEW" in there. Do you see those?
15    A.  Yes.
16    Q.  So what -- can you just explain what each of
17 those is for me?
18    A.  I believe there's definitions for those.
19    Q.  And we can scroll up, and I don't see a
20 definition of impact weapon here. Am I missing it?
21    A.  Well, there's a separate section for them.
22    Q.  There's a separate section on --
23    A.  But intermediate uses of force, there's an
24 intermediate use of force policy that explains those.
25    Q.  Okay. Then can you tell me, as used in this



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 82

1  chapter of the SOPs, what is considered an impact
2  weapon?
3      A.  A baton that is issued to officers is the
4  impact weapon that is issued to officers.
5      Q.  Okay.  Is anything else considered an impact
6  weapon?
7      A.  I mean, anything could be an impact weapon.
8  Any hard object could be an impact weapon, but the
9  impact weapon specifically that is issued to officers is
10  a baton.
11      Q.  What about a special impact munition system?
12  Is that considered an impact weapon under this policy?
13      A.  Yes.  And they -- they are not issued to all
14  officers, but those are weapons that could be used to
15  deploy objects that are impact weapons.
16      Q.  Okay.  Okay.  So like --
17      A.  But the general -- the impact weapon that
18  every officer has on their person is a baton.
19      Q.  Understood, understood.  And yeah, I should
20  clarify.  I'm not asking about -- you know, weapons that
21  are available to all officers.  I'm asking just for the
22  specific kinds of weapons that are governed by -- you
23  know, with specific provisions of this policy.  Does that
24  make sense?
25      A.  Yes.

Page 83

1      Q.  Okay.  So you said the special impact
2  munitions system would be --
3          MR. PAUL:  Ashok?  Ashok?  Before you -- if
4      you -- I don't mean to interrupt your question, but
5      there's been a request for a quick break -- for a
6      break.
7          MR. CHANDRAN:  Oh, okay.
8          MR. PAUL:  Is that okay?
9          MR. CHANDRAN:  Yeah, of course.  Go ahead,
10      Chief McKinley.  How long do you need?  Five
11      minutes?  Ten minutes?  Whatever you need.
12          THE WITNESS:  Ten minutes will be fine.
13          MR. CHANDRAN:  Okay.  We can do that.
14          THE REPORTER:  One moment.  I will take us off
15      the record.
16              (OFF THE RECORD)
17          THE REPORTER:  We are back on the record.  You
18      may proceed.
19          MR. CHANDRAN:  Thank you.
20  BY MR. CHANDRAN:
21      Q.  Okay.  So, Chief McKinley, I think before the
22  break we were talking a little bit about what kinds of
23  force tool would be considered impact weapons under the
24  policy.  But before we get back into that, is there
25  anything about your testimony you've given so far today

Page 84

1  that you want to amend, clarify, or correct?
2      A.  Yes.  So when we were talking about the act of
3  resistance definition, I think you asked a question
4  about could someone just -- who was just walking away
5  from an officer, simply just walking away, would that be
6  active resistance?  And I wanted to make sure that I was
7  clear.
8          In the -- in the definition of active
9  resistance, it -- it indicates that the subject must be
10  taken into custody.  So if the officer's attempting to
11  take -- take the subject into custody and -- and -- and
12  is posing these behaviors, that would be considered
13  active resistance.  But I wanted to clarify that just if
14  someone simply -- I said someone simply walking away is
15  not necessarily active resistance unless there's some
16  attempt to take that person into custody or make an
17  arrest.
18      Q.  Okay.  I see.
19      A.  And it is in -- it is in that definition of
20  active resistance.
21      Q.  I see.  So the definition, I think, says,
22  "Prevent an officer from placing the subject in custody
23  or taking control."
24      A.  Yes.
25      Q.  What does taking control mean in that

Page 85

1  situation?
2      A.  Right.  If a -- if an officer has the
3  authority to take control of that subject, so if we're
4  going to take them into custody, and we're going to take
5  control of them, we have a reasonable suspicion and
6  articulation to do that, then -- or probable cause to do
7  that, then that would be taking control of that subject
8  if there's an active resistance there.
9      Q.  All right.  So taking control just means the
10  same thing as placing a subject in custody?
11      A.  Yes.  We're going to -- we take control of the
12  subject to place them into custody.
13      Q.  Does taking control include actions short of
14  arrest?  Like, for example, if an officer is moving
15  someone away or giving someone orders, would that be
16  considered taking control?
17      A.  Moving someone away?
18      Q.  Uh-huh.
19          MR. PAUL:  Was that a yes, Ashok?
20          MR. CHANDRAN:  Yes.  Sorry.  Yes.  Bad on me.
21          THE WITNESS:  What do you mean by -- what do
22      you mean by moving someone away?
23  BY MR. CHANDRAN:
24      Q.  Earlier, for example, when we were talking
25  about a soft empty hand control, we talked about an

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 86

1  officer putting a hand on somebody's back and guiding
2  them away, or -- you know, otherwise putting hands on
3  someone for the purpose of gaining control of the
4  situation.  I'm wondering if that counts as taking
5  control under this definition.
6       A.   If a subject is preventing an officer from
7  taking control by demonstrating the behaviors that are
8  outlined in the definition of active resistance, then
9  yes, if we -- if -- if -- if the officer needs to take
10  control of a subject, and then -- and the subject is
11  presenting those behaviors, then that would be active
12  resistance.
13       Q.   Okay.  So when someone is walking away from an
14  officer who's trying to take control, even if it's not a
15  custodial arrest, that would still be active resistance?
16       A.   If a subject -- if the officer's intending to
17  place that subject into custody, then that would be
18  active resistance.
19       Q.   So it's only if the officer is placing the
20  person in custody?
21       A.   If the officer has the reason to place that
22  person into custody, detain that person, and the subject
23  is walking away, that would be active resistance.
24       Q.   Okay.  And so, taking control doesn't mean
25  anything different than placing the subject in custody?

Page 87

1  Maybe the officer --
2       A.   In the definition of active resistance.
3       Q.   Yeah.  Okay.
4       A.   Yeah.  Yeah, that would --
5       Q.   Okay.  So it would be helpful -- and I'm going
6  back up to the definition of active resistance.  And
7  here, do you see the part that I've highlighted?
8       A.   Yes.
9       Q.   Is this the clause you're referring to when
10  you were explaining or clarifying your answer earlier?
11       A.   Yes.
12       Q.   Okay.  And do you see at the end it says, "Are
13  intended to prevent an officer from placing the subject
14  in custody or taking control"?
15       A.   Yes.
16       Q.   I'm just trying to understand, do those mean
17  different things, and why are they kind of listed
18  separately?
19       A.   There can be a time that an officer needs to
20  take control of a subject, given the situation, but
21  ultimately does not take them into custody or make the
22  arrest of the subject.  They may have probable cause or
23  reasonable suspicion to take control of that person and
24  detain that person at that time, but they might -- may
25  not ultimately, based on the circumstances or the facts

Page 88

1  that they later learn, take that person into custody.
2  But they may have needed to take control of that person
3  at that time.
4       Q.   Okay.  So it's something separate from placing
5  the subject in custody?
6       A.   Okay.  They're detaining that -- that person.
7  I mean, you could interpret custody as -- as different
8  things.  So is it detention?  And -- and then are we
9  taking control, detaining that person, taking them into
10  custody, or are we making that arrest?
11       Q.   Yeah.  And I think I'm trying to understand
12  the city's interpretation of this, just because, like
13  you're saying, it can mean some different things to
14  different people.  I want what the city means when it
15  uses these words here.
16       A.   If a subject is using these behaviors to
17  prevent their arrest, taking them into custody, or the
18  officer taking control of the subject, but the officer
19  has reasonable suspicion and probable -- or -- and/or
20  probable cause to detain that person, those would be the
21  times that this would be considered active resistance.
22       Q.   Okay.  Okay.  So if an officer is trying to,
23  for example -- if you had reasonable suspicion to
24  conduct a stop, and the individual tries to walk away,
25  that would be active resistance?

Page 89

1       A.   Depending on the circumstances surrounding
2  that stop, it could be, yes.
3       Q.   All right.  And so, it doesn't need probable
4  cause for an arrest.  It just needs that the officer is
5  trying to take control in some way of the situation?
6       A.   Yes.
7       Q.   Okay.  Okay.  Thank you for -- that is helpful
8  clarification.  I appreciate that.  Is there anything
9  else that you wanted to clarify before we move on?
10       A.   No.
11       Q.   Great.  Okay.  So going back down to the
12  graphic in 9.1.4, I think we were discussing what
13  constitutes an impact weapon under this policy.  And I
14  think you made some mention of, like, an intermediate
15  force policy; is that right?
16       A.   Yes.
17       Q.   Is that a separate portion of 9.1, or is that
18  somewhere else in the SOPs?
19       A.   It's in 9.1.
20       Q.   Okay.  Okay.  I'll find that.  And I'll go
21  down to what I believe that section -- is this section,
22  9.1.12, the one that you were just referring to?
23       A.   Yes.
24       Q.   And if you just want to take a second and read
25  this to yourself.  I don't see in here any definitions

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of EMILY #McCARLEY, taken on June 18, 2024

30(b)(6)                                                                    90..93

Page 90

1  of what constitutes an impact weapon, but please let me
2  know if I'm missing anything.
3      A.   So, again, I explained that officers are
4  issued impact weapons, which are batons, but that is
5  what is referenced here, the impact weapon that is
6  approved by the department.
7      Q.   Right.  Understood.  So all officers can get a
8  baton as an impact weapon, but are there also other
9  kinds of impact weapons that are given to certain,
10 either, divisions or teams?
11     A.   They're -- they're not necessarily called
12 impact weapons.  If you move up, there's -- scroll up.
13 I'm sorry.  So there's special impact munition systems
14 that various teams have that you're referring to.
15     Q.   Okay.  And so, are special impact munition
16 systems considered impact weapons or not?
17     A.   They can be used as impact weapons, yes.
18     Q.   And so, would they be -- just scrolling back
19 up to 9.14, would they be treated as an impact weapon
20 for purposes of 9.1?
21     A.   Yes.
22     Q.   Okay.  Thank you.  Would a pepper ball also be
23 considered an impact weapon for purposes of 9.1?
24     A.   Pepper ball can be used as an impact weapon,
25 yes.

Page 91

1      Q.   Okay.  So it would also be subject to the
2  restrictions for impact weapons in 9.1?
3      A.   Yes.
4      Q.   Okay.  And does that matter based on the type
5  of pepper ball being used, or are they all considered
6  impact weapons?
7      A.   If a pepper ball is being used as an impact
8  weapon, it would be considered an impact weapon.  The --
9  the -- it wouldn't matter what was in the pepper ball.
10     Q.   Okay.  And when you say the pepper ball is
11 being used as an impact weapon, what does that mean?
12     A.   That the -- the pepper balls that are being
13 fired from the weapon are intended to strike someone as
14 an impact weapon.
15     Q.   Okay.  So does it matter if the pepper ball is
16 not intended to strike someone, but does strike them?
17     A.   Yes, it does matter.
18     Q.   Okay.  And so a pepper ball would be considered an
19 impact weapon if it's -- if it hits someone that an
20 officer intentionally fired at, but would not be
21 considered an impact weapon if it hit someone that the
22 officer didn't intend to hit?
23     A.   In both situations, a person is struck.  It
24 does matter the officer's intent and the officer's
25 articulation of their use of force.

Page 92

1      Q.   I -- oh, sorry.  Yeah.  I'm sorry.  I realize
2  I might not be being clear.  I understand that it
3  matters for a variety of purposes what the officer's
4  intent is.  I guess, I'm just trying to ask:  Does the
5  officer's intent matter in determining whether something
6  is an impact weapon or not?
7      A.   Yes.  If it -- if -- if the officer's
8  intending to use intend the pepper ball as an impact
9  weapon or is the officer intending to use the pepper
10 ball as a chemical agent dispersal system.
11     Q.   Okay.  Okay.  So a pepper ball is only
12 considered an impact weapon if an officer intends to
13 fire it and hits someone?
14     A.   From -- yes.  If the officer intends to use
15 the pepper ball as an impact weapon, then the pepper
16 ball is now an impact weapon.
17     Q.   Okay.  Okay.  So since you mentioned also that
18 pepper balls could be chemical agents, what is
19 considered a chemical agent under this policy?
20     A.   I believe there's a definition and there's a
21 separate section of policy for this.
22     Q.   Sure.  So I'm going to go up to this
23 definition here, and I'm highlighting what I believe is
24 the definition of a chemical agent.  Do you see that?
25     A.   Yes.

Page 93

1      Q.   And could you just read that out for me?
2      A.   Yes.  "Chemical agent, a departmentally
3  approved less lethal weapon, which consists of a
4  chemical compound that irritates the eyes to cause
5  tears, discomfort, and a temporary loss of visual
6  capacity."  And it gives examples, "Pepper spray, Mace,
7  and OC spray."
8      Q.   Okay.  So you -- one of the things listed here
9  is you said is OC spray, right?
10     A.   Yes.
11     Q.   Is HC also considered a chemical agent?
12     A.   Yes.
13     Q.   Okay.  And is CS also considered a chemical
14 agent?
15     A.   Yes.
16     Q.   Are there any other kinds of chemical agents
17 that are covered by this definition?
18     A.   Not that I'm aware of.
19     Q.   Okay.  Did you inquire about any other types
20 of chemical agents that are covered by this definition
21 in preparing for today's deposition?
22     A.   No.
23     Q.   Okay.  Does the delivery mechanism matter in
24 deciding whether something is a chemical agent or not?
25     A.   I'm sorry, what -- what was the question?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 27 of 85 PageID
#: 2685
The Deposition of EMILY MCCLEY, taken on June 18, 2024
30(b)(6)                                                                          94..97

Page 94

1 Expand.
2    Q.   Sorry.  Do you want me to repeat or restate
3 it?
4    A.   I guess restate it.
5    Q.   Sure.  Does it matter how, for example, OC is
6 deployed in deciding whether it's a chemical agent or
7 not?
8    A.   No, it's a chemical agent.
9    Q.   Okay.  I see.  So whether it's through a spray
10 canister from a triple chase or somewhere that it is a
11 chemical agent?
12    A.   Yes.
13    Q.   What types of delivery mechanisms does the
14 department have in store for using chemical agents?
15    A.   Well, every officer is issued an OC canister.
16    Q.   And -- sorry, go ahead.
17    A.   That is carried on their duty belt.  There's
18 pepper balls that we've discussed.  So the department
19 has pepper ball guns, not every officer has a pepper
20 ball gun.  Then there are canisters.  You mentioned
21 triple chasers that can be used to toss, hand-toss
22 canisters of gas, like chemical agents.  And then there
23 are launchers that can be used for chemical agents.
24    Q.   And what are some of the launchers that the
25 department has to deploy a chemical agent?

Page 95

1    A.   There's a 40-millimeter launcher.  The rest
2 are hand-toss canisters and then pepper ball guns if you
3 consider that a -- launcher.
4    Q.   Okay.  So you have OC canisters for all
5 officers, we have pepper ball guns, we have triple
6 chaser, we have the 40 mm launcher, and then other hand-
7 tossed forms.  Anything else?
8    A.   Yes.  Not that I'm aware of.
9    Q.   Okay.  Okay.  And I -- but I believe you said,
10 regardless of how they're delivered, they're all
11 chemical agents as defined here?
12    A.   Yes.
13    Q.   Okay.  And I think I won't scroll down to it,
14 but the other thing in that orange arc was CEW, which I
15 see is defined here as well.
16    A.   Yeah.
17    Q.   Okay.  So can you explain to me what a CEW is?
18    A.   Yes.  I'll read the definition.
19    Q.   Sure.
20    A.   "Conducted electrical weapon.  It's a
21 departmentally-approved less lethal weapon designed to
22 disrupt the subject's central nervous system, by means
23 of deploying battery-powered electrical energy
24 sufficient to cause intense muscle contractions,
25 affecting the individual's motor nervous system and/or

Page 96

1 disruption of the individual's sensory nervous system
2 and their central nervous system.  A CEW provides the
3 user with the capability of discharging probes, drive
4 setting, or a combination of both during a use-of-force
5 encounter."
6    Q.   And so, am I right to read this to me in a CEW
7 is what lay people might call a taser?
8    A.   Yes.
9    Q.   Okay.  So I'm going to scroll down again to
10 where we were at 9.1.4.  And looking back at this orange
11 arc that has chemical agent CEW and impact weapon
12 listed.  Do you see that?
13    A.   Yes.
14    Q.   I'm sorry.  I missed your answer.
15    A.   Yes, I see.
16    Q.   Okay.  Great.  Thank you.  What does this
17 policy say about when use of an impact weapon would be
18 appropriate?
19    A.   The impact weapon will become appropriate when
20 presented with active aggression all the way up to a
21 serious physical injury or death.
22    Q.   Okay.  So an impact weapon needs at least
23 active aggression before it would be permissible under
24 the policy?
25    A.   Yes.

Page 97

1    Q.   Okay.  How about a CEW?
2    A.   A CEW is you are going to need active
3 aggression for a CEW.  There's a CEW policy.
4    Q.   So you need -- also need active
5 aggression for a CEW.  What about a chemical agent?
6    A.   A -- a chemical agent could be appropriate in
7 an active resistance scenario, dependent on the
8 situation.
9    Q.   Okay.  Okay.  So earlier, we talked about a
10 pepper ball can be considered a chemical agent; is that
11 right?
12    A.   Yes.
13    Q.   If an individual was walking away from an
14 officer trying to take control of a situation, would
15 this policy permit the officer to fire a pepper ball at
16 that person?
17    A.   We would need a lot of -- more information to
18 make that determination.  There's a lot of other factors
19 to consider regarding that situation.  What is the crime
20 at hand?  What is the immediacy of the threat of the
21 subject?  Understand the resistance level.  What is the
22 flight?  What is the -- what are the surroundings?  So
23 there is a lot of other factors that the officer would
24 need to take to -- into consideration that are unknown,
25 before you would make -- be able to answer that

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 28 of 85 PageID
#: 2686
The Deposition of EMILY MCKINLEY, taken on June 18, 2024
30(b)(6)                                                                          98..101

Page 98

```
1   question.
2        Q.  Understood.  I understood that the officer
3   wouldn't always do it, but the policy would permit it?
4        A.  Again, according to our Use of Force Policy,
5   the entire Use of Force Policy, which discusses all of
6   those factors in much greater detail and provides more
7   guidance to officers on when to use certain levels of
8   force, they would need to take that entire situation
9   that's presented to them and make that determination.
10       Q.  Okay.  Okay.  Great.  I think I am done with
11  this document.  Okay.  So we were talking about the Use
12  of Force Policy.  And I think you mentioned that there
13  were some other policies about use of chemical agents;
14  is that right?
15       A.  Did I talk about that?
16       Q.  I think you mentioned that, but you might not
17  have.  So if you didn't, I can ask.  Does the department
18  have separate provisions of the SOPs that deal with
19  responding to protests?
20       A.  Yes.
21            MR. CHANDRAN:  I'm going to put in the chat
22       what we can mark as Plaintiff's Exhibit 83.  And
23       I'll go ahead and share my screen with that as
24       well.
25            (EXHIBIT 83 MARKED FOR IDENTIFICATION)
```

Page 99

```
1   BY MR. CHANDRAN:
2        Q.  All right.  McKenna [sic], can you see that?
3        A.  Yes.
4        Q.  So this is a section of the SOPs titled "Civil
5   Disturbances/Disorderly Crowds."  Is this the protest
6   response Policy for the LMPD?
7        A.  This is the Civil Disturbance Disorderly Crowd
8   Policy for LMPD.
9        Q.  Are there any other provisions of the SOPs
10  that govern LMPD's protest responses?
11       A.  Yeah.  I mean, this is the policy, yes.  This
12  is the policy that would discuss First Amendment, Fourth
13  Amendment.  A lot of that does include protests within
14  our policy.
15       Q.  Okay.  I guess, I'm just asking, are there any
16  other provisions that -- you know, govern that reaction,
17  or is it just this one?
18       A.  So the entire policy manual would govern an
19  officer's, I guess, reaction.  If you're talking about
20  use of -- our Use of Force Policy would be appropriate
21  in responding to protests as well or -- or -- you know,
22  all the way down to the Uniform Policy would be
23  appropriate when an officer's responding to use of
24  force.  So all of our policies, I guess, are applicable
25  to any situation.  But yes, this is the specific policy
```

Page 100

```
1   that discusses handling Fourth Amendment, First
2   Amendment issues, and that would mainly be pertained to
3   protests.
4        Q.  Okay.  So this addresses the protests, but the
5   other policies also govern officer conduct at protests?
6        A.  Our policy manual governs all of our -- our
7   decision making and -- and behavior our decisions and
8   behaviors and -- and response to protests.  And -- and
9   First Amendment demonstration, civil disturbances isn't
10  just limited to this policy -- you know, I guess that's
11  what I'm trying to --
12       Q.  I see.  Okay.
13       A.  -- get across is that our entire policy manual
14  governs our responses to -- to -- to these incidents as
15  well.
16       Q.  Okay.  So just -- so okay.  That makes sense.
17  So like we were saying, 9.1 kind of applies at all times
18  so that the use of force policies don't stop being in
19  effect, just because we're in a civil disturbance
20  situation?
21       A.  Right.
22       Q.  I see.  Okay.  Okay.  So just before we get
23  into the text of the policy, the chapter title, I had a
24  question for you.  What constitutes a civil disturbance
25  or a disorderly crowd under this policy?
```

