# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY

ATTICA SCOTT, CORBIN SMITH, KAYLA MEISNER, TYLER WEAKLEY, STEVIE SCHAUER, WILLA TINSLEY, PATRICK MOORE, and the KENTUCKY ALLIANCE AGAINST RACIAL AND POLITICAL REPRESSION, on behalf of themselves and all others similarly situated,

        Plaintiffs,

v.

LOUISVILLE/JEFFERSON COUNTY METRO GOVERNMENT, GREG FISCHER, individually and in his official capacity as Mayor of Louisville, ROBERT SCHROEDER, individually and in his official capacity as Interim Chief of the Louisville Metropolitan Police Department, LaVITA CHAVOUS, individually and in her official capacity as Assistant Chief of the Louisville Metropolitan Police Department, and LOUISVILLE METROPOLITAN POLICE DEPARTMENT OFFICER "J." JOHNSON, LOUISVILLE METROPOLITAN POLICE DEPARTMENT OFFICERS JOHN DOES #1-#15 and JANE DOE #1, in their individual capacities,

        Defendants.

Civil Action No. 3:20-cv-0535 (BJB) (CHL)

## PLAINTIFFS' REPLY IN FURTHER SUPPORT OF
## MOTION TO COMPEL FURTHER 30(b)(6) TESTIMONY

This dispute arises from the Subpoena and Notice of Deposition served on Mayor Craig Greenberg on May 17, 2023. Defendants moved to quash that subpoena and this Court denied that motion, making clear that the official statements and interpretations of Louisville/Jefferson County Metro Government's current policies and practices are "at issue in this litigation and are

a basis for the Parties' claims and defenses." ECF No. 154 at 2. Defendants objected to that order and, during a hearing on February 21, 2024, at the suggestion of this Court, the Parties agreed that if the City could produce an alternative deponent adequately prepared to speak to the current policies that would "largely eliminate [Plaintiffs'] need and desire to depose the mayor." ECF No. 184 at 43:14–17.

Thus, as a compromise solution to Defendants' objection to the deposition of Mayor Craig Greenberg—and following multiple meet-and-confers—the Parties agreed to a limited 30(b)(6) deposition on five noticed topics related to the meaning of currently operative policies, the specific process through which those policies were enacted, and the role of the Office of the Mayor in amending, interpreting, and implementing those policies. *See* ECF No. 214-1. Defendants designated Assistant Chief Emily McKinley to testify on behalf of the City regarding those five topics.

As set forth in Plaintiffs' motion to compel, however, Assistant Chief McKinley was neither adequately prepared nor knowledgeable about the noticed topics, rendering her testimony inadequate to satisfy the requirements of Federal Rule of Civil Procedure 30(b)(6). *See* ECF No. 214. Defendants do not meaningfully rebut Plaintiffs' claims. Instead, Defendants filed a motion for a protective order that purportedly also served as an opposition to Plaintiffs' motion to compel. ECF No. 215. In doing so, Defendants conflate two separate issues relating to two separate deposition notices: the operative Second Notice of Deposition, served on June 11, 2024, ECF No. 214-1, and the Second Amended Notice of Deposition served on November 15, 2024, an amended version of Plaintiffs' previously served 30(b)(6) notice addressing the policies and procedures in

place during the summer of 2020.[1] ECF No. 215-1. Plaintiffs hereby reply only to the former and will address the latter in a separate opposition.[2]

I. **The City's Designee Was Not Adequately Prepared, and Defendants Do Not Dispute Her Testimony Regarding Her Lack of Preparation**

Contrary to Defendants' position, Plaintiffs are not seeking perfection; rather, they seek adequate preparation as required under Rule 30(b)(6). As Defendants affirm, a designated witness "must be educated and gain the requested knowledge to the extent that it is reasonably available to the corporation." *Shall v. Suzuki Motor of Am., Inc.*, No. 4:14-cv-00074, 2017 WL 4050319, at *5 (W.D. Ky. Sept. 13, 2017) (citing *Pogue v. Nw. Mut. Life Ins. Co.*, No. 3:14-CV-598-CRS,