Page 101

```
1        A.  The entire policy.  I think there's --
2        Q.  Is this one where there's a definition?
3        A.  I'm not sure if there's a specific definition
4   for that down here.
5        Q.  Okay.  Here we go.
6        A.  Yeah.
7        Q.  Great.  So could you just read the definition
8   of civil disturbance for me?
9        A.  "Civil disturbance is an unlawful assembly
10  that constitutes a breach of the peace of any assembly
11  persons or any assembly persons."
12       Q.  And it looks like that definition continues
13  on --
14       A.  Oh, sorry.
15       Q.  -- the next --
16       A.  "Where there is" -- "where -- "where there is
17  an imminent danger of collective violence, destruction
18  of property, or other unlawful acts."  And it references
19  the KRS statute.
20       Q.  Okay.  And the KRS statute is a state law?
21       A.  Yes.
22       Q.  Okay.  So just going off this definition, it
23  seems like there needs to be an unlawful assembly,
24  right?
25       A.  Yes.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 29 of 85 PageID
#: 2687
The Deposition of EMILY McKINLEY, taken on June 18, 2024

30(b)(6)                                                                    102..105

Page 102

1  Q.  And I'm just going to scroll down.  An
2  unlawful assembly, is that using the definition later on
3  in this section?
4  A.  Yes, there's a definition of unlawful
5  assembly.
6  Q.  Okay.  And then it says, "Or any assembly of
7  persons where there is an imminent danger of collective
8  violence, destruction of property, or other unlawful
9  acts," right?
10 A.  Yes.
11 Q.  So where there's imminent danger of collective
12 violence, even if something's not an unlawful assembly,
13 it would be a civil disturbance under this policy?
14 MR. PAUL:  Object to form.
15 THE WITNESS:  Can you repeat the question
16 again?
17 BY MR. CHANDRAN:
18 Q.  Sure.  I guess I'm trying to figure out what
19 this "or" means here.  Do you see the one that I
20 highlighted?
21 A.  Yes.
22 Q.  So it seems like it's saying there's an
23 unlawful assembly that constitutes a breach of the peace
24 or any assembly of persons where there's imminent danger
25 of collective violence, destruction of property, or

Page 103

1  other unlawful acts.  Are those, sort of, two separate
2  ways that something can become a civil disturbance under
3  this policy?
4  A.  I mean, I read it as an unlawful assembly that
5  constitutes a breach of peace or any assembly of -- of
6  persons where there is an imminent danger of collective
7  violence, destruction of property, or unlawful acts.  So
8  the unlawful assembly definition is down at the bottom,
9  which if you go to that, is assembly of five or more
10 persons for the purpose of engaging or preparing to
11 engage in a riot.
12 Q.  Uh-huh.
13 A.  So if you insert that definition of an
14 unlawful assembly, then that would -- so, you have a --
15 people that are engaging in a riot that -- and then any
16 assembly of persons who are engaged in these behaviors
17 listed.
18 Q.  Right, okay.  So there's the two ways that
19 something becomes a civil disturbance.  One is the
20 unlawful assembly, which is five or more people gathered
21 to engage in a riot.
22 A.  Yes.
23 Q.  And the other is any assembly of persons where
24 there's imminent danger of collective violence,
25 destruction of property, or other unlawful acts?

Page 104

1  A.  Yes.
2  Q.  Okay.  That's helpful.  So what does
3  collective violence, as used in this definition, mean?
4  A.  Collective violence?
5  Q.  Yes.
6  A.  I would interpret that as an imminent danger
7  of collective, like multiple sequences of events, a
8  collection of violence.  It's not just isolated to one
9  event.
10 Q.  And what do you -- well, let me start with
11 saying, is that the City's official interpretation of
12 collective violence?  Or is that your personal
13 understanding?
14 A.  That is my understanding of collective
15 violence.
16 Q.  Does the City have a definition of collective
17 violence?
18 A.  I think this is in our state law, like revised
19 -- Kentucky riots statute that's listed there.
20 Q.  And that's KRS 525.050?
21 MR. CHANDRAN:  I'll -- I can mark this as an
22 exhibit and put it in the chat, as well.  I believe
23 we're on 84.
24 (EXHIBIT 84 MARKED FOR IDENTIFICATION)
25 BY MR. CHANDRAN:

Page 105

1  Q.  So I'll show you what we're marking as
2  Plaintiff's Exhibit 84, Chief McKinley.  And I'll
3  represent to you that this is on the State Legislature's
4  website for KRS 525.050.  Does this statute have any
5  reference to collective violence?
6  A.  I mean, if you have five or more people that
7  are preparing to engage in a riot, that would be a
8  collection of violence that would be occurring.
9  Q.  Okay.  So collective violence means more than
10 one person is engaged in violence?
11 A.  To me, collective violence means it's a
12 collection of incidents that are occurring that are
13 violent.
14 Q.  Could it be one person engaged in multiple
15 instances of violence?
16 A.  Well, for this definition, it is an assembly
17 of persons.  I suppose for other definitions, you could
18 have one person that's engaged in collective violence,
19 but that is not a civil disturbance.
20 Q.  Okay.  So does every person who's assembled
21 have to be engaged in collective violence for it to be a
22 civil disturbance?
23 A.  No.
24 Q.  How many people in an assembly of persons
25 would need to be engaged in collective violence before

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 106

1  something becomes a civil disturbance?

2      A.   There's not a -- a number.

3      Q.   Could it be one person?

4      A.   It needs to be -- it could be.

5      Q.   Okay.  So the next thing on here is

6  destruction of property.  Does the City have a

7  definition of what destruction of property means?

8      A.   The damaging or destroying of property.

9      Q.   Does that also have to be collective?  Like,

10 does it have to be a collective destruction of property

11 or is a single act of destruction of property enough?

12     A.   It could be one or multiple.

13     Q.   Okay.  Would it matter whether the property

14 being destroyed is public or private?

15     A.   It -- not by -- not for this definition.

16     Q.   Okay.

17     A.   No.

18     Q.   Okay.  So would breaking a window be

19 considered a destruction of property?

20     A.   Yes.

21     Q.   Would graffiti be considered destruction of

22 property?

23     A.   Yes.

24     Q.   Okay.  And the final thing on here is other

25 unlawful acts.  Do you see that?

Page 107

1      A.   Yes.

2      Q.   What other kinds of unlawful acts would make

3  an assembly --

4           THE REPORTER:  Excuse me for a second.  This

5      is the court reporter.  Mr. Chandran, your audio is

6      echoing.

7           MR. CHANDRAN:  I'm hearing it, too.  I'm

8      wondering where that's coming from.  Is it

9      something -- is that -- it's not coming in for me

10     now.

11          THE REPORTER:  Are you hearing -- it's better

12     on my end as well.

13          MR. CHANDRAN:  Maybe we can keep going.  And

14     if it comes back, we can see if there's a fix.

15          THE REPORTER:  Works for me.  Proceed, I'm

16     sorry.

17          MR. CHANDRAN:  No, that's okay.  Thank you.

18 BY MR. CHANDRAN:

19     Q.   So, Chief McKinley, what kinds of other

20 unlawful acts would make an assembly of persons a civil

21 disturbance under this policy?

22     A.   It could be any unlawful activity.

23     Q.   So any unlawful activity by an assembly of

24 persons would make it a civil disturbance?

25          MR. PAUL:  Object to form.

Page 108

1           THE WITNESS:  Sorry.  Can you rephrase that?

2      Or --

3  BY MR. CHANDRAN:

4      Q.   Sure.  I think you just testified it could be

5  any unlawful activity; is that right?

6      A.   It could be.  Any -- or unlawful acts.

7      Q.   Okay.  So any unlawful acts could make an

8  assembly of persons a civil disturbance under this

9  policy?

10          MR. PAUL:  Object to form.

11          THE WITNESS:  That is what the definition

12     says, "other unlawful acts."

13 BY MR. CHANDRAN:

14     Q.   And does the City believe this definition is

15 wrong?

16     A.   What was the question?

17     Q.   I -- you said that is what the definition

18 says.  I'm just trying to ask:  Is this definition

19 incorrect for the City's policy or is this the correct

20 definition that the City uses?

21     A.   That is the correct definition.

22     Q.   Okay.  Okay.

23          MR. CHANDRAN:  I'm wondering, Chief McKinley,

24     how are you doing on food and water and all that?

25     I'm wondering if it makes sense before we plunge

Page 109

1  into the next kind of substantive section to take a

2  quick break for lunch?

3           MR. PAUL:  That's fine.

4           THE WITNESS:  Okay.  That's fine.

5           MR. CHANDRAN:  And just -- oh, sorry.  Do you

6      think 45 minutes, an hour?  How long would you

7      need, Chief?

8           THE WITNESS:  An hour?

9           MR. CHANDRAN:  Yeah, that's fine.  Yes.

10          THE WITNESS:  Okay.

11          THE REPORTER:  Great.  Just a moment.  I'll

12     take us off the record.

13               (OFF THE RECORD)

14          THE REPORTER:  We are back on the record.  It

15     is 2:18 p.m.  You may proceed.

16 BY MR. CHANDRAN:

17     Q.   Okay.  Welcome back, Chief McKinley.  I hope

18 you had a good break.  I think if I'm remembering

19 correctly, we were discussing SOP 12.6; is that right?

20     A.   Yeah.

21     Q.   Do you remember that discussion?

22     A.   Yes.

23     Q.   Okay.  I'd like to share my screen again just

24 to get back to where we were.  Okay.  Are you able to

25 see my screen, Chief McKinley?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of EMILY MCCONLEY, taken on June 18, 2024

30(b)(6)                                                                          110..113

Page 110

1    A.    Yes.
2    Q.    Okay.  So I want to talk a little bit about
3  this definition of crowd control devices.  Do you see
4  that?
5    A.    Yes.
6    Q.    Would you mind just reading that into the
7  record for us?
8    A.    Sure.  "Crowd control devices: Devices and
9  equipment utilized to mitigate disorderly crowds. These
10  devices may include but are not limited to chemical
11  agents."  It gives examples, tear gas, pepper balls,
12  acoustic devices.  Gives examples, long-range acoustic
13  devices -- device, and flash bang devices. And it gives
14  examples, scat rounds and aerial bangs.
15    Q.    Okay.  Are there other kinds of weapons that
16  are considered crowd control devices under this
17  definition?
18    A.    There are various other types of chemical
19  agents.  So we've discussed chemical agents earlier. So
20  there's different -- different types of tear gas and
21  smoke as far as chemical agents go.
22    Q.    And when you say different types of gas and
23  smoke, were you talking about like OC, HC, CS?
24    A.    Yes.  Yes.
25    Q.    Okay.

Page 111

1    A.    But these would be the devices and equipment
2  that we would have to mitigate or control disorderly
3  crowds.
4    Q.    Okay.  Would impact weapons be included in
5  crowd control devices?
6    A.    An impact weapon is generally used for -- to
7  target individuals that have been identified as, I
8  guess, those committing crimes.  So not necessarily at a
9  crowd, but it would be used towards an individual if an
10  individual has been identified.
11    Q.    And how is that different from a crowd control
12  device?
13    A.    A crowd control device is going to control a
14  crowd of people.
15    Q.    Okay.  So --
16    A.    Not an individual.
17    Q.    Sorry, I didn't mean to cut you off.
18    A.    Not -- a crowd control device is not intended
19  to control one specific individual.
20    Q.    Okay.  Okay.  So the impact weapon is targeted
21  at one specific individual.  A crowd control device is
22  meant to affect more than just the one individual?
23    A.    Yes.
24    Q.    Okay.  What about a special impact munition
25  system?  Would that be considered a crowd control

Page 112

1  device, or something else?
2    A.    That -- if we would go back to the definition,
3  there's a definition of that.  There is a policy on
4  that.  Again, those are impact weapons like you just
5  described.  They would be used towards an individual.
6    Q.    Okay.  Okay.  I think there's -- one of the
7  things listed in here is acoustic devices, and then it
8  says, EG long-range acoustic device, LRAD.  Do you see
9  that?
10    A.    Yes.  Yes.
11    Q.    Are there any other kinds of acoustic devices
12  that are considered crowd control devices under this
13  policy?
14    A.    Not that I'm aware of.
15    Q.    I'm sorry.  Would you mind repeating that?
16    A.    Not that I'm aware of.
17    Q.    Okay.  And is that your personal awareness, or
18  is that the City's awareness?
19    A.    That would be the City's.  The acoustic device
20  that we would use would be the long-range acoustic
21  device.
22    Q.    Okay.  So there are no other acoustic devices
23  that the City has that are subject to this policy?
24    A.    To control crowds?
25    Q.    That's correct.

Page 113

1    A.    I mean, we have other methods of delivering,
2  so, like, we have megaphones or there's PA systems in
3  cars, but those are not necessarily acoustic devices to
4  control crowds.  There is a policy below on crowd
5  control devices that goes into a little more detail on
6  each of these.
7    Q.    Okay.  And we'll certainly get to those, and I
8  appreciate you foregrounding that.  So then on -- excuse
9  me.  Moving on to flash-bang devices, where the examples
10  given are scat rounds and aerial bangs, are there any
11  other kinds of flash-bang devices that the City uses
12  that are governed by this policy?
13    A.    Again, not that I'm aware of.
14    Q.    And just -- is that based on your personal
15  awareness, or the City's awareness?
16    A.    That is -- that is my knowledge.  I don't know
17  of any other flash-bang devices other than what's listed
18  here.
19    Q.    Did you ask anyone within the department about
20  other kinds of flash-bang devices that are governed by
21  this policy?
22    A.    No.
23    Q.    Did you ask anyone within the mayor's office
24  about other flash-bang devices that would be covered by
25  the policy?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of EMILY MCGINLEY, taken on June 18, 2024

30(b)(6)                                                                    114..117

Page 114

1    A.   No.

2    Q.   Did you review any inventory records or
3  anything about the types of flash-bang devices
4  maintained by the department?

5    A.   No.

6    Q.   Okay.  I'm going to scroll down to 12.6.5 of
7  this policy.  And this is a section of the policy
8  titled, "Use of Crowd Control Devices."  Do you see
9  that?

10   A.   Yes.

11   Q.   Is this the policy you were just referring to
12 when you said there was another policy that goes into
13 more detail about each of these devices?

14   A.   Yes.

15   Q.   Okay.  So I want to start with the second
16 sentence in this first paragraph, the one that I've
17 highlighted.  Would you mind reading that for me?

18   A.   "Crowd control devices may only be used," or -
19 - I'm sorry, "may only be utilized on disorderly or
20 unlawful crowds to prevent injury, death, or property
21 damage."

22   Q.   So does this restriction apply to all crowd
23 control devices?

24   A.   Yes, it says crowd control devices.

25   Q.   Okay.  So this includes pepper balls, for

Page 115

1  example?

2    A.   Yes.

3    Q.   Okay.  Are there any crowd control devices to
4  which this would not apply?

5    A.   I mean, it's used for when those devices are
6  used to control the crowd, so when pepper ball is used
7  to control a crowd.  And then -- what -- what was the
8  question again?

9    Q.   Oh, sorry.  I'm just -- okay.  Since this
10 language says, "Crowd control devices may only be
11 utilized on disorderly or unlawful crowds to prevent
12 injury, death, or property damage," I'm just asking, are
13 there any crowd control devices that could be used
14 without the -- in other circumstances -- you know, not
15 to prevent injury that are property damage?

16   A.   Yes.  I mean, so there are other times that we
17 would use chemical agents within the department that
18 have nothing to do with a crowd.

19   Q.   Okay.

20   A.   Or that we would use any of those things that
21 -- that are listed under the crowd control device that
22 has nothing to do with the crowd.  These are -- the
23 crowd control device only applies when they're used to
24 control a crowd.

25   Q.   I see.  Okay.  So -- understood.  So there

Page 116

1  might be other times where you want to use tear gas or a
2  pepper ball or something, but when it comes to crowd
3  management, you would need to -- it -- a crowd control
4  device can only be used to prevent injury, death, or
5  property damage?

6    A.   Yes.  If you were using those tools in a
7  manner to control a crowd, that would -- this is when
8  this would apply.

9    Q.   Okay.  And I think you said it would be all
10 crowd control devices are subject to this restriction?

11   A.   All -- yes.  When you are using those tools in
12 a way to -- as a crowd control device --

13   Q.   Correct.

14   A.   -- in that manner, when you're using it in the
15 manner of a crowd control device, that is when that
16 would apply.

17   Q.   Okay.  I have a question for you here on this
18 phrase, "disorderly or unlawful crowds."  Do you see
19 that?

20   A.   Yes.

21   Q.   So earlier, I believe we looked at a
22 definition of disorderly crowd, or we might -- I'll
23 scroll back.  There is a definition of disorderly crowd
24 on here.

25   A.   Yes.

Page 117

1    Q.   Do you see that?

2    A.   Yes.

3    Q.   Would you mind reading that definition for me?

4    A.   "Disorderly crowd.  A large group of
5  individuals who are not engaging in a lawful
6  demonstration by exhibiting unruly, violent,
7  intimidating, or uncooperative behavior."

8    Q.   And could you explain to me what violent
9  behavior would be as used in this definition?

10   A.   Behavior that -- with the intent to cause
11 injury or that could cause injury.

12   Q.   Okay.  Could you give me some examples of
13 that?

14   A.   Throwing rocks or bottles at people.

15   Q.   And then what would intimidating behavior be?

16   A.   It could -- it could be shouting intimidating
17 things.  It -- it could be positioning your body in an
18 intimidating way, threatening, yelling threats.  That
19 could all be intimidating.

20   Q.   What would shouting and intimidating --
21 shouting in an intimidating way mean?

22   A.   Again, like I -- I just explained.  Making
23 threats or implying threats, that sort of -- sort of
24 intimidating language.

25   Q.   Could you give me some example what kinds of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 118

1  threats would be considered shouting, intimidating
2  things?
3       A.   "I'm going to hit you."  "I" -- "I" -- "I
4  want" -- "come fight me," like that -- that -- those
5  things could be intimidating, threatening, blading your
6  body, balling your fists, a combination of all of those
7  things.
8       Q.   Okay.  Does it have to be a threat of physical
9  violence towards the person to be intimidating conduct?
10      A.   Physical violence?  For a person to be
11 intimidated, I think they have to have some sort of
12 apprehension or fear of harm.
13      Q.   So does that mean that there wouldn't have to
14 be a threat of violence for it to be intimidating
15 conduct?
16      A.   Well, I mean, I think if you have an
17 apprehension or fear of -- of physical harm, that --
18 that would be a threat of violence.
19      Q.   Okay.  And I guess what I'm trying to get at
20 is, like, what would -- under this policy, what would
21 constitute a -- an apprehension of physical harm then?
22      A.   I mean, if you have a large group of people
23 who are yelling threats at people, that could be
24 intimidating.
25      Q.   Yeah.  And I guess what I'm -- those threats,

Page 119

1  do they have to be threats of physical violence?  Could
2  it be threats of something else?  What could that be?
3       A.   I guess it could be something else.  Or if
4  you're threatening to burn the building down or set the
5  car on fire, all of -- those things could also be
6  intimidating.
7       Q.   Okay.  Would chants speaking negatively about
8  someone constitute intimidating behavior?
9            MR. PAUL:  Object to form.
10           THE WITNESS:  No.
11 BY MR. CHANDRAN:
12      Q.   Would chants to shut something down be
13 considered intimidating behavior?
14           MR. PAUL:  Object to form.
15           THE WITNESS:  Again, all of -- all of that
16      would need to be coupled with the situation at hand
17      and the behaviors of the crowd.
18 BY MR. CHANDRAN:
19      Q.   They are by the people?
20      A.   It -- that could -- that -- it -- it could be
21 with -- coupled with other factors.
22      Q.   Okay.  Okay.  What would an example of unruly
23 behavior be as used in this policy?
24      A.   I think it's all the things that -- that we
25 just described previously, and then unlawful behavior

Page 120

1  would be unruly.
2       Q.   So any unlawful behavior would be unruly?
3       A.   I would say unlawful behavior is unruly.
4       Q.   Okay.  Would jaywalking be considered an
5  unruly behavior under this definition?
6       A.   Not under this definition.  It -- it -- a -- a
7  large group of individuals -- we're talking about a
8  large group of individuals who are breaking the law and
9  doing that collectively together.  So we're not talking
10 about individual people here.
11      Q.   Sure.  I guess it's my understanding, for
12 example, that there is a state statute in Kentucky that
13 prohibits walking in the street when there's a sidewalk
14 available.  Are you familiar with that?
15      A.   Yes.
16      Q.   So if a group of people is walking in the
17 street where there's a sidewalk available, would that be
18 unruly behavior under this definition?
19      A.   No, not necessarily.
20      Q.   So if it -- so even though they're engaged in
21 an unlawful behavior, it wouldn't be unruly?
22      A.   If a group of people who are not engaging in a
23 lawful demonstration, so they're engaging in an unlawful
24 demonstration by exhibiting unruly behavior?
25      Q.   Right.  And then --

Page 121

1       A.   Yes, that would be --
2       Q.   Sorry.  Go ahead.
3       A.   That would be unruly.
4       Q.   Okay.  So, again, if a group of people is
5  violating that state statute by walking in the street
6  where there's a sidewalk available, that would make them
7  an -- that would make it unruly again?
8       A.   They're not necessarily participating in -- in
9  a demonstration.  That -- this is -- that is the purpose
10 of this policy, is for demonstrations.  And it -- it
11 says that in this definition.  So a -- a disorderly
12 crowd for not engaging in a lawful demonstration.  So
13 they're -- they're -- they are engaging in an unlawful
14 demonstration because they are exhibiting these
15 behaviors.
16      Q.   Okay.  Wait.  So -- sorry.  I guess I'm
17 getting a little confused.  A disorderly crowd has to be
18 engaging in a demonstration?
19      A.   According to this definition, yes.
20      Q.   Okay.  And if they're doing so by violating a
21 law, they are being unruly; is that right?
22           MR. PAUL:  Object to form.  Misstates
23      testimony.
24           THE WITNESS:  If the crowd has demonstrated
25      unlawful behavior, they're -- they are unlawfully

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 122

1    demonstrating.
2  BY MR. CHANDRAN:
3       Q.    And would that make them exhibiting unruly
4  behavior under this definition?
5       A.    Under this definition, yes.
6       Q.    Okay.  What would uncooperative behavior under
7  this definition mean?
8       A.    Not cooperating with lawful orders.  So --
9       Q.    So that would be -- sorry, go ahead.  I don't
10  want to cut you off.
11      A.    I was done.
12      Q.    Okay.  What kinds of lawful orders -- or what
13  kinds of lawful orders would a crowd's non-cooperation
14  with constitute uncooperative behavior under this
15  definition?
16      A.    A refusal to disperse.
17      Q.    Okay.  Any other kinds of uncooperative
18  behavior that would make a group of people a disorderly
19  crowd?
20      A.    I mean, there could be a -- there could be a
21  lot of uncooperative behavior.  If -- if -- if officers
22  are trying to affect arrests of people within the crowd
23  and -- and people are posing resistance to the officers
24  or interfering with those arrests, or if the subjects
25  that are being arrested or uncooperative or posing

Page 123

1  resistance, all of that could be uncooperative behavior
2  within the crowd.
3       Q.    And just, I guess, picking up on that, is
4  there any particular number of people who would have to
5  be engaging in unruly, violent, intimidating, or
6  uncooperative behavior before something becomes a
7  disorderly crowd?
8       A.    No.
9       Q.    Would it have to be more than one?
10      A.    You would need a large group of individuals.
11      Q.    And would they all need to be exhibiting
12  unruly, violent, intimidating, or uncooperative
13  behavior?
14      A.    No.
15      Q.    I guess, that's what I'm trying to get at.  How
16  many of the large group of individuals would need to be
17  exhibiting unruly, violent, intimidating, uncooperative
18  behavior before if it comes a disorderly crowd?
19      A.    There's not a number.  It's all going to be
20  determined on the situation at hand and all the factors
21  that are presented to the officers on-scene.  So it
22  could be a variety of numbers, dependent on the size of
23  the crowd.
24      Q.    Could it ever be a single person?
25      A.    If -- if the crowd is not complying with --

Page 124

1  with -- with the orders in the crowd, is -- is a part of
2  that group, if they're not complying with the lawful
3  orders that are given, then they would be engaging not -
4  - or they would not be engaging in a lawful
5  demonstration at that point.
6            So the crowd in and of itself is of a -- is a
7  disorderly crowd.  There could be people in that crowd
8  that might not be participating in the violent acts or
9  intimidating acts, but the crowd who -- if -- if the
10  crowd itself is -- are not engaging in an unlawful
11  demonstration, then that crowd would be a disorderly
12  crowd.
13      Q.    I guess, to use the example you gave about
14  refusing to comply with a dispersal order, which I
15  believe you said would be uncooperative behavior under
16  this definition, right?
17      A.    Yes.
18      Q.    If a crowd is gathered and -- you know, half
19  of the people try to comply with the order to disperse,
20  but half of the people are refusing the order to
21  disperse, does that make the whole crowd disorderly?
22  What -- where's the -- like, I'm trying to figure out
23  what the balance is here.
24      A.    Well, it sounds like half the people have now
25  disengaged and broken away from the crowd, so they're --

Page 125

1  they're dispersing.  So they are no longer a part of the
2  crowd.
3       Q.    So they wouldn't be considered part of the
4  disorderly crowd?
5       A.    They have dispersed.  They are no longer a
6  part of this -- the disorderly crowd.
7       Q.    Okay.  And the people who remain would be a
8  disorderly crowd?
9       A.    Yes.
10      Q.    Okay.  What about unruly behavior?  Which I
11  think we talked about would be a violation of law during
12  a demonstration.  How many people would need to violate
13  a law during a demonstration in order to make something
14  a disorderly crowd?
15      A.    Again, this goes back to the same baseline of
16  questioning from just a -- a bit ago.  There's not a
17  specific number that is going to get you to the
18  threshold of a disorderly crowd.  It's taking all of
19  these things into consideration, given the totality of
20  the circumstance that the officer is facing.  So I don't
21  have a number of people for you.
22      Q.    Would it have to be more than one?
23      A.    Again, I mean, you have to take the totality
24  of -- of what is happening within this crowd.  And if --
25  if there is an unruly behavior and they are not engaging

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 126

1  in a lawful demonstration, and there's an order to
2  disperse and the crowd has not dispersed, then the --
3  the -- the -- those who don't disperse are part of that
4  disorderly crowd.  So I -- I mean, I don't have an
5  answer as far as a number of people that would have to
6  be involved in any one of these specific descriptions of
7  behavior.
8      Q.    Is there any official city policy about -- you
9  know, how many people or how much of a crowd needs to
10 engage in any of these behaviors before a crowd can be
11 determined to be a disorderly crowd?
12     A.    No, I do not know of a city policy on that.
13     Q.    Are officers trained on how to make that
14 determination of when to make the whole crowd
15 disorderly?
16     A.    There's policy on the -- this entire policy
17 explains how to make those assessments, and that is the
18 purpose of this policy.
19     Q.    Okay.  Okay.  I'm going to scroll back down to
20 12.6.5.  And that sentence we were looking at earlier,
21 that reads, "Crowd control devices may only be utilized
22 on disorderly or unlawful crowds to prevent injury,
23 death, or property damage."  Do you see that?
24     A.    Yes.
25     Q.    So we've been talking about disorderly crowds.

Page 127

1  Is there a definition of unlawful crowds that the city
2  uses?
3      A.    If there's not a -- a definition in the
4  definitions, I mean, I guess the definition would be
5  what we just described as a disorderly crowd.  And I
6  think the -- the unlawful crowd speaks for itself within
7  the definition of disorderly as far as assembling
8  unlawfully.
9      Q.    Okay.  So an unlawful crowd -- excuse me.  Is
10 a crowd -- is any unlawful assembly?
11         MR. PAUL:  Object to form.
12         THE WITNESS:  It is a crowd that is behaving
13 unlawfully.
14 BY MR. CHANDRAN:
15     Q.    An unlawful crowd is a crowd that is doing
16 anything unlawful?
17     A.    It is a crowd that is unlawful.
18     Q.    Because their being -- acting unlawfully?
19     A.    Yes, it is a crowd that is exhibiting unlawful
20 behavior.
21     Q.    Okay.  And, I guess, like we were just talking
22 about, is there -- is that any violation of any law, or
23 are there only specific types of laws that they would be
24 violating to be declared an unlawful crowd?
25     A.    Again, it's not -- there's not a -- it doesn't

Page 128

1  restrict you to specific types of laws.  So, again, we
2  would take into consideration the totality of everything
3  that is happening, all the unlawful behavior, whatever
4  that may be.  But no, it does not restrict you to
5  specific laws when you were talking about what would
6  constitute being unlawful.
7      Q.    Okay.  Okay.  Okay.  So I believe we looked at
8  this language as well about crowd control devices may
9  only be used, leaving aside the disorderly or unlawful
10 crowds, to prevent injury death or property damage,
11 right?
12     A.    Yes.
13     Q.    Okay.  I am going to jump down a little bit to
14 a later paragraph that I'll highlight here.  The
15 sentence that I've highlighted, can you read that for
16 me?
17     A.    Yes.  "Pepper ball munitions may be utilized
18 to move disorderly or unlawful crowds by directing the
19 munitions at the ground or above the crowd."
20     Q.    So does this language about pepper ball
21 munitions require that -- sorry, let me rephrase that.
22 Does this sentence in the policy require that officers
23 only use pepper balls to prevent injury, death, or
24 property damage?
25     A.    Well, we're not reading the entire policy

Page 129

1  here.  We're -- we're, kind of, jumping around, but
2  there's a lot of other circumstances that would need to
3  come into play before an officer could use pepper balls
4  to move a disorderly or unlawful crowd.
5      Q.    Yeah.  I guess, I -- I'm asking what would
6  those considerations be before an officer could use
7  pepper balls to move a disorderly or unlawful crowd?
8      A.    Well, the second paragraph explains that the
9  use of chemical agents, which -- which are pepper balls,
10 for crowd control.  So disorderly or unlawful crowds to
11 control and remove those crowds, to control that crowd,
12 may only be authorized by the chief of police.
13     Q.    Okay.
14     A.    Officers must consider lower levels of force
15 prior to deploying chemical agents.  And then they may
16 only be authorized under the following safety
17 circumstances.  So the list of bullet points there are
18 what is going to be communicated to the chief of police
19 to make the decision of can we use pepper ball munitions
20 to move a disorderly or unlawful crowd?  And those
21 safety circumstances are to protect human life when an
22 individual or group of individuals is acting with the
23 intent to cause injury to police officers or other
24 persons.
25     Q.    Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 36 of 85 PageID
#: 2694
The Deposition of EMILY McKINLEY, taken on June 18, 2024
30(b)(6)                                                                    130..133

Page 130

1    A.    And they give examples of physical assault,
2  throwing bottles, rocks, bricks, chemicals, liquids,
3  fireworks, explosives, or other items.  When the
4  individual or group of individuals is acting with the
5  intent to cause serious property damage, mass vandalism,
6  looting, destruction of structures or vehicles to
7  prevent arson, or when there's a presence of gunfire
8  within the crowd.  So those would be the times, which
9  would be to prevent injury, death, or property damage,
10  that pepper ball munitions could be utilized to move a
11  disorderly or unlawful crowd.
12    Q.    Okay.  I assume, under 12.6.5, the City's
13  official policy is that pepper balls can only be used
14  when these conditions are met, these five bullet points?
15    A.    Pepper balls can only be used to -- for crowd
16  control.  So if I'm using -- if an officer is using a
17  pepper ball for the purpose of to control a crowd, that
18  is what is applied here.
19    Q.    Right.
20    A.    Now, like we discussed earlier, pepper balls
21  could be used in other situations throughout within law
22  enforcement.  But when we're talking about crowd
23  control, that's when pepper ball could be used
24  specifically to address the crowd and not an individual.
25    Q.    Okay.  So pepper balls -- understood.  Pepper

Page 131

1  balls when used for crowd control can only be used if
2  one of these five bullet points are met.
3    A.    Yes.  And it must be authorized by the chief
4  of police.
5    Q.    So the pepper balls can only be used when the
6  chief of police authorizes it?
7    A.    For the purposes of crowd control.
8    Q.    Understood.  Okay.  And so, just on that
9  language of the use of chemical agents for crowd control
10  may only be authorized by the chief of police or his or
11  her designee.
12    A.    Yes.
13    Q.    Does that include all kinds of chemical
14  agents?
15    A.    Yes.
16    Q.    Would it apply to OC spray?
17    A.    Yes.  If you are using OC spray for the
18  purpose of crowd control, --
19    Q.    Okay.
20    A.    -- not on an individual, that would apply
21  here.
22    Q.    Okay.  Are there any kinds of chemical agents
23  that would not be -- that could be used without the
24  chief's authorization in a crowd control capacity?
25    A.    No.

Page 132

1    Q.    Okay.  Okay.  So let me ask you this.  We've
2  talked about how pepper balls need the approval of the
3  chief and can't be used to -- on disorderly unlawful
4  crowds unless these five -- one of these five bullet
5  points exists, right?
6    A.    Yes.
7    Q.    This sentence right below that bullet point
8  list, could you read that for me?
9    A.    "Chemical agents will not be used to move or
10  control a lawful crowd," or -- excuse me, "for
11  disorderly or unlawful crowds that are merely refusing
12  to disperse, but do not present a specific danger as
13  outlined above."
14    Q.    Okay.  And could you tell me what that means?
15    A.    So that means -- so chemical agents will not
16  be used on a crowd that is lawful.
17    Q.    Uh-huh.
18    A.    It will not be used on a crowd that may be
19  unlawful, but they are just refusing to disperse.  An
20  example would be kind of what you talked about earlier.
21  You have a group of people who are in the middle of the
22  roadway, just simply refusing to disperse.  There would
23  never be a time that chemical agents would be authorized
24  to be used on that group of that disorderly or unlawful
25  crowd.

Page 133

1    Q.    Okay.  And what does "move" or "control" mean
2  as used in this sentence?
3    A.    Disperse and/or make arrests.
4    Q.    Okay.  So --
5    A.    I'm sorry, I -- I'm sorry.  I -- I didn't read
6  that sentence.  On a lawful crowd.  So to -- if -- if --
7  if a crowd is lawful and say, we need to move them for
8  their safety or recommend that, "hey, let's move to the
9  sidewalk," we would never move -- use chemical agents to
10  -- to do that.  If and maybe to control a crowd to
11  protect them or keep them safe or block off roadways, to
12  control that space, to allow that crowd to be lawful,
13  there would never be chemical agents used for that.
14    Q.    Okay.  So does this move or control phrase
15  also apply to disorderly or unlawful crowds?
16    A.    Yes.  I mean, we -- I mean, you may need to
17  move or control a disorderly or lawful crowd.
18    Q.    Okay.
19    A.    And -- or I'm sorry, a disorderly or unlawful
20  crowd.  So we would not use chemical agents to move or
21  control a disorderly or unlawful crowd that is simply
22  just refusing to disperse.
23    Q.    Okay.  So with that sentence, can I jump back
24  down to the sentence about pepper balls?
25    A.    Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 37 of 85 PageID
#: 2695
The Deposition of EMILY McKINLEY, taken on June 18, 2024
30(b)(6)                                                                      134..137

Page 134

1    Q.   Which reads, "Pepper ball munitions may be
2  utilized to move disorderly or unlawful crowds by
3  directing the munitions to the ground or above the
4  crowd."  Can you tell me what that sentence means?
5    A.   Sure.  The pepper ball is a chemical agent.
6  Again, it's above, we talk about chemical agents for
7  crowd control.  So pepper ball is -- is a form of
8  chemical agent.  When it talks about above or -- or at
9  the ground or above the crowd, is that what you want me
10 to clarify?
11   Q.   I guess I'm curious what this sentence that
12 says, "Pepper ball munitions may be utilized to move
13 disorderly or unlawful crowds."  What that means
14 compared to the above sentence we were just talking
15 about that says chemical agents will not be used to move
16 or control a disorderly or unlawful crowd, unless --
17   A.   Yes, unless they do not present the specific
18 danger as outlined above, that would apply to pepper
19 ball.  So --
20   Q.   Okay.
21   A.   -- you -- pepper ball is a chemical agent.  So
22 you still -- it's -- the -- the two paragraphs above the
23 pepper ball sentence would still apply.  Pepper ball as
24 a chemical agent.  So unless it presents the specific
25 dangers with the crowd present -- presents some specific

Page 135

1  dangers outlined above with those bullet points, pepper
2  ball would not be used to move or -- move or -- the
3  disorderly crowd, unless it presents those things.
4    Q.   Okay.  Did this second clause of the sentence,
5  "but do not present a specific danger as outlined
6  above," that is also a requirement of this sentence
7  about pepper balls?
8    A.   Yes.  In the chemical agent definition, the
9  two examples, if you read the chemical agent definition,
10 it goes back and explains that -- it gives examples.  So
11 the tear -- tear gas and pepper balls were the examples
12 of chemical agents.  So the powder in pepper ball is a
13 chemical agent.
14   Q.   Okay.  Okay.  So can I ask, what is this
15 sentence, it -- does this sentence impose any additional
16 restrictions on pepper balls, or is it just repeating
17 what is earlier?
18        MR. PAUL:  Object to form.
19        THE WITNESS:  Can you clarify your question?
20 BY MR. CHANDRAN:
21   Q.   Sure.  I think you've been describing how
22 pepper ball munitions also can only be used in a crowd
23 management capacity if one of these five bullet points
24 is met, right?
25   A.   Yes.

Page 136

1    Q.   And that's what this sentence about chemical
2  agents more broadly says, right?
3    A.   I'm -- I'm not following it.
4    Q.   Sure.  So this sentence says that chemical
5  agents of all kinds will not be used unless one of these
6  five bullet points is met, right?
7        MR. PAUL:  Object to form.  Misstates
8  testimony.
9  BY MR. CHANDRAN:
10   Q.   You can answer, Chief.
11   A.   To use a chemical agent for crowd control, you
12 must have those circumstances.
13   Q.   Understood.  And I believe it was your
14 testimony that that applies to pepper balls as well,
15 right?
16   A.   Yes.
17   Q.   So then I'm asking, does this sentence saying,
18 "Pepper ball munitions may be utilized to move
19 disorderly or unlawful crowds by directing the munitions
20 at the ground or above the crowd," impose any additional
21 restrictions on -- or different restrictions on pepper
22 balls compared to other kinds of chemical agents?
23   A.   No, it -- this paragraph is describing where
24 the pepper ball should be directed.  So when it's --
25 it's -- it's -- it's communicating that the pepper ball

Page 137

1  munition needs to be fired at the ground or above the
2  crowd.  And that means to disperse the chemical agent.
3  So it is telling you that you need to hit the ground,
4  disperse the chemical agent, or above the crowd being
5  strike a wall or some sort of hard object that could be
6  above the crowd that would cause the dispersal of the
7  chemical agent.  That's what is being communicated here.
8    Q.   Okay.  Okay.  I think I understand.  So just
9  to make sure that I have this right, the City's current
10 policy is that pepper ball munitions can only be used
11 for crowd management if one of these five criteria are
12 met and when doing so, they should be fired only at the
13 ground or above the crowd; is that right?
14       MR. PAUL:  Objection.  Misstates testimony.
15 BY MR. CHANDRAN:
16   Q.   You can answer.
17   A.   Yes.
18   Q.   How are officers trained on that rule about
19 pepper balls?
20   A.   They're -- officers do receive training during
21 annual firearms training on pepper ball systems.  So
22 that is how that is trained, during annual firearms
23 training.
24   Q.   And how many annual firearms trainings have
25 occurred since this policy was revised looking up at the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 138

1  top, December 19, 2022?

2      A.   So we actually have firearms training twice a

3  year, even though it's required by the state once a

4  year.  So LMPD does firearms training twice a year.  But

5  pepper ball, I would need to go review that training to

6  determine how often pepper ball was in that curriculum.

7  But firearms training is conducted at least twice a year

8  for every officer.

9      Q.   But sitting here, you don't know how many

10 times pepper ball was included in those trainings?

11     A.   I don't know.

12     Q.   Did you review any materials from any

13 trainings about pepper balls following December 19,

14 2022?

15     A.   Other than the PowerPoints and trainings that

16 were turned into me from the special response team

17 commander, I did not review any other training that has

18 anything to do with pepper ball.

19     Q.   Okay.  And I believe you mentioned you

20 remember getting at least one PowerPoint; is that right?

21     A.   Yes.

22     Q.   Did that PowerPoint address pepper balls?

23     A.   It could have.  I don't -- I don't recall.

24     Q.   Okay.  And then you mentioned getting a list

25 of training topics from the SRT commander; is that

Page 139

1  right?

2      A.   Yes.

3      Q.   And did that list of training topics include

4  pepper balls?

5      A.   I don't -- I don't recall if it -- it

6  discussed pepper balls specifically.  There's going to -

7  - there's general crowd control training on there, but I

8  don't know if it specifically said the word pepper ball.

9      Q.   Okay.  Did you -- I guess, once you got the

10 list of training, did you request any of the specific

11 training modules?

12     A.   No, I -- just the -- I just received the

13 PowerPoint.  That was the only thing that I can recall.

14     Q.   Okay.  So aside from that one PowerPoint, you

15 got the list of topics, but not the substance of any of

16 the trainings?

17     A.   Correct.  I don't have -- I do not have the

18 curriculum.

19     Q.   Okay.  And just for not having them, do you

20 mean you did not review them to prepare for today?

21     A.   Correct.

22     Q.   Okay.  Okay.  So I guess what I'm asking is,

23 sitting here today, do you know if any of the trainings

24 offered by LMPD explain that pepper ball munitions

25 cannot be used in a crowd management capacity unless one

Page 140

1  of these five criteria are present?

2      A.   You're asking -- what was the question again?

3      Q.   I guess, sitting here today, do you know how

4  many, if any, LMPD trainings discuss the restriction in

5  12.6.5 that pepper ball munitions may only be used for

6  crowd management if one of these five criteria are met?

7      A.   I -- I -- I don't know the number of trainings

8  that explicitly say that.

9      Q.   Okay.  Okay.  So I'd like to ask you a little

10 bit more about these specific criteria, if that's okay?

11     A.   Okay.

12     Q.   So the last line of the preceding

13 paragraph says, "Chemical agents may only be authorized

14 under the following safety circumstances."  Do you see

15 that?

16     A.   Yes.

17     Q.   Okay.  And the first one is to protect human

18 life, right?

19     A.   Yes.

20     Q.   Can you tell me what that means in this

21 policy?

22     A.   It would mean in really deadly poor

23 situations, if there's human life and is in danger.

24     Q.   Okay.  So this is if there's a threat of like

25 serious physical injury or death?

Page 141

1      A.   Yes.

2      Q.   And does that -- is that true for if there's

3  the threat of serious physical injury or death for one

4  person?

5      A.   Yes.

6      Q.   Okay.  The next one is "When an individual or

7  a group of individuals is acting with intent to cause

8  injury to police officers or other persons."  Do you see

9  that?  And then some examples are given.  I'm sorry.  Do

10 you see that?

11     A.   Yes.

12     Q.   Okay.  Great.  So it says, "When an individual

13 or a group of individuals," and so does this policy mean

14 that a single individual acting with intent to cause

15 injury to justify the use of chemical agents?

16     A.   Within a crowd, yes.

17     Q.   Is there any particular level of injury that

18 needs to be threatened before chemical agents could be

19 authorized under this policy?  I'm sorry, I couldn't

20 hear that answer.

21     A.   I'm -- I'm reading -- with -- I mean, if -- if

22 people are acting with the intent to cause injury and

23 they give examples of that.

24     Q.   Right.  I guess what I'm asking is, is there

25 any -- when talking about human life where you said it

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of EMILY McKINLEY, taken on June 18, 2024

30(b)(6)                                                          142..145

**Page 142**

1  has to be serious with a risk of death, is there any
2  level of injury that would need to be threatened for
3  this second bullet point before chemical agents could be
4  authorized?  Is it also serious physical injury or even
5  death?
6         MR. PAUL:  Object to form.
7         THE WITNESS:  Yes.  I mean, the examples they
8     give are examples that could readily cause serious
9     physical injury.
10 BY MR. CHANDRAN:
11        Q.  Okay.  So the second bullet point would
12 require serious physical injury, not just any physical
13 injury?
14        A.  I -- I think it reads, like it -- if you are
15 struck with a bottle or a rock, it could cause serious
16 physical injury, it could cause injury.  So when they're
17 acting with the intent to cause those injuries -- cause
18 injury, that is what is applied -- is applicable here.
19        Q.  Okay.  So it's acting with the intent, not
20 whether it's a serious injury or not?
21        A.  Yes.
22        Q.  Okay.  Okay.  And so, some of these examples
23 that are given here, the first one is physical assault.
24 Do you see that?
25        A.  Yes.

**Page 143**

1         Q.  Could you just explain to me what that means?
2         MR. PAUL:  Objection.  Form.
3         THE WITNESS:  Assaulting someone with your
4      physical body.
5  BY MR. CHANDRAN:
6         Q.  Okay.  So, like, a fist.
7         A.  Punching.
8         Q.  Oh, sorry.  Go ahead.
9         A.  Punching.  Punching, kicking.
10        Q.  So it's like physical combat.
11        A.  It could be.
12        Q.  Okay.  The next one is throwing bottles.  Can
13 you tell me what that means?
14        A.  When someone is throwing a bottle from a
15 crowd, or -- I don't know how else to explain that.
16        Q.  Okay.  Yeah, I'll ask, maybe -- does it
17 specify any particular kind of bottle?
18        A.  No, it just says bottles.
19        Q.  Okay.  So could it be any kind of bottle?
20        A.  Yes.
21        Q.  Okay.  So an individual throwing a water
22 bottle would be a justification for the use of chemical
23 agents?
24        A.  Again, we're -- you are going to take in the
25 totality of all the circumstances.  So just throwing a

**Page 144**

1  water bottle isn't necessarily going to get you here,
2  just like any physical assault, or rocks, or bricks.  The
3  -- the chief and the -- the supervisors on-scene are
4  going to have to assess the totality of the circumstance
5  of what this crowd is demonstrating, what the situation
6  has -- is being presented.  So there's a lot of factors,
7  again, that are going to be taken into consideration
8  before the chief makes this very high- level decision.
9         Q.  Right, okay.  So is an individual throwing a
10 water bottle, standing alone, would not be enough to
11 justify the use of chemical agents under this policy?
12        A.  Again, you -- you -- standing alone?  So
13 that's not a crowd anymore?
14        Q.  I guess.  Sorry.  I should say all these
15 questions are in the context of a crowd since this
16 policy only applies --
17        A.  Again, so can't say with -- one individual
18 within a crowd throwing a bottle, I cannot -- just given
19 that simple scenario without knowing other factors of --
20 regarding the crowd.  That could be an infinite number
21 of things of whether or not we're going to make that --
22 that decision to authorize that at that point.
23        Q.  Okay.  So it could or it could not depending
24 on the circumstances?
25        A.  Depending on the circumstances, those are

**Page 145**

1  things -- we would need to take all the totality of all
2  the circumstances into consideration when making that
3  decision.
4         Q.  In considering the totality of the
5  circumstances there, what other factors would the chief
6  or the designee consider?
7         A.  I mean, aside from the totality of the
8  circumstances, I don't know what -- what other things
9  are outside of the totality of the circumstance.
10        Q.  Sorry, I'm -- let me say what I mean by that.
11 You -- I think you meant -- you said throwing bottles --
12 you -- in order to decide whether to authorize the use
13 of chemical agents for throwing a water bottle, you'd
14 have to consider the totality of the circumstances.  I
15 guess I'm asking, what are the other circumstances that
16 would be considered before authorizing the use of
17 chemical agents in response to a water bottle being
18 thrown?
19        A.  Sure.  Are -- are there continuous water
20 bottles being thrown?  What was in the water bottle?
21 What was the bottle made of?  How large is the crowd?
22 What are the resources on the ground?  How many
23 officers?  Was an officer injured?  Were -- were any
24 people injured?  What time of day is it?  What is the
25 traffic like?  What is the weather?  What -- where is

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 40 of 85 PageID
#: 2698
The Deposition of EMILY MCCARTY SHELLEY, taken on June 18, 2024
30(b)(6)                                                                       146..149

Page 146

1  this occurring within the city?  How many people are
2  affected?
3          How -- you know, the -- the list goes on.  Have
4  we given warnings, dispersal warnings?  How long ago
5  have we given the dispersal warnings?  Does the crowd
6  seem to be dispersing?  Is it growing?  These -- it is a
7  big decision and there's a lot of factors to consider.
8      Q.  Are there any written documents clarifying,
9  for the chief or their designee, when to authorize the
10  use of chemical agents for an individual throwing a
11  water bottle from a crowd?
12      A.  This is the policy that our department has.  I
13  think I just rattled off several different -- I guess --
14  I guess, variables that could occur within a crowd.  And
15  the chief of police, it's their responsibility, per this
16  policy, to take all the information that they're
17  receiving from the supervisors or commanders that are on
18  the ground.
19          And maybe the chief -- the chief is observing
20  this to make that decision.  That cannot be condensed to
21  one document.  They are going to consider, do we need --
22  do we need to protect human life?  Is there -- is -- are
23  people acting with intent to cause injury?  Are people
24  intending to cause serious property damage?  Is -- are --
25  are -- is there arson that we need to prevent?  Is there

Page 147

1  gunfire within the crowd?  All of these things that
2  could have a lot of variety of factors that go along
3  with it.  That is what they're going to consider.
4          They're also going to use the consideration,
5  and I talked about it earlier, where it's not just this
6  policy that we're talking about.  So they're going to
7  look at our use of force policy and understand force,
8  and -- and they're going to look at the severity of
9  crimes that are occurring, the immediacy of the threat,
10  the resistance level.  So there's a lot of factors to
11  consider, and -- and it's -- it's not easily condensed
12  to one written document.
13      Q.  Okay.  So there's no written document for the
14  chief or their designee?
15      A.  There is a -- there is a -- we have a policy
16  and this is -- this is our policy.
17      Q.  I guess, yeah, I understand.  So beyond this
18  written document, there's no additional guidance for the
19  chief or the designee on what to consider before
20  authorizing chemical agents for an individual throwing a
21  water bottle from a crowd?
22      A.  We operate off -- off of this policy to make
23  those determinations and -- and assess the totality of
24  the circumstance.
25      Q.  Okay.  The next thing here is rocks.  Can you

Page 148

1  tell me what that means?
2      A.  A rock would be a piece of, I guess, earth
3  that is hard that could be thrown, so --
4      Q.  All right.  I should have clarified that.  Does
5  this also refer to throwing rocks, I guess?
6      A.  Yes.
7      Q.  Okay.  And does the throwing apply to the rest
8  of the stuff here, bricks, chemicals, liquids,
9  fireworks, explosives, or other items?
10      A.  Yeah, I guess, yes.  Throwing, yes.
11      Q.  Yeah.  So you've got to be throwing one of
12  these things in order for it to justify the use of
13  chemical agents?
14      A.  Well, I mean -- well, if you're setting off
15  fireworks within a crowd that -- you know, you're -- now
16  we're talking about protecting human life, you know?  So
17  I -- you don't have to necessarily throw your firework
18  or explosive, but if -- if fireworks or explosive are
19  going on within the crowd, I think you could articulate
20  that, just because they didn't throw the firework or
21  explosive, that now human life is in danger, there's
22  explosives going on within this crowd, if that makes
23  sense.
24      Q.  Yeah, that makes sense.  That makes sense.
25  Yeah, I think -- so in a scenario where there's a need

Page 149

1  to protect human life, it doesn't need to be any
2  specific conduct, like throwing fireworks or something.
3  It just needs to be that there's this risk of serious
4  physical injury?
5      A.  Yes.  These are examples.  These are examples,
6  and yes.
7      Q.  Okay.  Can I ask just quickly about this
8  throwing chemicals -- or I should say, chemicals and
9  liquids, do those also have to be thrown in order to be
10  -- justify the use of chemical agents on a crowd?
11      A.  Unless there's another way to -- again, this
12  isn't a -- these are examples.  I -- I -- I'm thinking
13  you could shoot a chemical from a water gun.  You could
14  toss a powder into an air within a crowd.  So there's
15  other ways to deploy those, I guess.  It doesn't
16  necessarily have to be thrown.
17      Q.  Okay.  But it has to be used in some way
18  against an officer or a person?
19      A.  Yes.
20      Q.  Okay.  Are there specific kinds of chemicals
21  that this is limited to?
22      A.  No.
23      Q.  I'm sorry.  I couldn't hear that.
24      A.  No.  No.
25      Q.  Okay.  Sorry.  Sorry, I feel like I'm having

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 41 of 85 PageID
#: 2699
The Deposition of EMILY McKINLEY, taken on June 18, 2024
30(b)(6)                                                                    150..153

Page 150

1  the audio issue again.  Are there specific kinds of
2  liquids that this policy is restricted to?
3      A.  No.  Again, the -- this is just examples of --
4      Q.  Okay.  So it could be any kind of chemical or
5  any kind of liquid?
6      A.  It could be.
7      Q.  Okay.  Okay.  Does this section of the SOPs
8  impose any kind of targeting requirement for chemical
9  agents?
10         MR. PAUL:  Object to form.
11         THE WITNESS:  I'm not sure I understand your
12  question, I guess.
13  BY MR. CHANDRAN:
14      Q.  Sure.  Does this policy impose any
15  restrictions on how chemical agents should be targeted
16  when used in a crowd management capacity?
17      A.  This -- this specific policy on the screen, it
18  is targeted.  I don't -- I'm not sure if I follow you.
19      Q.  I guess -- so if the decision is made to
20  authorize the use of, say, tear gas on a crowd because
21  one of these five criteria is met, does this policy
22  impose any restrictions on how the officers do it?  By -
23  - you know, targeting particular people or particular
24  areas, anything like that?
25      A.  Well, the -- it says that it -- it can be hand

Page 151

1  tossed or deployed from a launcher.  So it's going to be
2  deployed at the front of the crowd from the -- either
3  hand tossed, from the launcher.  The pepper ball
4  munitions talk about how you can direct them at the --
5  at the ground or above the crowd to deploy that chemical
6  agent.
7      Q.  Okay.
8      A.  It also goes on to say that you should not aim
9  at the body of an individual unless we're -- we are
10  addressing a particular individual.
11      Q.  Okay.  Okay.  I'm going to ask about this
12  third bullet point just when an individual or a group of
13  individuals is acting with the intent to cause serious
14  property damage.  Do you see that?
15      A.  Yes.
16      Q.  How does the city define serious property
17  damage in this policy?
18      A.  So it gives examples like mass vandalism,
19  looting, destruction of structures or vehicles.  Again,
20  these are things that the chief of police is going to
21  need to assess and -- and -- and take into consideration
22  the totality of the circumstances to determine is this
23  serious property damage.
24      Q.  And is that fully up to the chief's
25  discretion?  Is there any guidance or restrictions on

Page 152

1  that?
2      A.  In this policy here, this is up to the chief.
3  So this is -- these are all the -- the -- these are all
4  the bullet points, the circumstances that the chief is
5  considering when making the authorization to use
6  chemical agents for crowd control.
7      Q.  And does anybody review a chief's
8  determination that something constituted serious
9  property damage or not?
10      A.  Does -- do they review that?
11      Q.  Yeah.
12      A.  I -- I don't know what -- if you can explain
13  or if -- yeah, a little bit more.
14      Q.  Sure.  Yeah, yeah.  I guess, is there any
15  check on when the police chief determines that something
16  constitutes serious property damage or not?
17      A.  Well, I would hope that the chemical agent use
18  for the crowd control prevented the serious property
19  damage, so it's hard to measure what didn't occur.
20      Q.  Okay.  So this is meant to anticipate before
21  serious property damage occurs?
22      A.  When an individual or group of individuals is
23  acting with the intent to cause serious property damage,
24  if we can prevent that, that would be ideal.
25      Q.  Okay.  Are officers given any training on how

Page 153

1  to determine whether someone has the intent to cause
2  serious property damage?
3      A.  Again, this -- this is not at the officer
4  level.  This is at the chief's discretion based on
5  information that the chief is receiving from a variety
6  of sources, which could be their own independent
7  perspective.
8      Q.  Okay.  How is the chief supposed to determine
9  that an individual is acting with intent to cause
10  serious property damage under this policy?
11      A.  The chief has the ability to receive
12  information from supervisors on the ground from multiple
13  -- multiple different vantage points.  The chief has the
14  ability to review real-time crime center video.  So
15  Metro cams that may be in the area.  The chief has the
16  ability to live-stream and lab view officer body cam
17  video from multiple different vantage points that --
18  that is live.  These are things that are not available
19  to the average officer on the ground. And so, the chief
20  has the ability to take in a -- a wide variety of
21  information from a lot of sources to make this
22  assessment.
23      Q.  Okay.  And I guess what I'm asking, is there
24  any city guidance on what constitutes serious property
25  damage?



Kentuckiana Reporters                    502.589.2273 Phone
P.O. Box 3983                            502.584.0119 Fax
Louisville, KY 40201                     schedule@kentuckianareporters.com
                                         www.kentuckianareporters.com

The Deposition of EMILY McCARTHLEY, taken on June 18, 2024

30(b)(6)                                                                154..157

---

Page 154

1    A.  I mean, there's state laws on criminal
2  mischief, if that -- if that would be a guidance.  So
3  there's felony level criminal mischief charges, that
4  would be property damage.  I would consider a felony
5  level property damage to be serious.
6    Q.  Is that what serious property damage means in
7  this policy, a felony level mischief?
8    A.  That is not what that -- this policy says.  But
9  if you're asking for other guidance, that might help the
10  chief make that decision.  I think the state law, as far
11  as the various levels of criminal mischief, would be
12  something that they would consider.  So that wouldn't be
13  the only thing that would make that decision -- that
14  would -- that would elevate it to serious property
15  damage.  But I -- I would -- if you're asking for other
16  things to consider, that would be one thing that I would
17  consider.
18    Q.  Okay.  Okay.  The last two are, "To prevent
19  arson or when there's the presence of gunfire within the
20  crowd," right?
21    A.  Yes.
22    Q.  Okay.  Now jumping down, we talked about this
23  next sentence already.  So I'm going to move to the next
24  paragraph.  And it reads, "The only exception to this
25  mandate will be emergency situations where immediate

Page 155

1  action is required, and it is impractical for the ground
2  commander to wait for permission."  Do you see that?
3    A.  Yes.
4    Q.  What is the mandate that's referenced here
5  mean?
6    A.  The policy above.
7    Q.  Does it -- so it's the -- all of the policy
8  above?
9    A.  I mean, the requirement of the authorization
10  of the chief of police.
11    Q.  Okay.  So it's an exception to the requirement
12  of the chief's approval?
13    A.  Yes.
14    Q.  Is it an exception to the requirement that one
15  of these five bullet points be met?
16    A.  No, not necessarily.
17    Q.  Okay.  So if an officer determines that one of
18  these five bullet points is met, they could use chemical
19  agents; is that right?
20    A.  No, that -- that is -- and that -- so if we
21  read the rest of this paragraph that we're talking
22  about.  So, "Emergency situations where immediate action
23  is required and it's not practical for the ground
24  commander to wait for the permission from the chief."
25  They do give examples here.  Yes.  "Active" -- "active

Page 156

1  gunfire that is coming from a crowd when officers or
2  persons are actively being physically assaulted, and the
3  immediate use is required to protect officers and
4  others."
5    Q.  So can you give me an -- can you explain to me
6  the difference between active gunfire as used in this
7  sentence and then the presence of gunfire as used in
8  these bullet points?
9    A.  Right.  So active gunfire is continuous.  It's
10  -- it is happening now.  Presence of gunfire could --
11  could -- could be in -- in the past.  So -- but I'm
12  assessing a crowd now and there -- there's active
13  gunfire coming from the crowd.  I need to disperse this
14  crowd now.  These -- these -- these are examples of
15  exigent circumstances.  These are deadly force
16  situations that an officer could articulate the reason
17  for -- to not wait for permission from the chief of
18  police.
19       Again, they are going -- it goes on to say
20  that, "Commanders ordering the chemical agent deployment
21  will be held strictly accountable for any actions taken
22  based on this."  So they are going to have to articulate
23  the reasoning why.
24    Q.  Understood.  Understood.  Okay.  So if I'm
25  understanding correctly, active gunfire means the

Page 157

1  gunfire is ongoing right now?
2    A.  I mean, yes, it's active.  It's -- I mean, it
3  is actively occurring right now.
4    Q.  Okay.  And by contrast, the presence of
5  gunfire, it means that there was gunfire at some point
6  previously, but not currently?
7    A.  I mean, you could interpret it that way.
8    Q.  I'm sorry, the end of that cut off for me.
9    A.  Yes.  I mean -- yes.
10    Q.  Okay.
11    A.  There -- there -- there has been the presence
12  of gunfire within the crowd.
13    Q.  Okay.  Okay.  So when there was the presence
14  of gunfire at some point in the past, but it's not
15  currently ongoing, the chief can authorize the use of
16  tear gas, but an officer can't decide to use it on their
17  own?
18    A.  Yes.  And maybe the gunfire has subsided.  It
19  is not actively occurring right now.
20    Q.  Okay.  And I guess same question with respect
21  to actively being physically assaulted.  What does that
22  mean?
23    A.  They're actively being physically assaulted.
24  The assault is occurring now and based on guidance from
25  our use of force policy, we need to use force to end

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 43 of 85 PageID
#2701
The Deposition of EMILY MCKINLEY, taken on June 18, 2024
30(b)(6)                                                                    158..161

Page 158

2      Q.   Okay.  And would that -- I guess -- so that
3   means the physical assault is happening right now in the
4   moment?
5      A.   They're actively being physically assaulted,
6   yes.
7      Q.   Okay.
8      A.   And we -- and the immediate use of chemical
9   agents are required to protect officers and others.
10      Q.   Right.  So by contrast earlier, when it says,
11   "An individual or" -- "is acting with intent to cause
12   injury, e.g., physical assault," that refers to
13   situations where it's not currently ongoing?
14      A.   It's -- they're acting with the intent to
15   cause injury.  So it is not -- they're not actively
16   being physically assaulted.
17      Q.   Okay.  Okay.  Okay.  So just so that I have
18   this clear, like, an example would be active physical
19   assault, is that there's a fight going on in the crowd
20   right now.  In that situation, an officer could choose
21   to use a chemical agent for the safety of people in the
22   crowd?
23      A.   Again, I -- I would need to know more about
24   the physical assault that -- that is occurring, the
25   fight that is occurring.  How many people are involved,

Page 159

1   what weapons are being used, the size of the crowd. Are
2   people dispersing?  There -- there's a -- there are a
3   lot of factors but given a -- a -- a scenario, then you
4   could elect to do that.
5      Q.   Okay.
6      A.   All the factors.  Again, you're -- you are
7   going to have to articulate why that -- that was done.
8      Q.   Understood.  And by contrast, if the fight's
9   not ongoing, but people are balling up their fists in
10   the crowd, then that would be a scenario covered above
11   where the chief could authorize these of a chemical
12   agent, but a commanding officer couldn't independently
13   choose to do so?
14      A.   Yes.  Again, on that scenario, I mean, like
15   I've reiterated several times, the chief would have to
16   take in the totality of the circumstances.  So it's not
17   just there's people in the crowd balling their fists at
18   each other.  So I just want to make that clear that
19   there are an infinite number of factors to consider when
20   making that decision.
21      Q.   And again, just -- I guess to make sure we're
22   on the same page, are there any written guidelines or
23   other guidance for either the chief in authorizing the
24   use of chemical agents or ground commanders in
25   determining to use chemical agents, what factors they

Page 160

1   should we be considering?
2      A.   I mean, we -- we have our policy -- we have
3   our use of force policy.  Those are -- that -- that is
4   the guidance that our department has to make those
5   decisions.
6      Q.   Okay.  Anything else?
7      A.   No.  We operate based on our policy and law.
8      Q.   Okay.  So just moving down now to the
9   second to last paragraph here.  You see the sentence
10   starting with, "Special Impact Munition Systems"?
11      A.   Yes.
12      Q.   Now, this says -- actually, would you mind
13   just reading this one?
14      A.   Sure.  "Special Impact Munition Systems must
15   be used in accordance with 9.1.11.  SIMS may not be used
16   in a crowd dispersal capacity.  They should only be used
17   to target individuals who are displaying active
18   aggression."
19      Q.   So could you just tell me what this -- or what
20   this paragraph means?
21      A.   Sure.  So when we were talking about the use
22   of force policy, we talked about impact weapons.  And I
23   know I discussed the baton, and you brought up the
24   impact weapon, the -- in this capacity, the Special
25   Impact Munition System.  We talked about how impact

Page 161

1   weapons were to be used when -- for individuals, because
2   it is a more individual-based tool.  And it's -- it is
3   reiterating to officers and commanders that this tool is
4   not to be used to disperse crowds.  It is used for
5   individuals.
6      Q.   Okay.  So in contrast to the chemical agents
7   discussed earlier, SIMS should be targeting individuals?
8      A.   Yes.  SIMS are not chemical agents.
9      Q.   And this -- there's a reference here to active
10   aggression again at the end.  Do you see that?
11      A.   Yes.
12      Q.   I'll represent to you -- I don't believe that
13   12.6 has a separate definition section that includes
14   active aggression.  Does this use the same definition of
15   active aggression that's in the use of force policy?
16      A.   Yes.
17      Q.   Okay.  So if SIMS can only be used on people
18   who are displaying active aggression, could you just
19   talk me through how the restrictions on SIMS are
20   different than the restrictions on chemical agents under
21   this policy?
22      A.   Well, SIMS are impact munitions.  So it is a
23   device for impact that is for an -- it's to target an
24   individual.  Whereas a chemical agent is dispersed.  In
25   -- in this policy, it is talking about using a chemical

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 44 of 85 PageID
#: 2702
The Deposition of EMILY MCCARTHY, taken on June 18, 2024
30(b)(6)                                                          162..165

Page 162

1   agent in a dispersal method to disperse a crowd or to
2   move a crowd.  You can't necessarily move a crowd if --
3   if the tool -- it -- it's just one -- it -- it -- it can
4   only target one person.  So it's -- SIMS is for the
5   targeting of -- of individuals who are displaying active
6   aggression and not a crowd.
7       Q.   So why has the city decided that SIMS may not
8   be used in a crowd dispersal capacity?
9       A.   You cannot impact a crowd with a SIM munition
10  round.
11      Q.   So it's just from, like, an efficacy
12  perspective, it's less effective at crowd dispersal?
13      A.   Yes.  You are going to -- you are going to hit
14  one person when you -- using that.
15      Q.   Okay.
16      A.   So you're not -- you can't hit multiple people
17  with that.
18      Q.   Okay.  All right.  So the final paragraph on
19  this page starts with, "Long-range acoustic devices." Do
20  you see that?
21      A.   Yes.
22      Q.   And would you mind just reading that for me
23  real quick?
24      A.   Sure.  "Long-range acoustic devices will only
25  be used to give directions and make announcements to the

Page 163

1   crowd, unless the commanding officer can articulate why
2   it needs to be used in lieu of a different type of
3   force.  The manufacturer's recommendations for safe
4   deployment and special unit guidelines should be
5   followed for the use of -- of LRADs in order to minimize
6   the risk of injury."
7       Q.   So what are acceptable reasons why an LRAD
8   would need to be used in lieu of a different type of
9   force?
10      A.   I don't know what was --
11      MR. PAUL:  Can you hear us?  It -- we just got
12   a notification that our internet is unstable.  Is
13   there a question pending, or did we miss anything?
14      MR. CHANDRAN:  Oh, I think if the court
15   reporter could read back the last question, maybe
16   that's the only one that I think is missing.
17      THE REPORTER:  Sure.  Just a moment.
18      MR. CHANDRAN:  Thank you.  And also, Bruce, if
19   you need a couple minutes to check out the internet
20   situation, we can break.  I'm almost done with this
21   section.  I only got like a couple questions left,
22   but if you --
23      MR. PAUL:  No, that's fine.  We can finish
24   this out.  I just -- we didn't -- she answered, and
25   I don't know if you heard her answer, and I don't

Page 164

1   know if you asked a question after all.
2       MR. CHANDRAN:  No, I don't think I heard the
3   answer to the last question I asked.  Sorry about
4   that.
5       MR. PAUL:  Just said that it was -- just
6   repeat.
7       THE WITNESS:  Yeah, I just read it.
8       MR. PAUL:  Or the last thing she said was she
9   just read that last paragraph.
10      MR. CHANDRAN:  Oh, I see.  Okay.  And,
11   Alannah, would you mind just reading back what the
12   last question is when you have a minute?
13      THE REPORTER:  Sure.  Sure.  I'm sorry.  I'm
14   trying to listen to you guys, but I also need the -
15   - to read it back.  So just a moment.
16      (REPORTER READS BACK REQUESTED QUESTION)
17      THE WITNESS:  Is that -- that's the question?
18      MR. CHANDRAN:  Yes.
19      THE REPORTER:  That's the question.
20      THE WITNESS:  Okay.  There is the -- the
21   capability for LRADs to produce sound that could --
22   that would cause it -- the area to be uncomfortable
23   for people to be in, which could be used for a
24   crowd dispersal.  So, again, the commanding officer
25   on the scene is going to make that decision based

Page 165

1   on the totality of the circumstances.  And, again,
2   we are always trying to use the lowest amount of
3   force reasonable to attain the outcome.
4   BY MR. CHANDRAN:
5       Q.   Right.  And I guess what I'm trying to ask is,
6   here it says that an LRAD can be used, not just to give
7   directions or make announcements, if the commanding
8   officer can articulate why it needs to be used in lieu
9   of a different kind of force.  So, for example, what
10  would be a situation where using an LRAD to create that
11  high-pitch noise would be necessary over using another
12  type of force?
13      A.   I mean, again, you would need to look at the
14   totality of the circumstance.  If you're trying to
15   minimize injury, this could be an option that would be
16   at commander's, I guess, disposal if they would like to
17   elect to use that.  Again, they're going to need to
18   articulate why in lieu of whether that be chemical
19   agent, or some sort of -- if we're -- if -- if there are
20   individuals that are displaying active aggression that
21   need to be dispersed, that instead of using Special
22   Impact Munition systems that cause significant injury,
23   that this could be an option to minimize injury.
24      Q.   Does the city consider an LRAD a lower level
25  of force than SIMs?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 45 of 85 PageID
#: 2703
The Deposition of EMILY MCKINLEY, taken on June 18, 2024
30(b)(6)                                                                      166..169

Page 166

1    A.   Yes.  Producing sound versus striking an
2  individual, I would consider that a lower level use of
3  force.
4    Q.   Does the City consider an LRAD a lower level
5  of force than a chemical agent?
6    A.   It could be.  You would need to -- to look at
7  the totality of the circumstances of -- as far as when
8  you're going to use that, or why you're going to -- to
9  use that.
10    Q.   Okay.  So if I'm understanding correctly, an
11  LRAD is categorically a lower level of force than a
12  SIMs, and it could be a lower level of force than a
13  chemical agent, but not always; is that right?
14    A.   Correct.
15    Q.   Okay.  And this last question on this, how
16  does a commanding officer articulate this need to use an
17  LRAD for crowd disbursing?
18    A.   Again, it -- that -- that is going to be -- be
19  determined based on the totality of the circumstances.
20  So again, the infinite number of factors that could be
21  presented in a particular situation, the officers are
22  always going to consider -- and commanding officers are
23  always going to consider the severity of the crime, the
24  immediacy of threat, the resistance level, the flight of
25  -- of -- of any subjects that are potentially under

Page 167

1  arrest.  So that -- that -- those are all things that
2  are being taken into consideration along with all the
3  infinite number of factors that could be in any
4  situation.  The officer -- the commanding officer's
5  going to need to articulate all of those things.
6    Q.   And just from a procedure perspective, how
7  does that articulation go?  Does the commanding officer
8  fill out a form, do they report to somebody?  What
9  happens?
10    A.   When there's any use of force, there is a -- a
11  report that is taken, which is more than just a form.
12  It's a -- it's a -- a narrative.  There's a
13  documentation of injuries, and the officers involved.
14  And articulations of -- of the situation, and why
15  decisions were made.  And that is reviewed through the
16  chain of command on any use of force.
17    Q.   Okay.  So that's not specific to LRADs.  Any
18  use of force would require the same articulation of why
19  they use that force?
20    A.   Use of -- yes.  When officers use force, there
21  is a report that is taken for every use of force and
22  sent up through the chain of command.
23    MR. CHANDRAN:  Okay.  I think I am done with
24    this document -- or this part.  So maybe we can
25    take like a ten, 15-minute break?

Page 168

1    THE WITNESS:  Yes.
2    MR. PAUL:  Sounds good.
3    THE REPORTER:  Just a moment.
4    (OFF THE RECORD)
5    THE REPORTER:  We are back on the record.  It
6  is 4:07 p.m.  You may proceed.
7  BY MR. CHANDRAN:
8    Q.   Okay.  Welcome back, Chief McKinley.  Once
9  again, thank you for your patience.  I know it's been a
10  long day.  So I'd like to -- or I guess before we move
11  on from this, is there any aspect of your testimony from
12  this afternoon that you'd like to amend, or correct, or
13  revise in any way?
14    A.   Not necessarily in a -- a correction, but
15  during the break, I refreshed my recollection on the --
16  the SRT training list.  And in 2023, there was specific
17  training on less lethal and pepper ball systems that
18  included legal training, training on policy, and then
19  training on practical exercises.  And I just wanted to
20  make sure that you were aware of that training for our
21  special response team.
22    Q.   Thank you for informing me.  Has that training
23  -- or well, were any documents, such as PowerPoints or
24  handouts, used at that training?
25    A.   I -- I do not know that.  I just know that

Page 169

1  that was one of the training topics that I previously
2  discussed.
3    Q.   Okay.  So that was one of the trainings that
4  was on that list of trainings?
5    A.   Yes.
6    Q.   Okay.  Did you review any documents from that
7  training?
8    A.   No.
9    Q.   Okay.  Do you know whether any documents exist
10  from that training?
11    A.   I don't know.
12    Q.   Okay.  Okay.  Thank you very much.  Okay.  I'd
13  like to now move up to another portion of 12.6.  This is
14  12.6.4.  I'll share my screen again.  Chief, can you see
15  this screen that I've shared?
16    A.   Yes.
17    Q.   Okay.  I'll try to max it out.
18    MR. PAUL:  Can you share --
19    MR. CHANDRAN:  Yeah?
20    MR. PAUL:  I'm sorry.  Before you get started,
21    can you share that in the chat?
22    MR. CHANDRAN:  Oh, I believe it's -- the one I
23    shared in the chat is all of 12.6.  So it's the
24    same --
25    MR. PAUL:  Oh, it's --



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 170