---

[1] Plaintiffs' original 30(b)(6) notice was served on May 5, 2023. That notice seeks the official testimony of the City regarding numerous topics pertaining to the claims and defenses at issue in this case, including the City's chain of command, internal oversight mechanisms, officer training, and documentation surrounding the tracking and use of crowd control devices and other police actions during the 2020 protests. After the City raised various objections to the scope of that notice, Plaintiffs served an amended notice on June 30, 2023, and thereafter Defendants moved for a protective order raising still more objections to the amended notice. Defendants' motion remained pending until March 12, 2024, when this Court denied Defendants' respective motions for a protective order related to both the 30(b)(6) deposition and the deposition of Mayor Craig Greenberg, based on the Parties joint representations that they were working to narrow both disputes. *See* ECF Nos. 186, 188. In each of these joint status reports, the Parties made clear that the disputes arose from and would be resolved by two separate depositions. *See, e.g.,* ECF No. 190 ("The parties have now agreed as to the topics to be covered in the limited deposition, and are finalizing the date for such deposition. The parties will meet and confer after that deposition to discuss the remainder of the topics listed in Plaintiffs' initial 30(b)(6) notice."). And, as agreed, following the limited deposition, on July 12, 2024, Plaintiffs provided Defendants with a significantly revised Second Amended Notice of Deposition, narrowing the proposed topics for the 30(b)(6) deposition based on (1) the topics covered by the limited deposition notice; (2) proposed designations of testimony from Named Defendants; and (3) objections previously raised by Defendants in a Motion for a Protective Order filed on July 12, 2023. *See* ECF No. 144. That notice was further narrowed and re-served on November 15, 2024 in response to additional objections raised by Defendants. Defendants now attempt to conflate the two depositions in their combined Motion for Protective Order and Response to Plaintiffs' Motion to Compel.

[2] Pursuant to LR 7.1(c), Plaintiffs now timely reply to Defendants' Response to Plaintiffs' Motion to Compel [ECF No. 214]. Plaintiffs will separately oppose Defendants' Motion for a Protective Order [ECF No. 215] within the timeframe specified by the local rules.

2017 WL 3044763, at *8 (W.D. Ky. July 18, 2017)). While these obligations do not require "absolute perfection," they do require a "good faith" effort to prepare, such that a designee may answer relevant questions "fully, completely, and unevasively." *Weber Mfg. Techs, Inc. v. Plasan Carbon Composites, Inc.*, No. 14-12488, 2016 WL 8114507, at *5 (E.D. Mich. July 26, 2016) (citation omitted). A designee falls short of these obligations when they fail to take reasonable measures to obtain the information they need to do so, including by interviewing witnesses, reviewing relevant documents, and otherwise requesting relevant information. *See, e.g., id.; Schall*, 2017 WL 4050319, at *5 ("[S]uch a designee has a duty to reasonably obtain information from corporate documents, current or prior corporate employees, or any other sources reasonably available to the corporation."). The fact that such preparation is "voluminous and burdensome" does not excuse a party's obligations. *Champion Foodservice, LLC v. Vista Food Exch., Inc.,* No 1:13-cv-1195, 2016 WL 4468000, at *13 (N.D. Ohio Aug. 23, 2016) (citation omitted).

The record demonstrates that the City's designee was not adequately prepared to testify regarding any of the five agreed upon topics. To give just a few examples, Chief McKinley testified that in preparation for her deposition she failed to speak with relevant higher-ranking officials, *See* ECF No. 214-5 (McKinley Tr.) at 39:14–40:4;[3] to "ask anyone" about communications between the mayor's office and executive command on the meaning and interpretation of the relevant amendments, *id.* at 209:2–17;[4] to request or review any special orders, executive memos, or other

---

[3] *See, e.g.,* ECF No. 214-5 (McKinley Tr.) at 40:2–4 ("Q. . . Did you speak with anybody in the mayor's office to prepare for today's deposition? A. No.").

[4] *See, e.g., id.* at 209:2–17 ("Q. Since December 2022, has anybody within the mayor's office discussed SOP 9.1, the meaning or interpretation of it, with anyone in the executive command at LMPD? A. I don't have an answer to that. Q. Did you ask anyone for that information? A. I did not ask anyone for that information. Q. Okay. Since December 2022, has anyone in the mayor's office discussed the meaning or interpretations of SOP 12.6 with anyone in the executive command at LMPD? A. I -- I don't have an answer for that. Q. Did you ask anybody for that information? . . . A. I -- I did not ask for that.").

notifications about the amendments, *id.* at 27:8–25;[5] to make basic inquiries about the types of devices covered by the amended policies, *id.* at 113:19–114:5;[6] to request or review the substance of multiple relevant trainings, *id.* at 22:23–23:13, 24:12–15, 24:25–25:7; 25:17–19;[7] or to seek any information regarding the process through which the specific policy amendments relevant to the claims and defenses in this case were made, *id*. at 195:21–198:3.[8] This largely undisputed record is more than sufficient to establish that Chief McKinley was inadequately prepared to testify as the City's designee on the narrow topics the Parties had agreed upon.