```
 1          MR. CHANDRAN: -- exhibit.
 2          MR. PAUL:  I apologize.  You're good.
 3          MR. CHANDRAN:  No, thank you.
 4   BY MR. CHANDRAN:
 5      Q.   Okay.  So, Chief, 12.6.4 is titled Procedures.
 6   Do you see that?
 7      A.   Yes.
 8      Q.   What does this provision of the policy
 9   discuss?
10      A.   This provision of this policy really just
11   discusses and guides officers on how to respond to a
12   report of any sort of civil disturbance, or disorderly
13   crowd, what to do, what -- in that response, how to
14   assess, what to communicate, how to take in the totality
15   of the circumstances that would be presented to them.
16      Q.   So this is the procedures for responding to a
17   civil disturbance or a disorderly crowd?
18      A.   Yes.
19      Q.   Okay.  And I wanted to ask you about a couple
20   portions of this.  So it's a little bit of a longer one.
21   So I'm going to be jumping around a little bit, but I'll
22   direct you to the sentence as I'm asking that, okay?
23   Let me scroll down to the second page here.  And this
24   first sentence, the first complete sentence on the
25   second page reads, "The commanding officer is
```

Page 171

```
 1   responsible for determining and coordinating the
 2   enforcement action to respond to the incident."  Do you
 3   see that?
 4      A.   Yes.
 5      Q.   Who is the commanding officer as contemplated
 6   in this policy?
 7      A.   Whomever the highest ranking officer would be
 8   on the scene.  So -- and I mean, it -- we skipped a -- a
 9   large section of policy, but it talks about what -- how
10   -- what to communicate to the commanding officer, and
11   after the commanding officer arrives on-scene.  So this
12   could be a sergeant, could be a lieutenant, could be a
13   major depending on who the commanding officer is that
14   arrives on scene.
15      Q.   Okay.  So it's just whoever's the highest
16   ranking person on the ground?
17      A.   Yes.
18      Q.   Okay.  Okay.  And then the next sentence
19   reads, "The commanding officer will continually assess
20   and reasses the situation for the necessity of
21   intervention, or opportunities to disengage."  Do you
22   see that?
23      A.   Yes.
24      Q.   Okay.  And then, the final sentence of this
25   paragraph says, "Commanding officers may utilize
```

Page 172

```
 1   enforcement options including, but not limited to, the
 2   following."  Do you see that?
 3      A.   Yes.
 4      Q.   And then there's a list of five bullet points,
 5   right?
 6      A.   Yes.
 7      Q.   And what are these bullet points referring to?
 8      A.   These were various enforcement options that
 9   the commanding officer could utilize.
10      Q.   And just so that we're on the same page, it's
11   options that a commanding officer could utilize in
12   responding to a civil disturbance, or a disorderly
13   crowd?
14      A.   Yes.
15      Q.   Okay.  And just to walk through these, the
16   first one is the issuance of formal orders to disperse,
17   utilizing public address equipment in order for the
18   notification to be heard by all crowd leaders and
19   members, and says refer to SOP 12.29.  Do you see that?
20      A.   Yes.
21      Q.   Okay.  What does this mean?
22      A.   So 12.29 is -- is the policy on dispersal
23   order.  So the commanding officer, after they assess the
24   situation, to -- would make the decision to issue an
25   order to disperse if the crowd is disorderly, they would
```

Page 173

```
 1   utilize public address equipment.  That could include a
 2   PA system within a police vehicle, a bullhorn, or it
 3   could be an LRAD.
 4      Q.   All right.  So that's one of the options that
 5   a commanding officer has for the crowd is disorderly,
 6   they can issue an order to disperse following 12.29?
 7      A.   Yes.
 8      Q.   Okay.  The next bullet point reads, "The use
 9   of tactical maneuvers and other crowd management
10   formations to promote a dispersal of those who are
11   acting in violation of the law."  Do you see that?
12      A.   Yes.
13      Q.   What does that mean?
14      A.   This could mean positioning of officers in --
15   in a line to -- as you're dispersing -- giving the
16   dispersal order, that you may position officers in some
17   sort of line formation in front of the crowd to manage
18   that crowd or control that crowd.  That would be one of
19   the -- an option here.  There could be other tactical
20   things that you may consider.  So getting personnel at
21   other vantage points to gather more intel, so that --
22   that -- those could be tactical maneuvers that you might
23   use to get more intel to -- to gather intel on how to
24   disperse a crowd.  That -- that would be an example
25   there.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of EMILY MCCAULEY, taken on June 18, 2024

30(b)(6)                                                                    174..177

Page 174

1       Q.   I think you mentioned using certain
2   formations, like lining up, and then deploying personnel
3   for more intel.  Anything else that would fall into this
4   category of tactical maneuvers and other crowd
5   management formations?
6       A.   I mean, you could control, like, external
7   crowds.  If there's other people in the area that --
8   maybe we need to control traffic or -- or keep other
9   people, bystanders, from the area, if that is something
10  that we need to do to assist the crowd and -- you know,
11  managing some sort of egress route.  So these would all
12  be considerations that the supervisor might make on
13  scene as far as using formations to promote that.
14      Q.   Anything else?
15      A.   No.
16      Q.   Okay.  And when this bullet point says that,
17  "The maneuvers and formations can be used to promote a
18  dispersal of those who are acting in violation of the
19  law," how should commanding officers distinguish between
20  those who are acting in violation of the law and those
21  who are not?
22      A.   What do you -- what do you mean?
23      Q.   Sure.  So I believe, earlier, you testified
24  that in order to be a disorderly crowd, not everyone in
25  the crowd has to be behaving unlawfully, right?

Page 175

1       A.   Right.
2       Q.   So here, this language seems to say, "To
3   promote a dispersal of those who are acting in violation
4   of the law."  And I'm just asking how commanding
5   officers should make that distinction when considering
6   tactical maneuvers or crowd management formations?
7       A.   I mean, if -- if we can -- if there is a large
8   group of people who are violating the law by blocking
9   traffic, if I can use a formation or a tactical vantage
10  point or providing egress route to promote the dispersal
11  of them, that -- that would be an example there.
12      Q.   And so, is there an -- I guess how do
13  commanding officers distinguish between those who are
14  violating the law by, say, blocking traffic and those
15  who are not?
16      A.   I mean, the ones who are violating the law
17  blocking traffic would be the ones violating the law.  If
18  you are not participating in that, then you're not
19  violating the law.
20      Q.   Okay.  And I guess what I'm trying to get at
21  is, how should a commanding officer in considering
22  tactical maneuvers or crowd management formations treat
23  those two groups?
24      A.   I mean, I -- I guess I'm not understanding the
25  question.  If --

Page 176

1       Q.   Yeah, sure.  So --
2       A.   If you're violating the law, then -- then --
3   and there's a order to disperse because the crowd has
4   been deemed unlawful and -- and there's a lawful order
5   to disperse, then the crowd needs to disperse.
6       Q.   Okay.  So at that point, everyone becomes --
7   everyone is engaging in some unlawful conduct?
8       A.   If -- if there is a refusal to disperse, then
9   yes there -- I mean, you -- you could be in
10  consideration for violation of the law.  Again, there's
11  a lot of circumstances and totality and factors that
12  officers would need to consider when making those
13  determinations.
14      Q.   Okay.  Great.  And the next one is, "When
15  necessary, making arrests based on probable cause."  Do
16  you see that?
17      A.   Yes.
18      Q.   What does that mean?
19      A.   If there are arrests to be made based on
20  probable cause, utilizing enforcement options to make
21  those arrests, that would be an option available to
22  commanding officers.
23      Q.   Okay.  So the commanding officers could decide
24  to order people in the crowd arrested?
25      A.   Yes, they can use that option.