---

[5] *See also id.* at 202:2–204:3 ("Q. [. . .] Did you look in the PowerDMS system for any notifications that went out when these policies were amended in 2022? A. No. . . . Q. Okay. Did you look at any memos that were sent out from the executive command about the 2022 amendments, either to 9.1 or 12.6? A. No. Q. Did you look at any records about officers completing the electronic sign-off, having received and read the amended SOPs? A. . . . [No] Q. Did you check with any sergeants to see if sergeants read out the new provisions to line officers upon the amendments? A. No.").

[6] *See, e.g., id.* at 113:19–114:5 ("Q. Did you ask anyone within the department about other kinds of flash-bang devices that are governed by this policy? A. No. Q. Did you ask anyone within the mayor's office about other flash-bang devices that would be covered by the policy? A. No. Q. Did you review any inventory records or anything about the types of flash-bang devices maintained by the department? A. No.").

[7] *See also id.* at 139: 9–21 ("Q. [. . .] [O]nce you got the list of training, did you request any of the specific training modules? A. No, I -- just the -- I just received the PowerPoint. That was the only thing that I can recall. Q. Okay. So aside from that one PowerPoint, you got the list of topics, but not the substance of any of the trainings? A. Correct. I don't have -- I do not have the curriculum. Q. Okay. And just for not having them, do you mean you did not review them to prepare for today? A. Correct.").

[8] *See, e.g., id.* at 195:21–24 ("Q. In preparing for today's deposition, did you talk to anybody who was involved in that revision process [to SOP 9.1]? A. Not about that revision. No."); *id.* at 196:21–25 ("Q. Did you review any documents about the process for how those changes happened? A. I did not review documents of the process. I'm familiar with the process of generally how policy changes occur."); *id.* at 197:15–198:1 ("Q. [. . .] Did you ask anybody within LMPD about the process by which these 2022 amendments to 9.1 and 12.6 took place? A. I did not ask anybody about the process in which those amendments took place of the Chapter 12 policies. Q. And just to clarify, how about the Chapter 9 policies? A. No, I -- I did not ask anyone about the process of those particular changes. I'm just familiar with how policy changes *can happen* within the department.") (emphasis added).

## II.   As a Result of Inadequate Preparation, the Designee Was Unable to Answer Questions About the Noticed Topics

As a result of this lack of adequate preparation, Chief McKinley was unable to provide the City's official response—or at times any response—on myriad questions directly responsive to the five noticed topics and to the overall purpose of the limited deposition: To establish the City's position on the meaning of currently operative policies and the process through which those policies were enacted and implemented. In her own words, Chief McKinley did not "have specific information" about how amendments to SOP 9.1 were made, *id.* at 197:1–4; did not "know the history specifically of -- of why or -- or how -- [the revision to 12.6] was initiated," *id.* at 198:13–21; and did not have any information regarding who proposed or approved the revisions to become official policy, *id.* at 195:7–9, 199:9–14 ("Q. Do you know who approved the final version of SOP 9.1 before it was made official policy? A. No. Q. Do you know who approved the final version of 12.6 before it was made official policy? A. No."). Chief McKinley was also not aware whether, when, or how a key graphic on the use of force progression was amended. *See id.* at 47:1–12 ("Q. Was this progression of force graphic changed during those September 19, 2022 amendments? A. I -- I would need to go and review the previously revised, I guess, version. So I -- I do not -- I don't know just by looking at this right now. . . Q. [. . .] Do you know when this continuum was last changed? A. No."). Likewise, Chief McKinley "did not have an answer" and "did not ask anyone" whether any member of the Mayor's Office had spoken with LMPD's executive command about the meaning or interpretation of the relevant SOPs. *Id.* at 209:2–17. And when asked which policies were discussed during training on crowd control and the First Amendment, Chief McKinley responded, "I don't have the information in front of me." *Id.* at 25:17–19.