Page 177

1       Q.   Okay.  And then the next one here is, "The use
2   of chemical agents in a manner consistent with SOP 9.1."
3   Do you see that?
4       A.   Yes.
5       Q.   What does this mean?
6       A.   The commanding officer could make the decision
7   to use chemical agents in a manner consistent with 9.1.
8   Again, they would still need to comply with 12.6.5
9   regarding the use of chemical agents if it was to
10  disperse a crowd.  9.1 applies holistically to all of
11  that.
12      Q.   Sorry, go ahead.
13      A.   This doesn't, like -- this -- this could be
14  the use of chemical agents on an individual person
15  inconsistent with SOP 9.1.
16      Q.   I guess what I'm -- if this entire chapter
17  12.6 addresses crowd management, as we discussed
18  earlier, right, when would the -- this description of
19  use of chemical agents be on an individual and not on
20  the crowd?
21      A.   If there is an individual that is posing
22  active resistance during a crowd control incident, a
23  chemical agent can be used on that individual, and that
24  still could occur in a civil disturbance.
25      Q.   Okay.  And so, why does this bullet point not

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of EMILY McKINLEY, taken on June 18, 2024

Page 178

1  refer to 12.6.5?

2      A.   If it's -- if it -- if the chemical agent is
3  not being used for crowd control purposes to control a
4  crowd, if it's used for an individual within that crowd,
5  that could be when it could be applied here.

6      Q.   Okay.  So even though this is in the crowd
7  management section of the SOP, this sentence is
8  referring to an individual engaging in some -- or an
9  individual who would be subject of chemical agents?

10     A.   Correct.  Just like an arrest would be
11 individualized based on probable cause, just like the
12 use of special impact munitions consistent with 9.1
13 would be used on an individual basis.

14     Q.   Okay.  How has the city communicated to
15 officers that 9.1 governs the use of chemical agents
16 only in individualized situations while 12.6.5 governs
17 the use of chemical agents on crowds?

18     A.   The language within our policy, when policies
19 are revised, that language is delivered to the
20 department.  Officers have access to our policies.  In
21 addition, when the special response team is -- responds
22 to civil disturbance incidents, which that is the team
23 of officers that handle these types of situations, they
24 have readily available to them at their -- during their
25 callouts references to policy and law so that that -- it

Page 179

1  can guide their decisions.  So as they're in the field,
2  they -- they have these to refer to them.  So that's how
3  they're aware of these policies.

4      Q.   Is there anything beyond the language of the
5  policies that tells officers when to follow 9.1, when to
6  follow 12.6.5?

7      A.   No.  I mean, that -- that is the -- we operate
8  under our standard operating procedures.  So this is the
9  policy that officers are operating under.

10     Q.   Understood.  I guess I'm asking, is there any
11 other guidance or documents provided to officers on when
12 to use 9.1 or when to use 12.6.5?

13         MR. PAUL:  Object to form.

14         THE WITNESS:  There -- there is no difference
15     in -- in either one.  12.6.5 is when -- addresses
16     using crowd control devices, which are a number of
17     different things.  9.1 is our Use of Force Policy.
18     They all intertwine with each other.  They are not
19     -- they -- they are not necessarily separated.  Our
20     Use of Force Policy still applies into 12.6.5.
21     It's all applicable, all relevant to each other.

22 BY MR. CHANDRAN:

23     Q.   I understand.  I guess to make this a little
24 bit more concrete, I believe earlier you testified that
25 under 9.1 and the Use of Force graphic there, being

Page 180

1  around another person who's engaged in an act of
2  violence would not be considered any level of
3  resistance, right?

4          MR. PAUL:  Object to form.

5          THE WITNESS:  Are being around someone that is
6      engaged in a level of resistance?

7  BY MR. CHANDRAN:

8      Q.   Yeah.  I think we -- earlier, we were talking
9  about section 9.1, and we discussed a situation where an
10 individual is present and someone else is engaged in
11 violence?

12     A.   Yeah.  Right.

13     Q.   I believe you --

14     A.   We're talking about --

15     Q.   Sorry.  Go ahead.

16     A.   We're -- we're talking -- we're talking about
17 individuals there.  I -- I mean, 12.6.5 addresses a
18 crowd, so --

19     Q.   Right.  I'm just trying to remember.  I think
20 you said, in that situation, 9.1 would not permit the
21 use of force on the individual who's not engaged in
22 violence?

23     A.   Right.  And there's a lot of other factors
24 that you need to take into consideration.  Just simply
25 asking someone being around someone who is engaged in

Page 181

1  active resistance does not give enough context or
2  information to --you know, make that decision, as far as
3  if this is a -- a crowd that's demonstrating the -- the
4  factors that are necessary in 12.6.5 to deploy chemical
5  agents to control a crowd.

6      Q.   Right.  But I guess when we were talking about
7  12.6.5, you mentioned that it doesn't have to be that
8  everyone in the crowd is engaged in an unlawful act
9  before a chemical agent can be used on the crowd, right?

10     A.   Correct.

11     Q.   So given that difference between when force is
12 justified under 12.6.5 and 9.1, how are officers told
13 when to follow which policy?

14     A.   12.6.5, if you are going to use chemical
15 agents for the dispersal of a crowd, that is at -- that
16 is at the chief's authority.  Officers are not making
17 that decision.  And the chief is assessing the totality
18 of all of those circumstances based on the factors that
19 are within those bullet points in 12.6.5.

20     Q.   And I guess beyond the language of the
21 policies, is that communicated to officers in any way?

22     A.   I think it's -- and it's within the policy
23 that -- I don't -- that is what's communicated to
24 officers is our policy, and how we operate and how they
25 are guided by our policy.  That is -- the standard

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:20-cv-00535-BJB-CHL     Document 215-6     Filed 01/10/25     Page 49 of 85 PageID
#: 2707
The Deposition of EMILY McKINLEY, taken on June 18, 2024

30(b)(6)                                                                                    182..185

Page 182

1  operating procedures is -- is the way to communicate
2  those procedures to officers.
3      Q.  Is there anything else other than the policy,
4  the standard operating procedures?
5      A.  Just -- I mean, I know we discussed earlier
6  different forms of training, but -- you know, and then -
7  - you know, prior to the -- the -- the -- prior to the
8  change in the policy which happened, I think, in 2020,
9  as far as requiring the chief's -- chief's authorization
10  of chemical agents, it was a commanding officer.
11      And so, officers never had the authority to
12  make that decision in the first place.  It is a -- it is
13  commonly known throughout the department that if -- if
14  you are using chemical agents that is to disperse a
15  crowd, that is that very high-level decision.  And so,
16  the policy reflects how we operate.  And so, that is how
17  that's communicated to officers.  And our policy now
18  requires the authority of the chief of police.
19      Q.  I understand.  And just because you mentioned
20  trainings, did anything on the list of trainings, topics
21  that you received, reference how to navigate these two
22  policies?
23      A.  How to -- how -- I'm sorry?
24      Q.  Sorry.  Did anything in the training topics
25  that you received discuss how to navigate these two

Page 183

1  policies and how they interact -- intersect?
2      A.  Not that -- that I can recall.  I -- I -- I do
3  know that they have reference -- they have references to
4  the policies readily available to them at their
5  callouts.
6      Q.  Right.  Okay.  So officers have access to the
7  SOPs.  And I'm just trying to figure out if there are
8  any other documents beyond those?  To your knowledge,
9  any other --
10      A.  No.  So this -- to my knowledge, this -- the -
11  - the policy is -- is what we operate from.  The
12  language in our policy is -- is what officers are
13  operating from.
14      Q.  Okay.  So the city has provided no other
15  written guidance to officers on how to read these two
16  overlapping policies?
17      MR. PAUL:  Object to the characterization.  She
18  said the date.  Just object to the
19  characterization.
20  BY MR. CHANDRAN:
21      Q.  You can answer.
22      A.  The policy explains the difference.  12.6.5
23  clearly explains when the use of chemical agents for
24  crowd control is permitted.
25      Q.  Okay.  Okay.  Scrolling down to the next --

Page 184

1  the final bullet point here is the use of special impact
2  munition systems, SIMS, in a manner consistent with SOP
3  9.1.  Do you see that?
4      A.  Yes.
5      Q.  Same question.  Why did the city not include a
6  reference to 12.6.5 in this bullet point?
7      A.  Well, 12.6.5, when it talks about special
8  impact munition systems -- in 12.6.5, it -- it is
9  clarifying for officers that this is in no way -- way to
10  be used for crowd dispersal mechanism.  This is -- this
11  is an individualized target tool.
12      So in 12.6.5, that is what -- that -- it --
13  it's explaining that SIMS cannot be used for crowd
14  control, that it is only to be used for individuals --
15  targeted individuals.  And so, that -- that's why that's
16  in 12.6.5.  And then that's why that's here to say, this
17  is -- this is an option for commanding officers to use,
18  including but not limited to.  So yes, SIMS is a -- is
19  an option for commanding officers and officers.
20      Q.  Then I guess given the restrictions that SIMS
21  can't be used for crowd dispersal, wouldn't it be
22  important to include a reference to 12.6.5's
23  restrictions here in the procedures for crowd
24  management?
25      MR. PAUL:  Object to form.

Page 185

1      THE WITNESS:  12.6.5 is -- is the -- the
2  following policy.  I mean, it's -- it is in this --
3  the same chapter.  SIMS is a use of force, and we
4  use that inconsistent in -- in -- in a manner
5  consistent with our Use of Force Policy.  That is
6  what that's explaining here.
7  BY MR. CHANDRAN:
8      Q.  Right.
9      A.  In 12.6.5, it's just simply explaining that it
10  should not be used for a crowd dispersal tool.
11      Q.  Does anything --
12      A.  Or device.
13      Q.  I'm sorry.  Go ahead.  What was that?
14      A.  I think it's called a device.  Not a tool, a
15  device.  Crowd control device, but --
16      Q.  Sure.  Does anything in SOP 9.1 say SIMS
17  cannot be used for crowd dispersal?
18      A.  I would need to go back and -- and see if that
19  language is in 9.1 under the SIMS policy, but I'm not
20  sure.
21      Q.  We can do that.  Here.  You can just take a
22  look at this.  You don't have to read it all out loud,
23  but you can take a review.  I'll scroll down just to
24  show you that there's not more on the SIMS section.
25      A.  Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of EMILY MCKINLEY, taken on June 18, 2024

30(b)(6)                                                              186..189

Page 186

1    Q.   So is there any reference in this to the
2    restriction that SIMS should not be used for crowd
3    dispersal?
4    A.   There is not.
5    Q.   So would it be possible to use a SIMS in a
6    manner consistent with 9.1, but inconsistent with
7    12.6.5?
8         MR. PAUL:  Object to form.
9         THE WITNESS:  You use it according to 9.1.
10   BY MR. CHANDRAN:
11   Q.   Even in a civil disturbance or disorderly
12   crowd scenario?
13        MR. PAUL:  Object to form.  Mischaracterizes
14   her testimony and the policy.  You can move on --
15        MR. CHANDRAN:  I'm asking the witness for her
16   answer, not yours, Bruce.
17        MR. PAUL:  Sorry?
18        MR. CHANDRAN:  I'm asking the witness to
19   answer.  The speaking objections are getting a
20   little bit excessive.
21        MR. PAUL:  I will keep saying them when you
22   keep asking the same question over and over again,
23   Ashok.
24        MR. CHANDRAN:  You can state a form objection,
25   and that's kind of it.

Page 187

1         MR. PAUL:  No.  I'll keep objecting as I have.
2    BY MR. CHANDRAN:
3    Q.   You can answer, Chief.
4    A.   Again, 12.6.4 allows officers to use special
5    impact munition systems in a manner consistent with
6    9.1.
7    Q.   Right.  And 9.1 doesn't have a restriction on
8    SIMS for a crowd dispersal, right?
9         MR. PAUL:  Objection.  Mischaracterizes the
10   policy.
11        THE WITNESS:  9.1 does not have that.  12.6.5
12   addresses crowd dispersal, and it does have -- it
13   does mention that in there.
14   BY MR. CHANDRAN:
15   Q.   Right.  But 12.6.4 makes no reference to
16   12.6.5, right?
17        MR. PAUL:  Objection, again.
18        MR. CHANDRAN:  What's the basis of your
19   objection, Bruce?
20        MR. PAUL:  Form.  And you continue to say the
21   same thing over and over again, and she has
22   answered it multiple times now.
23        MR. CHANDRAN:  The question was simply whether
24   12.6.4 makes a reference to 12.6.5, which has not
25   been asked.

Page 188

1    BY MR. CHANDRAN:
2    Q.   Chief, you can answer.
3         MR. PAUL:  Oh, well, yes, she has answered
4    that.  She has answered that.  And I bet we can go
5    back into the testimony evidence --
6         MR. CHANDRAN:  I'm not asking you.
7    BY MR. CHANDRAN:
8    Q.   Chief, you can answer.
9         MR. PAUL:  -- about ten minutes ago, Ashok.
10   BY MR. CHANDRAN:
11   Q.   Chief, you can answer.
12   A.   Again, the use of special impact munition
13   systems should be consistent in a manner with SOP 9.1.
14   12.6.4 addresses procedures in response to these
15   incidents, 12.6.5 addresses crowd control dispersal
16   techniques, and -- and addresses why you -- why and when
17   you cannot use SIMS.
18   Q.   And, Chief, I'm just asking about 12.6.4.  It's
19   a yes or no question.
20   A.   Okay.
21   Q.   Does 12.6.4 make reference to 12.6.5?
22   A.   No.
23   Q.   Okay.  Thank you.  Why did the city not
24   include references to 12.6.5 in 12.6.4 in drafting this
25   policy?

Page 189

1    A.   12.6.5 is a part of the same chapter.  It is
2    immediately following 12.6.4.
3    Q.   Okay.  Okay.  So the last things I want to ask
4    you about on here is this one that reads -- sorry.
5    "Officers will attempt to disperse the crowd with a
6    dispersal order if the incident is minor and resources
7    permit.  Refer to SOP 12.29."  Do you see that?
8    A.   Yes.
9    Q.   What does it mean here for an incident to be
10   minor?
11   A.   If -- if there is no imminent threat.  If --
12   if -- if an officer can disperse the -- the crowd,
13   there's no imminent threat to anyone.
14   Q.   So if there's no imminent threat to a person?
15   A.   If there's no imminent threat the -- and we
16   can disperse the crowd, an officer can attempt to do
17   that.
18   Q.   What else would make an incident minor, as
19   defined in this policy?
20   A.   If there's no destruction of property, there's
21   no -- the crowd seems to be compliant with the officers
22   upon their -- their arrival, that could be a minor
23   incident.
24   Q.   So if a crowd is compliant, officers can
25   attempt to disperse the crowd with a dispersal order?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 51 of 85 PageID
#: 2709
The Deposition of EMILY MCKINLEY, taken on June 18, 2024
30(b)(6)                                                                                    190..193

Page 190

1    A.   Yes.  If I'm -- yes.
2    Q.   If an incident is not minor, do officers still
3  need to attempt a dispersal order?
4    A.   Yes.  There needs to be a -- a dispersal order
5  given.
6    Q.   Okay.  So whether the incident is minor or
7  not, there should be a dispersal order?
8    A.   Yes.
9    Q.   Okay.  So why does -- I guess, why does this
10  policy say, "Officers will attempt to disperse the crowd
11  with a disperse order if the incident is minor"?
12    A.   All right.  So we're reading one sentence out
13  of a large -- very large policy section.  So -- you
14  know, if -- if -- if there's a small crowd, if -- if we
15  need -- if it doesn't -- it doesn't look like this is
16  going to require a lot of resources, the officers -- the
17  first responding officers can attempt to disperse the
18  crowd with the dispersal order.  That -- that is all
19  that that sentence is -- is saying.
20    Q.   And I guess I'm trying to understand the flip
21  side.  Like if the incident is not minor, is there no
22  need to try a dispersal order?
23    MR. PAUL:  Object to form.
24    THE WITNESS:  No.  I said earlier, yes, we --
25    there would be a need to attempt to give a

Page 191

1  dispersal order.
2  BY MR. CHANDRAN:
3    Q.   Okay.  So regardless of the scenario?
4    MR. PAUL:  Object to form.  I have no idea
5    what you just said.
6  BY MR. CHANDRAN:
7    Q.   I said regardless of the scenario.
8    MR. PAUL:  Object to form.
9    THE WITNESS:  It -- the -- the -- the scenario
10    is -- is always going to be taken into
11    consideration of -- of how officers are going to --
12    going to respond.  There could be exigency, and
13    there could be some sort of immediacy of -- of
14    threat.  Again, officers are going to take into all
15    the fact -- take all the factors that are presented
16    to them in that situation to make a determination
17    of -- of what needs to happen next.
18  BY MR. CHANDRAN:
19    Q.   Okay.  So if there is an exigency, there
20  wouldn't need to be a dispersal order?
21    A.   I mean, if there's an exigency and we're
22  talking about human life, and we don't -- we do not have
23  time to give a dispersal order, then we need to act
24  then.  So there could be a time where that -- that could
25  happen.  Again, there -- there -- there is an infinite

Page 192

1  number of scenarios that could be presented to officers.
2  But at the minimum -- you know, if -- if -- if you can,
3  that is all this sentence is saying, is that officers
4  will attempt to disperse the crowd if -- if the incident
5  is minor and -- and resources permit that.
6    Q.   So what other kinds of exigencies would
7  justify not attempting a dispersal order?
8    A.   I mean --
9    Q.   You mean human life as one?
10    A.   Yeah.  I mean, just safety -- safety risks to
11  officers, to the public, to -- to citizens, to people
12  within the crowd.  There could be times where you -- you
13  -- you do not have time to give a dispersal order, but
14  there needs to be some sort of action taken to mitigate
15  that risk of safety.
16    Q.   Well, can you just explain safety risks a
17  little more?  What kind of safety risks?
18    A.   If there's -- if -- if there is gunfire in the
19  crowd and officers do not have time to give a dispersal
20  order and they need to act, that -- that could be a
21  safety risk.  If there is active arson that is occurring
22  within the crowd, that could be a safety risk.  Again,
23  all of those things are going to be dependent on a lot
24  of factors that an officer is continually assessing and
25  evaluating and assessing what the response should be.

Page 193

1    Q.   Okay.  I think you mentioned human life,
2  gunfire, active arson.  Anything else?
3    A.   I mean, those are just some examples.  I
4  mean --
5    Q.   Okay.  And then the final thing on this, it
6  says, "If the incident is minor and resources permit."
7  What does it mean, "if resources permit"?
8    A.   Availability of officers, the number of
9  officers there, if the officer has the ability or the
10  resources to provide the dispersal order, if they have a
11  PA system or -- or some sort of system to provide that
12  dispersal order.  Do they need to wait for other
13  officers respond?  Those are all things that could be
14  resources that could permit the officer or allow the
15  officer to give that order.
16    Q.   Okay.  And so, when you say availability of
17  officers, can you explain that a little bit?
18    A.   I mean, this could be the first officer on
19  scene of a disorderly crowd.  And if you're waiting for
20  additional officers to respond for backup, or
21  assistance, or to help direct the crowd with some sort
22  of egress, you may want to wait until you have
23  additional resources before you provide that dispersal
24  order.
25    Q.   Okay.  That makes sense.  You want more

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:20-cv-00535-BJB-CHL       Document 215-6       Filed 01/10/25       Page 52 of 85 PageID
#: 2710
The Deposition of EMILY McKINLEY, taken on June 18, 2024
30(b)(6)                                                                      194..197

Page 194

1  officers to be present before you issue a dispersal
2  order?
3       A.   Yes, that would -- I mean, officers need to --
4  to have resources available to them, so --
5       MR. CHANDRAN:  Okay.  Great.  I think I'm
6  coming up on the end here.  So do you want to take
7  like five minutes?  I've got just one or two more
8  topics and that are relatively short.
9       THE WITNESS:  Okay.
10      MR. CHANDRAN:  Come back at 4:50?
11      THE REPORTER:  Sounds good.  I'll get us off
12 the record.
13           (OFF THE RECORD)
14      THE REPORTER:  Okay.  We are back on the
15 record.  It is 4:54 p.m.  You may proceed.
16 BY MR. CHANDRAN:
17      Q.   Thank you.  Chief McKinley, I promise we're in
18 the last section of this, so I think we should be done
19 soon.  I just want to talk a little bit about the
20 process and timing for how these two chapters of the
21 SOPs were amended.  I think earlier when we were talking
22 about SOP 9.1, we looked at the revised date, which was
23 September 19, 2022.  Do you remember that?
24      A.   Yes.
25      Q.   And I believe you testified that was the date

Page 195

1  of the last revision to Chapter 9.1, right?
2       A.   Yes.
3       Q.   Was that September 19, 2022 revision to 9.1
4  part of a scheduled review of the SOPs, or was it -- you
5  know, like a periodic reassessment or anything?
6       A.   I don't know.
7       Q.   Who first proposed that Chapter 9.1 be revised
8  in 2022?
9       A.   I don't know.  If I recall, I believe -- and I
10 would need to refer back to some notes.  So I'm going by
11 memory right now.  But if I recall, some of the
12 additional language or the new language to that policy
13 from that revision was based off of some ordinance
14 language.  And so, if -- if there was a new ordinance
15 that included some use of force language, that would
16 have -- could have spurred a revision of that policy.  I
17 was not personally involved in that process of
18 initiating that.  So I do not remember or know what
19 spurred that.  But if I remember correctly, some of the
20 additional language was from some ordinance language.
21      Q.   In preparing for today's deposition, did you
22 talk to anybody who was involved in that revision
23 process?
24      A.   Not about that revision.  No.
25      Q.   Okay.  Did you review any documents about that

Page 196

1  revision process, like drafts, or e-mails, or anything
2  about what the amendments would be?
3       A.   So I did review, like I discussed, the -- the
4  revised document from that date and the document that I
5  reviewed had highlighted changes, what was the new --
6  what were the new changes.  And so, I did review those
7  new changes in our -- if I remember correctly, some of
8  those changes were referencing an ordinance that the
9  City had acquired.
10      Q.   Okay.  So you reviewed --
11      A.   If that makes sense to you.
12      Q.   Okay.  So I think I understand you reviewed a
13 document that had the changes themselves highlighted?
14      A.   Yes.  So I reviewed the previous draft and the
15 newest draft with the highlighted changes.  And if I
16 remember correctly, they were from a -- and some of the
17 -- some of the changed language were from ordinance.
18      Q.   So that would get to the substance of what the
19 changes between 2020 and 2022 were, right?
20      A.   Yes.
21      Q.   Did you review any documents about the process
22 for how those changes happened?
23      A.   I did not review documents of the process. I'm
24 familiar with the process of generally how policy
25 changes occur.

Page 197

1       Q.   And, I guess, do you have any information
2  about how these 2022 9.1 revisions happened?
3       A.   I do not have specific information of how that
4  occurred.
5       Q.   Okay.  And, I guess, the same questions with
6  respect to 12.6, which I'll represent to you had the
7  revised date of December 19, 2022.  Do you have any
8  information about the process by which the December 19,
9  2022 revisions to SOP 12.6 occurred?
10      A.   No, I have -- I do have the same and the
11 changes highlighted between the two policies.  So I do
12 have -- have those and I did review those.  As far as
13 the process of initiating those changes, I was not
14 personally involved in that.
15      Q.   Okay.  Did you ask anybody within LMPD about
16 the process by which these 2022 amendments to 9.1 and
17 12.6 took place?
18      A.   I did not ask anybody about the process in
19 which those amendments took place of the Chapter 12
20 policies.
21      Q.   And just to clarify, how about the Chapter 9
22 policies?
23      A.   No, I -- I did not ask anyone about the
24 process of those particular changes.  I'm just familiar
25 with how policy changes can happen within the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 198

1  department. And I do have the two drafts or the two --
2  not drafts, but the two documents with the highlighted
3  changes in the original or the previous.
4       Q.  Understood. Okay. Did you talk with anybody?
5  I think you mentioned for Chapter 9, there -- one of the
6  reasons for the edits was some new ordinance, right?
7       A.  Yes. I -- I remember a reference -- there
8  being a reference in the policy, the new policy, and
9  some ordinance language.
10      Q.  Okay. Do you remember any of the -- any other
11 reasons why Chapter 9.1 was changed?
12      A.  No, not -- not off the top of my head.
13      Q.  Okay. Do you know any of the reasons why
14 Chapter 12.6 was changed, specifically?
15      A.  No, not specifically. I -- I do know that the
16 dispersal order was changed. But I -- I don't know the
17 history specifically of -- of why or -- or how that --
18 that was initiated. I do know that Deputy Chief
19 Humphrey was involved in -- in some of those policy
20 revisions. But other than that, I do not know the depth
21 of that or any history.
22      Q.  Okay. And you said Deputy Chief Humphrey was
23 involved. Was he involved in both the 12.6 and 9.1
24 revisions?
25      A.  I have not spoke to him about the -- are you

Page 199

1  talking about the use of force revisions?
2       Q.  Yes. I'm sorry about that.
3       A.  I have not specifically spoke to him about
4  those revisions and -- and his involvement in that. I
5  do know his position on the department, and he is
6  involved in policy revisions. So it would -- it would
7  be known that he is involved in policy revisions
8  throughout the department.
9       Q.  Do you know who approved the final version of
10 SOP 9.1 before it was made official policy?
11      A.  No.
12      Q.  Do you know who approved the final version of
13 12.6 before it was made official policy?
14      A.  No.
15      Q.  Okay. Will the City commit to not readopting
16 the version of SOP 9.1 that was in effect during the
17 summer of 2020?
18           MR. PAUL: Objection. Outside of the scope of
19      the designated topics. You can answer if you have
20      a personal opinion or you want to commit the City,
21      okay?
22           THE WITNESS: I personally do not believe the
23      City will adopt the use of force policy that was in
24      effect in 2020.
25 BY MR. CHANDRAN:

Page 200

1       Q.  And same question with respect to 12.6.
2       A.  Same answer. I -- I personally do not believe
3  the City will adopt the policy that was in effect in
4  2020.
5       Q.  Okay. And those are answers in your personal
6  capacity, not on behalf of the City?
7       A.  Correct.
8       Q.  Okay. I believe, earlier, I asked you if you
9  had asked for or reviewed any special orders. Do you
10 remember that?
11      A.  Yes.
12      Q.  And I believe you said you had not?
13      A.  Correct. I do not recall reviewing any
14 special orders in preparation for this deposition.
15      Q.  So do you know if any official in the City has
16 issued special orders governing the use of crowd control
17 devices, since December 19, 2022, when Chapter 12.6 was
18 last amended?
19      A.  I do not know of any special orders that have
20 been issued regarding those since they've been amended.
21      Q.  Okay. I'm sorry. When you say you do not
22 know of any, do you mean that none exist or that you
23 don't know whether they exist?
24      A.  I attempted to determine if they exist. I do
25 not know of any that exist. So I did not find any that

Page 201

1  existed for those policies since the revisions.
2       Q.  Okay. How did you attempt to find those
3  special orders?
4       A.  I don't remember specifically. But, I mean,
5  we can -- we can search on e-mail, we can search on
6  PowerDMS. I would generally be aware of if special
7  orders existed for particular policies. I'm not aware
8  of any, and so I don't know of any special orders that
9  would exist or that have been delivered regarding these
10 policies.
11      Q.  Did you search your e-mail for any special
12 orders that relate to these policies?
13      A.  Again, I don't remember how I looked this up,
14 if I looked in e-mail or in PowerDMS. But I do not know
15 of any special orders that exist for the amendments of
16 these policies.
17      Q.  Okay. And just because you mentioned
18 PowerDMS, did you -- what PowerDMS records do you
19 remember looking at?
20      A.  I -- I don't remember. If I -- if -- I mean,
21 we log on to power DMS and sign off on policy updates or
22 different documents that are delivered throughout the
23 department. Again, I don't -- I don't remember if I
24 looked on e-mail or if I asked or searched, but I don't
25 know of any policy revisions or special orders regarding

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL     Document 215-6     Filed 01/10/25     Page 54 of 85 PageID
#: 2712
The Deposition of EMILY MCKINLEY, taken on June 18, 2024

30(b)(6)                                                                              202..205

Page 202

1  these policies.
2      Q.   Okay.  Did you look in the PowerDMS system for
3  any notifications that went out when these policies were
4  amended in 2022?
5      A.   No.
6      Q.   Do you know whether PowerDMS notifications
7  actually went out about these amendments?
8      A.   I mean, that is the way that we communicate
9  policy revisions.  So that would be the way that they
10 would've been delivered to the department.
11     Q.   Okay.  And, I guess, you might not notice
12 having not looked for it, but did you -- do you know
13 when the PowerDMS notification concerning the September
14 2022 amendments to 9.1 was?
15     A.   I don't know.  But I do know that, for our
16 contract policy, that officers have to be notified of
17 policy changes ten days prior to the policy becoming
18 active, so the notification would had to have gone out
19 prior -- ten days prior to the activation of the policy.
20 So it would've been at least ten days prior to the date
21 of the activation.  For a policy to be active, officers
22 have to be notified ten days.
23     Q.   Okay.
24     A.   For a policy change.
25     Q.   So that should exist?

Page 203

1      A.   The record of that?
2      Q.   Uh-huh.
3      A.   Or --
4      Q.   Yes.
5      A.   I mean that is how policies are communicated,
6  policy changes are communicated through PowerDMS, so --
7      Q.   Okay.  But again, just to prepare for this
8  deposition, you didn't look at the notifications?
9      A.   I do not look at the notifications.
10     Q.   Okay.  Did you look at any memos that were
11 sent out from the executive command about the 2022
12 amendments, either to 9.1 or 12.6?
13     A.   No.
14     Q.   Did you look at any records about officers
15 completing the electronic sign-off, having received and
16 read the amended SOPs?
17
18
19     A.   (No verbal response.)
20     Q.   Could you hear my question?
21     A.   Yes.  I -- I -- you asked if I'd -- I said no
22 to that answer.
23     Q.   Okay.  Sorry.  The audio cut out for me.
24     A.   Sorry.
25     Q.   Did you check with any sergeants to see if

Page 204

1  sergeants read out the new provisions to line officers
2  upon the amendments?
3      A.   No.
4      MR. CHANDRAN:  Okay.  Okay.  Can we take a
5  quick five-minute break?  I think I'm done, but I
6  just want to go over my outline real quick.
7      THE WITNESS:  Surely.
8      MR. CHANDRAN:  Come back at 5:15.
9          (OFF THE RECORD)
10     THE REPORTER:  We're back on the record.
11 BY MR. CHANDRAN:
12     Q.   Okay.  Okay.  I just have a final couple
13 questions for you.  I believe earlier you testified that
14 you had asked for e-mails between the executive command
15 and people in the mayor's office, regarding the
16 statement that the mayor's office made about the SOPs
17 we've been discussing.  Do you remember that?
18     A.   Yes.
19     Q.   And I believe you said you received no e-
20 mails?
21     A.   There were no e-mails from the chief, deputy
22 chief, or assistant chiefs, anyone who held those ranks
23 through the mayor's office, regarding the communication
24 listed in that number two.
25     Q.   Did you ask anybody in either the executive

Page 205

1  command or the mayor's office about in-person
2  conversations that were had regarding these statements?
3      A.   I did, and no one recalled those statements of
4  -- at those ranks.
5      Q.   Did you ask anybody in the mayor's office
6  about this statement?
7      A.   Yes.  I spoke with their public information
8  officer about the statement.
9      Q.   And who was that?
10     A.   Kevin Trager.
11     Q.   Okay.  And when did you speak with Kevin
12 Trager about that?
13     A.   I don't remember the exact date.
14     Q.   Did you speak with him one time, multiple
15 times?
16     A.   I don't remember if there were a couple phone
17 calls back and forth, but I speak with him frequently on
18 different things, so I don't remember specifically how
19 many times we spoke about this.
20     Q.   And when you spoke with him about this, what
21 did you ask him?
22     A.   If he remembers communicating with LMPD
23 regarding the language that's in that section.
24     Q.   And what did he tell you?
25     A.   He indicated that he had conversations with

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL     Document 215-6     Filed 01/10/25     Page 55 of 85 PageID
#: 2718
The Deposition of EMILY MCCARSLEY, taken on June 18, 2024
30(b)(6)                                                                      206..209

Page 206

1    LMPD's Public Information Office, not anyone holding the
2    rank of chief, deputy chief, or assistant chief.
3        Q.    Okay.   What role does LMPD's Public
4    Information Office have in interpreting the SOPs?
5        A.    Well, LMPD's Public Information Office has a
6    sworn sergeant in the office.   They can provide some
7    interpretation.   You know, they could ask other people
8    within the department for interpretation.   I guess that
9    would be their -- their role in communicating that, if
10   their -- their job is to communicate to the public.
11       Q.    And I guess can they interpret the SOPs in a
12   way that binds LMPD leadership?
13       A.    They're LMPD employees, and I mean they
14   interpret the policies based on how the policy is
15   articulated.
16       Q.    And do their interpretations control what the
17   chief, or the deputy chief, or the assistant chiefs do
18   with the policy?
19       A.    Their interpretations are not necessarily what
20   the chief or deputy chief must interpret.   Their job
21   would not necessarily be to interpret the policy, but to
22   communicate what the policy says, which would be the
23   language of the policy, not using other words to
24   interpret that policy.
25       Q.    Okay.   So the chief, or the deputy chief, or

Page 207

1    the assistant chiefs would be free to interpret the
2    policy differently from the way that the Public
3    Information Office interpreted it?
4        A.    Well, I mean the Public Information Office
5    would communicate what the policy says, so this -- they
6    would communicate what the language of the policy is,
7    and -- and if the mayor's office or Mayor's PIO asked
8    what the language of the policy is, that's what the
9    PIO's office would communicate back to them.
10       Q.    I'm going to just share quickly what we
11   previously marked as Exhibit 81, which is the list of
12   topics and the notice.   Do you remember this?
13       A.    Yes.
14       Q.    Okay.   And I just want to direct your
15   attention to Topic 2, which is the one we're discussing
16   now.   And midway through this paragraph, the -- there's
17   a quote saying that -- the mayor's spokesman explaining
18   that chemical agents could only be used, "In cases to
19   protect human life, protect from great physical harm,
20   when there is gunfire within a crowd, or other extreme
21   circumstances."   Do you see that?
22       A.    Yes.
23       Q.    Is the language requiring great physical harm
24   before chemical agents could be used in the SOPs?
25       A.    It is not in the SOPs.