Defendants do not dispute, nor can they, that Chief McKinley was unable to testify on behalf of the City in response to several noticed topics. For example, the record is unambiguous

that Chief McKinley was unable to testify regarding communications with the mayor's office, including the basis for the specific policy interpretation made by the Office of the Mayor in the press and identified by Plaintiffs over one year ago. *Id.* at 208:1–12 ("Q. Does the city have any understanding of where that language came from? A. I think the mayor would have to -- spokesperson would have to articulate that, but that is our -- it is not specific language from our policy. It could be an interpretation of policy.").[9] Likewise, the record is unambiguous that Chief McKinley was unable to answer questions regarding the process through which these specific amendments were made, *id.* at 197:1–4; 198:13–21, 199:9–14, to affirm, beyond her own personal knowledge, whether any special orders had been issued by the Chief modifying the relevant procedures, *id.* at 27:8–25; 202:2–204:3, or to testify regarding the content of any trainings— including whether and how they "trained [] or otherwise instructed" officers on the relevant changes to the Standard Operating Procedures.[10] On each of these topics, Chief McKinley's testimony therefore fell far short of the "full[], complete[], and unevasive[]" answers required of a designee. *Weber*, 2016 WL 8114507, at *5.

---

[9] *See also id.* at 209:2–17 ("Q. Since December 2022, has anybody within the mayor's office discussed SOP 9.1, the meaning or interpretation of it, with anyone in the executive command at LMPD? A. I don't have an answer to that. Q. Did you ask anyone for that information? A. **I did not ask anyone for that information.** Q. Okay. Since December 2022, has anyone in the mayor's office discussed the meaning or interpretations of SOP 12.6 with anyone in the executive command at LMPD? A. I -- I don't have an answer for that. Q. Did you ask anybody for that information? . . . A. I -- **I did not ask for that.**") (emphasis added).

[10] *See, e.g., id.* at 25:17–19 ("Q. And so, which policies were discussed at the training on crowd control and First Amendment? A. I don't have that information in front of me."); *id.* at 138:9–18 (testifying "I don't know" in response to questions about whether and which trainings discussed pepper ball use specifically); *id.* at 139:22–140:8 ("Q. I guess, sitting here today, do you know how many, if any, LMPD trainings discuss the restriction in 12.6.5 that pepper ball munitions may only be used for crowd management if one of these five criteria are met? A. I -- I -- I don't know the number of trainings that explicitly say that.").

Defendants instead focus on "three hypotheticals" which, in their view, Chief McKinley was adequately prepared to address, implying that testimony on these examples was sufficient to satisfy the obligations of the designee. First, it is clear that these "hypotheticals" were illustrative of the ways that the plain language of the Standard Operating Procedures remains insufficient to establish whether or to what extent recent policy changes appropriately re-dressed the harms Plaintiffs' experienced during the summer of 2020. *See, e.g.,* ECF No. 184 at 9:14–19, 17:22–18:2.[11] Plaintiffs were seeking and entitled to testimony on current policy beyond the confines of those three specific examples. Any attempt to frame Plaintiffs' representations to the Court otherwise is belied by the record. *See id.* at 43:14–44:14, 78:20–79:1. Moreover, to the extent that Defendants object to the relevance of the noticed topics, those objections should have been raised before the deposition. The Parties were instructed to confer and advise the Court whether an agreement could be reached on these topics. *Id.* at 78:20–79:1. Following that directive, the Parties represented to this Court that they had conferred and agreed upon the noticed topics. *See* ECF No. 190 at 2. Having conferred twice, then agreed upon the topics, Defendants cannot evade their obligations by raising new objections after the fact.

Regarding Topic 1, the Meaning and Official Interpretation of Policies, Defendants argue that, despite clear language to the contrary, Chief McKinley was testifying on behalf of the City at all times. Specifically, Defendants argue that "uttering the words 'I think' or 'I would consider' does not automatically render the statement a personal opinion" and that additional context makes clear that Chief McKinley intended to bind the City through her testimony, even when she used such qualifying language. *See* ECF No. 215-1 at 10. The opposite is true: Chief McKinley was

---

[11] Moreover, for the reasons described above and in Plaintiffs' motion to compel, the designee was not adequately prepared to testify on behalf of the City about the interpretation or application of the policy, including regarding key definitions relevant to each hypothetical scenario.