Page 208

1        Q.    Does the city have any understanding of where
2    that language came from?
3        A.    I think the mayor would have to --
4    spokesperson would have to articulate that, but that is
5    our -- it is not specific language from our policy.   It
6    could be an interpretation of policy.
7        Q.    And whose interpretation of policy?   That's
8    the city's interpretation of the policy?   Is this the
9    mayor's interpretation?   Someone else's?
10       A.    It's not exact language of our policy, but it
11   is an -- it is -- it could be interpreted as language
12   from our policy.
13       Q.    And is that -- is this the city's official
14   interpretation of the policy?
15       MR. PAUL:   Objection.   Form.
16       THE WITNESS:   The city's interpretation of the
17   policy would be the language of the policy.
18   BY MR. CHANDRAN:
19       Q.    Okay.   Okay.   Since December of 2022, has
20   anyone in the mayor's office discussed SOP 9.1 with
21   anyone in the executive command at LMPD?
22       MR. PAUL:   Objection.   Outside of the scope of
23   the notice.
24   BY MR. CHANDRAN:
25       Q.    You can answer.

Page 209

1        A.    What was the question?
2        Q.    Since December 2022, has anybody within the
3    mayor's office discussed SOP 9.1, the meaning or
4    interpretation of it, with anyone in the executive
5    command at LMPD?
6        A.    I don't have an answer to that.
7        Q.    Did you ask anyone for that information?
8        A.    I did not ask anyone for that information.
9        Q.    Okay.   Since December 2022, has anyone in the
10   mayor's office discussed the meaning or interpretations
11   of SOP 12.6 with anyone in the executive command at
12   LMPD?
13       A.    I -- I don't have an answer for that.
14       Q.    Did you ask anybody for that information?   I'm
15   sorry.   I think my audio cut out a little bit.   Did you
16   answer?
17       A.    I -- I did not ask for that.
18       MR. CHANDRAN:   Okay.   Okay.   Well, I'm at the
19   end of my questions.   I think we're going to have
20   to hold this open, just because a number of the
21   topics were not adequately prepared, so --
22       MR. PAUL:   I have some questions.   I have some
23   questions.
24       MR. CHANDRAN:   Go ahead.   Sure.
25       CROSS-EXAMINATION

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of EMILY MCKINLEY, taken on June 18, 2024

30(b)(6)                                                                    210..213

Page 210

BY MR. PAUL:

1   Q.   First on those topics that -- or on those
2   questions that -- I should have just asked you: Has
3   anyone in the mayor's office communicated with anyone in
4   the executive staff of the LMPD regarding the meanings
5   of 9.1 or 12.6?  Do you remember those questions?

6   A.   Yes.

7   Q.   Okay.  Were you designated by the City of
8   Louisville to testify about the meaning and official
9   interpretation of Sections 9.1.4 today?

10  A.   Yes.

11  Q.   And were you designated by the City of
12  Louisville to testify about the meaning and
13  interpretation of 12.6.4, the current version of it?

14  A.   Yes.

15  Q.   And were you designated by the City of
16  Louisville to testify about the meaning and official
17  interpretation of Section 12.6.5?

18  A.   Yes.

19  Q.   And were you designated by the City of
20  Louisville to testify today about the meaning and
21  official interpretation of Section 12.29?

22  A.   Yes.

23  Q.   And as you sit here today, are you prepared to
24  testify about those meanings?

Page 211

1   A.   Yes.

2   Q.   And have you testified truthfully about those
3   topics?

4   A.   Yes.

5   Q.   Okay.  On Topic 2, where it talks about all
6   communications between the chief, deputy chief, and
7   assistant chief, and any member of the mayor's office,
8   communicating concerning the meaning and interpretation
9   of those provisions, and -- I won't read the whole
10  thing, but you remember Topic 2, correct?

11  A.   Yes.

12  Q.   Were you prepared to testify about that today?

13  A.   Yes.

14  Q.   You testified truthfully about that today?

15  A.   Yes.

16  Q.   On Topic 3, "The date on which the currently
17  operated versions of those four provisions of the SOPs
18  were revised and put in effect, as well as the process
19  by which each of those provisions occurred."  Were you
20  designated by the city to testify about those dates?

21  A.   Yes.

22  Q.   And were you designated by the city to testify
23  about the process of how SOPs are revised and put into
24  effect?

25  A.   Yes.

Page 212

1   Q.   Now, on that note, are you able to testify
2   today about the process that LMPD uses for changing its
3   standard operating procedures?

4   A.   Yes.

5   Q.   Okay.  And are you able to testify truthfully
6   about that process?

7   A.   Yes.

8   Q.   Okay.  And so, let's take Section 9.1 of the
9   Louisville standard operating procedures.  Would the
10  current version of that procedure, of that operating
11  procedure, have gone through the general process that
12  you're able to testify about today?

13  A.   Yes.

14  MR. CHANDRAN:  Objection.  Calls for
15  speculation.

16  BY MR. PAUL:

17  Q.   Oh.  Do you know who did any -- did the
18  current version of Standard Operating Procedure 9.1 go
19  through the formal LMPD process to be enacted?

20  A.   Yes.

21  Q.   Okay.  The same question for 12.6?

22  A.   Yes.

23  Q.   And same question for 12.29?

24  A.   Yes.

25  Q.   Are you speculating in answering that

Page 213

1   question?

2   A.   No, that is the process for changing all
3   policies.

4   Q.   Okay.  And you were designated to come here
5   today and talk about that process, and you're able to do
6   so today, correct?

7   A.   Yes.

8   Q.   Now, to avoid any accusations of changing your
9   testimony, did you go through each one of those policy
10  changes and look at each red line and interview everyone
11  who may have reviewed it?

12  A.   No.

13  Q.   No.  But is it your testimony you are able to
14  talk generally about the process by which each one of
15  those revisions occurred, generally speaking?

16  MR. CHANDRAN:  Objection.  Mischaracterizes
17  testimony.

18  MR. PAUL:  I didn't hear a form objection
19  there.  Do you have a form objection?

20  MR. CHANDRAN:  Yeah.  To the extent it
21  mischaracterizes testimony form.

22  BY MR. PAUL:

23  Q.   Okay.  Topic 4 deals with special orders.  As
24  you sit here today, did you find any special orders that
25  changed or amended the Section 9.1 that we've been

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 57 of 85 PageID
#: 2715
The Deposition of EMILY McKINLEY, taken on June 18, 2024
30(b)(6)                                                                214..217

Page 214

1   talking about today of the standard operating
2   procedures?
3       A.   No.
4       Q.   Did you find any special orders that changed
5   or amended Section 12 -- or, yeah, 12.6 of the standard
6   operating procedures as we've been talking about it
7   today?
8       A.   No.
9       Q.   We didn't really talk about Section 12.29 of
10  the standard operating procedures today, but did you
11  find any special orders that changed or amended Section
12  12.29?
13      A.   No.
14      Q.   Okay.  The final topic was all methods by
15  which LMPD officers were informed of, trained on, or
16  otherwise instructed concerning the revisions to
17  currently operating operative versions of, and then
18  those sections of the SOPs.  Were you designated to this
19  by the City to testify about that topic today?
20      A.   Yes.
21      Q.   Did you prepare for that topic?
22      A.   Yes.
23      Q.   And as you sit here today, are you prepared to
24  testify about that topic?
25      A.   Yes.

Page 215

1       Q.   Okay.  You were asked about going back and
2   looking at what records did you look at to find out if
3   the current versions of any of the standard operating
4   procedures that we've been discussing were received by
5   the officers.  Do you remember that line of questioning?
6       A.   Yes.
7       Q.   Do you have any reason to believe that those
8   provisions, enacted in 2022 for the most part, did not
9   receive the officers?
10      A.   No.
11          MR. CHANDRAN:  Objection.  Calls for
12  speculation.
13  BY MR. PAUL:
14      Q.   Did you find any special orders that
15  overlapped or changed or amended any of those sections?
16      A.   No.
17          MR. PAUL:  So with that, pending any further
18  questions that you have, we would object to the
19  deposition being left open because we think that
20  she has testified that she is adequately prepared
21  and able to testify on those topics today.  And I
22  have nothing further at this point.
23          MR. CHANDRAN:  Okay.  Give me two minutes.  I
24  don't think I have anything further, but let me
25  just go through my notes, okay?

Page 216

1          THE REPORTER:  You want me to stop the record?
2          MR. CHANDRAN:  Yeah, that would be great.
3          (OFF THE RECORD)
4          THE REPORTER:  We're now back on the record.
5   It's 5:43 p.m.  You may proceed.
6          MR. CHANDRAN:  Okay.  So we don't have any
7   more questions for the witness.  We maybe --
8   perhaps unsurprisingly, disagree about the level of
9   preparedness and whether the 30(b)(6) obligation
10  has have been satisfied, but I don't see a reason
11  to hold the witness to discuss that, so we can
12  close that.  Maybe if, Bruce, you can stay on for a
13  minute or two to schedule a meet and confer about
14  this and the remaining 30(b)(6) topics for the
15  coming weeks?
16          MR. PAUL:  I'll stay on to talk about the
17  former, not the latter, but yeah.
18          THE REPORTER:  Okay.  Before we go off the
19  record, I do just want to ask for transcript
20  orders.  Mr. Chandran?
21          MR. CHANDRAN:  Yes.  Could we get a rush on
22  the transcript, please?
23          THE REPORTER:  Sure.  When do you need it by?
24          MR. CHANDRAN:  Given the holiday, do you think
25  one week would be sufficient time for you?

Page 217

1          THE REPORTER:  One week.  Business days.  So
2   next Tuesday?
3          MR. CHANDRAN:  Yeah, that would be great.
4          THE REPORTER:  Okay.  Just a moment for me to
5   confirm that date.  Let's see.  Next Tuesday.
6   Okay.  The 25th.  No problem.  Okay.
7          MR. PAUL:  We'll take a -- I'll take a copy on
8   that date as well, please.
9          THE REPORTER:  A copy.  You got it.  Anyone
10  else?  Okay.  Okay.  And I do have -- I just have,
11  like, one spelling, but we can go off the record
12  before I address that.  Okay.  We're going off the
13  record at 5:45 p.m.
14          (DEPOSITION CONCLUDED AT 5:45 P.M. ET)
15
16
17
18
19
20
21
22
23
24
25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
                                                              Page 218
 1                   CERTIFICATE OF REPORTER

 2

 3      I do hereby certify that the witness in the foregoing

 4      transcript was taken on the date, and at the time and

 5      place set out on the Stipulation page hereof, by me

 6      after first being duly sworn to testify the truth, the

 7      whole truth, and nothing but the truth; and that the

 8      said matter was recorded digitally by me and then

 9      reduced to typewritten form under my direction, and

10      constitutes a true record of the transcript as taken,

11      all to the best of my skill and ability. I certify that

12      I am not a relative or employee of either counsel and

13      that I am in no way interested financially, directly or

14      indirectly, in this action.

15

16

17

18

19

20

21      ALANNAH FLEET,

22      COURT REPORTER/NOTARY

23      MY COMMISSION EXPIRES: 03/25/2028

24      SUBMITTED ON:  06/25/2024

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 59 of 85 PageID
#: 2717
The Deposition of EMILY MCKINLEY, taken on June 18, 2024

30(b)(6)                                                                            219

**Exhibits**

**Exhibit 81_**
**McKinley**
  18:22 207:11

**Exhibit 82_**
**McKinley**  40:7,
8

**Exhibit 83_**
**McKinley**
  98:22,25

**Exhibit 84_**
**McKinley**
  104:24 105:2

_____

**-**

**--you**  181:2

_____

**0**

**04-08-03**  41:25

**09-19-22**  42:13

**09-21-20**  42:7

_____

**1**

**11:22**  49:22

**12**  20:9 23:21
  197:19 214:5

**12.29**  172:19,
  22 173:6 189:7
  210:22 212:23
  214:9,12

**12.6**  109:19
  161:13 169:13,
  23 177:17
  197:6,9,17
  198:14,23
  199:13 200:1,
  17 203:12
  209:11 210:6
  212:21 214:5

**12.6.4**  169:14
  170:5 187:4,15,
  24 188:14,18,
  21,24 189:2

210:14

**12.6.5**  114:6
  126:20 130:12
  140:5 177:8
  178:1,16 179:6,
  12,15,20
  180:17 181:4,7,
  12,14,19
  183:22 184:6,7,
  8,12,16 185:1,9
  186:7 187:11,
  16,24 188:15,
  21,24 189:1
  210:18

**12.6.5's**  184:22

**15-minute**
  167:25

**19**  42:21,25
  46:23 47:2
  138:1,13
  194:23 195:3
  197:7,8 200:17

_____

**2**

**2**  26:12,13,23
  27:1 207:15
  211:5,10

**20**  35:24

**2003**  42:4

**2020**  10:6
  42:22 182:8
  196:19 199:17,
  24 200:4

**2021**  14:19
  16:14,17 17:10

**2022**  42:21,25
  46:23 47:2
  138:1,14
  194:23 195:3,8
  196:19 197:2,7,
  9,16 200:17
  202:4,14
  203:11 208:19
  209:2,9 215:8

**2023**  14:22
  15:1 16:22
  17:20 22:11
  23:10,15,22
  24:8,17 31:4,8,

10,17 32:12,18
33:1,13 36:8
38:24 168:16

**2024**  22:11
  23:10 24:9,13,
  17 32:17,19,22
  33:15 34:9
  35:13,18,25
  36:4,8 38:1,5

**2025**  35:22
  36:4,10

**21**  42:22

**24**  35:24

**25th**  217:6

**2:18**  109:15

_____

**3**

**3**  211:16

**30(b)(6)**  216:9,
  14

_____

**4**

**4**  213:23

**40**  32:7,22,24
  33:2,12 95:6

**40-**  32:19

**40-hour**  31:13
  33:23 35:8

**40-millimeter**
  95:1

**45**  109:6

**4:07**  168:6

**4:50**  194:10

**4:54**  194:15

_____

**5**

**525.050**  104:20
  105:4

**5:15**  204:8

**5:43**  216:5

**5:45**  217:13,14

_____

**6**

**6**  43:16

_____

**8**

**8**  42:4

**81**  18:21,22
  207:11

**82**  40:7,8

**83**  98:22,25

**84**  104:23,24
  105:2

_____

**9**

**9**  197:21 198:5

**9.1**  41:17 43:12,
  14 46:14 51:20
  58:13,19 89:17,
  19 90:20,23
  91:2 100:17
  177:2,7,10,15
  178:12,15
  179:5,12,17,25
  180:9,20
  181:12 184:3
  185:16,19
  186:6,9 187:6,
  7,11 188:13
  194:22 195:1,3,
  7 197:2,16
  198:11,23
  199:10,16
  202:14 203:12
  208:20 209:3
  210:6 212:8,18
  213:25

**9.1.11**  160:15

**9.1.12**  89:22

**9.1.2**  43:8
  55:20 56:19

**9.1.4**  20:9
  43:17 50:21
  59:16 71:17
  78:22 89:12
  96:10 210:10

**9.14**  90:19

_____

**A**

**A-L-L-E-N**
  30:16

**a.m.**  49:22

**ability**  59:23
  153:11,14,16,
  20 193:9

**academy**
  15:22 32:2,10
  69:2,4,6,7,11,
  12,14,17,20,22
  70:3 71:8

**acceptable**
  163:7

**access**  178:20
  183:6

**accordance**
  160:15

**account**  43:24
  44:6,14,19
  45:23

**Accountability**
  14:11,12 15:8,
  20 16:3,13,16,
  19,21 17:7 18:3
  34:6

**accountable**
  41:14 156:21

**accurate**  48:5,
  11

**accurately**
  14:5

**accusations**
  213:8

**acknowledgin**
**g**  67:15

**ACLU**  7:16 8:5

**acoustic**
  110:12 112:7,8,
  11,19,20,22
  113:3 162:19,
  24

**acquired**



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 60 of 85 PageID
The Deposition of EMILY MCKINLEY, Taken on June 18, 2024
#2718
30(b)(6)                                                                              220

196:9

**act** 53:2,9
59:22 63:12
73:3 84:2
106:11 180:1
181:8 191:23
192:20

**acting** 53:21
54:6,7 127:18
129:22 130:4
141:7,14,22
142:17,19
146:23 151:13
152:23 153:9
158:11,14
173:11 174:18,
20 175:3

**action** 56:2
155:1,22 171:2
192:14

**actions** 56:22
57:7 58:9 60:15
85:13 156:21

**activation**
202:19,21

**active** 54:20,21
56:15,21 57:5,
14,17,23 58:2
59:4,16 60:2,4,
5,7,9,12,16
63:18 64:15,18,
19,22 73:5,9
79:11,22 80:5,
11,14,25 81:5
84:6,8,13,15,20
85:8 86:8,11,
15,18,23 87:2,6
88:21,25 96:20,
23 97:2,4,7
155:25 156:6,9,
12,25 157:2
158:18 160:17
161:9,14,15,18
162:5 165:20
177:22 181:1
192:21 193:2
202:18,21

**actively** 156:2
157:3,19,21,23
158:5,15

**activity** 40:22
107:22,23

108:5

**acts** 101:18
102:9 103:1,7,
25 106:25
107:2,20 108:6,
7,12 124:8,9

**addition**
178:21

**additional**
13:1 135:15
136:20 147:18
193:20,23
195:12,20

**address** 33:20
130:24 138:22
172:17 173:1
217:12

**addresses**
100:4 177:17
179:15 180:17
187:12 188:14,
15,16

**addressing**
151:10

**adequately**
209:21 215:20

**administrative**
14:15 17:2,18,
23

**adopt** 199:23
200:3

**aerial** 110:14
113:10

**affect** 111:22
122:22

**affected** 146:2

**affecting** 58:4
95:25

**affirm** 8:25

**affirmations**
12:5

**afternoon**
168:12

**agent** 81:14
92:10,19,24
93:2,11,14,24
94:6,8,11,25

96:11 97:5,6,10
134:5,8,21,24
135:8,9,13
136:11 137:2,4,
7 151:6 152:17
156:20 158:21
159:12 161:24
162:1 165:19
166:5,13
177:23 178:2
181:9

**agents** 92:18
93:16,20 94:14,
22,23 95:11
98:13 110:11,
19,21 115:17
129:9,15 131:9,
14,22 132:9,15,
23 133:9,13,20
134:6,15
135:12 136:2,5,
22 140:13
141:15,18
142:3 143:23
144:11 145:13,
17 146:10
147:20 148:13
149:10 150:9,
15 152:6
155:19 158:9
159:24,25
161:6,8,20
177:2,7,9,14,19
178:9,15,17
181:5,15
182:10,14
183:23 207:18,
24

**aggression**
54:21 59:16
60:2,4,7,9
63:18 64:18,22
73:5 79:22
80:5,11 81:1,5
96:20,23 97:3,5
160:18 161:10,
14,15,18 162:6
165:20

**agree** 8:19

**ahead** 13:11
18:24 19:20
40:6,10 50:19
51:2 54:17
56:18 83:9

94:16 98:23
121:2 122:9
143:8 177:12
180:15 185:13
209:24

**aid** 24:19

**aim** 151:8

**air** 149:14

**Alannah**
164:11

**Albert** 10:14
11:13

**Allen** 30:11,13,
14,16,24 34:15
39:13

**amend** 50:2
84:1 168:12

**amended**
194:21 200:18,
20 202:4
203:16 213:25
214:5,11
215:15

**Amendment**
24:24 25:2,18
31:5,8 35:9,13,
17 36:3,8,12,20
37:4,10,14,25
38:4,14 39:3
99:12,13 100:1,
2,9

**amendments**
47:2 196:2
197:16,19
201:15 202:7,
14 203:12
204:2

**ammunition**
66:8

**amount** 33:16
165:2

**and/or** 88:19
95:25 133:3

**Andrew** 8:4

**announce** 8:1

**announcemen
ts** 162:25 165:7

**annual** 15:23
30:5,24 38:9
51:11,13 68:5
69:21 70:5
137:21,22,24

**answering**
212:25

**answers** 11:21
50:1 200:5

**anticipate**
152:20

**anymore**
144:13

**apologize**
170:2

**apparently**
50:13

**appearance**
7:5

**appearances**
7:24

**appearing** 7:9,
11,17,20 10:8

**appendix**
19:10,13 20:20
26:18

**applicable**
37:1 44:2 60:25
99:24 142:18
179:21

**application**
24:19

**applied** 20:15,
22 45:1 130:18
142:18 178:5

**applies** 40:25
41:7 100:17
115:23 136:14
144:16 177:10
179:20

**apply** 40:21
41:6 43:12
114:22 115:4
116:8,16
131:16,20
133:15 134:18,
23 148:7



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 61 of 85 PageID
#: 2719
The Deposition of EMILY MCKINLEY, Taken on June 18, 2024
30(b)(6)                                                                    221

**appreciated**
24:6

**apprehension**
118:12,17,21

**approval**
132:2 155:12

**approved** 90:6
93:3 199:9,12

**approximately**
9:21 23:14
24:12 29:2,11

**April** 42:4

**arc** 65:13,14
71:18,19,25
72:11,21 74:2
76:18,21 78:23
81:10 95:14
96:11

**arcs** 65:6,10

**area** 71:20
153:15 164:22
174:7,9

**areas** 150:24

**arm** 77:22

**arms** 56:7

**arrest** 57:22,23
58:4,11 84:17
85:14 86:15
87:22 88:10,17
89:4 167:1
178:10

**arrested**
122:25 176:24

**arrests** 122:22,
24 133:3
176:15,19,21

**arrival** 189:22

**arrives** 171:11,
14

**arrows** 44:11
45:12 52:22
53:7,11,17
54:2,14

**arson** 130:7
146:25 154:19
192:21 193:2

**articulate**
148:19 156:16,
22 159:7 163:1
165:8,18
166:16 167:5
208:4

**articulated**
206:15

**articulation**
85:6 91:25
167:7,18

**articulations**
167:14

**Ashok** 7:7 9:10
49:2 83:3 85:19
186:23 188:9

**aspect** 168:11

**assault** 59:22,
24 60:8 130:1
142:23 144:2
157:24 158:1,3,
12,19,24

**assaulted**
156:2 157:21,
23 158:5,16

**Assaulting**
143:3

**assembled**
105:20

**assembling**
127:7

**assembly**
101:9,10,11,23
102:2,5,6,12,
23,24 103:4,5,
8,9,14,16,20,23
105:16,24
107:3,20,23
108:8 127:10

**assess** 15:14
44:9 45:20
53:2,8 74:22,23
144:4 147:23
151:21 170:14
171:19 172:23

**assessing**
44:20 45:23
46:10 53:9,20
54:6 156:12

181:17 192:24,
25

**assessment**
153:22

**assessments**
126:17

**assigned**
31:21

**assignment**
32:17

**assist** 174:10

**assistance**
193:21

**assistant** 14:9,
21,25 15:3
16:22 26:24
204:22 206:2,
17 207:1 211:7

**assume** 13:5
23:21,24 56:15
130:12

**attain** 165:3

**attempt** 84:16
189:5,16,25
190:3,10,17,25
192:4 201:2

**attempted**
200:24

**attempting**
45:4,10,14
84:10 192:7

**attend** 25:6
31:22 69:3,7,8,
15,20

**attended** 31:24
71:8

**attending** 7:6

**attention** 75:2
207:15

**attorney** 13:9
19:25 20:2,4,
15,23

**attorneys** 9:13

**audio** 8:2 11:8
12:1 28:15
29:17 39:10

49:12,25 50:5
107:5 150:1
203:23 209:15

**audit** 15:10,11,
12

**auditors** 15:12

**August** 14:22
15:1 16:22
17:20 34:7

**authority** 85:3
181:16 182:11,
18

**authorization**
131:24 152:5
155:9 182:9

**authorize**
144:22 145:12
146:9 150:20
157:15 159:11

**authorized**
129:12,16
131:3,10
132:23 140:13
141:19 142:4

**authorizes**
131:6

**authorizing**
145:16 147:20
159:23

**availability**
193:8,16

**average**
153:19

**avoid** 33:24
213:8

**aware** 9:17
39:19,22,23
47:18 48:17,19
50:13,23,24
58:17,18,19
70:6,10,12
74:13 93:18
95:8 112:14,16
113:13 168:20
179:3 201:6,7

**awareness**
112:17,18
113:15

     **B**

**B-R-A-T-C-H-
E-R** 22:6

**B-R-O-W-N**
30:22

**back** 16:11
20:18 29:4
36:11 41:9
45:13 48:24
49:4,21,24
60:22 71:17
73:16 77:23
78:22 83:17,24
86:1 87:6 89:11
90:18 96:10
107:14 109:14,
17,24 112:2
116:23 125:15
126:19 133:23
135:10 163:15
164:11,15,16
168:5,8 185:18
188:5 194:10,
14 195:10
204:8,10
205:17 207:9
215:1 216:4

**backup** 193:20

**Bad** 85:20

**balance**
124:23

**ball** 90:22,24
91:5,7,9,10,15,
18 92:8,10,11,
15,16 94:19,20
95:2,5 97:10,15
115:6 116:2
128:17,20
129:19 130:10,
17,23 134:1,5,
7,12,19,21,23
135:2,12,22
136:18,24,25
137:10,21
138:5,6,10,18
139:8,24 140:5
151:3 168:17

**balling** 118:6
159:9,17



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 62 of 85 PageID
#2720
The Deposition of EMILY MCKINLEY, taken on June 18, 2024
30(b)(6)                                                                                        222

**balls** 91:12
92:18 94:18
110:11 114:25
128:23 129:3,7,
9 130:13,15,20,
25 131:1,5
132:2 133:24
135:7,11,16
136:14,22
137:19 138:13,
22 139:4,6

**band** 79:7

**bang** 110:13

**bangs** 110:14
113:10

**based** 43:23
53:1 62:13
63:16 64:3
80:3,4 87:25
91:4 113:14
153:4 156:22
157:24 160:7
164:25 166:19
176:15,19
178:11 181:18
195:13 206:14

**baseline**
125:15

**basic** 11:14
15:22 69:2,18,
19 70:4,13 71:8

**basis** 70:21
71:4 178:13
187:18

**baton** 67:1
82:3,10,18 90:8
160:23

**batons** 90:4

**battery-
powered** 95:23

**bear** 11:6

**begin** 9:4
12:19

**beginning**
55:17

**behalf** 7:11,16,
19 18:17 50:15
200:6

**behaving**
127:12 174:25

**behavior**
100:7 117:7,9,
10,15 119:8,13,
23,25 120:2,3,
5,18,21,24
121:25 122:4,6,
14,18,21 123:1,
6,13,18 124:15
125:10,25
126:7 127:20
128:3

**behaviors**
84:12 86:7,11
88:16 100:8
103:16 119:17
121:15 126:10

**belt** 94:17

**bet** 188:4

**big** 146:7

**binds** 206:12

**bit** 9:23 11:7
15:6 16:11 28:7
43:5 44:4 50:17
52:9,10 74:4
83:22 110:2
125:16 128:13
140:10 152:13
170:20,21
179:24 186:20
193:17 194:19
209:15

**black** 54:12,18
59:15 72:1

**Blackboard**
32:3,10

**blading** 118:5

**block** 31:8
32:20 33:6,23
35:8,9 39:3
133:11

**blocked** 33:2

**blocking**
175:8,14,17

**blocks** 33:23
36:15,18

**blue** 64:25 74:2
75:6 76:6

**bodily** 61:4,8

**body** 117:17
118:6 143:4
151:9 153:16

**bottle** 142:15
143:14,17,19,
22 144:1,10,18
145:13,17,20,
21 146:11
147:21

**bottles** 117:14
130:2 143:12,
18 145:11,20

**bottom** 103:8

**box** 41:23

**boxes** 41:16

**Bratcher** 22:2,
5,7 28:18,21,24
29:3,19 39:14

**breach** 101:10
102:23 103:5

**break** 13:15,
19,24 33:22
83:5,6,22
109:2,18
163:20 167:25
168:15 204:5

**breaking**
56:25 106:18
120:8

**Brennan** 8:4

**bricks** 130:2
144:2 148:8

**bright** 76:23

**broader** 43:13

**broadly** 136:2

**broke** 33:22

**broken** 124:25

**brought**
160:23

**Brown** 30:19
39:13

**Bruce** 7:10
21:7 163:18
186:16 187:19
216:12

**building** 119:4

**bullet** 129:17
130:14 131:2
132:4,7 135:1,
23 136:6 142:3,
11 151:12
152:4 155:15,
18 156:8 172:4,
7 173:8 174:16
177:25 181:19
184:1,6

**bullhorn** 173:2

**bureau** 14:11,
13,16,17,18,21,
23,25 15:4,7,9,
20 16:3,13,17,
20,21,23,24
17:8 18:4 34:7

**burn** 119:4

**Business**
217:1

**bystanders**
174:9

---
**C**
---

**call** 34:12
44:18 96:7

**called** 90:11
185:14

**callouts**
178:25 183:5

**calls** 29:5
205:17 212:14
215:11

**cam** 153:16

**cams** 153:15

**canceled** 24:1

**canister** 94:10,
15

**canisters**
94:20,22 95:2,4

**capabilities**
15:10

**capability** 96:3
164:21

**capacity** 18:9
93:6 131:24
135:23 139:25
150:16 160:16,
24 162:8 200:6

**capture** 12:6

**captured**
50:13

**car** 119:5

**career** 16:1
70:12

**carried** 94:17

**carry** 59:23

**cars** 113:3

**case** 9:13,15
10:9,10,13,16,
22,23,25 11:13
36:13,21,24
37:5,10,15
38:17 51:18
68:11

**cases** 207:18

**categorically**
166:11

**category**
174:4

**Catherine** 7:18

**caused** 66:2,
15

**causing** 65:25

**caveat** 13:22

**center** 44:12
153:14

**central** 95:22
96:2

**CEW** 81:14
95:14,17 96:2,
6,11 97:1,2,3,5

**chain** 167:16,
22



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 63 of 85 PageID
#2721
The Deposition of EMILY MCKINLEY, taken on June 18, 2024
30(b)(6)                                                                              223

**Chandran** 7:7,
8,22 8:3,16,21
9:6,11 18:19,23
20:16 21:4,6,8
24:3,7 36:1,16
40:6,9 47:24
48:9,16 49:3,8,
10,13,16,19,23
50:20 51:1
62:21 63:23
83:7,9,13,19,20
85:20,23 98:21
99:1 102:17
104:21,25
107:5,7,13,17,
18 108:3,13,23
109:5,9,16
119:11,18
122:2 127:14
135:20 136:9
137:15 142:10
143:5 150:13
163:14,18
164:2,10,18
165:4 167:23
168:7 169:19,
22 170:1,3,4
179:22 180:7
183:20 185:7
186:10,15,18,
24 187:2,14,18,
23 188:1,6,7,10
191:2,6,18
194:5,10,16
199:25 204:4,8,
11 208:18,24
209:18,24
212:14 213:16,
20 215:11,23
216:2,6,20,21,
24 217:3

**change** 10:17
33:10,18 34:2,
3,5,14 35:3
44:12,25 182:8
202:24

**changed** 32:22
47:1,11 48:25
196:17 198:11,
14,16 213:25
214:4,11
215:15

**changing**
43:23 44:8,10,

22,23 212:2
213:2,8

**chants** 119:7,
12

**chapter** 41:19
46:14 51:20
82:1 100:23
177:16 185:3
189:1 195:1,7
197:19,21
198:5,11,14
200:17

**chapters**
20:19 194:20

**characterizati
on** 183:17,19

**charge** 30:7

**charges** 154:3

**chase** 94:10

**chaser** 95:6

**chasers** 94:21

**chat** 18:20 40:7
98:21 104:22
169:21,23

**check** 152:15
163:19 203:25

**chemical**
81:13 92:10,18,
19,24 93:2,4,
11,13,16,20,24
94:6,8,11,14,
22,23,25 95:11
96:11 97:5,6,10
98:13 110:10,
18,19,21
115:17 129:9,
15 131:9,13,22
132:9,15,23
133:9,13,20
134:5,6,8,15,
21,24 135:8,9,
12,13 136:1,4,
11,22 137:2,4,7
140:13 141:15,
18 142:3
143:22 144:11
145:13,17
146:10 147:20
148:13 149:10,

13 150:4,8,15
151:5 152:6,17
155:18 156:20
158:8,21
159:11,24,25
161:6,8,20,24,
25 165:18
166:5,13 177:2,
7,9,14,19,23
178:2,9,15,17
181:4,9,14
182:10,14
183:23 207:18,
24

**chemicals**
130:2 148:8
149:8,20

**chief** 9:7 14:9,
21,24,25 15:3
16:23 18:6,25
26:24 34:4,12
39:17,24 40:11
49:24 51:3
83:10,21 105:2
107:19 108:23
109:7,17,25
129:12,18
131:3,6,10
132:3 136:10
144:3,8 145:5
146:9,15,19
147:14,19
151:20 152:2,4,
15 153:5,8,11,
13,15,19
154:10 155:10,
24 156:17
157:15 159:11,
15,23 168:8
169:14 170:5
181:17 182:18
187:3 188:2,8,
11,18 194:17
198:18,22
204:21,22
206:2,17,20,25
211:6,7