repeatedly and plainly given the opportunity to clarify whether her testimony was on behalf of the City and she repeatedly made clear that it was not. For example, when attempting to clarify the definition of "collective violence" as used within SOP 12.6, Plaintiffs expressly asked "is that the City's official interpretation of collective violence [o]r is that your personal understanding?" Chief McKinley replied: "That is my understanding of collective violence." ECF No. 214-5 at 104:10–15.[12] Likewise, when seeking to understand the kinds of "flash-bang" devices used by the City and governed by the amended policy, Plaintiffs asked, "is that based on your personal knowledge or the City's awareness?" Chief McKinley responded, "that is my knowledge. I don't know of any other flash-bang devices other than what's listed here." *Id.* at 113:9–18. She further affirmed that she had not asked anyone within the department or the mayor's office about which devices would be covered by the policy or reviewed any records about the same. *Id.* at 113:19–114:5. Similarly, despite acknowledging that the Office of the Mayor communicated an "interpretation of policy" to the public, Chief McKinley was unprepared to testify on behalf of the City regarding the basis for that interpretation, instead stating that "the mayor would have to -- spokesperson would have to articulate that," despite being designated as a deponent precisely to obviate the need for testimony from the mayor. *Id.* at 208:1–6.[13] Based on her own statements, it is therefore clear that when Chief McKinley used terms such as "I think," she intended to communicate only her personal

---

[12] *See also id.* at 154:6–17 ("Q. Is that what serious property damage means in this policy, a felony level mischief? A. **That is not what that -- this policy says.** But if you're asking for other guidance, that might help the chief make that decision. I think the state law, as far as the various levels of criminal mischief, would be something that they would consider. So that wouldn't be the only thing that would make that decision -- that would -- that would elevate it to serious property damage. But I -- I would -- if you're asking for other things to consider, that would be one thing that I would consider."). (emphasis added).

[13] *See also Fed. Deposit Ins. Corp. v. Butcher*, 116 F.R.D. 196, 199 (E.D. Tenn. 1986), *aff'd*, 116 F.R.D. 203 (E.D. Tenn. 1987) ("One of the purposes of Rule 30(b)(6) is to curb any temptation a corporation might have to shunt a discovering party from 'pillar to post' by presenting deponents who each disclaims knowledge of facts clearly known to someone in the organization.").

knowledge. This intention is in keeping with Chief McKinley's own testimony regarding her preparation; put simply, Chief McKinley chose to testify in her personal capacity at various points throughout the deposition because she lacked the information needed to testify on behalf of the City.

Defendants' attempts to re-frame Chief McKinley's testimony as adequate—despite her own repeated acknowledgment of her lack of information and inadequate preparation—are plainly at odds with both the record and the law. Again, the City was obligated to produce a witness "knowledgeable about the . . . subjects described in the notice and to prepare the witness . . . to testify not simply to their own knowledge, but the knowledge of the corporation." *Schnatter v. 247 Grp., LLC*, 343 F.R.D. 325, 331 (W.D. Ky. 2022) (Lindsay, J.). It is beyond dispute that information about the meaning, interpretation, training, and amendment process of official Louisville Metro Police Department policies and procedures is squarely knowledge within the possession of the City. Nevertheless, Defendants failed to produce a deponent prepared to testify to "the knowledge of the [City]," *id.,* on each of these topics.

## CONCLUSION

Thus, Plaintiffs respectfully request that Louisville/Jefferson County Metro Government be compelled to designate a different individual with appropriate knowledge or adequately prepare the previous designee to testify about the noticed topics.

Dated: January 24, 2025
Louisville, KY

Respectfully Submitted,

/s/ *Catherine Logue*
Catherine Logue*
Christopher Kemmitt*
Gabriel Diaz*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector St., 5th Floor
New York, NY 10006
(212) 965-2200
clogue@naacpldf.org
ckemmitt@naacpldf.org
gdiaz@naacpldf.org

Corey Shapiro
ACLU OF KENTUCKY FOUNDATION
325 W. Main St., Suite 2210
Louisville, KY 40202
(502) 581-9746
corey@aclu-ky.org

Samuel Shapiro*
EMERY CELLI BRINCKERHOFF ABADY
WARD & MAAZEL LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
(212) 763-5000
sshapiro@ecbawm.com

*Counsel for Plaintiffs*
**Admitted pro hac vice*

## CERTIFICATE OF SERVICE

    I hereby certify that on January 24, 2025, the foregoing was electronically filed with the Clerk of the Court using CM/ECF which will send notice of electronic filing to the registered counsel.

/s/ *Catherine Logue*
Catherine Logue

*Counsel for Plaintiffs*