**chief's** 131:24
151:24 152:7
153:4 155:12
181:16 182:9

**chiefs** 26:2,24
204:22 206:17
207:1

**chokehold**
66:10,12

**chokeholds**
66:11 68:7

**choose** 158:20
159:13

**circle** 44:11
53:7 54:10,11,
18 59:16 60:19
61:16,21 64:25
65:1 72:1,2,12,
21 74:3 75:6,7,
11,19 76:6,7,
18,19,22

**circles** 65:4,6

**circumstance**
57:16 125:20
144:4 145:9
147:24 165:14

**circumstance
s** 43:25 59:3,4,7
62:12,14 87:25
89:1 115:14
129:2,17,21
136:12 140:14
143:25 144:24,
25 145:2,5,8,
14,15 151:22
152:4 156:15
159:16 165:1
166:7,19
170:15 176:11
181:18 207:21

**citizens**
192:11

**city** 18:12,17
31:23 37:24
38:3 45:5 46:18
48:17 50:15,16,
22,24 57:13
65:16 67:22,25
88:14 104:16
106:6 108:14,
20 112:23
113:11 126:8,
12 127:1 146:1
151:16 153:24
162:7 165:24
166:4 178:14
183:14 184:5
188:23 196:9

199:15,20,23
200:3,6,15
208:1 210:8,12,
16,20 211:20,
22 214:19

**city's** 70:22
71:4 88:12
104:11 108:19
112:18,19
113:15 130:12
137:9 208:8,13,
16

**civil** 31:5 99:4,
7 100:9,19,24
101:8,9 102:13
103:2,19
105:19,22
106:1 107:20,
24 108:8
170:12,17
172:12 177:24
178:22 186:11

**civilian** 15:12

**clarification**
58:5,6 62:19
89:8

**clarified** 148:4

**clarify** 12:25
50:2 59:8 82:20
84:1,13 89:9
134:10 135:19
197:21

**clarifying**
28:24 55:19
87:10 146:8
184:9

**classes** 31:19

**clause** 87:9
135:4

**clavicle** 66:2,
15 67:4,10,13
70:2,24 71:7

**clear** 40:24
84:7 92:2
158:18 159:18

**clockwise**
54:4

**close** 216:12

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 64 of 85 PageID #: 2722
The Deposition of EMILY MCKINLEY, Taken on June 18, 2024
30(b)(6)                                                                 224

closely 52:11

collection
104:8 105:8,12

collective
101:17 102:7,
11,25 103:6,24
104:3,4,7,12,
14,16 105:5,9,
11,18,21,25
106:9,10

collectively
120:9

color 79:6,7

colored 65:3,6

combat 143:10

combination
96:4 118:6

command
27:20,23
167:16,22
203:11 204:14
205:1 208:21
209:5,11

commander
21:18,22 22:1
138:17,25
155:2,24

commander's
165:16

commanders
146:17 156:20
159:24 161:3

commanding
34:25 159:12
163:1 164:24
165:7 166:16,
22 167:4,7
170:25 171:5,
10,11,13,19,25
172:9,11,23
173:5 174:19
175:4,13,21
176:22,23
177:6 182:10
184:17,19

commands
56:1 76:4

commit

199:15,20

committing
111:8

commonly
182:13

communicate
170:14 171:10
182:1 202:8
206:10,22
207:5,6,9

communicate
d 68:17,21 69:1
129:18 137:7
178:14 181:21,
23 182:17
203:5,6 210:4

communicatin
g 136:25 205:22
206:9 211:8

communicatio
n 18:12 26:11,
14,22 204:23

communicatio
ns 26:1,7,21
211:6

compared
134:14 136:22

comparing
76:6

complete
72:11,21 75:11,
18 76:19
170:24

completed
32:11

completing
203:15

compliance
15:13 16:7

compliant
54:20 55:9
63:17 64:4,12
76:13 79:9
80:15 189:21,
24

comply
124:14,19

177:8

complying
55:11,25
123:25 124:2

compound
93:4

comprised
15:12

computer
39:10

concept 25:12
47:20,22 51:22

concepts
35:24 48:14

concern 60:10

CONCLUDED
217:14

concrete
179:24

condensed
146:20 147:11

conditions
130:14

conduct 88:24
100:5 118:9,15
149:2 176:7

conducted
95:20 138:7

confer 216:13

confirm 217:5

confirming
28:2

confused
121:17

confusing
12:24

congruent
25:11

Connor 44:17

consent 16:8

consideration
45:3 57:18
73:21 79:25
97:24 125:19

128:2 144:7
145:2 147:4
151:21 167:2
176:10 180:24
191:11

consideration
s 129:6 174:12

considered
58:2 63:1,13
66:10 67:5,11
68:19 70:24
71:12 78:19
82:1,5,12 83:23
84:12 85:16
88:21 90:16,23
91:5,8,18,21
92:12,19 93:11,
13 97:10
106:19,21
110:16 111:25
112:12 118:1
119:13 120:4
125:3 145:16
180:2

consistent
177:2,7 178:12
184:2 185:5
186:6 187:5
188:13

consists 93:3

constantly
43:23 44:8
45:12 53:19
54:5

constitute
118:21 119:8
122:14 128:6

constituted
152:8

constitutes
68:1 89:13 90:1
100:24 101:10
102:23 103:5
152:16 153:24

constitutional
35:23 36:9

constitutionall
y 52:3

contemplated
171:5

context 13:2
44:6 144:15
181:1

continually
171:19 192:24

continue
187:20

continued
31:15

continues
101:12

continuous
145:19 156:9

continuously
44:9 45:20
53:22 69:12
74:22

continuum
47:11 63:1

contract
202:16

contractions
95:24

contrast 157:4
158:10 159:8
161:6

control 24:24
25:1,18 56:3,23
77:1,5,9,12,14,
18,19 78:3,4,13
79:6,8,12,14,21
80:4,7,10,14
84:23,25 85:3,
5,7,9,11,13,16,
25 86:3,5,7,10,
14,24 87:14,20,
23 88:2,9,18
89:5 97:14
110:3,8,16
111:2,5,11,13,
18,19,21,25
112:12,24
113:4,5 114:8,
18,23,24 115:3,
6,7,10,13,21,
23,24 116:3,7,
10,12,15
126:21 128:8
129:10,11
130:16,17,23

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

131:1,7,9,18,24
132:10 133:1,
10,12,14,17,21
134:7,16
136:11 139:7
152:6,18
173:18 174:6,8
177:22 178:3
179:16 181:5
183:24 184:14
185:15 188:15
200:16 206:16

**conversations**
205:2,25

**cooperating**
122:8

**coordinating**
35:2 171:1

**copy** 217:7,9

**core** 52:13

**Corey** 7:14,15

**corner** 41:15

**correct** 33:7
35:11 42:19,23
46:25 47:8 50:3
52:20 57:9 63:7
70:17 80:16
81:7 84:1
108:19,21
112:25 116:13
139:17,21
166:14 168:12
178:10 181:10
200:7,13
211:10 213:6

**correction**
168:14

**correctly** 75:5
109:19 156:25
166:10 195:19
196:7,16

**Counsel** 8:15

**count** 62:8

**counts** 67:22
68:14 86:4

**County** 9:16
18:8,13

**couple** 163:19,
21 170:19
204:12 205:16

**coupled** 59:23
119:16,21

**courses** 15:25
31:6

**court** 7:23
11:18,23 22:3
48:23,24 49:3
107:5 163:14

**cover** 25:8
40:18

**covered** 24:25
25:15 38:15
70:3 93:17,20
113:24 159:10

**covers** 40:19
51:12 76:20

**create** 65:25
165:10

**created** 14:18,
19 16:13,17
17:10

**creates** 61:5,6,
7

**creation** 17:11

**crime** 44:19,22
45:21 46:2,9,16
57:20 59:10
63:2 73:23
97:19 153:14
166:23

**crimes** 111:8
147:9

**criminal** 154:1,
3,11

**criteria** 137:11
140:1,6,10
150:21

**CROSS-
EXAMINATIO
N** 209:25

**crowd** 24:23
25:1,18 99:7
100:25 110:3,8,
16 111:5,9,11,

13,14,18,21,25
112:12 113:4
114:8,18,22,24
115:3,6,7,10,
13,18,21,22,23,
24 116:2,3,7,
10,12,15,22,23
117:4 119:17
121:12,17,24
122:19,22
123:2,7,18,23,
25 124:1,6,7,9,
10,11,12,18,21,
25 125:2,4,6,8,
14,18,24 126:2,
4,9,10,11,14,21
127:5,6,9,10,
12,15,17,19,24
128:8,19 129:4,
7,10,11,20
130:8,11,15,17,
22,24 131:1,7,
9,18,24 132:10,
16,18,25 133:6,
7,10,12,17,20,
21 134:4,7,9,
16,25 135:3,22
136:11,20
137:2,4,6,11,13
139:7,25 140:6
141:16 143:15
144:5,13,15,18,
20 145:21
146:5,11,14
147:1,21
148:15,19,22
149:10,14
150:16,20
151:2,5 152:6,
18 154:20
156:1,12,13,14
157:12 158:19,
22 159:1,10,17
160:16 162:1,2,
6,8,9,12 163:1
164:24 166:17
170:13,17
172:13,18,25
173:5,9,17,18,
24 174:4,10,24,
25 175:6,22
176:3,5,24
177:10,17,20,
22 178:3,4,6
179:16 180:18
181:3,5,8,9,15

182:15 183:24
184:10,13,21,
23 185:10,15,
17 186:2,12
187:8,12
188:15 189:5,
12,16,21,24,25
190:10,14,18
192:4,12,19,22
193:19,21
200:16 207:20

**crowd's**
122:13

**crowds** 99:5
110:9 111:3
112:24 113:4
114:20 115:11
116:18 126:22,
25 127:1
128:10,18
129:10,11
132:4,11
133:15 134:2,
13 136:19
161:4 174:7
178:17

**CS** 93:13
110:23

**curious** 134:11

**current** 14:7
22:1,11 26:13
137:9 210:14
212:10,18
215:3

**curricula**
21:17 22:15
25:21 27:5

**curriculum**
21:13 22:8,9
25:4 31:5
38:16,20,21,24
138:6 139:18

**custodial**
86:15

**custody** 56:3,
23 84:10,11,16,
22 85:4,10,12
86:17,20,22,25
87:14,21 88:1,
5,7,10,17

**cut** 32:14 57:3
111:17 122:10
157:8 203:23
209:15

**cutting** 11:8

———————

**D**

———————

**D-A-L-E** 30:22

**D-A-V-I-D**
30:16

**Dale** 30:19
39:13

**damage** 62:10,
15 63:2,4,9
114:21 115:12,
15 116:5
126:23 128:10,
24 130:5,9
146:24 151:14,
17,23 152:9,16,
19,21,23 153:2,
10,25 154:4,5,
6,15

**damaging**
62:7,25 63:9
106:8

**danger** 101:17
102:7,11,24
103:6,24 104:6
132:12 134:18
135:5 140:23
148:21

**dangers**
134:25 135:1

**darker** 75:18

**date** 17:16 18:2
19:8 41:25
42:2,3,7,9,13,
15,16,17
183:18 194:22,
25 196:4 197:7
202:20 205:13
211:16 217:5,8

**dates** 211:20

**David** 30:11,
13,14 34:15
39:13

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of EMILY MCKINLEY, taken on June 18, 2024

**day** 13:14,18 145:24 168:10

**days** 202:17, 19,20,22 217:1

**deadly** 61:11, 15 65:14,16,18, 24 66:5,10,12, 13,20 67:5,8, 11,19,23 68:1, 8,9,11,14,19 69:25 70:22,24 71:6,12,18,22, 25 72:8,13,17, 23 73:1,4,8,17 75:10 81:3 140:22 156:15

**deal** 25:1 98:18

**deals** 46:15 213:23

**death** 54:21 60:19 61:5,10, 12,16,17,22 62:3,4 63:19 64:8,21 66:1,3, 16 67:14,15 70:7 71:21 72:3,7,14,25 73:6,10,18 76:14 81:4 96:21 114:20 115:12 116:4 126:23 128:10, 23 130:9 140:25 141:3 142:1,5

**December** 138:1,13 197:7, 8 200:17 208:19 209:2,9

**decide** 8:14 145:12 157:16 176:23

**decided** 33:18, 21 36:3 162:7

**deciding** 58:9 93:24 94:6

**decision** 34:4, 13,24 35:6,16 44:1,15 71:24 73:25 100:7

129:19 144:8, 22 145:3 146:7, 20 150:19 154:10,13 159:20 164:25 172:24 177:6 181:2,17 182:12,15

**decisions** 100:7 160:5 167:15 179:1

**declared** 127:24

**decree** 16:9

**deemed** 176:4

**defendant** 10:10,16,23

**Defense** 7:8,19 8:6 9:12

**define** 151:16

**defined** 57:5, 25 66:5 95:11, 15 189:19

**defining** 75:7

**definition** 55:20,24 56:16 59:19,20 60:23, 24 61:9,11,24 62:2 64:4 65:18 68:22 69:25 70:22 71:5 75:25 77:6 78:1 81:20 84:3,8, 19,21 86:5,8 87:2,6 92:20, 23,24 93:17,20 95:18 101:2,3, 7,12,22 102:2,4 103:8,13 104:3, 16 105:16 106:7,15 108:11,14,17, 18,20,21 110:3, 17 112:2,3 116:22,23 117:3,9 120:5, 6,18 121:11,19 122:4,5,7,15 124:16 127:1,3, 4,7 135:8,9

161:13,14

**definitions** 43:10,12,14 55:16,19 56:16 62:6 63:16 81:18 89:25 105:17 127:4

**degree** 78:19

**deliver** 31:6

**delivered** 23:5 31:16 47:21 71:9 95:10 178:19 201:9, 22 202:10

**delivering** 36:10 37:2 48:15 113:1

**delivers** 16:6

**delivery** 93:23 94:13

**demanding** 13:17

**demands** 55:11

**demonstrate** 63:8

**demonstrated** 121:24

**demonstrating** 43:21 79:1,10 86:7 122:1 144:5 181:3

**demonstration** 56:8 100:9 117:6 120:23, 24 121:9,12,14, 18 124:5,11 125:12,13 126:1

**demonstrations** 121:10

**department** 15:11 16:6 20:15 31:9 41:9 45:6 69:11,13 90:6 94:14,18, 25 98:17 113:19 114:4

115:17 146:12 160:4 178:20 182:13 198:1 199:5,8 201:23 202:10 206:8

**department's** 14:10 45:17 48:6 50:10 51:10,24

**departmentally** 93:2

**departmentally-approved** 95:21

**depend** 66:22

**dependent** 97:7 123:22 192:23

**depending** 59:6 79:22 80:18 89:1 144:23,25 171:13

**depends** 57:16

**depict** 45:4

**depicted** 45:14,25 80:22, 23

**depicts** 45:9

**deploy** 82:15 94:25 149:15 151:5 181:4

**deployed** 94:6 151:1,2

**deploying** 95:23 129:15 174:2

**deployment** 156:20 163:4

**deposition** 9:15,19,24,25 10:3 11:13,15, 22 12:1 19:8,9, 16 21:11 23:16 28:9,13,20 30:1 38:25 39:15,20, 21 40:3 93:21 195:21 200:14

203:8 215:19 217:14

**depositions** 38:22

**depth** 198:20

**deputy** 14:24 26:24 34:3,11 198:18,22 204:21 206:2, 17,20,25 211:6

**describe** 45:10

**describing** 135:21 136:23

**description** 177:18

**descriptions** 126:6

**designated** 199:19 210:8, 12,16,20 211:20,22 213:4 214:18

**designed** 95:21

**designee** 18:7 131:11 145:6 146:9 147:14, 19

**destroyed** 106:14

**destroying** 106:8

**destruction** 101:17 102:8, 25 103:7,25 106:6,7,10,11, 19,21 130:6 151:19 189:20

**detail** 98:6 113:5 114:13

**details** 10:20

**detain** 86:22 87:24 88:20

**detaining** 88:6,9

**detention** 88:8



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 67 of 85 PageID #:2725
The Deposition of EMILY MCKINLEY, taken on June 18, 2024
30(b)(6)                                                                                    227

**determination**
74:14 97:18
98:9 126:14
152:8 191:16

**determination
s** 147:23 176:13

**determine**
26:10 38:11
138:6 151:22
153:1,8 200:24

**determined**
123:20 126:11
166:19

**determines**
152:15 155:17

**determining**
44:6 92:5
159:25 171:1

**developing**
34:18 35:5

**development**
16:1,4,5 17:14,
17,22 18:2
30:6,8,18

**developments**
37:6

**develops** 16:5

**device** 110:13
111:12,13,18,
21 112:1,8,19,
21 115:21,23
116:4,12,15
161:23 185:12,
14,15

**devices** 110:3,
8,10,12,13,16
111:1,5 112:7,
11,12,22 113:3,
5,9,11,17,20,24
114:3,8,13,18,
23,24 115:3,5,
10,13 116:10
126:21 128:8
162:19,24
179:16 200:17

**diagram** 53:5
81:2

**die** 61:18

**difference**
32:25 60:2,4
61:15 78:11
156:6 179:14
181:11 183:22

**differences**
69:22

**differently**
73:3 207:2

**direct** 9:5
151:4 170:22
193:21 207:14

**directed** 56:24
57:6,8 60:16
136:24

**directing**
128:18 134:3
136:19

**direction** 54:2
56:5 75:21
76:1,7,11,15,18

**directions**
162:25 165:7

**disagree** 50:20
216:8

**disbursing**
166:17

**discharge**
41:4

**discharging**
96:3

**discomfort**
93:5

**discretion**
151:25 153:4

**discuss** 22:7
25:3 31:2 99:12
140:4 170:9
182:25 216:11

**discussed**
19:24 20:1,3,
14,22 21:10,18,
21 22:12 23:19
25:6,17 30:4
46:22 48:14
51:21 68:4
94:18 110:19
130:20 139:6

**difference** (cont.)
160:23 161:7
169:2 177:17
180:9 182:5
196:3 208:20
209:3,10

**discusses**
51:19 98:5
100:1 170:11

**discussing**
39:22 51:7
52:22 89:12
109:19 204:17
207:15 215:4

**discussion**
19:15 37:13
109:21

**discussions**
37:21,23

**disengage**
171:21

**disengaged**
124:25

**disfigurement**
61:7

**disorderly**
99:7 100:25
110:9 111:2
114:19 115:11
116:18,22,23
117:4 121:11,
17 122:18
123:7,18 124:7,
11,21 125:4,6,
8,14,18 126:4,
11,15,22,25
127:5,7 128:9,
18 129:4,7,10,
20 130:11
132:3,11,24
133:15,17,19,
21 134:2,13,16
135:3 136:19
170:12,17
172:12,25
173:5 174:24
186:11 193:19

**dispersal**
92:10 124:14
137:6 146:4,5
160:16 162:1,8,
12 164:24

**difference** (cont.)
172:22 173:10,
16 174:18
175:3,10
181:15 184:10,
21 185:10,17
186:3 187:8,12
188:15 189:6,
25 190:3,4,7,
18,22 191:1,20,
23 192:7,13,19
193:10,12,23
194:1 198:16

**disperse**
122:16 124:19,
21 126:2,3
132:12,19,22
133:3,22 137:2,
4 156:13 161:4
162:1 172:16,
25 173:6,24
176:3,5,8
177:10 182:14
189:5,12,16,25
190:10,11,17
192:4

**dispersed**
125:5 126:2
161:24 165:21

**dispersing**
125:1 146:6
159:2 173:15

**displaying**
160:17 161:18
162:5 165:20

**disposal**
165:16

**disrupt** 95:22

**disruption**
96:1

**distinction**
175:5

**distinguish**
174:19 175:13

**distributed**
26:4

**disturbance**
31:6 99:7
100:19,24
101:8,9 102:13
103:2,19

**difference** (cont.)
105:19,22
106:1 107:21,
24 108:8
170:12,17
172:12 177:24
178:22 186:11

**disturbances**
100:9

**Disturbances/
disorderly**
99:5

**division** 15:10,
17,19,21 16:2
17:2,9,12,18,
19,24 30:2,10
33:20 34:7,16
35:1

**divisions** 15:9
90:10

**DMS** 201:21

**document**
19:1,4,7,11
40:13,15 43:16
98:11 146:21
147:12,13
167:24 196:4,
13

**documentatio
n** 27:16 167:13

**documents**
21:9 22:21,23
23:6 25:5,24
26:20 27:3 28:8
29:20 146:8
168:23 169:6,9
179:11 183:8
195:25 196:21,
23 198:2
201:22

**draft** 196:14,15

**drafting**
188:24

**drafts** 196:1
198:1,2

**drive** 96:3

**duties** 41:3,5

**duty** 41:12
94:17

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of EMILY MCKINLEY, taken on June 18, 2024

30(b)(6)                                                                        228

# E

e- 25:25 204:19

e-mail 28:22,25
201:5,11,14,24

e-mails 26:3,6,
20 27:3 29:12
196:1 204:14,
21

e.g. 56:10
158:12

earlier 34:16
46:22 52:10
59:20 65:20
68:4 85:24
87:10 97:9
110:19 116:21
126:20 130:20
132:20 135:17
147:5 158:10
161:7 174:23
177:18 179:24
180:8 182:5
190:24 194:21
200:8 204:13

early 15:17

earth 148:2

ease 18:11

easily 147:11

echoing 107:6

edits 198:6

effect 11:22
43:2,4 100:19
199:16,24
200:3 211:18,
24

effective 41:24
42:2 162:12

efficacy
162:11

egress 174:11
175:10 193:22

elect 159:4
165:17

elective 15:25

electrical
95:20,23

electronic
203:15

elevate 154:14

else's 208:9

emergency
154:25 155:22

Emily 8:10,12

employees
206:13

empty 77:1,2,
4,9,14,17,19
78:1,2,4,11,12,
13,14,16,20
79:6,8,12,14,
18,19,21 80:4,
6,7,10,13,24
81:4,6 85:25

enacted
212:19 215:8

encounter
64:5,9 96:5

encountering
52:19 55:1
75:13 79:23
80:14

encounters
62:24 63:6

end 12:17
44:19 49:6 64:7
87:12 107:12
157:8,25
161:10 194:6
209:19

ended 10:21

energy 95:23

enforcement
130:22 171:2
172:1,8 176:20

engage
103:11,21
105:7 126:10

engaged 62:24
63:4,5 73:4,9
103:16 105:10,
14,18,21,25

120:20 180:1,6,
10,21,25 181:8

engages 63:12

engaging
55:2,6 75:14
103:10,15
117:5 120:22,
23 121:12,13,
18 123:5 124:3,
4,10 125:25
176:7 178:8

entire 31:12
47:23 58:7,12,
15,21 98:5,8
99:18 100:13
101:1 126:16
128:25 177:16

equipment
110:9 111:1
172:17 173:1

essentially
45:11

estimate 29:11

et al 9:15,16

evaluating
192:25

event 104:9

events 104:7

evidence
71:13,15 188:5

evolve 44:25
71:22 79:2

evolves 53:13
54:9

evolving 43:23
44:22,23 53:6,
21 74:16,23

exact 10:20
17:16 18:2
24:11 205:13
208:10

EXAMINATIO
N 9:5

examples
56:4,10,12,24
57:10 66:4 93:6
110:11,12,14

113:9 117:12
130:1 135:9,10,
11 141:9,23
142:7,8,22
149:5,12 150:3
151:18 155:25
156:14 193:3

exception
154:24 155:11,
14

excessive
186:20

exchanged
29:12

exchanges
29:4,10

excuse 28:19
80:4 107:4
113:8 127:9
132:10

execute 41:11

executive
27:20,23
203:11 204:14,
25 208:21
209:4,11 210:5

exercises
168:19

exhibit 18:21,
22 40:7,8
98:22,25
104:22,24
105:2 170:1
207:11

exhibiting
117:6 120:24
121:14 122:3
123:11,17
127:19

exigencies
192:6

exigency
191:12,19,21

exigent 156:15

exist 169:9
200:22,23,24,
25 201:9,15
202:25

existed 201:1,
7

exists 132:5

Expand 94:1

expectations
41:12

expected
18:16

explain 40:23
60:1 81:16
95:17 117:8
139:24 143:1,
15 152:12
156:5 192:16
193:17

explained
58:11 90:3
117:22

explaining
45:11 87:10
184:13 185:6,9
207:17

explains 58:8
69:22 81:24
126:17 129:8
135:10 183:22,
23

explanation
78:11

explicitly
51:20 140:8

explosive
148:18,21

explosives
130:3 148:9,22

extends 75:6

extent 10:3
39:23 50:21
213:20

external 174:6

extreme
207:20

eyes 93:4

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 69 of 85 PageID
#: 2727
The Deposition of EMILY MCKINLEY, taken on June 18, 2024
30(b)(6)                                                                            229

**F**

**facility** 15:16

**facing** 72:5
125:20

**fact** 8:19 72:11,
20 75:11 80:24
191:15

**factors** 44:13,
16,18 45:20
57:18 73:22
79:25 80:18
81:7 97:18,23
98:6 119:21
123:20 144:6,
19 145:5 146:7
147:2,10 159:3,
6,19,25 166:20
167:3 176:11
180:23 181:4,
18 191:15
192:24

**facts** 87:25

**fair** 13:6 14:1
23:21

**fall** 174:3

**falling** 56:5

**familiar** 44:17
120:14 196:24
197:24

**fear** 118:12,17

**feed** 49:1

**feedback** 11:8
17:6 41:21

**feel** 12:7,25
13:15,16
149:25

**feels** 36:22
38:17

**fell** 17:17 34:8

**felony** 154:3,4,
7

**field** 24:20
40:20,21 41:1,2
52:19 179:1

**fight** 118:4
158:19,25

**fight's** 159:8

**fighting** 51:15
68:7

**figure** 102:18
124:22 183:7

**fill** 167:8

**final** 10:21
60:18 81:9
106:24 162:18
171:24 184:1
193:5 199:9,12
204:12 214:14

**find** 89:20
200:25 201:2
213:24 214:4,
11 215:2,14

**fine** 8:1 83:12
109:3,4,9
163:23

**finish** 12:15,19
57:2 163:23

**finished** 12:13
57:4

**fire** 92:13 97:15
119:5

**firearms** 51:13
68:5 137:21,22,
24 138:2,4,7

**fired** 91:13,20
137:1,12

**firework**
148:17,20

**fireworks**
130:3 148:9,15,
18 149:2

**firing** 66:6

**fist** 143:6

**fists** 118:6
159:9,17

**five-minute**
204:5

**fix** 107:14

**fixed** 56:6

**flash** 110:13

**flash-bang**
113:9,11,17,20,
24 114:3

**fleeing** 57:22

**flight** 45:2,22
73:24 97:22
166:24

**flip** 13:4 190:20

**focused** 59:11

**follow** 150:18
179:5,6 181:13

**food** 108:24

**force** 10:12
40:16,18,19
41:1,9 43:18,20
44:2,7,15 45:1,
23,24 46:10,19
47:1,16,23
48:6,11,18
50:9,10 51:6,
10,14,16,19,24
52:3,4,7 56:14
58:7,9,10,15,21
61:11,12,15
63:1 65:7,10,
14,17,18,24
66:5,10,12,20
67:5,8,11,19,23
68:1,8,9,11,14,
20 70:1,22,24
71:6,12,18,22
72:1,8,13,17,23
73:1,4,8,17
74:15 75:11
78:19 79:3 80:2
81:3,23,24
83:23 89:15
91:25 98:4,5,8,
12 99:20,24
100:18 129:14
147:7 156:15
157:25 160:3,
22 161:15
163:3,9 165:3,
9,12,25 166:3,
5,11,12 167:10,
16,18,19,20,21
179:17,20,25
180:21 181:11
185:3,5 195:15
199:1,23

**foregrounding**
113:8

**form** 8:14
22:15,18 48:7
62:16 63:20
102:14 107:25
108:10 119:9,
14 121:22
127:11 134:7
135:18 136:7
142:6 143:2
150:10 167:8,
11 179:13
180:4 184:25
186:8,13,24
187:20 190:23
191:4,8 208:15
213:18,19,21

**formal** 172:16
212:19

**format** 10:25
11:2 22:16

**formation**
15:23 173:17
175:9

**formations**
173:10 174:2,5,
13,17 175:6,22

**forms** 28:1,5
95:7 182:6

**forward** 49:25

**four-** 33:22

**four-hour** 33:5
36:15,18

**Fourth** 99:12
100:1

**free** 12:25
13:17 207:1

**frequently**
51:9 205:17

**front** 25:5,19
151:2 173:17

**full** 8:8 65:4
74:3 76:7,22

**fully** 69:9
151:24

**Fund** 7:8,19

8:6 9:12

**future** 16:9

**G**

**gaining** 86:3

**gaps** 33:24

**gas** 94:22
110:11,20,22
116:1 135:11
150:20 157:16

**gather** 173:21,
23

**gathered**
103:20 124:18

**gave** 9:24
11:13 50:1
124:13

**geared** 24:23

**general** 82:17
139:7 212:11

**generally** 24:1,
22 40:17 66:25
69:17 78:14
111:6 196:24
201:6 213:14,
15

**give** 9:1 10:25
49:17 78:10
117:12,25
130:1 141:23
142:8 155:25
156:5 162:25
165:6 181:1
190:25 191:23
192:13,19
193:15 215:23

**giving** 11:21
12:4 52:9 76:1
85:15 173:15

**glass** 13:16

**glitch** 49:7

**good** 7:7,20
9:7 109:18
168:2 170:2
194:11

**govern** 99:10,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of EMILY MCKINLEY, taken on June 18, 2024

230

16,18 100:5

**governed**
82:22 113:12,
20

**governing**
200:16

**Government**
9:16 18:8,13

**governs** 40:25
100:6,14
178:15,16

**grab** 78:7

**grabbing**
77:21

**grabs** 77:10

**graffiti** 106:21

**Graham** 44:17,
18

**graphic** 43:21
45:3,6,9,13,15
46:1,4,5,8,14,
17,19,20 47:1,
16,19,21,25
48:2,5,10,15,18
50:8,25 51:7
52:8,9,13,15
56:15 63:25
74:11 78:24
80:21,22 89:12
179:25

**great** 8:18
12:11 14:3
18:15 89:11
96:16 98:10
101:7 109:11
141:12 176:14
194:5 207:19,
23 216:2 217:3

**greater** 78:19
98:6

**green** 75:18
76:17,18

**grip** 57:1

**ground** 11:14
51:15 68:7
128:19 134:3,9
136:20 137:1,3,
13 145:22

146:18 151:5
153:12,19
155:1,23
159:24 171:16

**group** 117:4
118:22 120:7,8,
16,22 121:4
122:18 123:10,
16 124:2
129:22 130:4
132:21,24
141:7,13
151:12 152:22
175:8

**groups** 175:23

**growing** 146:6

**grueling** 13:17

**GST** 51:15

**guess** 10:21
15:25 20:17
36:2 47:4 48:4,
10 57:25 58:17,
23 61:14 62:13
64:2 67:2 73:3
77:25 79:4 92:4
94:4 99:15,19,
24 100:10
102:18 111:8
118:19,25
119:3 120:11
121:16 123:3,
15 124:13
127:4,21 129:5
134:11 139:9,
22 140:3
141:24 144:14
145:15 146:13,
14 147:17
148:2,5,10
149:15 150:12,
19 152:14
153:23 157:20
158:2 159:21
165:5,16
168:10 175:12,
20,24 177:16
179:10,23
181:6,20
184:20 190:9,
20 197:1,5
202:11 206:8,
11

**guessing** 47:9
56:14

**guidance** 98:7
147:18 151:25
153:24 154:2,9
157:24 159:23
160:4 179:11
183:15

**guide** 179:1

**guided** 181:25

**guidelines**
159:22 163:4

**guides** 170:11

**guiding** 86:1

**gun** 94:20
149:13

**gunfire** 130:7
147:1 154:19
156:1,6,7,9,10,
13,25 157:1,5,
12,14,18
192:18 193:2
207:20

**guns** 94:19
95:2,5

**guys** 164:14

**Gwinn-
villaroel** 39:25

_____

**H**
_____

**half** 124:18,20,
24

**hand** 8:25
45:19 52:16,17
57:20 77:1,2,4,
9,13,14,15,17,
19,22 78:1,3,4,
7,12,13,14,16,
20,21 79:6,7,8,
12,14,18,19,21
80:4,7,10,13,24
81:4,6 85:25
86:1 97:20
119:16 123:20
150:25 151:3

**hand-** 95:6

**hand-toss**
94:21 95:2

**handful** 29:4,
10,13,18

**handgun** 66:6

**handguns**
68:6

**handle** 178:23

**handling** 100:1

**handouts**
168:24

**hands** 77:12,
16,18 78:13,14
86:2

**happen** 31:10
38:12 58:1 69:5
191:17,25
197:25

**happened**
38:14 182:8
196:22 197:2

**happening**
12:2 125:24
128:3 156:10
158:3

**hard** 77:2 78:1,
2,4,12,14,20
79:6,18,19,21
80:4,7,10,13,24
81:4,6 82:8
137:5 148:3
152:19

**harder** 12:6

**harm** 118:12,
17,21 207:19,
23

**harming** 56:24
57:8 60:16

**HC** 93:11
110:23

**head** 14:23
17:16 20:12
24:10,21 26:8
46:12 66:1,14,
19 67:4,10,13
68:14,19 70:2,
7,23 71:7,11

198:12

**headed** 12:16,
18

**heading** 43:8,
17

**heads** 12:4

**health** 15:18
61:6

**hear** 11:1 37:18
39:6 141:20
149:23 163:11
203:20 213:18

**heard** 37:8
48:24 163:25
164:2 172:18

**hearing** 11:3
107:7,11

**held** 41:14
69:21 156:21
204:22

**helpful** 42:24
43:15 56:13
69:24 72:10
79:16 87:5 89:7
104:2

**hey** 133:8

**high-** 144:8

**high-level**
182:15

**high-pitch**
165:11

**higher** 64:13

**highest** 64:8
171:7,15

**highlight**
56:18 65:21
128:14

**highlighted**
61:13 87:7
102:20 114:17
128:15 196:5,
13,15 197:11
198:2

**highlighting**
92:23



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 71 of 85 PageID
#: 2729
The Deposition of EMILY MCKINLEY, taken on June 18, 2024
30(b)(6)                                                                    231

**hired** 69:19

**hires** 69:5,7 70:5

**history** 198:17, 21

**hit** 91:21,22 118:3 137:3 162:13,16

**hits** 91:19 92:13

**hold** 48:22 209:20 216:11

**holding** 56:6 206:1

**holds** 77:10

**holiday** 216:24

**holistically** 177:10

**hope** 109:17 152:17

**hoping** 13:18

**hour** 31:7 32:20 33:23 39:3 109:6,8

**hours** 32:7,21 22,24 33:2,12

**houses** 15:10

**human** 129:21 140:17,23 141:25 146:22 148:16,21 149:1 191:22 192:9 193:1 207:19

**Humphrey** 14:24 34:4,13 39:18 198:19, 22

**I**

**idea** 191:4

**ideal** 152:24

**identification** 8:15 18:22 40:8 98:25 104:24

**identified** 111:7,10

**immediacy** 44:20 45:21 46:2,10,15 57:21 59:9 73:23 97:20 147:9 166:24 191:13

**immediately** 189:2

**imminent** 59:25 60:7 101:17 102:7, 11,24 103:6,24 104:6 189:11, 13,14,15

**impact** 66:2, 15,19,22,23,25 67:2,9,12 68:13,18 70:1, 6,23 71:6,11 81:13,20 82:1, 4,5,7,8,9,11,12, 15,17 83:1,23 89:13 90:1,4,5, 8,9,12,13,15, 16,17,19,23,24 91:2,6,7,8,11, 14,19,21 92:6, 8,12,15,16 96:11,17,19,22 111:4,6,20,24 112:4 160:10, 14,22,24,25 161:22,23 162:9 165:22 178:12 184:1,8 187:5 188:12

**impairment** 61:6,7

**implementatio n** 16:8 30:7 34:10

**implementing** 34:5

**implying** 117:23

**important** 12:2,12 41:8 45:16,25 51:23

52:2,5 53:24 74:14 184:22

**impose** 135:15 136:20 150:8, 14,22

**impractical** 155:1

**improvement** 14:11,13 15:8, 14,20 16:3,13, 17,20,21 17:8 18:4 34:7

**in-** 31:21

**in-person** 205:1

**in-service** 15:24 30:5,24 31:3,4,9,10,11, 13,22,24 32:7, 12,16 33:14 35:12,18 38:1, 2,25 39:4 51:11 69:15,21 70:25 71:3,4

**in-services** 70:5,15,18

**inaccuracies** 48:17 50:10,24

**incident** 10:1, 3,5,6 52:16 171:2 177:22 189:6,9,18,23 190:2,6,11,21 192:4 193:6

**incidents** 100:14 105:12 178:22 188:15

**include** 25:12 35:13,17 36:19, 25 37:4,9 70:23 71:6 85:13 99:13 110:10 131:13 139:3 173:1 184:5,22 188:24

**included** 35:22 70:24 111:4 138:10 168:18 195:15

**includes** 15:9, 15,21 16:1,4,7 51:13,15 70:1 114:25 161:13

**including** 172:1 184:18

**inconsistent** 177:15 185:4 186:6

**incorporated** 35:24 51:16

**incorrect** 108:19

**independent** 153:6

**independently** 159:12

**individual** 18:9 53:23 57:7 77:10 78:5 88:24 97:13 111:9,10,16,19, 21,22 112:5 120:10 129:22 130:4,24 131:20 141:6, 12,14 143:21 144:9,17 146:10 147:20 151:9,10,12 152:22 153:9 158:11 161:24 166:2 177:14, 19,21,23 178:4, 8,9,13 180:10, 21

**individual's** 95:25 96:1

**individual- based** 161:2

**individualized** 178:11,16 184:11

**individuals** 79:9 111:7 117:5 120:7,8 123:10,16 129:22 130:4 141:7,13 151:13 152:22

160:17 161:1,5, 7 162:5 165:20 180:17 184:14, 15

**infinite** 144:20 159:19 166:20 167:3 191:25

**information** 22:17 23:15 25:19 26:25 32:1,3 37:4 38:18 48:1 49:1 62:9,11 97:17 146:16 153:5, 12,21 181:2 197:1,3,8 205:7 206:1,4,5 207:3,4 209:7, 8,14

**informed** 18:15 214:15

**informing** 168:22

**initially** 10:16 46:21 69:11

**initiated** 198:18

**initiating** 195:18 197:13

**injured** 145:23, 24

**injuries** 66:2, 15 142:17 167:13

**injury** 54:21 59:25 60:8,14, 19,24 61:4,21, 25 63:19 64:7, 21 66:1,3,16 67:14,15,16 70:8 71:21 72:2,7,14,25 73:6,10,18 76:14 78:16,17 81:4 96:21 114:20 115:12, 15 116:4 117:11 126:22 128:10,23 129:23 130:9



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 72 of 85 PageID
#: 2730
The Deposition of EMILY MCKINLEY, taken on June 18, 2024
30(b)(6)                                                                    232

140:25 141:3,8,
15,17,22 142:2,
4,9,12,13,16,
18,20 146:23
149:4 158:12,
15 163:6
165:15,22,23

**inquire** 93:19

**insert** 103:13

**instances**
105:15

**instruct** 24:5

**instructed**
214:16

**instrumental**
34:17 35:4

**intel** 173:21,23
174:3

**intend** 91:22
92:8

**intended** 56:22
87:13 91:13,16
111:18

**intending**
86:16 92:8,9
146:24

**intends** 92:12,
14

**intense** 95:24

**intent** 91:24
92:4,5 117:10
129:23 130:5
141:7,14,22
142:17,19
146:23 151:13
152:23 153:1,9
158:11,14

**intentionally**
67:13 91:20

**interact** 183:1

**interfering**
122:24

**interim** 34:12
39:17

**intermediate**
81:23,24 89:14

**internet**
163:12,19

**interns** 7:22
8:4

**interpret** 88:7
104:6 157:7
206:11,14,20,
21,24 207:1

**interpretation**
88:12 104:11
206:7,8 208:6,
7,8,9,14,16
209:4 210:10,
14,18,22 211:8

**interpretation
s** 206:16,19
209:10

**interpreted**
207:3 208:11

**interpreting**
206:4

**interrupt** 83:4

**intersect**
183:1

**intertwine**
179:18

**intervention**
15:18 171:21

**interview**
213:10

**intimidated**
118:11

**intimidating**
117:7,15,16,18,
19,20,21,24
118:1,5,9,14,24
119:6,8,13
123:5,12,17
124:9

**introduced**
46:21

**inventory**
114:2

**investigation**
57:19

**involved**
34:13,23 126:6

158:25 167:13
195:17,22
197:14 198:19,
23 199:6,7

**involvement**
199:4

**irritates** 93:4

**isolated** 104:8

**issuance**
172:16

**issue** 29:17
150:1 172:24
173:6 194:1

**issued** 67:1
82:3,4,9,13
90:4 94:15
200:16,20

**issues** 24:24
25:2 50:1,5
100:2

**issuing** 76:4

**Item** 26:12,23
27:1

**items** 130:3
148:9

---

**J**

**J-U-S-T-I-N**
34:21

**January** 31:14
33:13

**jaywalking**
120:4

**Jefferson**
18:8,13

**job** 14:8
206:10,20

**join** 16:19

**joined** 16:21
18:4

**joining** 69:11

**joint** 77:10

**Jonah** 10:14

**jump** 128:13
133:23

**jumping** 129:1
154:22 170:21

**jurisdiction**
17:12

**justification**
143:22

**justified**
181:12

**justify** 141:15
144:11 148:12
149:10 192:7

**Justin** 34:17,
21

---

**K**

**Kate** 7:14

**Kentucky** 7:16
8:5 32:5,6
104:19 120:12

**Kevin** 8:5
205:10,11

**kick** 78:15

**kicking** 143:9

**kicks** 78:5

**kind** 12:4,22
27:17 44:7 62:3
74:2,4 87:17
100:17 109:1
129:1 132:20
143:17,19
150:4,5,8 165:9
186:25 192:17

**kinds** 40:21
67:2,9 77:13
82:22 83:22
90:9 93:16
107:2,19
110:15 112:11
113:11,20
117:25 122:12,
13,17 131:13,
22 136:5,22
149:20 150:1
192:6

**knowing**
144:19

**knowledge**
113:16 183:8,
10

**KRS** 101:19,20
104:20 105:4

**Kyle** 8:4

---

**L**

**lab** 153:16

**language**
115:10 117:24
128:8,20 131:9
175:2 178:18,
19 179:4
181:20 183:12
185:19 195:12,
14,15,20
196:17 198:9
205:23 206:23
207:6,8,23
208:2,5,10,11,
17

**large** 117:4
118:22 120:7,8
123:10,16
145:21 171:9
175:7 190:13

**launcher** 95:1,
3,6 151:1,3

**launchers**
94:23,24

**law** 25:11,16
36:13,21,24
37:5,10,15
38:17 41:13
51:18 52:4,5
68:11 101:20
104:18 120:8
121:21 125:11,
13 127:22
130:21 154:10
160:7 173:11
174:19,20
175:4,8,14,16,
17,19 176:2,10
178:25

**lawful** 56:5

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

117:5 120:23
121:12 122:8,
12,13 124:2,4
126:1 132:10,
16 133:6,7,12,
17 176:4

**laws** 127:23
128:1,5 154:1

**lay** 96:7

**lead** 66:3,16
67:14,15 70:7

**leaders** 172:18

**leadership**
206:12

**leads** 47:9

**learn** 30:3 88:1

**learned** 31:6

**leaving** 128:9

**left** 163:21
215:19

**legal** 7:8,19 8:6
9:12 24:18
36:12,17,22
37:1,3,9 38:4,9,
15,17 51:18
68:10 168:18

**Legislature's**
105:3

**legs** 13:16
78:15

**lethal** 93:3
95:21 168:17

**level** 32:4
44:23 45:21
51:14 55:1,5
59:11 62:7,10,
15,25 63:3,5,8,
9,13 64:4,8,11,
25 65:10 71:22
73:20 75:12
79:2,13,15,24
80:1,7 97:21
141:17 142:2
144:8 147:10
153:4 154:3,5,7
165:24 166:2,4,
11,12,24 180:2,
6 216:8

**levels** 45:1
46:6,7 54:23
62:23 65:7
72:22 75:7
76:20 98:7
129:14 154:11

**lieu** 163:2,8
165:8,18

**lieutenant**
22:2 171:12

**life** 129:21
140:18,23
141:25 146:22
148:16,21
149:1 191:22
192:9 193:1
207:19

**limitation**
58:20

**limited** 100:10
110:10 149:21
172:1 184:18

**limply** 56:5

**lines** 41:24

**lining** 174:2

**liquid** 150:5

**liquids** 130:2
148:8 149:9
150:2

**list** 18:16
19:15,24 20:1,4
22:18 24:14,17
25:21 27:4
29:21 129:17
132:8 138:24
139:3,10,15
146:3 168:16
169:4 172:4
182:20 207:11

**listed** 20:7,9,
12,19 46:3 56:9
58:20 70:2
87:17 93:8
96:12 103:17
104:19 112:7
113:17 115:21
204:24

**listen** 28:15
164:14

**lists** 23:17

**live** 66:7
153:18

**live-stream**
153:16

**LMPD** 26:17
27:20,23 30:4
31:16 32:23
33:18 99:6,8
138:4 139:24
140:4 197:15
205:22 206:12,
13 208:21
209:5,12 210:5
212:2,19
214:15

**LMPD's** 99:10
206:1,3,5

**located** 72:1

**location** 7:5
63:24

**locking** 56:7

**locks** 77:10

**log** 201:21

**logs** 27:12,13,
14

**Logue** 7:18

**long** 46:18
58:25 69:21
83:10 109:6
146:4 168:10

**long-range**
110:12 112:8,
20 162:19,24

**longer** 33:24
125:1,5 170:20

**looked** 23:4,10
61:16 65:19
71:3 79:17
116:21 128:7
194:22 201:13,
14,24 202:12

**looting** 130:6
151:19

**loss** 61:7 93:5

**lot** 16:10 44:16

73:24 79:17
97:17,18,23
99:13 122:21
129:2 144:6
146:7 147:2,10
153:21 159:3
176:11 180:23
190:16 192:23

**loud** 185:22

**Louisville**
14:10 18:8,13
210:9,13,17,21
212:9

**Louisville/
jefferson** 9:16

**lower** 80:8
129:14 165:24
166:2,4,11,12

**lowest** 64:4
80:1 165:2

**LRAD** 112:8
163:7 165:6,10,
24 166:4,11,17
173:3

**LRADS** 163:5
164:21 167:17

**lunch** 109:2

———

**M**

**Mace** 93:6

**made** 33:10
34:3 35:16
70:10,12 89:14
145:21 150:19
167:15 176:19
199:10,13
204:16

**mail** 26:1

**mails** 204:20

**maintained**
114:4

**major** 17:1
30:3,10,24
34:15,16 39:13
171:13

**make** 12:2,13,
20,24 13:9 24:3

48:4 53:8 67:19
82:24 84:6,16
87:21 97:18,25
98:9 107:2,20,
24 108:7 121:6,
7 122:3,18
124:21 125:13
126:13,14,17
129:19 133:3
137:9 144:21
146:20 147:22
153:21 154:10,
13 159:18,21
160:4 162:25
164:25 165:7
168:20 172:24
174:12 175:5
176:20 177:6
179:23 181:2
182:12 188:21
189:18 191:16

**makes** 45:5
71:24 79:15
100:16 108:25
144:8 148:22,
24 187:15,24
193:25 196:11

**making** 34:2
35:6 44:1,15
73:25 74:14,17
88:10 100:7
117:22 145:2
152:5 159:20
176:12,15
181:16

**manage**
173:17

**management**
116:3 135:23
137:11 139:25
140:6 150:16
173:9 174:5
175:6,22
177:17 178:7
184:24

**managing**
174:11

**mandate**
154:25 155:4

**mandated**
15:21 31:4,8,11
36:15 38:2

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 74 of 85 PageID
#: 2732
The Deposition of EMILY MCKINLEY, taken on June 18, 2024
30(b)(6)                                                                                                234

**maneuvers** 173:9,22 174:4, 17 175:6,22

**manner** 116:7, 14,15 177:2,7 184:2 185:4 186:6 187:5 188:13

**manual** 99:18 100:6,13

**manufacturer' s** 163:3

**mark** 18:20 40:7 98:22 104:21

**marked** 18:22 40:8 98:25 104:24 207:11

**marking** 105:1

**mass** 130:5 151:18

**materials** 39:2 138:12

**matter** 75:12 91:4,9,15,17,24 92:5 93:23 94:5 106:13

**matters** 92:3

**max** 169:17

**mayor** 208:3

**mayor's** 26:2, 5,10,16,24 40:3 113:23 204:15, 16,23 205:1,5 207:7,17 208:9, 20 209:3,10 210:4 211:7

**Mcbrayer** 7:11

**Mckenna** 99:2

**Mckinley** 8:10, 12,24 9:7 14:7 18:6,25 40:11 49:24 51:3 83:10,21 105:2 107:19 108:23 109:17,25 168:8 194:17

**meaning** 11:2 50:21 53:12 61:17 63:25 209:3,10 210:9, 13,17,21 211:8

**meanings** 210:5,25

**means** 11:21 52:9 59:23 61:16 66:7 72:5 77:11 85:9 88:14 95:22 102:19 105:9, 11 106:7 132:14,15 134:4,13 137:2 140:20 143:1, 13 148:1 154:6 156:25 157:5 158:3 160:20

**meant** 12:9,22 13:17 72:22 111:22 145:11 152:20

**measure** 152:19

**mechanism** 93:23 184:10

**mechanisms** 68:25 94:13

**med** 24:19

**meet** 28:18,19, 21 216:13

**meeting** 7:6 28:17

**megaphones** 113:2

**member** 31:16 32:23 211:7

**members** 30:4 31:9,11 172:19

**memorized** 59:1

**memory** 20:13 195:11

**memos** 27:19, 22 203:10

**mention** 21:12 89:14 187:13

**mentioned** 9:11 10:15 16:12 23:9 25:20 26:15,18, 23 28:17 30:23 32:18 35:7 39:12 68:7 69:25 71:2 92:17 94:20 98:12,16 138:19,24 174:1 181:7 182:19 193:1 198:5 201:17

**messaged** 47:21

**messaging** 16:6 35:2

**met** 130:14 131:2 135:24 136:6 137:12 140:6 150:21 155:15,18

**method** 162:1

**methods** 113:1 214:14

**Metro** 9:16 14:10 18:8,13 25:3 153:15

**middle** 24:5 132:21

**midway** 207:16

**mind** 22:3 30:14,20 56:19 61:2 65:20 110:6 112:15 114:17 117:3 160:12 162:22 164:11

**minimal** 56:2

**minimize** 163:5 165:15, 23

**minimum** 80:10 192:2

**minor** 189:6, 10,18,22 190:2, 6,11,21 192:5 193:6

**minute** 164:12 216:13

**minutes** 83:11, 12 109:6 163:19 188:9 194:7 215:23

**mischaracteri zes** 186:13 187:9 213:16, 21

**mischief** 154:2,3,7,11

**missed** 29:15 96:14

**missing** 81:20 90:2 163:16

**Misstates** 36:6 121:22 136:7 137:14

**mitigate** 110:9 111:2 192:14

**mm** 95:6

**modules** 139:11

**moment** 44:15 49:17 83:14 109:11 158:4 163:17 164:15 168:3 217:4

**month** 32:21, 24 33:5,21

**monthly** 21:20 22:13 23:17,19, 20,25 24:2,8,9, 11,15

**months** 32:21 33:8,9 69:21

**morning** 7:7, 21 9:7

**morning's** 50:2

**motion** 36:4

**motor** 95:25

**move** 16:16 17:1,17 49:25 52:22 56:6 78:8 89:9 90:12 128:18 129:4,7, 20 130:10 132:9 133:1,7, 8,9,14,17,20 134:2,12,15 135:2 136:18 154:23 162:2 168:10 169:13 186:14

**moving** 45:12, 13 53:7 54:5,10 56:4 64:24 77:23 78:6 85:14,17,22 113:9 160:8

**multiple** 104:7 105:14 106:12 153:12,13,17 162:16 187:22 205:14

**munition** 82:11 90:13,15 111:24 137:1 160:10,14,25 162:9 165:22 184:2,8 187:5 188:12

**munitions** 83:2 128:17,19, 21 129:19 130:10 134:1,3, 12 135:22 136:18,19 137:10 139:24 140:5 151:4 161:22 178:12

**muscle** 95:24

**mute** 7:12

---

## N

**NAACP** 7:8,18 8:6 9:11

**named** 10:10, 16,22 35:4

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 75 of 85 PageID
#: 2738
30(b)(6)                    The Deposition of EMILY MCKINLEY, taken on June 18, 2024                    235

narrative
167:12

narrower
43:13

narrowly
80:21

naturally 47:9

navigate
182:21,25

necessarily
39:20 62:10
63:5 84:15
90:11 111:8
113:3 120:19
121:8 144:1
148:17 149:16
155:16 162:2
168:14 179:19
206:19,21

necessity
171:20

neck 66:1,14
67:4,10,13
68:19 70:2,7,23
71:7,11

needed 88:2

negatively
119:7

nervous 95:22,
25 96:1,2

newest 196:15

nodding 12:4

noise 49:7
165:11

non-
cooperation
122:13

note 7:24 8:2
24:3 212:1

notes 195:10
215:25

notice 7:24
19:8 50:22
202:11 207:12
208:23

notification

163:12 172:18
202:13,18

notifications
202:3,6 203:8,9

notified 50:22
202:16,22

November
33:15

number 9:13
26:23 41:17,19
106:2 123:4,19
125:17,21
126:5 140:7
144:20 159:19
166:20 167:3
179:16 192:1
193:8 204:24
209:20

numbers
123:22

——————

O

oath 11:18

object 47:17
48:7 56:6 62:16
63:20 82:8
102:14 107:25
108:10 119:9,
14 121:22
127:11 135:18
136:7 137:5
142:6 150:10
179:13 180:4
183:17,18
184:25 186:8,
13 190:23
191:4,8 215:18

objecting
187:1

objection
13:12 35:19
36:6 48:12
137:14 143:2
186:24 187:9,
17,19 199:18
208:15,22
212:14 213:16,
18,19 215:11

objections

13:9 186:19

objects 82:15

obligation
216:9

observing
75:2 146:19

obvious 12:17

OC 93:7,9 94:5,
15 95:4 110:23
131:16,17

occasionally
11:9

occur 146:14
152:19 177:24
196:25

occurred 38:6
137:25 197:4,9
211:19 213:15

occurring
57:20 62:12
105:8,12 146:1
147:9 157:3,19,
24 158:24,25
192:21

occurs 152:21

offered 31:19
139:24

office 26:2,5,
10,16,25 36:22
37:2 38:17 40:3
113:23 204:15,
16,23 205:1,5
206:1,4,5,6
207:3,4,7,9
208:20 209:3,
10 210:4 211:7

officer 14:7
15:12 32:5,6,20
33:16,19,21
43:22,24 44:5,
9,13,14,15,21,
24 52:18 55:1,
10,12 56:2,22,
24 57:8,11,14
58:3 59:3 60:16
62:24 63:6
64:5,9 65:8,10,
11,25 66:6
69:19 71:23

72:5,7,12,17,23
73:15,17,21,25
74:7,10,12,13,
17,22 75:1
76:3,14 79:23,
24 80:1,19
82:18 84:5,22
85:2,14 86:1,6,
9,14,19,21
87:1,13,19
88:18,22 89:4
91:20,22 92:9,
12,14 94:15,19
97:14,15,23
98:2 100:5
125:20 129:3,6
130:16 138:8
145:23 149:18
153:3,16,19
155:17 156:16
157:16 158:20
159:12 163:1
164:24 165:8
166:16 167:4,7
170:25 171:5,7,
10,11,13,19
172:9,11,23
173:5 175:21
177:6 182:10
189:12,16
192:24 193:9,
14,15,18 205:8

officer's 33:6
55:6,11 56:1,25
61:15 74:21
84:10 86:16
91:24 92:3,5,7
99:19,23 167:4

officers 27:20,
23 28:2 31:20,
23 32:11 33:25
35:1 36:7,14,22
37:2 38:18
40:19,25 41:11
45:18 47:15,18
51:9,11,17,24
52:2,6 53:8,16
54:24 67:1,22,
25 68:12,13
69:1,3,4,7,10,
15,16 70:6,9
71:10 75:12
82:3,4,9,14,21
90:3,7 95:5
98:7 122:21,23

123:21 126:13
128:22 129:14,
23 137:18,20
141:8 145:23
150:22 152:25
156:1,3 158:9
161:3 166:21,
22 167:13,20
170:11 171:25
173:14,16
174:19 175:5,
13 176:12,22,
23 178:15,20,
23 179:5,9,11
181:12,16,21,
24 182:2,11,17
183:6,12,15
184:9,17,19
187:4 189:5,21,
24 190:2,10,16,
17 191:11,14
192:1,3,11,19
193:8,9,13,17,
20 194:1,3
202:16,21
203:14 204:1
214:15 215:5,9

official 104:11
126:8 130:13
199:10,13
200:15 208:13
210:9,17,22

on-scene
123:21 144:3
171:11

ongoing
15:23,24 157:1,
15 158:13
159:9

open 11:23
209:20 215:19

operate 147:22
160:7 179:7
181:24 182:16
183:11

operated
211:17

operating
179:8,9 182:1,4
183:13 212:3,9,
10,18 214:1,6,
10,17 215:3



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of EMILY MCKINLEY, taken on June 18, 2024

**operative** 214:17

**opinion** 199:20

**opportunities** 15:14 171:21

**option** 165:15, 23 173:19 176:21,25 184:17,19

**options** 65:11 172:1,8,11 173:4 176:20

**orange** 81:11 95:14 96:10

**order** 19:21 27:23 53:16 124:14,19,20 125:13 126:1 145:12 148:12 149:9 163:5 172:17,23,25 173:6,16 174:24 176:3,4, 24 189:6,25 190:3,4,7,11, 18,22 191:1,20, 23 192:7,13,20 193:10,12,15, 24 194:2 198:16

**ordered** 63:17, 21 64:11

**ordering** 156:20

**orders** 27:8,10 28:3 85:15 122:8,12,13 124:1,3 172:16 200:9,14,16,19 201:3,7,8,12, 15,25 213:23, 24 214:4,11 215:14 216:20

**ordinance** 195:13,14,20 196:8,17 198:6, 9

**organ** 61:8

**original** 42:3

50:12 198:3

**originally** 10:11,22 72:19

**outcome** 10:22 165:3

**outer** 65:9

**outline** 204:6

**outlined** 86:8 132:13 134:18 135:1,5

**overlapped** 215:15

**overlapping** 183:16

**oversaw** 14:25

**oversee** 14:10 15:3 17:22

**overseeing** 14:21

**overt** 59:22

---

**P**

**p.m.** 109:15 168:6 194:15 216:5 217:13, 14

**PA** 113:2 173:2 193:11

**pages** 58:25

**paragraph** 114:16 128:14 129:8 136:23 140:13 154:24 155:21 160:9, 20 162:18 164:9 171:25 207:16

**paragraphs** 134:22

**parenthetical** 56:10

**part** 10:24 29:16 34:4,9 35:8 36:18 44:5 45:16 50:21

51:21 87:7 124:1 125:1,3,6 126:3 167:24 189:1 195:4 215:8

**participating** 121:8 124:8 175:18

**parties** 7:4

**parts** 43:6

**passive** 54:20 55:14,21,24 56:11 63:17 64:12,16 79:10 80:14

**past** 156:11 157:14

**patience** 168:9

**Paul** 7:10,14 13:9 14:24 20:4,10,23 21:1,5 23:23 24:4 34:4 35:19 36:6 47:17 48:7,12,22 49:9 50:17 62:16 63:20 83:3,8 85:19 102:14 107:25 108:10 109:3 119:9,14 121:22 127:11 135:18 136:7 137:14 142:6 143:2 150:10 163:11,23 164:5,8 168:2 169:18,20,25 170:2 179:13 180:4 183:17 184:25 186:8, 13,17,21 187:1, 9,17,20 188:3,9 190:23 191:4,8 199:18 208:15, 22 209:22 210:1 212:16 213:18,22 215:13,17 216:16 217:7

**paying** 75:2

**peace** 32:6

101:10 102:23 103:5

**peer** 15:17

**pending** 16:9 163:13 215:17

**people** 15:25 26:4,12,17,21, 22 31:16 45:8 88:14 96:7 103:15,20 105:6,24 111:14 117:14 118:22,23 119:19 120:10, 16,22 121:4 122:18,22,23 123:4 124:7,19, 20,24 125:7,12, 21 126:5,9 132:21 141:22 145:24 146:1, 23 150:23 158:21,25 159:2,9,17 161:17 162:16 164:23 174:7,9 175:8 176:24 192:11 204:15 206:7

**pepper** 90:22, 24 91:5,7,9,10, 12,15,18 92:8, 9,11,15,18 93:6 94:18,19 95:2,5 97:10,15 110:11 114:25 115:6 116:2 128:17,20,23 129:3,7,9,19 130:10,13,15, 17,20,23,25 131:5 132:2 133:24 134:1,5, 7,12,18,21,23 135:1,7,11,12, 16,22 136:14, 18,21,24,25 137:10,19,21 138:5,6,10,13, 18,22 139:4,6, 8,24 140:5 151:3 168:17

**perceiving**

74:24

**perception** 74:8,20,21,24 75:14

**performance** 15:9,13,14,16, 19

**period** 32:25 42:7

**periodic** 195:5

**permissible** 73:4 79:19 96:23

**permission** 155:2,24 156:17

**permit** 97:15 98:3 180:20 189:7 192:5 193:6,7,14

**permitted** 72:7 73:2,9,17 183:24

**person** 59:25 77:12 80:15 82:18 84:16 86:20,22 87:23, 24 88:1,2,6,9, 20 91:23 97:16 105:10,14,18, 20 106:3 118:9, 10 123:24 141:4 149:18 162:4,14 171:16 177:14 180:1 189:14

**personal** 104:12 112:17 113:14 199:20 200:5

**personally** 50:16 195:17 197:14 199:22 200:2

**personnel** 26:9 173:20 174:2

**persons** 101:11 102:7,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of EMILY MCKINLEY, taken on June 18, 2024

30(b)(6)                                                                    237

24 103:6,10,16, 23 105:17,24 107:20,24 108:8 129:24 141:8 156:2

**perspective** 153:7 162:12 167:6

**pertained** 100:2

**phone** 28:22, 24 29:5 205:16

**phrase** 59:15 79:18 116:18 133:14

**phrases** 74:6

**physical** 54:21 56:2,21 59:22 60:15,19,24 61:4,21,25 63:19 64:7,8,21 66:1,3,16 67:14,16 70:8 71:21 72:2,7, 13,25 73:5,10, 18 74:18 75:14 76:13 81:4 96:21 118:8,10, 17,21 119:1 130:1 140:25 141:3 142:4,9, 12,16,23 143:4, 10 144:2 149:4 158:3,12,18,24 207:19,23

**physically** 156:2 157:21, 23 158:5,16

**pick** 49:6

**picking** 123:3

**picture** 45:12

**piece** 148:2

**PIO** 207:7

**PIO's** 207:9

**place** 19:9 21:15 31:12 42:3 46:19 58:19 69:14,16

85:12 86:17,21 182:12 197:17, 19

**placement** 53:23 81:2

**placing** 56:3, 22 84:22 85:10 86:19,25 87:13 88:4

**plain** 61:17

**plaintiff** 10:14

**Plaintiff's** 18:20 98:22 105:2

**plaintiffs** 7:16, 19 8:17,21 9:12,14

**plan** 53:2,8,9

**planning** 53:20 54:6

**play** 129:3

**plunge** 108:25

**point** 8:19 10:17 13:14,19 16:25 58:13 124:5 132:7 142:3,11 144:22 151:12 157:5,14 173:8 174:16 175:10 176:6 177:25 184:1,6 215:22

**pointing** 54:3

**points** 31:17 129:17 130:14 131:2 132:5 135:1,23 136:6 152:4 153:13, 17 155:15,18 156:8 172:4,7 173:21 181:19

**police** 14:9,10 26:2 45:6 69:19 129:12,18,23 131:4,6,10 141:8 146:15 151:20 152:15 155:10 156:18

173:2 182:18

**policies** 19:25 20:7,9,12,14,18 25:11,17 45:17 51:12 98:13 99:24 100:5,18 178:18,20 179:3,5 181:21 182:22 183:1,4, 16 197:11,20, 22 201:1,7,10, 12,16 202:1,3 203:5 206:14 213:3

**policy** 15:13 16:4,5,6 17:14, 22 18:2 24:18 25:3,4,9,13,15, 16 30:7 40:16, 18 41:5,10,13 42:3,9,14,16, 18,20,24 43:2, 4,6,8 44:3 45:7, 25 46:21,23 47:19,23 48:6, 8,11,18 50:11 51:10,16,24 52:4 55:9,15, 17,24 56:11 57:6,15,25 58:6,8,12,16,22 60:3 61:10,25 62:15 63:11 66:5,11,24 67:5,23 68:1, 17,18,21 70:3 71:23 72:8 73:2,16 75:24 76:8 78:12 79:8,20 81:24 82:12,23 83:24 89:13,15 92:19, 21 96:17,24 97:3,15 98:3,4, 5,12 99:6,8,11, 12,14,18,20,22, 25 100:6,10,13, 23,25 101:1 102:13 103:3 107:21 108:9, 19 112:3,13,23 113:4,12,21,25 114:7,11,12 118:20 119:23 121:10 126:8,

12,16,18 128:22,25 130:13 137:10, 25 140:21 141:13,19 144:11,16 146:12,16 147:6,7,15,16, 18,22 150:2,14, 17,21 151:17 152:2 153:10 154:7,8 155:6,7 157:25 160:2,3, 7,22 161:15,21, 25 168:18 170:8,10 171:6, 9 172:22 178:18,25 179:9,17,20 181:13,22,24, 25 182:3,8,16, 17 183:11,12, 22 185:2,5,19 186:14 187:10 188:25 189:19 190:10,13 195:12,16 196:24 197:25 198:8,19 199:6, 7,10,13,23 200:3 201:21, 25 202:9,16,17, 19,21,24 203:6 206:14,18,21, 22,23,24 207:2, 5,6,8 208:5,6,7, 8,10,12,14,17 213:9

**poor** 140:22

**poorly** 37:8 55:4

**portion** 46:9 89:17 169:13

**portions** 170:20

**posing** 55:13 76:13 84:12 122:23,25 177:21

**position** 15:1 16:23 173:16 199:5

**positioning** 71:18 78:25 117:17 173:14

**possibility** 33:14

**potentially** 33:17 166:25

**powder** 135:12 149:14

**power** 56:6 201:21

**Powerdms** 27:12,14,17 201:6,14,18 202:2,6,13 203:6

**Powerpoint** 22:25 23:2,4 25:22,23 27:4 29:22,24 138:20,22 139:13,14

**Powerpoints** 138:15 168:23

**practical** 155:23 168:19

**preceding** 140:12

**prefer** 7:23 21:1

**preparation** 28:12 39:21 70:19 200:14

**prepare** 19:21, 23 25:24 27:6 28:8,18,19 29:3,20 30:1 39:15,21 40:3 58:23 139:20 203:7 214:21

**prepared** 19:17 209:21 210:24 211:12 214:23 215:20

**preparedness** 216:9

**preparing** 21:10 23:15

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 78 of 85 PageID
#2736
The Deposition of EMILY MCKINLEY, taken on June 18, 2024
30(b)(6)                                                                              238

28:9 38:22,25
93:21 103:10
105:7 195:21

**presence** 74:7,
10,12,14,18
75:14 130:7
154:19 156:7,
10 157:4,11,13

**present** 23:12
59:23 63:12
74:13 80:19
81:8 132:12
134:17,25
135:5 140:1
180:10 194:1

**presentation**
23:1,4

**presentations**
23:3

**presented**
22:12 23:18
30:4 44:1,13,
21,24 45:1,22
47:20 54:24
96:20 98:9
123:21 144:6
166:21 170:15
191:15 192:1

**presenting**
86:11

**presents** 60:7
134:24,25
135:3

**prevent** 56:2,
22 84:22 87:13
88:17 114:20
115:11,15
116:4 126:22
128:10,23
130:7,9 146:25
152:24 154:18

**prevented**
152:18

**preventing**
86:6

**previous**
21:14,15 22:10
47:20 50:4
196:14 198:3

**previously**
42:10 47:4
119:25 157:6
169:1 207:11

**printing** 35:23

**prior** 14:24
17:1,16 129:15
182:7 202:17,
19,20

**private** 106:14

**probable** 85:6
87:22 88:19,20
89:3 176:15,20
178:11

**probes** 96:3

**problem** 19:2
217:6

**problems**
39:10

**procedure**
167:6 212:10,
11,18

**procedures**
170:5,16 179:8
182:1,2,4
184:23 188:14
212:3,9 214:2,
6,10 215:4

**proceed** 35:6
49:22 83:18
107:15 109:15
168:6 194:15
216:5

**PROCEEDING**
**S** 7:1

**process** 30:7,8
32:16 34:24
38:1 194:20
195:17,23
196:1,21,23,24
197:8,13,16,18,
24 211:18,23
212:2,6,11,19
213:2,5,14

**produce**
164:21

**Producing**
166:1

**proficient** 19:2

**progression**
43:18,20 46:18
47:1,15 50:9
51:6 56:14

**prohibits**
120:13

**prolonged**
61:6,7

**promise**
194:17

**promote**
173:10 174:13,
17 175:3,10

**promoted**
16:22

**property** 62:7,
9,14,25 63:2,4,
9 101:18 102:8,
25 103:7,25
106:6,7,8,10,
11,13,19,22
114:20 115:12,
15 116:5
126:23 128:10,
24 130:5,9
146:24 151:14,
16,23 152:9,16,
18,21,23 153:2,
10,24 154:4,5,
6,14 189:20

**proposed**
195:7

**protect** 129:21
133:11 140:17
146:22 149:1
156:3 158:9
207:19

**protecting**
148:16

**protest** 9:25
10:2,5 24:24
36:19 37:5,14,
25 38:4,14 56:7
99:5,10

**protests** 98:19
99:13,21 100:3,
4,5,8

**provide** 38:18
193:10,11,23
206:6

**provided** 22:9
179:11 183:14

**providing**
175:10

**provision**
25:15 46:13
170:8,10

**provisions**
21:10 82:23
98:18 99:9,16
204:1 211:9,17,
19 215:8

**PRV** 42:6,16

**public** 106:14
172:17 173:1
192:11 205:7
206:1,3,5,10
207:2,4

**pulling** 56:25

**punch** 78:15

**punches** 78:4

**Punching**
143:7,9

**purpose** 86:3
103:10 121:9
126:18 130:17
131:18

**purposes**
90:20,23 92:3
131:7 178:3

**put** 11:18 18:19
33:6 36:4 40:6
58:5 98:21
104:22 211:18,
23

**putting** 77:16,
22 86:1,2

---

**Q**

**qualifications**
68:6

**question**
12:14,15,17,18

13:5,11,23
25:25 37:7
47:10 48:25
50:4,5,7,8,17
53:14,16 59:11
61:19 63:22
64:1 67:6,24
72:18 83:4 84:3
93:25 98:1
100:24 102:15
108:16 115:8
116:17 135:19
140:2 150:12
157:20 163:13,
15 164:1,3,12,
16,17,19
166:15 175:25
184:5 186:22
187:23 188:19
200:1 203:20
209:1 212:21,
23 213:1

**questioning**
12:23 125:16
215:5

**questions**
13:10 144:15
163:21 197:5
204:13 209:19,
22,23 210:3,6
215:18 216:7

**quick** 13:18
78:10 83:5
109:2 162:23
204:5,6

**quickly** 42:12
149:7 207:10

**quote** 207:17

---

**R**

**raise** 8:24

**rank** 206:2

**ranking** 171:7,
16

**ranks** 26:4,12,
13,17,23
204:22 205:4

**rattled** 146:13



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 79 of 85 PageID
#: 2737
The Deposition of EMILY MCKINLEY, taken on June 18, 2024
30(b)(6)                                                                                    239

re-say 64:3

reaction 99:16, 19

read 20:13 48:24 49:4 53:1 54:17 58:15,21, 25 59:20 65:22 66:17 77:8 78:3 89:24 93:1 95:18 96:6 101:7 103:4 128:15 132:8 133:5 135:9 155:21 163:15 164:7,9,15 183:15 185:22 203:16 204:1 211:9

reader 43:22 45:4

readily 142:8 178:24 183:4

reading 41:17 46:6 56:19 61:2 65:21 68:23 71:18,25 72:1,2 110:6 114:17 117:3 128:25 141:21 160:13 162:22 164:11 190:12

readjust 49:12

readopting 199:15

reads 41:24 61:21 74:7,8 77:1,2 126:21 134:1 142:14 154:24 164:16 170:25 171:19 173:8 189:4

real 162:23 204:6

real-time 153:14

realize 92:1

reason 14:4 76:17 86:21 156:16 215:7

216:10

reasonable 80:2 85:5 87:23 88:19,23 165:3

reasoning 156:23

reasons 163:7 198:6,11,13

reassess 44:9 171:20

reassessment 195:5

recall 23:8 24:22 29:18,23 39:16 138:23 139:5,13 183:2 195:9,11 200:13

recalled 26:14 205:3

receive 22:16 23:15 26:20 33:14 36:14 51:11,17 68:12 137:20 153:11 215:9

received 22:18 23:18 26:4,11 28:2 33:11 36:7 38:9 139:12 182:21,25 203:15 204:19 215:4

receives 32:23

receiving 33:17,19 146:17 153:5

recent 17:15 42:17

recognize 40:13

recollection 168:15

recommend 133:8

recommendations 163:3

record 7:3 8:2, 9,14 12:9,11 21:1 34:20 49:15,18,20,21 56:20 61:3 78:3 83:15,16,17 109:12,13,14 110:7 168:4,5 194:12,13,15 203:1 204:9,10 216:1,3,4,19 217:11,13

recording 12:1

records 32:10, 13,15 114:2 201:18 203:14 215:2

recruits 15:23

red 65:14 71:18,25 72:21 74:2 213:10

refer 55:5 69:17 148:5 172:19 178:1 179:2 189:7 195:10

reference 26:25 105:5 161:9 182:21 183:3 184:6,22 186:1 187:15, 24 188:21 198:7,8

referenced 26:11,13 90:5 155:4

references 101:18 178:25 183:3 188:24

referencing 196:8

referring 24:21 50:16 54:22 68:22 69:18 70:4 87:9 89:22 90:14 114:11 172:7 178:8

refers 42:1,8, 15,17 158:12

reflect 65:10

reflected 48:2

reflection 48:5,11,13

reflects 48:18 182:16

refresh 20:13

refreshed 168:15

refusal 122:16 176:8

refusing 56:5 124:14,20 132:11,19,22 133:22

reiterated 159:15

reiterating 161:3

relate 201:12

related 27:17

relevant 25:15 30:3 31:5 36:21,24 37:14 38:17,18 47:22 179:21

rely 20:13

remain 125:7

remaining 216:14

remains 43:2

remember 10:4,13,18,19, 20 11:12,17,18 18:1,2,5 20:11 23:2 24:10,12, 16,21 25:23 26:8 29:5,9,11 65:19 109:21 138:20 180:19 194:23 195:18, 19 196:7,16 198:7,10 200:10 201:4, 13,19,20,23 204:17 205:13, 16,18 207:12

210:6 211:10 215:5

remembering 109:18

remembers 205:22

reminded 31:7

remotely 7:17, 20

remove 129:11

repeat 8:11 11:9 13:1 29:17 30:12 37:7 39:8 48:20 53:14 67:6 71:1 72:20 73:12 76:10 94:2 102:15 164:6

repeating 112:15 135:16

rephrase 55:4 108:1 128:21

report 167:8, 11,21 170:12

reporter 7:3, 13,23,25 8:7, 11,13,18,23 9:4 11:18 22:4 48:24 49:4,5, 11,14,17,21 83:14,17 107:4, 5,11,15 109:11, 14 163:15,17 164:13,16,19 168:3,5 194:11, 14 204:10 216:1,4,18,23 217:1,4,9

represent 9:12 105:3 161:12 197:6

representing 9:14

request 24:4 27:10,22 28:5 83:5 139:10

REQUESTED 164:16

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**requests** 55:11

**require** 60:12, 13 128:21,22 142:12 167:18 190:16

**required** 138:3 155:1,23 156:3 158:9

**requirement** 135:6 150:8 155:9,11,14

**requirements** 36:9

**requires** 32:5 182:18

**requiring** 182:9 207:23

**research** 16:4 17:17 30:6,18

**resistance** 44:23 45:21 46:6,7 54:20,23 55:2,5,13,15, 21,24 56:11,15, 21 57:5,14,17, 24 58:2 59:4,11 60:3,5,12,17 62:7,11,15,23, 25 63:3,5,8,10, 14,18 64:5,9, 12,15,16,19,22 71:22 72:22 73:9,20 75:7,13 76:20 79:2,10, 11,13,15,24 80:7,14,15 84:3,6,9,13,15, 20 85:8 86:8, 12,15,18,23 87:2,6 88:21,25 97:7,21 122:23 123:1 147:10 166:24 177:22 180:3,6 181:1

**resisting** 57:22

**resources** 145:22 189:6 190:16 192:5

**193**:6,7,10,14, 23 194:4

**respect** 157:20 197:6 200:1

**respond** 170:11 171:2 191:12 193:13, 20

**responding** 98:19 99:21,23 170:16 172:12 190:17

**responds** 178:21

**response** 21:19,22,23,24 24:23 31:8 35:9,14,17 36:3,8,12,19 37:5,10,14,25 38:4,14 39:3 59:13 99:6 100:8 138:16 145:17 168:21 170:13 178:21 188:14 192:25 203:19

**responses** 99:10 100:14

**responsibility** 17:8 146:15

**responsible** 16:8 34:2 35:2 171:1

**rest** 31:15 95:1 148:7 155:21

**restate** 12:25 63:22 94:2,4

**restrain** 77:10, 19 78:5

**restrict** 128:1,4

**restricted** 150:2

**restriction** 114:22 116:10 140:4 186:2 187:7

**restrictions** 91:2 135:16 136:21 150:15, 22 151:25 161:19,20 184:20,23

**REV** 42:7,16

**review** 20:25 21:9,13,19 22:20,21,23 23:6 27:8,10, 12,16,19,23 28:1,5,9 32:9, 13,15 38:21,24 39:2 47:3 114:2 138:5,12,17 139:20 152:7, 10 153:14 169:6 185:23 195:4,25 196:3, 6,21,23 197:12

**reviewed** 19:25 20:6,17, 18,19 21:17 22:25 23:2,3 24:13 25:21 27:5,7 28:8 29:20 70:18 167:15 196:5, 10,12,14 200:9 213:11

**reviewing** 25:23 200:13

**reviews** 16:5

**revise** 168:13

**revised** 42:10, 12,14,15,16,18, 20,21,25 46:23 47:4 104:18 137:25 178:19 194:22 195:7 196:4 197:7 211:18,23

**revision** 42:17 195:1,3,13,16, 22,24 196:1

**revisions** 28:2 197:2,9 198:20, 24 199:1,4,6,7 201:1,25 202:9 213:15 214:16

**reword** 63:22

**right-hand** 41:15 54:19

**ring** 74:3

**riot** 103:11,15, 21 105:7

**riots** 104:19

**risk** 61:5,12 65:25 142:1 149:3 163:6 192:15,21,22

**risks** 192:10, 16,17

**roadway** 132:22

**roadways** 133:11

**rock** 142:15 148:2

**rocks** 117:14 130:2 144:2 147:25 148:5

**role** 206:3,9

**room** 49:12

**round** 162:10

**rounds** 110:14 113:10

**route** 174:11 175:10

**rule** 137:18

**rules** 11:14

**running** 56:25 58:1

**rush** 216:21

---

**S**

**safe** 133:11 163:3

**safety** 15:18 60:10 129:16, 21 133:8 140:14 158:21 192:10,15,16,

**17**,21,22

**sat** 9:19

**satisfied** 216:10

**scat** 110:14 113:10

**scenario** 97:7 144:19 148:25 159:3,10,14 186:12 191:3,7, 9

**scenarios** 192:1

**scene** 164:25 171:8,14 174:13 193:19

**schedule** 21:14 32:23 33:6,22 34:18 35:5 36:10 38:10,11 216:13

**scheduled** 38:7 195:4

**schedules** 21:14

**scope** 35:20,21 50:18 199:18 208:22

**Scott** 9:15

**screen** 18:24 19:21 40:10,11 51:3 98:23 109:23,25 150:17 169:14, 15

**scroll** 43:7,16 55:18 60:22 61:20 65:20 71:17 77:7 78:2 81:19 90:12 95:13 96:9 102:1 114:6 116:23 126:19 170:23 185:23

**scrolling** 19:10 90:18 183:25



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of EMILY MCKINLEY, taken on June 18, 2024

30(b)(6)                                                                                                            241

search 201:5, 11

searched 201:24

section 50:9 66:24 67:8 72:2 81:21,22 89:21 92:21 99:4 102:3 109:1 114:7 150:7 161:13 163:21 171:9 178:7 180:9 185:24 190:13 194:18 205:23 210:18, 22 212:8 213:25 214:5,9, 11

sections 210:10 214:18 215:15

send 29:19

sending 8:14

sense 12:20,25 45:5 79:15 82:24 100:16 108:25 148:23, 24 193:25 196:11

sensory 96:1

sentence 67:8 114:16 126:20 128:15,22 132:7 133:2,6, 23,24 134:4,11, 14,23 135:4,6, 15 136:1,4,17 154:23 156:7 160:9 170:22, 24 171:18,24 178:7 190:12, 19 192:3

separate 59:9 61:14 81:21,22 88:4 89:17 92:21 98:18 103:1 161:13

separated 79:5 179:19

separately 87:18

September 42:21,22,25 46:23 47:2 194:23 195:3 202:13

sequences 104:7

sergeant 34:17 39:13 171:12 206:6

sergeant's 34:20

sergeants 203:25 204:1

series 31:19 41:16

service 31:22

services 14:15 17:2,18,23

sessions 33:25

set 24:9 31:20 119:4

sets 76:25

setting 96:4 148:14

severity 44:18, 22 45:20 46:2, 9,15 57:20 59:10 73:23 147:8 166:23

shaded 54:11

shaking 12:4

Shapiro 7:15

share 18:24 40:10 51:2 98:23 109:23 169:14,18,21 207:10

shared 19:1 169:15,23

sharing 19:20

shoot 149:13

short 85:13 194:8

shouting 117:16,20,21 118:1

show 81:5 105:1 185:24

showing 79:1 80:21

shut 119:12

sic 99:2

side 13:4 54:19 190:21

sidewalk 120:13,17 121:6 133:9

sign 201:21

sign-off 28:1 203:15

significant 33:16 165:22

signify 72:22

SIM 162:9

similar 24:9

similarly 11:25 12:11 32:16 73:8

simple 144:19

simply 84:5,14 132:22 133:21 180:24 185:9 187:23

SIMS 160:15 161:7,8,17,19, 22 162:4,7 165:25 166:12 184:2,13,18,20 185:3,16,19,24 186:2,5 187:8 188:17

single 106:11 123:24 141:14

sit 14:3 210:24 213:24 214:23

sitting 47:6

138:9 139:23 140:3

situation 43:22,24,25 44:8,10,11 45:19 52:14,16 53:6,8,10,12,21 54:9 71:21 72:6 73:15,16 74:15, 22,23 75:2 79:3,22 80:2 85:1 86:4 87:20 89:5 97:8,14,19 98:8 99:25 100:20 119:16 123:20 144:5 158:20 163:20 165:10 166:21 167:4,14 171:20 172:24 180:9,20 191:16

situations 37:3,20 44:12, 16,20 52:21 57:6 66:12 68:9 71:12 72:16 79:1 91:23 130:21 140:23 154:25 155:22 156:16 158:13 178:16,23

size 123:22 159:1

skipped 171:8

skipping 42:12

small 190:14

smallest 65:13

Smith 8:4

smoke 110:21, 23

soft 77:1,4,9, 14,17,19 78:11, 13,16,20 79:6, 7,12,14 85:25

solemnly 8:25

somebody's 86:1

something's 102:12

SOP 20:19 21:9 28:2 41:17,19 109:19 172:19 177:2,15 178:7 184:2 185:16 188:13 189:7 194:22 197:9 199:10,16 208:20 209:3, 11

SOPS 36:25 46:9,15 50:9 51:20 82:1 89:18 98:18 99:4,9 150:7 183:7 194:21 195:4 203:16 204:16 206:4, 11 207:24,25 211:17,23 214:18

sort 12:23 32:17 33:19 53:12 54:10 66:3,16 103:1 117:23 118:11 137:5 165:19 170:12 173:17 174:11 191:13 192:14 193:11, 21

sound 12:6 164:21 166:1

sounded 49:7

sounds 124:24 168:2 194:11

sources 153:6, 21

space 133:12

speak 29:2,25 30:2 39:14,17, 20,24 40:2 205:11,14,17

speaking 119:7 186:19 213:15

speaks 127:6

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 82 of 85 PageID
#: 2740
The Deposition of EMILY MCKINLEY, taken on June 18, 2024
30(b)(6)                                                                              242

**special** 21:18,
23,24 27:8,10
28:3 82:11 83:1
90:13,15
111:24 138:16
160:10,14,24
163:4 165:21
168:21 178:12,
21 184:1,7
187:4 188:12
200:9,14,16,19
201:3,6,8,11,
15,25 213:23,
24 214:4,11
215:14

**specialized**
62:2

**specials** 21:20

**specific** 19:25
25:14 40:21
62:10 71:15
82:22,23 99:25
101:3 111:19,
21 125:17
126:6 127:23
128:1,5 132:12
134:17,24,25
135:5 139:10
140:10 149:2,
20 150:1,17
167:17 168:16
197:3 208:5

**specifically**
13:10 21:2 25:1
26:9 82:9
130:24 139:6,8
198:14,15,17
199:3 201:4
205:18

**speculating**
212:25

**speculation**
212:15 215:12

**spell** 34:19

**spelling** 22:3
30:14,20
217:11

**spoke** 28:22,24
30:10,18,23
34:16 39:12
198:25 199:3

205:7,19,20

**spokesman**
207:17

**spokesperson**
208:4

**spray** 93:6,7,9
94:9 131:16,17

**spurred**
195:16,19

**SRT** 21:24 22:1
138:25 168:16

**staff** 210:5

**standard**
179:8 181:25
182:4 212:3,9,
18 214:1,5,10
215:3

**standing** 56:4
144:10,12

**start** 12:14
55:8 104:10
114:15

**started** 31:14
34:8 169:20

**starting** 54:19
56:10 65:13
160:10

**starts** 162:19

**state** 7:4 8:8
32:4,5,6,7,11
101:20 104:18
105:3 120:12
121:5 138:3
154:1,10
186:24

**stated** 50:6

**statement**
204:16 205:6,8

**statements**
205:2,3

**stationary**
56:4

**statute** 101:19,
20 104:19
105:4 120:12
121:5

**stay** 216:12,16

**step** 13:15
64:13,15,18,22

**sticking** 74:4

**stipulates** 8:22

**stop** 19:20
88:24 89:2
100:18 216:1

**store** 94:14

**strategy** 35:5

**stream** 38:15

**street** 120:13,
17 121:5

**stretch** 13:16

**strictly** 156:21

**strike** 78:15
91:13,16 137:5

**strikes** 77:15
78:5

**striking** 77:17
78:8 166:1

**stringent** 52:5

**struck** 91:23
142:15

**structure**
32:17 34:14

**structures**
130:6 151:19

**structuring**
35:3

**stuff** 148:8

**subject** 45:2,
22 54:25 55:6,
10,25 56:3,23
57:6,21 58:3,4
72:6,24 73:4,18
74:13,18 75:15
76:2,3,12 84:9,
11,22 85:3,7,
10,12 86:6,10,
16,17,22,25
87:13,20,22
88:5,16,18 91:1
97:21 112:23
116:10 178:9

**subject's**
56:21 57:7 58:9
95:22

**subjects**
122:24 166:25

**subsided**
157:18

**substance**
48:1,4 139:15
196:18

**substantial**
61:5 65:25

**substantive**
109:1

**sufficient**
95:24 216:25

**summer**
199:17

**supervisor**
30:6,17 174:12

**supervisors**
144:3 146:17
153:12

**support** 15:17

**suppose**
105:17

**supposed**
53:11 153:8

**Surely** 204:7

**surrounding**
89:1

**surroundings**
97:22

**suspicion** 85:5
87:23 88:19,23

**swear** 8:25

**sworn** 32:6
206:6

**system** 27:17
32:4 82:11 83:2
92:10 95:22,25
96:1,2 111:25
160:25 173:2
193:11 202:2

**systems** 15:18

90:13,16 113:2
137:21 160:10,
14 165:22
168:17 184:2,8
187:5 188:13

—————

**T**

**tac** 24:18

**tactical** 173:9,
19,22 174:4
175:6,9,22

**taking** 45:2
56:1,3,23
84:23,25 85:7,
9,13,16 86:4,7,
24 87:14 88:9,
17,18 125:18

**talk** 12:12 30:5
46:5,7 98:15
110:2 134:6
151:4 161:19
194:19 195:22
198:4 213:5,14
214:9 216:16

**talked** 21:2
28:7 75:8,10
81:10 85:25
97:9 125:11
132:2,20 147:5
154:22 160:22,
25

**talking** 36:17
59:12 66:23
83:22 84:2
85:24 98:11
99:19 110:23
120:7,9 126:25
127:21 128:5
130:22 134:14
141:25 147:6
148:16 155:21
160:21 161:25
180:8,14,16
181:6 191:22
194:21 199:1
214:1,6

**talks** 46:9
134:8 171:9
184:7 211:5

**target** 111:7

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

160:17 161:23
162:4 184:11

**targeted**
111:20 150:15,
18 184:15

**targeting**
150:8,23 161:7
162:5

**taser** 96:7

**taught** 71:9

**team** 15:17
21:19,22,23,24
22:10 23:13
138:16 168:21
178:21,22

**teams** 90:10,14

**tear** 110:11,20
116:1 135:11
150:20 157:16

**tears** 93:5

**techniques**
188:16

**telling** 137:3

**tells** 13:10
179:5

**temporary**
93:5

**ten** 32:21 33:8
83:11,12
167:25 188:9
202:17,19,20,
22

**tens** 33:9

**tenure** 69:13

**testified** 108:4
174:23 179:24
194:25 204:13
211:2,14
215:20

**testify** 14:4
18:7,16 19:17
210:9,13,17,21,
25 211:12,20,
22 212:1,5,12
214:19,24
215:21

**testifying** 10:7
11:23 50:15

**testimony** 9:1
10:25 19:21
36:6 50:2 71:4,
14 83:25
121:23 136:8,
14 137:14
168:11 186:14
188:5 213:9,13,
17,21

**text** 100:23

**that'd** 77:21

**thing** 59:14
63:24 65:22
79:17 85:10
95:14 106:5,24
139:13 147:25
154:13,16
164:8 187:21
193:5 211:10

**things** 11:10
16:10 37:9
53:17,20,22
56:9 73:24
87:17 88:8,13
93:8 112:7
115:20 117:17
118:2,5,7
119:5,24
125:19 135:3
144:21 145:1,8
147:1 148:12
151:20 153:18
154:16 167:1,5
173:20 179:17
189:3 192:23
193:13 205:18

**thinking** 61:14
149:12

**thought** 33:11

**threat** 44:20
45:21 46:3,10,
15 57:21 59:10
60:7,14 72:13
73:23 97:20
118:8,14,18
140:24 141:3
147:9 166:24
189:11,13,14,
15 191:14

**threatened**
141:18 142:2

**threatening**
72:6,24 73:5,
10,18 117:18
118:5 119:4

**threats** 117:18,
23 118:1,23,25
119:1,2

**threshold**
125:18

**throat** 66:1,14
67:4,10,13
68:19 70:2,7,23
71:7,12

**throw** 148:17,
20

**throwing**
117:14 130:2
143:12,14,21,
25 144:9,18
145:11,13
146:10 147:20
148:5,7,10,11
149:2,8

**thrown** 145:18,
20 148:3 149:9,
16

**time** 17:23
18:13 19:9
31:20 33:2,16
42:14,17 87:19,
24 88:3 132:23
145:24 191:23,
24 192:13,19
205:14 216:25

**times** 9:21
12:7,17 13:8
29:2 41:5,7
76:9,11 88:21
100:17 115:16
116:1 130:8
138:10 159:15
187:22 192:12
205:15,19

**timing** 194:20

**title** 100:23

**titled** 43:10,17
99:4 114:8

170:5

**today** 9:8 14:3
18:7 19:23
25:24 27:6,24
28:8,10,13,18
29:3,20 43:3,4
47:7 58:24
70:19 83:25
139:20,23
140:3 210:10,
21,24 211:12,
14 212:2,12
213:5,6,24
214:1,7,10,19,
23 215:21

**today's** 21:10
23:16 28:20
30:1 38:22,25
39:15 40:3
93:21 195:21

**told** 181:12

**tool** 83:23
161:2,3 162:3
184:11 185:10,
14

**tools** 116:6,11

**top** 17:16 20:11
24:10,21 26:8
41:15,17 46:11
138:1 198:12

**topic** 25:15
38:18 207:15
211:5,10,16
213:23 214:14,
19,21,24

**topics** 18:16
19:15,18,22,24
20:4 21:14,19
22:12,19 23:12,
18 24:11,14,16,
17 25:22 27:4
29:21 30:3
31:14 35:20
39:22 50:22
138:25 139:3,
15 169:1
182:20,24
194:8 199:19
207:12 209:21
210:2 211:3
215:21 216:14

**toss** 94:21
149:14

**tossed** 95:7
151:1,3

**totality** 43:25
45:19 59:6
125:19,23
128:2 143:25
144:4 145:1,4,
7,9,14 147:23
151:22 159:16
165:1,14 166:7,
19 170:14
176:11 181:17

**track** 31:23

**tracked** 32:1,2,
4

**tracking** 32:4

**tracks** 32:8

**traffic** 145:25
174:8 175:9,14,
17

**Trager** 205:10,
12

**train** 51:23
67:22,25

**trained** 23:17
47:15 48:2
51:9,21 68:8,
13,16 71:10
126:13 137:18,
22 214:15

**training** 15:13,
21,22 16:2
17:9,12 21:12,
13,14,15,16,19,
20 22:8,9,11,
13,15,19 23:10,
13,19,20,25
24:2,8,9,11,15,
23 25:4,5,6,7,
10,12,14,16,18,
21 27:4,5 29:21
30:2,9 31:5,10
32:2,7,8,10,12,
20,22,23,24
33:2,12,13,15,
17,19,20,25
34:7,14,16
35:1,13,18,25

---



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

30(b)(6)                                                                              244

36:4,5,7,10,12,
14 37:4,22 38:6
51:12,13,14,15,
16,18 68:4,5,6,
10,12 69:2,4,6,
7,8,10,12,14,
15,18,20,22
70:3,4,13
137:20,21,23
138:2,4,5,7,17,
25 139:3,7,10,
11 152:25
168:16,17,18,
19,20,22,24
169:1,7,10
182:6,24

**trainings**
22:21,24 23:1,
5,7,14,21
24:13,25 25:22
30:24 31:3
36:19,25 37:25
38:3,5 47:20,22
51:17,21 70:11,
16,19,25 71:3,5
137:24 138:10,
13,15 139:16,
23 140:4,7
169:3,4 182:20

**transcript**
30:15,21 59:21
65:23 216:19,
22

**transcription**
12:1

**transcripts**
28:9

**transition**
17:15

**transitioned**
18:3

**transitioning**
79:10

**treat** 175:22

**treated** 90:19

**trial** 11:3

**trick** 12:23

**triple** 94:10,21
95:5

**true** 41:4 141:2

**truth** 9:1,2

**truthfully** 14:5
211:2,14 212:5

**Tuesday**
217:2,5

**turned** 138:16

**turning** 45:13

**two-** 31:7 39:2

**two-hour** 35:9

**type** 45:24
66:22 91:4
163:2,8 165:12

**types** 93:19
94:13 110:18,
20,22 114:3
127:23 128:1
178:23

———

**U**

**uh-huh** 12:5
74:9 85:18
103:12 132:17
203:2

**uh-uh** 12:5

**ultimately** 35:1
87:21,25

**uncomfortable**
164:22

**uncooperative**
56:1 117:7
122:6,14,17,21,
25 123:1,6,12,
17 124:15

**understand**
11:23 13:5
18:1,6 19:13
25:8 27:2 41:11
45:18 52:3,6
59:8,9 62:17
87:16 88:11
92:2 97:21
137:8 147:7,17
150:11 179:23
182:19 190:20
196:12

**understanding**
19:6 38:13
62:22 64:1
104:13,14
120:11 156:25
166:10 175:24
208:1

**understands**
62:4

**understood**
36:2 39:24
47:6,25 59:2
60:18 63:11
69:10 71:16
73:14 74:1
75:17 76:17,21
79:4 80:3,20
81:9 82:19 90:7
98:2 115:25
130:25 131:8
136:13 156:24
159:8 179:10
198:4

**unfolding** 75:3

**Uniform** 99:22

**unit** 15:11,15,
18 16:4,5,7
17:14,17,23
18:3 30:6,18
163:4

**unknown**
97:24

**unlawful**
101:9,18,23
102:2,4,8,12,23
103:1,4,7,8,14,
20,25 106:25
107:2,20,22,23
108:5,6,7,12
114:20 115:11
116:18 119:25
120:2,3,21,23
121:13,25
124:10 126:22
127:1,6,9,10,
15,16,17,19,24
128:3,6,9,18
129:4,7,10,20
130:11 132:3,
11,19,24
133:15,19,21
134:2,13,16

136:19 176:4,7
181:8

**unlawfully**
121:25 127:8,
13,18 174:25

**unnatural** 12:7

**unruly** 117:6
119:22 120:1,2,
3,5,18,21,24
121:3,7,21
122:3 123:5,12,
17 125:10,25

**unstable**
163:12

**unsurprisingly**
216:8

**update** 38:15

**updated** 36:22
45:7

**updates** 24:18
36:13,17 37:3,
9,10,15 38:4,10
51:18 68:10
201:21

**use-of-force**
10:6 96:4

**user** 96:3

**utilize** 80:1
171:25 172:9,
11 173:1

**utilized** 110:9
114:19 115:11
126:21 128:17
130:10 134:2,
12 136:18

**utilizing**
172:17 176:20

———

**V**

**vandalism**
130:5 151:18

**vantage**
153:13,17
173:21 175:9

**variables**
146:14

**variety** 31:13
37:21 51:12
92:3 123:22
147:2 153:5,20

**vehicle** 173:2

**vehicles** 130:6
151:19

**verbal** 59:13
75:21 76:1,7,
11,14,18
203:19

**verbalize** 12:3,
8

**version** 47:4
199:9,12,16
210:14 212:10,
18

**versions**
211:17 214:17
215:3

**versus** 166:1

**victim** 61:5

**video** 7:17
153:14,17

**videoconferen
ce** 7:9

**videos** 28:12

**view** 70:22
153:16

**violate** 125:12

**violating**
121:5,20
127:24 175:8,
14,16,17,19
176:2

**violation**
125:11 127:22
173:11 174:18,
20 175:3
176:10

**violence** 63:13
101:17 102:8,
12,25 103:7,24
104:3,4,8,12,
15,17 105:5,8,
9,10,11,15,18,
21,25 118:9,10,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:20-cv-00535-BJB-CHL    Document 215-6    Filed 01/10/25    Page 85 of 85 PageID
#: 2748
The Deposition of EMILY MCKINLEY, taken on June 18, 2024
30(b)(6)                                                                    245

14,18 119:1
180:2,11,22

**violent**  105:13
117:6,8 123:5,
12,17 124:8

**visual**  43:20
93:5

**visually**  45:9

**vocalize**  12:3,8

**W**

**W-E-S-L-E-Y**
22:5

**W-I-T-T**  34:22

**wait**  121:16
155:2,24
156:17 193:12,
22

**waiting**  193:19

**walk**  52:10
73:15 88:24
172:15

**walking**  56:25
57:11,13,17,23
58:1,10 59:3
84:4,5,14
86:13,23 97:13
120:13,16
121:5

**wall**  137:5

**wanted**  59:14
84:6,13 89:9
168:19 170:19

**warnings**
146:4,5

**watch**  28:12

**water**  13:16
108:24 143:21
144:1,10
145:13,17,19,
20 146:11
147:21 149:13

**ways**  103:2,18
149:15

**weapon**  66:2,
15,19,23,25

67:12 70:6
71:11 81:13,20
82:2,4,6,7,8,9,
12,17 89:13
90:1,5,8,19,23,
24 91:8,11,13,
14,19,21 92:6,
9,12,15,16 93:3
95:20,21 96:11,
17,19,22 111:6,
20 160:24

**weapons**  67:3,
9 68:14,18
70:1,23 71:6
82:14,15,20,22
83:23 90:4,9,
12,16,17 91:2,6
110:15 111:4
112:4 159:1
160:22 161:1

**weather**
145:25

**website**  105:4

**week**  31:21,22
32:25 33:1
216:25 217:1

**weeks**  216:15

**wellness**
15:15

**Wesley**  22:2,5,
7 28:18,21,24
29:3,19 39:14

**wheel**  45:13

**white**  54:12,18
59:16

**whoever's**
171:15

**Whomever**
171:7

**wide**  153:20

**William**  39:13

**window**  106:18

**Witt**  34:17,22

**wondering**
67:9 86:4 107:8
108:23,25

**word**  53:23
56:14 59:15
139:8

**worded**  37:8
55:4

**wording**  60:18

**words**  45:10,
11 53:4 54:11,
16,17 55:5
63:16,17,24
65:9 76:25
78:25 81:13
88:15 206:23

**work**  9:11

**worked**  17:20

**working**  16:24
32:16

**Works**  107:15

**would've**
22:10 26:13
31:14 202:10,
20

**written**  22:14,
18 52:13 54:16
58:13 66:24
75:21 146:8
147:12,13,18
159:22 183:15

**wrong**  108:15

**Y**

**Yang**  8:5

**year**  22:10,11
31:12,15 33:3
34:9 35:8
138:3,4,7

**year's**  39:3

**years**  22:13
23:10

**yelling**  117:18
118:23

**yellow**  76:21,
23 78:23

**York**  7:9,20

**Z**

**zoom**  7:17 19:1
52:25 61:21
71:17



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com